# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------x
MARC S. KIRSCHNER solely in his capacity as
TRUSTEE of THE MILLENNIUM LENDER
CLAIM TRUST,                                      :

                                        :

                   Plaintiff,                :                Index No. _____

                                          :

             -against-               :                **SUMMONS**

                                          :

J.P. MORGAN CHASE BANK, N.A., J.P. MORGAN
SECURITIES LLC, CITIBANK GLOBAL
MARKETS INC., CITIBANK, N.A., BMO CAPITAL       :                Date Index
MARKETS CORP., BANK OF MONTREAL,                                No. Purchased:_____
SUNTRUST ROBINSON HUMPHREY, INC., and
SUNTRUST BANK,                                   :

                        Defendants.               :
------------------------------------------------------------------ x

**TO THE ABOVE NAMED DEFENDANTS:**

      **YOU ARE HEREBY SUMMONED** and required to serve upon Plaintiff's attorney an

answer to the Complaint in this action and to serve a copy of your answer, or, if the Complaint is

not served with this Summons, to serve a notice of appearance, on the Plaintiff's attorney within

twenty (20) days after service of this Summons, exclusive of the day of service (or within thirty (30)

days after service is complete if this Summons is not personally delivered to you within the State of

New York); and in case of your failure to appear or answer, judgment will be taken against you by

default for the relief demanded in the Complaint.

      The bases for designating New York County as the venue for this action are: (i) pursuant to

CPLR Section 503(a), one or more of the parties reside in New York County, and Plaintiff designates

New York County as the place of trial for this action; (ii) pursuant to CPLR 503(c), one or more of

Defendants J.P. Morgan Chase Bank, N.A., J.P. Morgan Securities LLC, Citibank Global Markets

Inc., Citibank, N.A., and BMO Capital Markets Corp. has its principal office and/or principal place

of business in New York; and (iii) pursuant to Section 10.12 of the Credit Agreement, dated as of

April 16, 2014, among Millennium Laboratories, LLC, the Defendants, and others, the Defendants

consented, and waived any objection, to designation of this Court as the venue of any action or

proceeding relating to such Credit Agreement.

Dated: New York, New York
       August 1, 2017

                                       WOLLMUTH MAHER & DEUTSCH LLP

                                       By: _____
                                             David H. Wollmuth
                                             Lyndon M. Tretter
                                             Jeffrey Coviello

                                       500 Fifth Avenue
                                       New York, New York 10110
                                       Tel: (212) 382-3300

                                       *Attorneys for Plaintiff Marc S. Kirschner,*
                                       *solely in his capacity as Trustee of the*
                                       *Millennium Lender Claim Trust*

**TO:**

J.P. MORGAN CHASE BANK, N.A.
270 Park Avenue
New York, NY 10017

J.P. MORGAN SECURITIES LLC
277 Park Avenue, 3rd Floor
New York, NY 10172

CITIBANK GLOBAL MARKETS INC.
390 Greenwich Street
New York, New York 10013

CITIBANK, N.A.
388 Greenwich Street
New York, New York 10013

2

BMO CAPITAL MARKETS CORP.
3 Times Square
New York, NY 10036

BANK OF MONTREAL
115 S. LaSalle St.
Chicago, Ill. 60603

SUNTRUST ROBINSON HUMPHREY, INC.
3333 Peachtree Road
Atlanta, GA 30326

SUNTRUST BANK
3333 Peachtree Road
Atlanta, GA 30326

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------------x

MARC S. KIRSCHNER solely in his capacity as
TRUSTEE of THE MILLENNIUM LENDER                  :
CLAIM TRUST,

                                                :

             Plaintiff,                       :     Index No. _____

                                                :

      -against-                               :     **COMPLAINT**

J.P. MORGAN CHASE BANK, N.A., J.P. MORGAN         :
SECURITIES LLC, CITIBANK GLOBAL
MARKETS INC., CITIBANK, N.A., BMO CAPITAL         :
MARKETS CORP., BANK OF MONTREAL,
SUNTRUST ROBINSON HUMPHREY, INC., and             :
SUNTRUST BANK,
                                                :

             Defendants.                      :

--------------------------------------------------------------------x

       Plaintiff, Marc S. Kirschner, solely in his capacity as trustee (the "Trustee") of the

Millennium Lender Claim Trust (the "Trust"), by his and its attorneys, Wollmuth Maher &

Deutsch LLP, allege as and for the Complaint in this matter as follows:

### INTRODUCTION

       1.     This Complaint relates to a $1.775 billion transaction in which Defendants offered

and sold to the Trust's beneficiaries—approximately 70 institutional investor groups, comprised

of roughly 400 mutual funds, hedge funds, and other institutional investors (the "Investors")—

debt obligations of Millennium Health LLC f/k/a Millennium Laboratories LLC ("Millennium"

or the "Company"), a California-based urine drug testing company.  Defendants misrepresented

or omitted to state material facts in the offering materials they provided and communications

they made to Investors concerning the legality of the Company's sales, marketing and billing

practices and the known risks posed by a pending government investigation into the illegality of

such practices.

2.      Just months after the Investors purchased the securities, the U.S. Department of Justice in December 2014 notified Millennium that it would intervene in False Claims Act proceedings previously commenced by *qui tam* relators over the Company's health law violations and, in February 2015, the federal Centers for Medicare and Medicaid Services ("CMS") threatened to revoke Millennium's ability to bill Medicare based on allegations of flagrantly illegal billing practices by the Company.

3.      Defendants failed to notify the Investors of these and other important events as they happened.  The Investors therefore did not discover Defendants' misconduct until a year after their investment, in May 2015, when Millennium informed them of a settlement in principle with the federal government and state Medicaid programs for $256 million.  Millennium finalized that settlement as of October 16, 2015 and, less than a month later, on November 10, 2015, the Company and certain of its affiliates (referred to collectively as the "Debtors") filed a "pre-packaged" bankruptcy (the "Millennium Bankruptcy").

4.      Styled as "leveraged loans," the debt obligations that Defendants sold to the Investors back in April 2014 (the "Notes") have all the attributes of and, in fact, constituted credit agency-rated and tradeable debt "securities" within the meaning of the Blue Sky laws of the offering State of California and the purchasing Investors' States.  Defendants, acting as underwriters and broker-dealers, arranged the offering and J.P Morgan Chase Bank N.A. ("JPMNA") was the direct seller of the securities to the buyers.  As such, Defendants are all statutorily liable to Plaintiff under the applicable States' laws for sponsoring the materially false presentation of Millennium's financial condition and business practices.

5.      But Defendants' misconduct went beyond that proscribed by the States for responsible broker-dealers, underwriters and sellers of securities.  Defendants violated common

2

law duties by negligently misrepresenting Millennium's compliance with Medicare and

Medicaid laws and its financial health at a time when Defendants knew or should have known

that Millennium's suspect business practices had produced artificially-inflated results of

operations, a materially misleading balance sheet and exposure to unaccounted-for loss

contingencies that, with the new debt to the Investors, rendered the Company insolvent.

6.      Further, JPMNA breached its fiduciary and contractual duties as Administrative

Agent under a credit agreement that governed the securities upon the sales to the Investors.

JPMNA and its affiliate, JP Morgan Securities LLC, knew or should have known as of the April

16, 2014 effective date of the credit agreement that Millennium had failed to satisfy conditions

precedent to and/or was in default under the agreement.  JPMNA breached its duties to the

Investors because it and the other Defendants received tens of millions of dollars in fees from

Millennium in return for arranging and underwriting the offering and, even more motivating,

escaped hundreds of millions of dollars in their own individual exposure to Millennium when, at

the closing on April 16, 2014, the Investors' funds were used to retire the term loan component

of Defendants' prior financing of Millennium.

7.      JPMNA also breached its performance obligations under the credit agreement by

failing to notify Investors of additional defaults by Millennium over the course of the remainder

of 2014 and prior to the Company's May 2015 announcement of its $256 million agreement-in-

principle to settle with the federal government and states.  The credit agreement required

JPMNA to notify the Investors promptly of Company defaults and to take directions from them

concerning remedial actions such as acceleration of the debt.  JPMNA's breaches caused the

Investors to hold (or buy more) Millennium securities in ignorance of the adverse developments,

while at the same time depriving the Investors of the opportunity to exercise their contractual

rights under the credit agreement before government intervention against Millennium rendered those rights useless.

8.      The Debtors' plan of reorganization was confirmed in the Millennium Bankruptcy on December 14, 2015. The Plan created the Trust and provided for the contribution to it of the Investors' claims against Defendants. The Trust now seeks rescission of the Investors' purchases or, alternatively, damages for the securities law, contract and agency law and other common law violations.

## JURISDICTION AND VENUE

9.      This Court has personal jurisdiction over Defendants because: (i) they have their principal places of business in New York; (ii) sufficient acts, transactions and occurrences out of which the Investors' claims arose under other States' Blue Sky Laws occurred in New York; and/or (iii) they contractually submitted to the jurisdiction of state and federal courts in New York in any action relating to the 2014 Credit Agreement (defined below).

10.     Plaintiff designates New York County as the place of trial. Venue is designated in New York County because: (i) Plaintiff resides in New York County; (ii) one or more Defendants has its principal office, principal place of business and/or residence in New York County; and (iii) in the 2014 Credit Agreement, Defendants consented, and waived any objection, to designation of this Court as the venue of any action relating to such Credit Agreement.

## PARTIES AND SIGNIFICANT NON-PARTIES

*Parties*

11.     Plaintiff, Marc S. Kirschner, is a natural person residing in New York who has been appointed as the Trustee of the Trust established pursuant to (a) the Amended Prepackaged

Joint Plan of Reorganization of Millennium Lab Holdings II, LLC et al. (the "Plan"), which Plan

was confirmed on December 14, 2015 by order of the U.S. Bankruptcy Court for the District of

Delaware, and (b) the "Millennium Lender Claim Trust Agreement" dated December 21, 2015.

12.     Defendant J.P. Morgan Chase Bank, N.A. is a national banking association with a

principal place of business in New York. JPMNA was the "Administrative Agent" for the

Investors under the Credit Agreement dated as of April 16, 2014 among JPMNA, Millennium

and an affiliate, and the Investors (the "2014 Credit Agreement"). JPMNA funded $1.775 billion

in debt financing to Millennium in the form of a term loan and assigned individual amounts of

the $1.775 billion to each Investor in separate purchase and sale agreements. JPMNA was thus

the "seller" of the Millennium securities to the Investors. JPMNA was also one of four lenders

to Millennium under a $50 million revolving loan facility that closed at the same time as the

$1.775 billion term loan, but which revolving facility was never drawn upon by Millennium.

13.     Defendant J.P. Morgan Securities LLC ("JPM Securities") is a registered broker-

dealer and investment advisor with its principal place of business in New York, but which is also

engaged in the business of effecting transactions in securities nationwide. JPM Securities was

one of two "Joint Lead Arrangers" and "Joint Bookrunners" for the 2014 Millennium debt

financing and acted as an underwriter and broker-dealer of the securities sold to the Investors in

connection therewith.

14.     JPMNA and JPM Securities are affiliates of each other. They and their non-party

affiliates that advised or transacted with Millennium are generally referred to as "JP Morgan"

unless the context requires specifying the entity involved.

15.     Defendant Citibank Global Markets Inc. ("CitiGlobal") is a registered broker-

dealer and investment advisor with its principal place of business in New York, but which is also

5

engaged in the business of effecting transactions in securities nationwide. CitiGlobal was, with JPM Securities, the other of the two Joint Lead Arrangers and Joint Bookrunners for the 2014 Millennium debt financing. CitiGlobal was also a "Syndication Agent" for the Investors and acted as an underwriter and broker-dealer of the securities sold to the Investors in connection therewith.

16.     Defendant Citibank, N.A. is a national banking association with a principal place of business in New York and is an affiliate of Defendant CitiGlobal. Defendant Citibank N.A. was one of four lenders to Millennium under a $50 million revolving loan facility that closed at the same time as the $1.775 billion term loan, but which revolving facility was never drawn upon by Millennium. Defendant Citibank, N.A. received upfront and periodic fees from Millennium for the bank's role in the revolving credit facility.

17.     Defendant BMO Capital Markets Corp. ("BMOCap") is an indirectly, wholly-owned subsidiary of the Bank of Montreal. BMOCap is a registered-broker dealer with its principal place of business in New York, but which is also engaged in the business of effecting transactions in securities nationwide. BMOCap was one of the two Co-Managers and Co-Documentation Agents for the 2014 Millennium debt financing and acted as an underwriter and broker-dealer of the securities sold to the Investors in connection therewith.

18.     Defendant Bank of Montreal ("BMO") is a chartered bank under the Bank Act of Canada and is a public company incorporated in Canada. It is an affiliate of Defendant BMO Cap. Defendant BMO was one of four lenders to Millennium under a $50 million revolving loan facility that closed at the same time as the $1.775 billion term loan, but which revolving facility was never drawn upon by Millennium. Defendant BMO received upfront and periodic fees from Millennium for the bank's role in the revolving credit facility.

6

19.     Defendant SunTrust Robinson Humphrey, Inc. ("STRH") is a wholly owned subsidiary of SunTrust Banks, Inc. It is a registered-broker dealer with its principal place of business in Georgia, but is also engaged in the business of effecting transactions in securities nationwide. STRH was, with JPM Securities, CitiGlobal and BMOCap, one of the "Arrangers" of the 2014 debt financing for Millennium and acted as an underwriter and broker-dealer of the securities sold to the Investors in connection therewith.

20.     Defendant SunTrust Bank ("SunTrust") is a wholly owned subsidiary of SunTrust Banks, Inc. It is a member of the FDIC chartered under the laws of the State of Georgia and provides banking and trust products, including investment advisory products and services. SunTrust was one of the two Co-Managers and Co-Documentation Agents for the 2014 Millennium debt financing. Defendant SunTrust is an affiliate of Defendant STRH. Defendant SunTrust was also one of four lenders to Millennium under a $50 million revolving loan facility that closed at the same time as the $1.775 billion term loan, but which revolving facility was never drawn upon by Millennium. Defendant SunTrust received upfront and periodic fees from Millennium for the bank's role in the revolving credit facility.

*Significant Non-parties*

21.     Although not formally parties to this action, the Trust beneficiaries as of the date of the December 21, 2015 Trust Agreement—most of whom were original Investors in the Millennium securities sold by Defendants in April 2014—are approximately 400 mutual funds, pension funds, universities, collateralized loan obligation vehicles and other institutional investors. The Trust beneficiaries have conveyed to the Trust their claims against Defendants, including but not limited to claims under the Blue Sky laws of California, Colorado, Illinois and Massachusetts. The Trust beneficiaries have also empowered the Trust to tender to Defendants

7

any securities or other consideration required to obtain rescission under such state statutes and/or under the common law.

      22.    Millennium was until April 9, 2014, a California corporation formally named Millennium Laboratories, Inc. Effective that day, Millennium converted to a California limited liability company under the name Millennium Laboratories LLC. On September 1, 2014, the limited liability company changed its name from Millennium Laboratories LLC to Millennium Health LLC.

      23.    After soliciting the Investors to support a prepackaged plan of reorganization during the fall of 2015, Millennium filed for relief under Chapter 11 of the Bankruptcy Code on November 10, 2015 and was, with certain other entities discussed below, reorganized pursuant to the Millennium Bankruptcy Plan. This Complaint concerns the operating company, Millennium, only in its pre-bankruptcy petition form and, unless specificity is required for a particular purpose, refers to the entity simply as "Millennium" regardless of whether it was, at the time, a California corporation or a California limited liability company and regardless of whether its formal name was Millennium "Laboratories" or Millennium "Health."

      24.    Immediately prior to the April 9, 2014 date on which Millennium converted from corporate to limited liability company form, non-party Millennium Laboratories Holdings, Inc. ("ML Holdings"), a Delaware corporation, directly held 100% of the stock of Millennium. As of April 9, 2014, an intermediate holding company, Millennium Lab Holdings II, LLC ("ML Holdings II"), a Delaware limited liability company, was formed to hold the stock of Millennium (and, upon Millennium's conversion from a corporation into a limited liability company, 100% of the membership interests in Millennium). At the same time, ML Holdings became a 55% holder of the membership interests in ML Holdings II. The majority of the equity interests in

8

ML Holdings were controlled by Millennium's founder James Slattery, and persons affiliated with or related to him.

25.     Non-party TA Associates Management, L.P. ("TA Associates") is a manager of private equity funds, some of which, through affiliates, became investors in Millennium in 2010 as further described below. As of April 9, 2014, affiliates of TA Associates held the other 45% of the membership interests of ML Holdings II not held by ML Holdings.

## FACTUAL BACKGROUND

*The Millennium Insiders And The Defendants*

26.     Millennium was formed in 2007 under the name Millennium Laboratories, Inc. as a California corporation with its headquarters in San Diego. Its primary business was to provide urine drug testing ("UDT")—laboratory-based diagnostic testing and analysis of urine samples sent by referring physicians who wanted detailed information on their patients' use or misuse of legal and illegal drugs.

27.     Equity in Millennium was privately-held. The Company's founder, James Slattery, his relatives, friends and business associates controlled Millennium through their holding company, ML Holdings, whose stock they held through various family trusts.

28.     In 2010, investment funds managed by TA Associates invested $196 million in what was then the Millennium corporate structure in exchange for warrants and debentures issued by the Company's direct parent at the time, ML Holdings. The debentures were redeemed at par in the 2014 financing and, at the same time, TA warrants in ML Holdings were converted into a 45% membership interest in the newly-created direct parent of Millennium, ML Holdings II, thereby entitling TA to hundreds of millions of dollars in the simultaneous extraordinary dividend of financing proceeds. After the 2014 financing and restructuring, Slattery and his

9

relatives, friends and associates (via their complete ownership of the original ML Holdings) held the other 55% of Millennium's newly-created direct parent, ML Holdings II.

29.    At all times, Millennium generated the vast majority of its revenues from lab testing of patients insured under the federal Medicare program and joint federal and state Medicaid programs, and from testing of patients insured by commercial health care plans that followed billing and reimbursement practices similar to those of Medicare and Medicaid. Specifically, under federal law Millennium was required to restrict billing to those lab services and tests medically necessary for each individual patient as independently determined by each patient's doctor (instead of, for example, creating "standing orders" for tests across groups of patients) and to avoid certain kinds of commercial relationships and transactions with the physicians referring the urine samples that might improperly induce or influence the number referrals or the tests per referral.

30.    The rise and fall of Millennium is a story of its directors, officers and controlling shareholders (the "Insiders") artificially pumping up revenue and profitability by encouraging and/or coercing referring physicians to order medically unnecessary tests and then, assisted by the Defendant banks and broker-dealers, extracting more than the equity value of the Company through a dividend funded by a misleading securities offering to Investors.

*The Illegal Conduct And Resulting Qui Tams, DOJ Investigation & Competitor Lawsuits*

31.    In March 2012, JPMNA, JPM Securities, STRH, Bank of Montreal, and SunTrust, among others, provided a $310 million term loan facility and a $20 million revolving credit facility to Millennium (the "2012 Credit Agreement").

32.    After Defendants and the other participating lenders in the 2012 Credit Agreement were committed, but two days before the closing on that Agreement, on March 27,

2012, Millennium received a subpoena from the U.S. Department of Justice ("DOJ"), acting though the U.S. Attorneys' Office for the District of Massachusetts, for production of documents in connection with an investigation into federal health care offenses (the "DOJ Investigation").

33.    The subpoena was connected to a *qui tam* action filed against the Company two months earlier, on January 17, 2012, in that same District: *U.S. ex rel. McGuire v. Millennium Labs.*, Inc., No. 12-cv-10132-NMG (D. Mass.). This was the first of several *qui tams* filed against Millennium in 2012 and 2013 in which the federal government ultimately intervened. A copy of the United States' complaint in intervention (not including exhibits) in *U.S. ex rel Mark McGuire et al. v. Millennium Laboratories, Inc., et al.*, Nos. 12cv10132, 12cv10631, 13cv10825 (D. Mass.) (filed Mar. 19, 2015) is annexed hereto as Exhibit A and is referred to herein as the "DOJ Complaint."

34.    As the DOJ Complaint explains, well before the *qui tam* relators first filed their actions in 2012, Millennium was engaged in illegal sales and marketing practices. *See, e.g.*, DOJ Complaint ¶ 93 (referring to e-mail dated September 10, 2009 encouraging the sales force to obtain "standing order" forms for multiple tests from physicians); *id* at ¶ 143 (detailing efforts by Millennium to undermine or deceive an outside compliance consultant in 2010).

35.    The DOJ Complaint summarizes the accusations as falling into two legal-regulatory categories: one relating to the requirement that Medicare be billed only for tests that are "reasonable and necessary" (*see* 42 U.S.C § 1395y(a)(1)(A)); and the other relating to the "Stark Law" (42 U.S.C. §1395nn, named after the sponsoring Congressman) and the federal "Anti-Kickback Statute" (42 U.S.C. § 1320a-7(b)(b)), both of which proscribe certain forms of remuneration to or relationships with physicians who refer Medicare-billable work to other providers such as drug testing labs. DOJ Compl. ¶ 2.

11

36.     As alleged by the DOJ and the *qui tam* relators, Millennium's entire business

model and thus its revenue growth had, for years, been predicated on "a variety of schemes to

routinely order excessive amount of UDT [urine drug testing] for all patients . . . regardless of

individual patient assessment or need." *Id.* at ¶ 3. Discussed at length (and supported by

numerous exhibits), the DOJ Complaint cites, among other such schemes:

     a.   The use of physician standing order forms (called "Custom Profiles") to

           encourage routine, excessive UDT;

     b.   Billing for tests for "PCP" or "angel dust" among Medicare patients, almost

           all of whom are 65 and over and have very little likelihood of using such

           drugs;

     c.   Dissemination of false and misleading information to physicians about the

           lack of reliability of in-office testing of urine samples and pressuring

           physicians to provide routine referrals to Millennium's labs to "confirm" even

           expected, negative in-office results; and

     d.   Labeling physician practices as "Troubled" if they did not order what

           Millennium considered to be a sufficiently profitable number of tests and

           threatening such "Troubled Practices" with termination of their relationship

           with Millennium unless their orders increased.

37.     The alleged violations of the Stark Law and the Anti-Kickback Statute were based

on Millennium's provision of various "services and benefits to physician customers (including

free supplies . . .) contingent on referrals of certain amounts of tests to Millennium." *Id.* at ¶ 3.

A program called the "POC Test Cup Program" constituted the single largest and most

12

widespread violation alleged. *See, e.g., id.* ¶¶ 146-178. "POC" is an acronym for "point-of-care"—that is, the situs of the patient-physician visit, such as a doctor's office or clinic.

38.     In brief, the POC Test Cup Program was a program under which Millennium provided urine sample test "cups" with embedded "strips" of chemical reactants that, upon the patient's urinating into the cup, would turn (or not turn) colors or otherwise give readings that would allow the physician to make an immediate clinical determination. Millennium provided the cups "free" to the physicians if they agreed not to bill Medicare, Medicaid, or a commercial payor for the cup or the in-office test. The "catch" was that the physicians were contractually required to refer the sample placed in the cup to Millennium for "confirmatory" testing at Millennium's lab and had to pay Millennium for the cup if he or she did *not* send the sample in to Millennium. *Id.* at ¶ 147 ("physicians had to pay for any of the 'free' POC test cups that did not generate referrals to Millennium.")

39.     The DOJ and the relators were not the only ones to challenge the legality of Millennium's POC Test Cup Program. In 2011, one of Millennium's competitor's, Ameritox Ltd. ("Ameritox") brought suit in federal district court, *Ameritox, Ltd. v. Millennium Laboratories, Inc.*, Case No. 8:11-cv-0075 (M.D. Fla.) (the "Ameritox Litigation"). Ameritox's complaint incorporated the Stark Law and Anti-Kickback Statute into private federal and state law causes of action on the grounds that the statutory violations inherent in the POC Test Cup Program constituted "unfair competition."

40.     Millennium paid an army of lawyers to defend against the "warn[ings] by consultants, customers, competitors, insurers and regulators that its marketing schemes were illegal." DOJ Compl. at ¶ 7. Unbeknownst to the Investors, by March and April 2014, when Defendants induced the Investors to invest in Millennium, the battle was all but over.

13

Millennium was sure to lose and lose big, but no one except those with access to Millennium's non-public information could know the imminence and extent of the loss. Millennium's Insiders, its auditors and attorneys, and the Defendants had that access.

*The Pump and Dump – Leveraged Loans To Investors, Dividends To Insiders, Pay-Off and Fees to Defendants*

41.    Beginning contemporaneously with the DOJ's first subpoena to Millennium on March 27, 2012, JP Morgan carefully monitored the progress of the DOJ Investigation. For example, on that very day, March 27, 2012, regular outside counsel to JP Morgan asked the General Counsel of Millennium, Martin Price, to address the subpoena. Price replied that he would be willing to do so and suggested including in the conversation the Company's regular outside counsel on health care regulatory matters, Hogan Lovells, upon whom the Company had relied "in 2009 in anticipation that the government would ultimately look into these issues."

42.    Nine months later, in December 2012, JP Morgan's counsel told Millennium that her "clients asked me to get an update" on the DOJ Investigation. Millennium's General Counsel Price responded that he would add to the conversation "our lead counsel on the DOJ matter," a member of a Boston firm called Collora LLP that specialized in defending white collar criminal matters. (The Collora firm later resigned from the representation effective October 1, 2013).

43.    By February 2013, the matter had become sufficiently serious that Millennium sought to add to the Company's defense team a former high-ranking prosecutor from the Boston U.S. Attorneys' Office ("Boston USAO"), Michael Loucks of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden Arps" or "Skadden"), who was well acquainted with the prosecutors investigating the Company. Millennium also retained Loucks and Skadden Arps to defend the

14

civil Ameritox Litigation which was based on some of the same Stark Law and Anti-Kickback

Statute allegations underlying parts of the DOJ Investigation.

44.     Loucks made several presentations to his former colleagues at the Boston USAO

on behalf of the Company and was deemed by the Company to be the authority with special

knowledge of and insights on the Company's exposure to criminal or civil penalties and damages

in connection with the DOJ Investigation, the *qui tams* and the Ameritox Litigation.

45.     At the same time JP Morgan was monitoring the DOJ Investigation, it was

exploring with the Company ways to refinance the 2012 Credit Agreement and to earn new fees

in such a refinancing. In a written presentation to Millennium dated May 31, 2013, JP Morgan

suggested that the Company consider leveraged "pro rata" and "institutional" loans, either of

which could be designed to provide funding for a substantial cash distribution to Company

shareholders.

46.     Generally speaking, "pro rata" loans are provided by a syndicate of banks or

financing companies through revolving credits and amortizing term loans that resemble

traditional bank loans in terms of their amortization schedules, covenants and oversight of the

borrower. "Institutional" loans, by contrast, are sold widely to non-bank entities in ways that

promote secondary trading, similar to the fashion in which private placement securities are sold

to and traded among accredited investors; the loans do not amortize much of the principal over

the term and they provide "lite" borrower covenants more consistent with those in high-yield

corporate bonds than those in actual bank loans. Such institutional loans usually require ratings

from credit rating agencies.

47.     At first—*i.e.*, in the May 2013 presentation—JP Morgan proposed *both* a loan by

a consortium of banks *and* to syndicate a new leveraged loan in the institutional market. In this

way, the amounts outstanding under the 2012 Credit Agreement would be satisfied, but the lenders under the 2012 Agreement would participate among themselves and with a few other banks in a new loan "A" that would be separate from, and senior to, the proposed institutional facility "B."

48.     In December 2013, JP Morgan and most of the members of the existing bank consortium allowed Millennium a slight increase in the "Tranche A" term loan commitment (from $310 million to $320 million) to facilitate Millennium's acquisition of a subsidiary.

49.     However, by the end of February 2014, the only financing option left on the table was "Plan B"—a huge institutional financing that would take out the $304 million principal balance still owed to the existing bank lenders (including JPMNA) under term loan provisions of the 2012 Credit Agreement as amended in December 2013 and still leave over $1 billion for Millennium Insiders through an extraordinary dividend and bonuses.

50.     As one of the JP Morgan bankers explained to Millennium's management, "Banks do not play in deals like this given the leverage and lack of covenants.  We also don't need a lot [or] (any) revolver banks.  It's very different from [the bank financing that] you have today . . . ."

*Early March 2014: Inadequate Due Diligence And Procurement Of Inflated Ratings*

51.     In the parlance of the leveraged loan and high-yield debt industry, Millennium was a "debut" issuer—meaning it had never before issued debt rated by credit rating agencies such as Moody's and Standard & Poor's ("S&P").  Such ratings are critical to the issuer (and to the underwriter who commits itself to sell the issuer's debt to investors) because the weaker the rating, the higher the perceived risk to investors who may therefore exact more onerous interest rates and terms to compensate, or who may decline to buy the issuance at all.

16

52.     JP Morgan controlled every aspect of the rating process for Millennium, down to writing the Rating Agency Presentation or "RAP" for Millennium and scripting oral responses to questions that management was likely to be asked by rating agency personnel. When JP Morgan was finished with the written presentation, Millennium's CEO congratulated the bankers on a job well done. In reality, as JP Morgan knew, the RAP falsely touted Millennium's compliance with health care laws on medical necessity, claiming that it was a leading laboratory for "physician[ ] choice" in "selection of tests," and made no mention whatsoever of the existence of the DOJ Investigation or Ameritox Litigation that contradicted such claims and that posed huge, imminent, and quantifiable risks for the Company in and of themselves.

53.     Millennium's "debut" status as an issuer was not the only factor that should have driven rigorous "due diligence" by the underwriter Defendants (also referred to hereinafter as "Underwriters") on the Investors' behalf. The sheer size of the $1.775 billion term loan amount (almost six times that in the 2012 Credit Agreement), the extraordinary dividend of $1.2 billion to the Insiders, and the fact that the Company itself would have no access to the funds advanced (virtually all of which in excess of the extraordinary dividend was earmarked to pay off JP Morgan and lenders for past financing and to provide them huge fees for the present financing), all demanded heightened and lengthy scrutiny. However, the fact that most of the prior lenders, and specifically JPMNA and Citibank, did not intend to hold any of the new term loan created the opposite incentive. Defendants abandoned their obligations in order to get the deal done. In fact, Defendants ran through the "diligence" process in *two weeks*—from Friday, February 28, 2014 to Friday, March 14, 2014—and, as detailed below, Defendants recklessly disregarded and hid from the Investors the problems with Millennium's business and the risks that Defendants either already knew about or uncovered in even that short period.

17

54.     Defendants divided the due diligence into "business/financial" and "legal" issues. The business aspects were led by a JP Morgan banker named Benjamin Chiarelli, who had never before worked on an underwritten deal. From the outset, Chiarelli made clear that his interest was in pleasing the Millennium Insiders, not in putting any hard questions to them. For example, Chiarelli asked to speak with only one representative of one insurance company with whom Millennium did business and settled for interviewing one physician customer about Millennium. Chiarelli let Millennium select the participants it "felt comfortable introducing us to" and he provided in advance a list of prepared questions to Millennium and its hand-picked candidate so the candidate would not be caught off-guard. The soft treatment went over well with the Insiders. Millennium hired Chiarelli from JP Morgan Securities within weeks after the closing of the April 2014 transaction.

55.     The legal due diligence was even more truncated despite the fact that JP Morgan's attorneys had not spoken with any representative of the Company or its counsel about the DOJ Investigation or the Ameritox Litigation in over a year. JP Morgan's initial list of questions for the Insiders about the Company included a reference to "pending litigation and [the DOJ's] HIPAA subpoenas." This started a back-and-forth email correspondence between Underwriters' counsel and Millennium General Counsel Martin Price about a "legal call" to discuss such issues. Price responded that "I will likely ask Mike Loucks of Skadden's Boston team to join for the discussion of the DOJ matter." Price forwarded the exchange to Loucks and asked him to "[p]lease hold 15 minutes . . . to discuss the investigation."

56.     The conference call took place on March 7, 2014. The questioning was led by outside counsel for the Underwriters who had been following the DOJ Investigation of Millennium on behalf of JP Morgan since the Company's receipt of the government's first

18

subpoena in late March 2012. The call was attended by JP Morgan bankers, representatives of

other Underwriters (CitiGlobal, BMOCap, and STRH), many of the Insiders and the Company's

transaction counsel, Hogan, among others. While Underwriters' counsel was given more time to

ask questions than the 15 minutes Price had asked Loucks to reserve, during the call Price was e-

mailing with the JP Morgan bankers about his other "commitments" and the bankers offered to

intervene to "wrap it up for you."

57.     In the call, Loucks summarized the history and status of the DOJ Investigation

and then turned to what he knew was the most pressing issue: the likely outcome and effect of

the criminal and civil investigations on the Company. Loucks stated without caveats that in his

informed opinion, the conduct of which the Company stood accused in the DOJ Investigation

was less egregious than that of other laboratory companies that had settled with governmental

entities for $20 million or less.

58.     An Underwriter on the call, picking up on Loucks's reference to other settlements,

jumped in with a leading question that if $20 million represented "egregious conduct," shouldn't

Millennium's exposure be lower?   Loucks readily agreed, stating "You could conclude that."

Loucks even went on to opine as to the likely immateriality of the result on Millennium's

finances, immediately adding: "[t]here does not feel to me to be a material result" to Millennium

from the DOJ Investigation.

59.     This was exactly what Defendants wanted to hear (even if the financial materiality

comment was totally unsupported in fact): that Millennium's outside counsel chiefly responsible

for the DOJ Investigation was willing to go on record that the result of the DOJ Investigation

was not going to be financially material to Millennium. In appreciation of Loucks's remarks,

one of the JP Morgan bankers wrote to Millennium's CEO, "Good call on legal today."

60.    Because they were not able finish their questions on March 7 about the DOJ

Investigation or inquire into Millennium's other legal matters, such as the upcoming Ameritox

Litigation trial, Underwriters' counsel asked Price for another call with Loucks. Afraid of what

Loucks might say if pressed, Price asked Hogan's Ron Wisor for support, stating that "I'd rather

not have Mike [Loucks] on the call to provide an unsolicited dissertation on the mechanics of the

[Boston] USAO. If [the Underwriters] have questions [that Loucks] is uniquely positioned to

answer, I've told them we can connect [with] him later in the day – that will at least allow me to

vet the questions [beforehand]. I expect we can put this [remaining legal due diligence] to rest

w/o [without] him."

61.    The JP Morgan bankers had no objection to Wisor's taking over the legal

diligence and no real interest in getting to the truth concerning the Company's exposure in the

DOJ Investigation and Ameritox Litigation—they were shifting the risk to the Investors. The

same is true of the other Underwriters, who were happy to follow JP Morgan's lead, get credit in

the "league tables" (a ranking in the financial press of top banks by deal volume, etc.), and enjoy

the economics (*i.e.*, fees) on the deal. Indeed, BMOCap and the STRH bankers participated in

the first round of due diligence calls only in "listen mode" (*i.e.*, no speaking) and none of the

Defendants' bankers even attended the March 14, 2014 call. They were concerned only with

getting the deal done so as to refinance each bank's way out of its existing loan to Millennium, to

obtain the fees and recognition for arranging the new financing, and to promote their

relationships with the Insiders.

62.    JP Morgan's "Credit Committee" approved the transaction on the morning of

March 14, 2014—before the follow-up "legal diligence" call with Price and Wisor even took

place. Later that day, Underwriters' counsel had the call with Price and Wisor. Counsel

received several pieces of new information that should have led to more diligence by the Underwriters and, ultimately, disclosure to Investors. First, Price stated that if the judge or jury in the Ameritox Litigation (the trial of which was only two months away at the time) found that Millennium's POC Test Cup Program violated federal law, such a finding would fuel the DOJ Investigation. Counsel noted that Millennium's reliance on two health care experts—Wisor himself and another lawyer named Lew Morris—to defend the Program in the upcoming trial of the Ameritox Litigation could be problematic since the witnesses had ties to the Company and would not be viewed by the trier of fact to be independent.

63.    Second, Price related the events of a meeting he attended at the Boston USAO the previous day, March 13, 2014 *and* the fact that yet another meeting was set up for 2 weeks hence. It was or should have been clear to the Underwriters from the description Price gave and the frequency of the meetings with the DOJ that the prosecutors were actively investigating not only the POC Test Cup program, but also Millennium's use of "Custom Profiles" to encourage doctors to do unnecessary tests and its refusal to deal with "Troubled Practices" that did not order enough tests. Yet, Defendants did nothing with this information.

64.    Even more shocking, the Defendants failed to ask and get an answer to the obvious follow-up questions: what were Millennium's billings associated with the alleged health law violations in the DOJ Investigation? The amount associated with the POCT Cup program was easily quantifiable at the time: it was just shy of $90 million as of March 2014, which represented a substantial amount of assets (in the form of fraudulent receivables) and revenue, and which no doubt would have influenced both the rating agencies and the Investors had those facts been disclosed. The figures associated with the other "medical necessity" violations were

21

necessarily higher. (As it later turned out, $90 million of the Company's $256 million settlement with the DOJ was for the POC Test Cup Program).

65.     In sum, although JP Morgan and the other underwriter Defendants had, through their own counsel, discovered facts that would have caused any reasonable underwriter, arranger or manager of a leveraged loan distribution to investigate further the materiality of the DOJ Investigation and the legality of the Company's business practices under scrutiny in that Investigation and the Ameritox Litigation, Defendants willfully turned a "blind eye" to those facts. Indeed, as discussed below, Defendants authored offering materials for, and made oral statements to, potential investors that misrepresented the Company's litigation exposure and the legality of its business practices in order to fraudulently induce the Investors to purchase the Millennium Notes.

*Late March 2014: The Misrepresentations And Omissions To The Investors In The Offering*

66.     In the executed Commitment Letter dated March 16, 2014 (the "2014 Commitment Letter"), Defendants JPMNA, JPM Securities, CitiGlobal, STRH, SunTrust, BMOCap and BMO agreed that three of them (JPMNA, BMO and SunTrust) plus CitiGlobal or one of its affiliates would be "Initial Lenders" of $1.765 billion term loan (later increased to $1.775 billion) to Millennium. Millennium agreed that Defendants would be entitled to "syndicate" that initial loan amount to a group of institutional lenders managed by the "Lead Arrangers" in cooperation with Millennium and that Millennium would have the right to "disqualify" certain candidates from the investor pool.

67.     JPM Securities and CitiGlobal (or an affiliate) were made "Lead Arrangers" of the syndication effort and BMOCap and SunTrust were made "Co-Managers."

22

68.     The Company agreed to Defendants' various fees for their broker-dealer and bank affiliates in a "Fee Letter" dated March 16, 2014 that was incorporated by reference into the 2014 Commitment Letter. Millennium agreed to pay Defendants an "Underwriting Fee" on the aggregate principal amount of the commitments of $1.815 billion (then a $1.765 billion term loan facility and $50 million revolving facility), plus a separate "Upfront Fee." At the Closing a month later, the various fees paid to Defendants totaled $35.3 million, with the lion's share going to the two "leads"—JPM Securities and CitiGlobal. (JPM Securities and its bank affiliate JPMNA received $20 million of those fees). As the 2014 Commitment Letter states, one law firm acted as Underwriters' counsel to all of the Defendant signatories and its fees were also paid by Millennium.

69.     If the fees to Defendants were generous, the money flowing to the Millennium Insiders was staggering. According to a Confidential Information Memorandum ("CIM") prepared by JP Morgan and CitiGlobal for potential investors, the distribution to Millennium shareholders and management was to be just shy of $1.27 *billion*. Also, $304 million was devoted to paying off the amended 2012 Credit Agreement, thereby giving each of the Defendant banks (all of whom were participants in the 2012 financing) a means of exiting their existing term loan exposure to Millennium. Finally, the parties intended to devote some $196 million to the retirement of debentures that Millennium had issued to TA Associates' affiliates when TA Associates first made its investment in the Company back in 2010.

70.     The CIM and indeed the entire offer of the Millennium securities to the Investors originated in California where Millennium was based. JP Morgan sent its bankers to Millennium's offices in San Diego to help Millennium prepare the CIM and JP Morgan's and Citibank's trade names and logos appear on each of the CIM's pages. At around the same time,

the Lead Arrangers helped Millennium create a series of over 50 PowerPoint slides, called an "Investor Presentation," that recast some of the information in the CIM and presented additional details about Millennium and the proposed investment in it.

71.     The Millennium securities offering anticipated two categories of Investors: "Public Side Investors" (prospective investors who did not want to become privy to material non-public information concerning Millennium) and "Private Side Investors" (those who wanted access to such material non-public information, but who agreed to abide by laws and regulations governing its use).

72.     Significantly, the CIM omitted any discussion of "risk factors" or other warnings about investing in Millennium. This omission was by JP Morgan's fiat. In a Hogan memo to the Insiders on March 12, 2014, Hogan noted that the Underwriters had rejected in the term sheet annexed to their commitment letter "any possibility of disclosure [to Investors] of material litigations, requiring instead a clear representation that we are not subject to any material litigation at all." Hogan further commented "This could prevent our utilization of the term loans and revolving loans."

73.     Nevertheless, Hogan tried to squeeze in some very general and "boilerplate" disclosure on litigation risk in the CIM and on March 27, 2014 provided Millennium with comments. Hogan noted that "there are no [r]isk factors in the CIM . . . . A few that should be considered are: upcoming changes in reimbursements . . . risk of losing regulatory certifications . . . and ongoing litigation . . . ." Millennium forwarded the comment to JP Morgan, but the bankers refused to implement it on the grounds that the "CIM is not a SEC document" and that it was not "customary" to cite risk factors in a leveraged loan CIM. A JP Morgan banker added "I

really do not want to include this." Similarly, the "Investor Presentation" contained no information about the above known risks and "ongoing litigation."

74.    Millennium acquiesced in the lack of even vague risk disclosure to the Investors, but internally Price griped to Hogan: "what rights do syndicate lenders have here? We disclosed all this stuff to [JP Morgan and Citigroup] and it's in the data room [for the Underwriters]. They are driving the syndication and what info is provided to the syndicates. So could an Invest[or] come back on us, or is their [legal] claim better against [JP Morgan]?"

75.    At the same time the CIM and Investor Presentation were being scrubbed of any reference to the regulatory and litigation risks that threatened Millennium's very existence, Defendants misrepresented, and omitted to state, material facts concerning the underlying business practices that created those risks and loss contingencies.

76.    The material misstatements and omissions in the CIM include but are not limited to the following:

- Under "Company overview" and "Recurring revenue business model" the CIM misrepresented the drivers of Millennium's growth, stating that "[s]ince its inception in late 2007, Millennium has grown organically to become one of the largest clinical laboratories and the largest medication monitoring specialty laboratory in the U.S." The CIM further stated that "[t]o date, the Company has analyzed and tested over 6.4 million patient specimens, of which approximately 2.4 million occurred in 2013." The CIM failed to disclose that this growth was not organic, but instead the product of fraud and abusive business practices.

- Under "Company overview" the CIM also misrepresented that "Millennium has achieved exceptional success by putting customers first, providing innovative

solutions that deliver high-quality results." In reality, Millennium was putting

profitability first ahead of customers, labeling certain physician groups as

"Troubled Practices" to either get them to increase their referrals or to terminate

them for insufficient profitability to Millennium.

- In the same vein, the CIM also misrepresented that "Millennium helps clinicians

  meet regulatory requirements and adhere to national guidelines" and that

  "[g]rowth from existing customers was primarily due to increased patient visits as

  Millennium's customers have expanded their patient base along with the

  Company being successful in educating clinicians on the clinical value of UDT."

  This was materially misleading because it failed to disclose that what the

  Company called "educating clinicians," was then being investigated by the DOJ

  as fraudulent and unlawful sales and marketing practices.

- Under "Compliance" the CIM misrepresented that "The Company has developed

  strict compliance policies and procedures and requires full adherence from all

  employees." The CIM also falsely described Millennium's "[h]igh-touch,

  national sales organization with a commitment to customers and compliance

  through ongoing education and training." The CIM failed to disclose the material

  fact that the Company's own compliance consultants had repeatedly warned

  Millennium that its marketing practices were illegal.

- Under "Reimbursement" the CIM falsely stated that "Tests per specimen is driven

  by customer demand as Millennium customers order tests on an a la carte basis . .

  . ." Under the heading "Strong competitive position," the CIM further

  misrepresented that "[t]he Company is focused on offering solutions that provide

clinical utility to aid the decision making by healthcare professionals." In truth, the Company artificially stimulated demand and booked revenue through medically unnecessary tests, improper relationships with referring physicians and threats to discontinue service if the physicians did not increase the numbers of tests they ordered.

- For the same reasons, the CIM's representation that "Millennium has built a highly skilled sales and service organization that is focused on providing world-class service to existing customers and establishing new clinician relationships" was false and misleading.

- The CIM also misrepresented Millennium's "leading market share" and "revenue, Adjusted EBITDA and specimen volume [compound annual growth rates] of over 74% from 2009 to 2013" by failing to disclose the illegal practices driving that market share, revenue and EBITDA, and growth rate.

- The CIM stated that the "Company is known for best-in-class customer service which is one of the key drivers of active account growth over the past seven years." Once again, the CIM failed to disclose that this "best-in-class" company was actually fighting intense regulatory scrutiny and civil litigation surrounding "customer service" practices including inducing and pressuring physicians to conduct medically unnecessary tests.

- The statement in the CIM that through Millennium's services "patients receive higher quality-of-care and drug therapy becomes more efficient" is false and misleading. Millennium failed to disclose that it routinely pressured physicians to

27

order tests that were unrelated to the therapy that the patients were receiving and that the patients did not need.

- The CIM also mispresented that "[i]n addition to scale and superior testing results, Millennium enjoys several other important advantages over the other laboratories in the industry." The CIM misleads by failing to mention that its competitors had sued it because any competitive "advantages" had been obtained through illegal business practices.

77.    The Investor Presentation contains additional material misstatements and omissions, including but not limited to the following:

- It states that Millennium's key strengths include its "[d]iversified and growing customer base with strong payor relationships that include national contracts" and "[i]ndustry leading margin profile with high Free Cash Flow." No disclosure is made of the illegal practices driving the growth in the customer basis and margin profile.

- It mispresents that "Millennium is dedicated to advancing clinical best practices and care outcomes through scientific research and education" and "[h]elp[s] clinicians meet regulatory requirements and adhere to national guidelines." In truth, Millennium used pressure tactics to induce physicians to deviate from best practices and perform medically unnecessary testing in violation of applicable regulations and guidelines.

- It also misrepresents Millennium's "[c]ommitment to compliance with dedicated Chief Compliance Officer and in-house legal team . . . ." In particular, the "Compliance and legal update" section recites Millennium's "commitment to

28

ethical and responsible business practices" but fails to disclose the unethical and

irresponsible business practices, and related litigation and regulatory risk factors.

78.     In addition to the CIM and Investor Presentation, the Company and the

Defendants provided potential investors with historical financial statements of the Company that

had either been reviewed or audited by the Company's auditors, KPMG LLP ("KPMG").

Millennium also provided financial projections, which the Defendants vouched for. The

historical financial statements, including but not limited to Note 13 to the Notes to Consolidated

Financial Statements of Millennium as of December 31, 2013 and 2012, were false and

misleading because they failed to properly account for and/or disclose the reasonable possibility

of material losses associated with the DOJ Investigation, the Ameritox Litigation, and the

underlying business practices at issue. The historical financial statements also failed to devalue

accounts receivable and other assets to reflect the potential uncollectability of the same based on

illegal conduct, which threatened not only receivables owed by government payors, but also

those owed by commercial insurance companies that had incorporated provisions similar to the

governmental payors' rules and regulations into their contracts with Millennium.

79.     The Company's financial projections also were false, misleading, and based on

unreasonable assumptions for numerous reasons, including that (i) they were based on historical

reimbursement rates for Millennium's lab services that Millennium's management and

Defendants knew or should have known were based on fraudulent and illegal practices and

therefore not sustainable even in the near term, and (ii) they failed to take into account the

unsustainable revenue growth amid increasing competition and vulnerability of pricing.

29

*April 2014: Investors' Questions About The DOJ Investigation And Other Risks*

80.     The misleading disclosure in the CIM, Investor Presentations, financial statements and projections—discussing only the positive about the Company without disclosing any of the negative—was augmented by disingenuous answers to questions about potential risks that certain Investors put to the Company and the Defendants as "Arrangers" of the financing. JP Morgan advised Millennium to discuss the DOJ Investigation and the Ameritox Litigation only if a prospective Investor directly raised a question about either topic and it scripted misleading answers for management in a "Q&A" format.

81.     Under the question topic of "DOJ Investigation," JP Morgan suggested the following answer, "View is that this will be a non-event; have not heard from them [DOJ] in some time; government investigations are rarely closed." This was deliberately false and misleading in light of Defendants' knowledge of (i) Millennium's recent and frequent meetings with the Boston USAO, and (ii) Price's admission that Millennium's loss in the upcoming trial of the Ameritox Litigation would likely further fuel the DOJ Investigation.

82.     On the question of "Litigation," the draft Q&A was also flippant. JP Morgan suggested that Millennium management answer: "we used litigation proactively and early because the regulators were slow to react; sued 4 or 5 of our competitors, won 3; we've never paid a dime; We beat [A]meritox 2 years ago; now counter[-]suing, coming to trial this summer; best guest [sic] is people will spend legal fees and no causality will be found." No mention was made about counsel's observation about the lack of independence of the Millennium experts and thus their credibility to the trier of fact in the Ameritox Litigation.

83.     JP Morgan personnel themselves answered written inquiries by Investors in a similar fashion. For example, in response to an Investor's question "Had the Company ever been

30

accused of or found guilty of violating the Anti-Kickback Statutes/the Stark Law," a JP Morgan

banker replied "This is a very litigious space and while Millennium has had litigation brought

against them they have never lost a case or had to change a business practices." Again, JP

Morgan misled by downplaying the seriousness of the then existing challenges to Millennium's

POC Test Cup Program. Indeed, the response does not even mention the DOJ Investigation and

the imminent trial on that very issue in the Ameritox Litigation. This was an intentional

omission of information necessary to make the response that JP Morgan did give the Investor not

misleading. The Investor became one of the largest purchasers in the offering.

84.     In the first half of April 2014, Defendants and the Company made executives

available for meetings and conference calls with potential Investors. Defendants also introduced

their counsel to the Investors, noting that Defendants had assigned their counsel to interview

Millennium's outside lawyers at Skadden and Hogan about the risks posed by the DOJ

Investigation and the Ameritox Litigation. On these conference calls, business executives of the

Company aided by JP Morgan bankers, also responded falsely to questions relating to the risks to

the Company's revenues through cuts in Medicare reimbursement for lab services.

85.     The Underwriters stated that investors should be reassured that Millennium was

represented by Loucks since he was a former high-ranking official in the Boston USAO that was

leading the DOJ Investigation and that Loucks himself believed that the result of the

Investigation would not be material in terms of the Company's finances.

86.     In fact, having just made two new presentations to the Boston USAO dated March

13, 2014 on the POC Test Cup Program and other Millennium business practices under

investigation, Loucks was back at the Boston USAO with yet another presentation, dated April 8,

2014, that sought to defend Millennium's sales and marketing tactic of labeling certain physician

31

groups as "Troubled Practices" to either get them to increase their referrals or to terminate them for insufficient profitability to Millennium. The intensity of the interactions between Company counsel and the DOJ investigators demonstrates that the DOJ Investigation was neither dormant nor proceeding toward a "non-event" or favorable outcome for Millennium, as had been represented to the Investors earlier, and the reassurances about the likely immateriality of the result of the DOJ Investigation needed to be corrected to reflect the likelihood of a materially adverse effect on the Company and its finances. Nevertheless, Defendants and the Company concealed and suppressed the truthful and complete information.

87.     The Underwriters' and Millennium's legal representatives on the Investor conference calls relayed Loucks's statements in the March 7, 2014 due diligence session on why the exposure the Company faced in the DOJ Investigation was not financially material to the Company. They stated that Skadden had opined, and they concurred, that Millennium's conduct under investigation was less culpable than that in two comparable lab company settlements and that the likely exposure of Millennium in the DOJ Investigation was no more than $20 million.

88.     The Underwriters' and Millennium's legal representatives went even further to minimize the significance of the DOJ Investigation by stating the parallel *qui tam* actions in the District of Massachusetts to which the DOJ Investigation related were spiteful acts of disgruntled Millennium former employees that had been financially sponsored by a Millennium competitor, Ameritox—all to convey the misleading impression that the allegations themselves were not serious or true.

89.     On the issue of the risks to Millennium's revenues posed by potential cuts in Medicare reimbursement amounts, JP Morgan sponsored a conference call between potential Investors and Millennium representatives Brock Hardaway (CEO), Tim Kennedy (CFO) and

Daniel Pencak (VP) in which the Company stated that it had hired a consultant who was familiar with the workings of the members of the government panels considering the reimbursement revisions, and that the changes "could be 1-2% positive and [at] most 5-6% negative."

90.     By the time the Company released its first quarter results for the following year, it was clear that the projections for reimbursement from government programs had been unreasonable when made. The Company announced that its total revenue was down 9.7% and revenue per specimen had declined 19.4% as a result of "an unfavorable payor mix shift from Medicare to Medicaid and Managed Medicaid, moving in-network with a large national payor, and reimbursement reductions as a result of a variety of policy changes."

91.     The CIM, the Investor Presentation, the historical financial statements of Millennium and Millennium financial projections, the oral and written responses to Investors' questions and the various other materials made available to Investors, as well as other written and oral communications with Investors by Millennium, Defendants, KPMG or any of their agents, representatives or employees during the offering period are referred to collectively herein as the "Offering Materials," and the materially misleading statements in, and omissions from, the Offering Materials are referred to collectively herein as the "Actionable Misstatements and Omissions."

*The Funding And Sales To Investors*

92.     Under the terms of Defendants' 2014 Commitment Letter with Millennium, Defendants had the obligation as "Initial Lenders" to fund the $1.775 billion term loan, but also had the right to syndicate all of it to the Investors pursuant to the assignment provisions of the 2014 Credit Agreement.

33

93.     The "syndication" was for all intents and purposes a securities distribution. The Defendants required the Investors or their investment advisors to make a final legally binding offer to purchase the Millennium securities "with your [arranger] salesperson" up to a maximum amount on or before 5 p.m. (Eastern) on April 14, 2014. The next day, April 15, 2014, the Defendant-Arrangers informed the Investors or their investment advisors of the gross "allocation" each had been awarded. Each sale was made at "99"—or 99% of the face amount of the securities purchased.

94.     The advisors that managed the mutual and other funds considering an investment in the Millennium Notes had the right to inform the Arrangers of the "sub-allocations" they wanted to make to particular Investors in their own groups. For example, an investment advisor with discretionary authority over multiple funds might make an offer to purchase $50 million in Millennium securities, receive a gross allocation from Defendants of $45 million (depending on whether and to what extent the total $1.775 billion was subscribed for) and then sub-divide that $45 million among 9 Investors in increments of $5 million each.

95.     The funding to Millennium and the securities distribution to the Investors proceeded in three inter-related and contemporaneous steps. In the first step, JPM Securities, CitiGlobal, STRH and BMOCap agreed among themselves that JPM Securities or its affiliate, JPMNA, would "as an accommodation" to the "Other Arrangers" perform the entire initial funding and that the other Defendants would have to contribute only if some of the Investors failed in their obligations to buy the securities for which they had committed. In a second step, JPMNA contracted with Millennium for a "Master Consent" of the Company to sell the securities to the Investors up to the amounts listed in a schedule exhibited to the Consent. In the third and final step, effective no later than the time JPMNA funded Millennium, each individual

34

Investor at the sub-account level as "Buyer" became irrevocably committed to JPMNA as "Seller" to purchase the Millennium security in the amount it had subscribed for and been allocated (called the "Sold Loan"). The actual sale between JPMNA and each Investor was later documented through a formal Assignment and Assumption agreement. Each Investor succeeded to the rights of JPMNA under, and itself became a party to, the 2014 Credit Agreement between and among all Investors, Millennium, ML Holdings II and JPMNA as Administrative Agent.

96.     The debt began to trade as early as April 15th (even before the effective date of the Credit Agreement on April 16th). Like any group of company executives communicating with their underwriters and broker-dealers, Millennium's executives were curious about how the security was performing in secondary trading relative to the initial offering price of 99 and what that trading indicated, in hindsight, on the question of whether Millennium could have raised even more money. To respond, Jenny Lee, the JPM Securities Managing Director for High Yield and Leveraged Loan Capital Markets, wrote at 1:26 p.m. (Eastern time) on the 15th that:

> The TL [term loan] broke for trading at 99.125 and has since [on the same trading day] traded up to 99.25 which is exactly where you'd like to see the TL trading. For the avoidance of doubt, you [as issuer] did not leave any money on the table. The [Investor] accounts that I've spoken with are happy with their allocations.

97.     The Millennium Insiders thanked JP Morgan profusely, not so much on behalf of the Company as for making them and their families rich personally. Referring to the $1.2 billion dollar extraordinary dividend of the loan proceeds to the Insiders, Millennium President Howard Appel wrote to the JP Morgan team on April 17, 2014, "It's more than getting the [loan] deal done; you've changed our personal lives for generations."

98.     Never the ones to miss a cross-marketing opportunity, the JP Morgan bankers on the deal introduced the Insiders to their colleagues in the JP Morgan "Private Bank" so that JP

35

Morgan could earn even more fees through the Insiders in their newly enriched personal capacities.

*The Terms And First Breach Of The 2014 Credit Agreement*

99.     As noted, the 2014 Credit Agreement became effective on April 16, 2014. Section 5.2 of the Agreement provided that the obligation of each Investor—defined under the Credit Agreement as a "Lender"—"to make any extension of credit requested to be made by it on any date (including its initial extension of credit . . .) is subject to the satisfaction of the following conditions precedent . . . ."

100.     The conditions precedent under Section 5.2 are (a) that "[e]ach of the representations and warranties made by [Millennium and certain of its affiliates] in or pursuant to [the 2014 Credit Agreement] shall be true and correct in all material respects on and as of the date made as if made on and as of such [credit extension request] date" and (b) "[n]o Default or Event of Default [as defined in the 2014 Credit Agreement] shall have occurred and be continuing on such [credit extension request] date . . . ."

101.     Section 4 of the 2014 Credit Agreement contains the representations and warranties of Millennium and it contains 21 subsections, many of which have several subparts of their own. Below are just a few that were untrue and were breached as of the Closing Date in light of the illegal sales, marketing and billing practices of the Company, the then-current status of the DOJ Investigation and Ameritox Litigation, and the size and probability of the associated loss contingencies as a financial accounting matter:

      a. "4.1  Financial Condition.  (a) The unaudited pro forma forecasted consolidated balance sheet of [Millennium Holdings II] and its consolidated Subsidiaries . . . has been prepared based on the information reasonably available to [Millennium Holdings II] as of the date of delivery thereof, and presents fairly in the good faith belief of [Millennium Holdings II] on a pro forma basis the estimated financial position . . . . (b) The audited consolidated

36

balance sheets of [Millennium Holdings II] and its consolidated Subsidiaries as at December 31, 2011, December 31, 2012 and December 31, 2013 . . . reported on by and accompanied by an unqualified report from KPMG LLP present fairly the[ir] consolidated financial condition . . . .   All such financial statements . . . have been prepared in accordance with GAAP . . . .  As of the Closing Date, no [Millennium] Group Member has any material . . . contingent liabilities . . . that are not reflected in the most recent financial statements referred to in this paragraph to the extent that GAAP would require that disclosure.

b.   "4.2   <u>No Change</u>.  Since December 31, 2013, there has been no development or event that has had or would reasonably be expected to have a Material Adverse Effect" (defined as a material adverse effect on the business, property, financial condition or results of operations of Millennium).

c.   "4.3   <u>Existence: Compliance with Law</u>.  Each [Millennium] Group Member . . . is in compliance with all Requirements of Law [including "rules and regulations" applicable to it] except to the extent that the failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect."

d.   "4.6   <u>Litigation</u>.  No litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending . . . that would reasonably be expected to have a Material Adverse Effect."

e.   "4.19 <u>Accuracy of Information</u>.  No written statement or information contained in this Agreement, any other Loan Document, the Confidential Information Memorandum or any other document . . . or statement furnished by or on behalf of any Loan Party to the Administrative Agent or the Lenders, or any of them . . . contained as of the date [of] such . . . (or, in the case of the Confidential Information Memorandum, as of the date of this Agreement) . . . any untrue statement of material fact or omitted to state a material fact necessary to make the statements contained herein or therein not materially misleading . . . .  The projections and <u>pro forma</u> financial information contained in the materials referenced above are based upon good faith estimates and assumptions believed by management . . . to be reasonable at the time made . . . .  There is no fact known to [Millennium or its affiliates] that would reasonably be expected to have a Material Adverse Effect that has not been expressly disclosed herein, in the other Loan Documents, in the Confidential Information Memorandum or in any other documents . . . and statements furnished to the Administrative Agent and the Lenders . . . .

f.   4.22 <u>Solvency</u>.  Each Loan Party [including Millennium] is, and after giving effect to the Transactions [including the dividend to Millennium Insiders] and the incurrence of all Indebtedness and obligations being incurred in connection herewith and therewith will be and will continue to be, Solvent.

37

102.    A "Default" is defined under the 2014 Credit Agreement as any of the events specified in Section 8.1 of the Agreement regardless of "whether or not any requirement for the giving of notice, lapse of time, or both has been satisfied." The material inaccuracy of a representation and warranty as of the date it was made is an ordinary "Default" under Section 8.1(b).

103.    Because the above representations and warranties in the 2014 Credit Agreement, among others, were materially inaccurate as of April 15 and 16, 2014, there was a Default under Section 8.1 of the Agreement on those dates. Those Defaults, together with the breaches of the representations and warranties themselves, meant that the conditions precedent to JPMNA's obligation to fund Millennium under the 2014 Credit Agreement (and the Investors' simultaneous commitments to JPMNA for their parts of that funding) had not been satisfied.

104.    Section 2.1 of the 2014 Credit Agreement provides that "[s]ubject to the terms and conditions hereof [*i.e.*, of the entire 2014 Credit Agreement, including but not limited to Section 5.2], each Tranche B Term Lender severally agrees" to make its loan to Millennium "on the Closing Date . . . ." Because the Section 5.2 conditions precedent had not been satisfied, the Tranche B Term Lender, JPMNA, did not have any obligation to provide funds to Millennium on the Closing Date and/or to require the Investors to provide their funds to JPMNA.

105.    JPMNA knew or should have known that the Section 5.2 conditions precedent had not been satisfied and it breached its contractual duties, express and implied, and fiduciary duties as agent to the Investors by (i) failing to give the Investors notice of such Defaults and (ii) proceeding with the funding of Millennium. JPMNA did so because it was conflicted in its duty of loyalty to the Investors by its own desire (a) to eliminate its own term loan and firm commitment underwriting exposure under the 2012 Credit Agreement (as amended) and

38

Defendants' 2014 Commitment Letter, respectively, (b) to earn fees for itself and its affiliate JPM Securities, and (c) to curry favor with the Insiders from whom it hoped to solicit future business.

106.    Indeed, within two weeks the Closing of the 2014 Credit Agreement, JP Morgan began pitching to the Millennium Insiders "Project Mountain"—a potential sale of the entire Company to a private equity firm or strategic buyer.

*Millennium Is Caught But Notifies Only JP Morgan, Not The Investors or Secondary Traders*

107.    Like the Securities Exchange Act of 1934 and SEC Rules promulgated thereunder, which require issuers to disclose information about themselves after an initial public offering of their securities, the Credit Agreement imposed obligations on Millennium and JPMNA as Agent to disseminate financial statements and other information to Investors periodically (*i.e.,* quarterly and annually) and contemporaneously with intervening material developments.

108.    Millennium's disclosure was relevant and important not only to the administration of the 2014 Credit Agreement and enforcement of rights thereunder, but also (subject to rules and regulations for trading on material non-public information) to the prices at which the Millennium securities traded in secondary markets and the ability of the Investors to trade the securities or to hedge against risk in continuing to hold them. JP Morgan assigned a "High Yield Research" Analyst to help disseminate non-confidential information about the Company to new potential investors in the Notes. As the analyst described his duties to the Insiders, "I help firms like your put their best foot forward as fairly as I can. It's pretty similar to an Equity analyst actually. Because [however] your company's financials are not going to be filed with the SEC

39

(vs most HY [High-Yield] bond issuers) we would not be writing any research notes – that's the key difference here – all dialogue with investor clients is verbal."

109.    Section 6.6(b), (c) and (e) of the 2014 Credit Agreement required Millennium to give JPMNA and "each Lender" notice of, among other things, "any . . . investigation or proceeding that may exist *at any time* between any [Millennium] Group Member and any Governmental Authority, that if adversely determined would reasonably be expected to have a Material Adverse Effect" (emphasis added), "any litigation or proceeding . . . in which the amount involved is $15,000,000 or more and not fully covered by insurance" and, more generally, any "development or event that has had or would reasonably be expected to have a Material Adverse Effect."

110.    On June 16, 2014, two months after the Closing Date of the 2014 Credit Agreement, the jury in the Ameritox Litigation delivered a verdict that included answers to special interrogatories in which the jury found that Millennium's POC Test Cup Program violated both the Stark Law and the Anti-Kickback statute.

111.    The jury's damage award—$2.755 million compensatory and $12 million punitive (the latter of which the Court in September 2014 reduced to $8.5 million)—focused on Millennium's unjust enrichment in a few states (Florida, Tennessee and Texas).  It did not purport to assess the damages suffered by any payor, such as Medicare or Medicaid, let alone on a nationwide basis.

112.    Millennium suspended the POC Test Cup Programs shortly after the Ameritox Litigation jury verdict.

113.    Interest on the original Ameritox Litigation judgment would easily put the amount involved at over the $15 million figure in the 2014 Credit Agreement and it is doubtful

40

that any of the punitive damages would have been covered by insurance. Further, given both (a) the potential for collateral estoppel or preclusive effect of the judgment, and (b) the loss of revenue associated with the suspension of the POC Test Cup Program, the Company had sustained developments that could "reasonably be expected to have a Material Adverse Effect" as defined in the 2014 Credit Agreement.

114.    Clearly, JP Morgan viewed the verdict as having a material effect on the Company's valuation. According to an e-mail on the date of the verdict between the Company's General Counsel, Price, and a Skadden lawyer, JP Morgan bankers had informed Price's superiors at Millennium that the verdict "will have a $500m [million] impact on valuation." JP Morgan could have and should have offered such a risk assessment of such a verdict to the Investors two months earlier.

115.    Millennium did not "promptly" provide the required notice under the 2014 Credit Agreement of the Ameritox verdict on June 16, 2014 and JPMNA as Agent and market-maker for the securities knew it, but took no action to inform the Investors. In a June 26, 2014 e-mail between Jenny Lee of JPM Securities and the Millennium CFO, Lee wrote that "Your [term loan] is trading around 100.5. The recent news about the $14.5mm [sic $14.755mm] jury verdict to Ameritox has not impacted the trading levels . . . . Its [sic] not clear that accounts are focused or aware of the jury award."

116.    But certain Investors did learn of the verdict on their own and questioned Millennium executives about it. The executives reassured the Investors that the jury verdict was contrary to legal advice that the Company had received regarding the propriety of the POC Test Cup Program and that the Company believed that it had a strong appeal. They characterized their suspension of the Program as a "precautionary" step.

41

117.    On August 15, 2014, Hogan Lovells on behalf of Millennium wrote a lengthy
letter to CMS pursuant to the CMS Voluntary Self-Referral Disclosure Protocol to resolve
potential violations of the Stark physician self-referral law.  The letter noted that the Company
had an exposure of $90 million for improper billing of the Medicare program due to just that Cup
Program alone.  Defendants knew or should have known before the Closing of the 2014 Credit
Agreement of at least this $90 million exposure and the likelihood of its realization, but they
negligently, recklessly or deliberately misrepresented this probable exposure to the Investors.
Further, no contemporaneous notice of the Self-Referral was provided to the Investors when it
was submitted in August 2014.

118.    In late December 2014, the DOJ informed the Company (which immediately
informed JP Morgan) that the DOJ would be intervening in the *qui tam* relators' suits to pursue
civil claims against the Company.  Shortly thereafter, in early 2015, the Company engaged in
negotiations and settlement discussions with the DOJ regarding the government's claims.  Price
decided to tap his personal lawyer in the DOJ Investigation, Joseph Savage from the Boston
office of the Goodwin Proctor law firm, to lead settlement negotiations with Boston USAO in
lieu of Loucks.  By the end of January 2015, Savage was writing to Price that Boston USAO
attorneys were "not in the 'same universe'" as the Company concerning the settlement
negotiations.  Price had authorized Savage and Loucks to open with a $4 million settlement
offer; according to Savage, the USAO attorneys responded that "they expect this case is over
$100 million and at one point . . . said the case was [worth] hundreds of millions."  No notice
was provided to the Investors.

119.    By letter dated February 9, 2015, Noridian Healthcare Solutions, LLC
("Noridian"), a Medicare Administrative Contractor ("MAC") for CMS notified Millennium that

42

the Company's Medicare billing privileges would be revoked on account of alleged

administrative billing abuses relating to claims submitted by Millennium for services provided,

after their dates of death, to 59 Medicare beneficiaries. As Medicare reimbursement was

Millennium's single largest source of revenue by a considerable margin, termination of those

billing privileges would likely be fatal to the Company.

120.    On March 19, 2015, the DOJ filed the civil complaint in intervention, the DOJ

Complaint, about which it had notified the Company back in December 2014.

121.    Despite these existential threats to Millennium, the Company and the Defendants

remained mute (vis-à-vis the Investors) throughout February and March 2015. Finally, on April

1, 2015, the last day available under the 2014 Credit Agreement for the Company to provide

Investors with fourth quarter 2014 financial information, the company buried, in the middle of

the contingencies section of the report, a brief statement concerning the notice it had received

from its Medicare Administrator about billing Medicare for 59 beneficiaries that were dead and

the resulting threat to the Company's ongoing ability to continue to bill Medicare.

122.    The April 1, 2015 report to Investors was materially misleading about the

severity of the risks posed by the Medicare Administrator's action. In addition, it lacked any

mention of the filing of the DOJ Complaint. In fact, by this time, the Company was in serious

settlement negotiations with the government, which would cripple its ability to repay the

Investors and lead to its bankruptcy filing.

123.    Finally, on May 22, 2015, the Company disclosed to the Investors that it had

reached a preliminary global settlement with the government for $256 million ($90 million of

which was allocated to the POC Test Cup Program) to resolve all of the outstanding issues with

the government including the Medicare billing/coding issues and the ongoing DOJ Investigation. The Wall Street Journal published news of the settlement on June 14, 2015.

124.    Millennium finalized a settlement with the DOJ and the State of Florida as of October 16, 2015 and, less than a month later, on November 10, 2015, the Company and certain of its affiliates filed the Millennium Bankruptcy.

## FIRST CAUSE OF ACTION
### (Against JPMNA)
### Violation Of Cal. Corp. Sec. Law § 25501

125.    Plaintiff repeats and realleges the allegations of the foregoing paragraphs as if fully incorporated herein.

126.    California Corporate Securities Law ("Cal. Corp. Sec. Law") Section 25501 states in part:

> Any person who violates Section 25401 shall be liable to the person who purchases a security from him or sells a security to him, who may sue either for rescission or for damages (if the plaintiff or the defendant, as the case may be, no longer owns the security), unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission or that the defendant exercised reasonable care and did not know (or if he had exercised reasonable care would not have known) of the untruth or omission.

127.    Cal. Corp. Sec. Law Section 25401 states:

> It is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

128.    The "leveraged loans" sold by Defendants to Investors were "securities" within the definition of Cal. Corp. Sec. Law § 25019.

129.    The offer by Defendants to sell the securities of Millennium was made in the State

of California because the offer originated in the State within the meaning of Cal. Corp. Sec. Law

§ 25008(b) and was made through documents and communications from California, where

Millennium was based.  In addition, the California Corporate Securities Law applies because

Millennium and the Defendants solicited orders from Investors in California and Investors made

offers to buy or purchase and accepted offers to sell in California and such California Investors

have contributed their claims to the Trust.

130.    JPMNA was the direct seller of the securities to the Investors whose claims are

assets of the Plaintiff Trust, and is a "Person" as defined by Cal. Corp. Sec. Law § 25013.

131.    JPMNA violated Cal. Corp. Sec. Law Section 25401 because it sold the

Millennium securities to the Investors "by means of . . . written or oral communication[s] that

include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary to

make the statements made, in the light of the circumstances under which the statements were

made, not misleading."

132.    The means by which JPMNA sold the securities to the Investors include the

Offering Materials.

133.    The Offering Materials contain Actionable Misstatements And Omissions as

defined above.

134.    The Actionable Misstatements And Omissions were material.

135.    JPMNA is liable to the Trust for rescission of the Investors' purchases of the

Millennium securities or damages in connection therewith.

## SECOND CAUSE OF ACTION
(against JPM Securities, CitiGlobal, BMOCap and STRH)
### Violation Of Cal. Corp. Sec. Law § 25504

45

Case 1.17 cv 00334 PSS  Document 1 1  Filed 08/21/17   Page 50 of 149

136.    Plaintiff repeats and realleges the allegations of the foregoing paragraphs as if fully incorporated herein.

137.    Section 25504 of the California Corporate Securities Law states in part:

> Every person who directly or indirectly controls a person liable under Section 25501 . . . and every broker-dealer or agent who materially aids in the act or transaction constituting the violation [of Section 25501 is] also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist

138.    The non-bank defendants, JPM Securities, CitiGlobal, BMOCap, and STRH (the "Broker-Dealer Defendants") were all broker-dealers in the Millennium offering to the Investors as defined under Cal. Corp. Sec. Law § 25004.

139.    The Broker-Dealer Defendants materially aided in the acts or transactions pled herein, which acts or transactions constituted violations of Section 25501 by, among other things, drafting and circulating the Offering Materials, acting as Lead Managers, Co-Managers, or Arrangers of the offering, soliciting offers to purchase from the Investors, and causing their bank affiliates to commit the "initial" funding of Millennium, which was supplanted by the funding of the Investors.

### THIRD CAUSE OF ACTION
(against all Defendants)
### Violation of Massachusetts Uniform Securities Act, M.G.L.A. 110A §§ 101, 410

140.    Plaintiff repeats and realleges the allegations of the foregoing paragraphs as if fully incorporated herein.

141.    This claim is brought under the Massachusetts Uniform Securities Act, M.G.L.A. 110A § 101, against all Defendants, in the right of the Investors who received in the Commonwealth of Massachusetts an offer of Millennium securities directed by the Defendants to

46

the Commonwealth of Massachusetts (the "Massachusetts Investors") and whose claims have

been contributed to the Trust.

142.     Section 101 of the Massachusetts Uniform Security Act, M.G.L.A. 110A § 101,

states, in material part, that "[i]t is unlawful for any person, in connection with the offer, sale, or

purchase of any security, directly or indirectly . . . . to make any untrue statement of a material

fact or to omit to state a material fact necessary in order to make the statements made, in the light

of the circumstances under which they are made, not misleading."

143.     Section 410 of the Massachusetts Uniform Security Act, M.G.L.A. 110A § 410,

states, in material part:

> (a) Any person who
>
> > (2) offers or sells a security by means of any untrue statement of a material
> > fact or any omission to state a material fact necessary in order to make the
> > statements made, in the light of the circumstances under which they are
> > made, not misleading, the buyer not knowing of the untruth or omission,
> > and who does not sustain the burden of proof that he did not know, and in
> > the exercise of reasonable care could not have known, of the untruth or
> > omission, is liable to the person buying the security from him, who may
> > sue either at law or in equity to recover the consideration paid for the
> > security, together with interest at six per cent per year from the date of
> > payment, costs, and reasonable attorneys' fees, less the amount of any
> > income received on the security, upon the tender of the security, or for
> > damages if he no longer owns the security. Damages are the amount that
> > would be recoverable upon a tender less the value of the security when the
> > buyer disposed of it and interest at six per cent per year from the date of
> > disposition.
>
> (b) Every person who directly or indirectly controls a seller liable under
> subsection (a), every partner, officer, or director of such a seller, every person
> occupying a similar status or performing similar functions, every employee of
> such a seller who materially aids in the sale, and every broker-dealer or agent who
> materially aids in the sale are also liable jointly and severally with and to the same
> extent as the seller, unless the non-seller who is so liable sustains the burden of
> proof that he did not know, and in exercise of reasonable care could not have
> known, of the existence of the facts by reason of which the liability is alleged to

47

exist. There is contribution as in cases of contract among the several persons so liable.

144.    The "leveraged loans" sold by Defendants to the Massachusetts Investors were "securities" within the meaning of the Massachusetts Uniform Securities Act.

145.    The offer by Defendants to sell the Millennium securities was made in the Commonwealth of Massachusetts because Millennium and the Defendants solicited orders from the Massachusetts Investors in Massachusetts and the Massachusetts Investors made offers to buy or purchase and accepted offers to sell in Massachusetts.

146.    Defendants violated the Massachusetts Uniform Securities Act because they either offered or sold the Millennium securities to the Massachusetts Investors by means of the Actionable Misrepresentations And Omissions in the Offering Materials or were the control person of such an offeror or seller, or were a broker-dealer in the offering within the meaning of such Act.

147.    The Actionable Misstatements And Omissions were material and the Massachusetts Investors did not know the untruth or omissions therein.

148.    All Defendants are liable to the Trust for rescission of the Massachusetts Investors' purchases of the Millennium securities or damages in connection therewith.

## FOURTH CAUSE OF ACTION
(against JPMNA)
### For Violation of Colorado Securities Act, C.R.S. §§ 11-51-501(1), 11-51-604

149.    Plaintiff repeats and realleges the allegations of the foregoing paragraphs as if fully incorporated herein.

150.    This claim is brought under the Colorado Securities Act against JPMNA, in the right of Investors who received in the State of Colorado an offer of Millennium securities

directed by the offeror to the State (the "Colorado Investors") whose claims have been

contributed to the Trust.

151.    Section 11-51-501(1)(b) of the Colorado Securities Act states, in material part,

that "[i]t is unlawful for any person, in connection with the offer, sale, or purchase of any

security, directly or indirectly . . . . [t]o make any untrue statement of a material fact or to omit to

state a material fact necessary in order to make the statements made, in the light of the

circumstances under which they are made, not misleading."

152.    Section 11-51-604(4) of the Colorado Securities Act states, in material part:

> Any person who sells a security in violation of section 11-51-501 (1) (b)
> (the buyer not knowing of the untruth or omission) and who does not
> sustain the burden of proof that such person did not know, and in the
> exercise of reasonable care could not have known, of the untruth or
> omission is liable to the person buying the security from such person, who
> may sue to recover the consideration paid for the security, together with
> interest at the statutory rate from the date of payment, costs, and reasonable
> attorney fees, less the amount of any income received on the security, upon
> the tender of the security, or is liable for damages if the buyer no longer
> owns the security. Damages are deemed to be the amount that would be
> recoverable upon a tender, less the value of the security when the buyer
> disposed of it, and interest at the statutory rate from the date of disposition.

153.    The "leveraged loans" sold by Defendants to the Colorado Investors were

"securities" within the meaning of the Colorado Securities Act.

154.    The offer by Defendants to sell the Millennium securities was made in the State of

Colorado because Millennium and the Defendants solicited orders from the Colorado Investors

in Colorado and the Colorado Investors made offers to buy or purchase and accepted offers to

sell in Colorado.

155.    JPMNA violated the Colorado Securities Act because, in connection with the sale

of the Millennium securities, it made the Actionable Misstatements And Omissions in the

Offering Materials to Colorado Investors

49

156. The Actionable Misstatements And Omissions were material and the Colorado Investors did not know the untruth or omissions therein.

157. JPMNA is liable to the Trust for rescission of the Colorado Investors' purchases of the Millennium securities or damages in connection therewith.

### FIFTH CAUSE OF ACTION
(Against All Defendants Except JPMNA)
**Violation of Colorado Securities Act, C.R.S. §§ 11-51-501, 11-51-604**

158. Plaintiff repeats and realleges the allegations of the foregoing paragraphs as if fully incorporated herein.

159. Section 11-51-604(5)(c) of the Colorado Securities Act states, in material part, that "[a]ny person who knows that another person liable under subsection (3) or (4) of this section is engaged in conduct which constitutes a violation of section 11-51-501 and who gives substantial assistance to such conduct is jointly and severally liable to the same extent as such other person."

160. All Defendants provided substantial assistance to JPMNA's and/or Millennium's violation of Section 11-51-501 by, among other things, drafting and circulating the Offering Materials provided to the Colorado Investors in connection with the offering and which contained the Actionable Misstatements And Omissions, by acting as Lead Managers or Co-Managers, or Arrangers of the offering, by soliciting offers to purchase from the Colorado Investors, and by causing their bank affiliates to commit the "initial" funding of Millennium intending that such initial funding be supplanted by the funding of the Colorado Investors.

161. As alleged further herein, at the time such Defendants provided substantial assistance to JPMNA and/or Millennium in connection with the sale of the Millennium securities

to the Colorado Investors, such Defendants knew that JPMNA and/or Millennium engaged in conduct which constitutes a violation of Section 11-51-501 of the Colorado Securities Act.

## SIXTH CAUSE OF ACTION
(against all Defendants)
### Violation of Illinois Securities Law, 815 ILCS 5/12 – 5/13

162.    Plaintiff repeats and realleges the allegations of the foregoing paragraphs as if fully incorporated herein.

163.    This claim is brought under the Illinois Securities Law against all Defendants in right of Investors who received in the State of Illinois an offer of Millennium securities directed by the offeror to the State (the "Illinois Investors") and whose claims have been contributed to the Trust.

164.    Section 12.G of the Illinois Securities Law states, in material part, that "[i]t shall be a violation of the provisions of this Act for any person. . . . . [t]o obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

165.    Section 13 of the Illinois Securities Law states:

A. Every sale of a security made in violation of the provisions of this Act shall be voidable at the election of the purchaser exercised as provided in subsection B of this Section; and the issuer, controlling person, underwriter, dealer or other person by or on behalf of whom said sale was made, and each underwriter, dealer, internet portal, or salesperson who shall have participated or aided in any way in making the sale, and in case the issuer, controlling person, underwriter, dealer, or internet portal is a corporation or unincorporated association or organization, each of its officers and directors (or persons performing similar functions) who shall have participated or aided in making the sale, shall be jointly and severally liable to the purchaser as follows:

(1) for the full amount paid, together with interest from the date of payment for the securities sold at the rate of the interest or dividend stipulated in the

51

securities sold (or if no rate is stipulated, then at the rate of 10% per annum) less any income or other amounts received by the purchaser on the securities, upon offer to tender to the seller or tender into court of the securities sold or, where the securities were not received, of any contract made in respect of the sale; or

(2) if the purchaser no longer owns the securities, for the amounts set forth in clause (1) of this subsection A less any amounts received by the purchaser for or on account of the disposition of the securities.

If the purchaser shall prevail in any action brought to enforce any of the remedies provided in this subsection, the court shall assess costs together with the reasonable fees and expenses of the purchaser's attorney against the defendant. Any provision of this subsection A to the contrary notwithstanding, the civil remedies provided in this subsection A shall not be available against any person by reason of the failure to file with the Secretary of State, or on account of the content of, any report of sale provided for in subsection G or P of Section 4 [815 ILCS 5/4], paragraph (2) of subsection D of Sections 5 [815 ILCS 5/5] and 6 [815 ILCS 5/6], or paragraph (2) of subsection F of Section 7 [815 ILCS 5/7] of this Act.

166. The "leveraged loans" sold by Defendants to the Illinois Investors were "securities" within the meaning of the Illinois Securities Law.

167. The offer by Defendants to sell the Millennium securities was made in the State of Illinois because Millennium and the Defendants solicited orders from Investors in Illinois and Investors in Illinois made offers to buy or purchase and accepted offers to sell in Illinois.

168. Millennium and the Defendants obtained money or property through the sale of Millennium securities by means of the Actionable Misrepresentations and Omissions in the Offering Materials.

169. Each of the Defendants was either a controlling person, underwriter, dealer or other person by or on behalf of whom said sale was made, or a controlling person, underwriter or dealer who participated or aided in making the sale of the Millennium securities to the Illinois Investors.

170.    The Actionable Misstatements And Omissions were material.

171.    All Defendants are liable to the Trust for rescission of the Illinois Investors' purchases of the Millennium securities or damages in connection therewith.

172.    On June 9, 2016, the Trust, on behalf of the Illinois Investors, provided notice of the Illinois Investors' claims to the Defendants by registered mail addressed to the person to be notified at his or her last known address with proper postage affixed pursuant to Section 13.B of the Illinois Securities Law.

### SEVENTH CAUSE OF ACTION
(against all Defendants)
### For Negligent Misrepresentations

173.    Plaintiff repeats and realleges the allegations of the foregoing paragraphs as if fully incorporated herein.

174.    In addition, or in the alternative, to their statutory duties as underwriters, sellers and broker-dealers in connection with the Millennium securities offering, Defendants owed common law duties to the Investors in Defendants' capacities as "Arrangers" of the Millennium financing and "Initial Lenders" to Millennium under the 2014 Commitment Letter.

175.    The Investors constituted a limited group of persons for whose benefit and guidance the Defendants supplied the Offering Materials and the Defendants supplied those Materials to the Investors with the intent to influence the decision-making of the Investors.

176.    The Defendants had knowledge superior to that of the Investors of the facts surrounding the DOJ Investigation because of the unique access to which Defendants and their agents had to Millennium's in-house and outside counsel.

53

177.     The Offering Materials contained Actionable Misstatements And Omissions because Defendants failed to exercise reasonable care or competence in obtaining and communicating true and accurate information.

178.     Defendants carelessly, recklessly, and otherwise in a grossly negligent manner failed to exercise the degree of skill, care and competence exercised by and expected by competent members of the finance profession performing similar work.

179.     The Investors Actionable Misstatements And Omissions were material and the Investors justifiably relied upon them in making their investment decisions.

180.     The negligence of Defendants was a proximate cause of injury to the Investors.

181.     All Defendants are liable to the Trust for rescission of the Investors' purchases of the Millennium securities or damages in connection therewith.

**EIGHTH CAUSE OF ACTION**
(against JPMNA)
**For Breaches Of Fiduciary Duty**
(for separate acts as of and after the Closing Date)

182.     Plaintiff repeats and realleges the allegations of the foregoing paragraphs as if fully incorporated herein.

183.     JPMNA was appointed "the agent of [each] Lender" under Section 9.1 of the 2014 Credit Agreement.  Although JPMNA simultaneously purported to disclaim "*any* fiduciary duty to any Lender," *id* (italics added), as a matter of law, there were limits on the extent to which JPMNA could contractually disclaim fiduciary duties.

184.     For example, while JPMNA might legally be able to disclaim certain fiduciary duties of care, such as "any obligation to any Lender *to ascertain or inquire* as to the observance or performance of any of the agreements" by Millennium in the Credit Agreement (Section 9.3),

54

it still owed a duty of loyalty not to prefer JP Morgan's financial interests over the contract rights of Investors. But JPMNA violated that duty of loyalty.

185.    As of April 15, 2014, JPMNA had possession, custody or control of information from Millennium, Millennium's counsel and from Defendants' own counsel that the conditions precedent to the Closing of the 2014 Credit Agreement had not been satisfied.

186.    In order to eliminate its own obligations under the 2012 Credit Agreement (as amended), to satisfy its firm commitment underwriting obligation under Defendants' 2014 Commitment Letter, and to obtain tens of millions of dollars in fees for JP Morgan from the Closing of the 2014 Credit Agreement, JPMNA breached its duties as agent to the Investors by knowingly or recklessly disregarding Millennium's lack of satisfaction of the conditions precedent under Section 5.2 of the Agreement and nevertheless calling for a funding by Investors.

187.    JPMNA's breach of fiduciary duty was a proximate cause of the Investors' funding of Millennium and of the Investors' subsequent losses when the truth became known.

188.    JPMNA is liable to the Trust for rescission of the Investors' transactions with it, or alternatively, damages in an amount to be determined at trial.

### NINTH CAUSE OF ACTION
(Against JPMNA)
### For Breaches of Contract as of the Closing Date

189.    Plaintiff repeats and realleges the allegations of the foregoing paragraphs as if fully incorporated herein.

190.    Independent of and in addition to its fiduciary duties as an agent under the 2014 Credit Agreement, JPMNA also had express contractual duties thereunder. One of those express duties was observance and enforcement of conditions precedent to the Closing.

55

191.    Section 5.1 of the 2014 Credit Agreement provides "Conditions to Extension of Credit on the Closing Date" and Section 5.2 provides for additional conditions precedent that are applicable on "any date (including [an Investor's] initial extension of credit ..."), which necessarily includes the Closing Date.

192.    JPMNA knew or should have known that several of the conditions precedent to the Investors' funding at Closing had not been satisfied and thus JPMNA breached the 2014 Credit Agreement by calling for the Investors' funding of the Tranche B Term Loan on the Closing Date and making them Lenders to the Company.

193.    For example and without limitation, JPMNA knew or should have known as of the Closing Date, that the Company's representations and warranties in the 2014 Credit Agreement were not true and correct in all material respects, that the executed legal opinions and audited financial statements and projections provided to the Investors were materially misleading, and the Company was or would be rendered in Default and Insolvent (as defined in the 2014 Credit Agreement) simultaneously with the Closing.

194.    JPMNA breached the 2014 Credit Agreement by requiring each Investor to fund a share of the Tranche B Term Loan notwithstanding the failure of the Company to satisfy numerous conditions precedent and each Investor was foreseeably injured as a result of JPMNA's breach.

195.    The Trust, on behalf of the Investors, is entitled to damages for JPMNA's breach of such contractual duties in an amount to be determined at trial.

## TENTH CAUSE OF ACTION
### (Against JPMNA)
### Breaches Of Other Express Contractual Duties On And After the Closing Date

196.    Plaintiff repeats and realleges the allegations of the foregoing paragraphs as if fully incorporated herein.

197.    Upon receiving notice of a Default or Event of Default, JPMNA was required to provide notice to all Investors and to take such actions as shall be reasonably directed by a number of them (contractually defined as the "Required Lenders").

198.    JPMNA's actual knowledge of a Default by Millennium, as a matter of law, constituted notice of the Default and JPMNA cannot escape its contractual duty to notify the Investors by relying upon other contract provisions that purport to require the notice to label itself a "notice of default."

199.    JPMNA had notice of a Default by Millennium as of the Closing Date of the 2014 Credit Agreement; accordingly, it was required to provide notice of the Default to all Investors. Had JPMNA timely provided the contractual notice to the Investors, they would have exercised their rights under Section 8.1(B)(ii) to declare the term loan, with accrued interest thereon, to be due and payable forthwith.

200.    Additionally and alternatively, JPMNA had notice of a Default by Millennium at times after the Closing Date of the 2014 Credit Agreement and, at those times, failed to provide the contractually-required notice to the Investors. If JPMNA had not breached its express obligations to the Investors, the latter would have exercised their rights under Section 8.1(B)(ii) to declare the term loan, with accrued interest thereon, to be due and payable forthwith.

201.    The Investors were damaged by JPMNA's express breach of contract in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION
(Against JPMNA)
### For Breaches Of Implied Contractual Duty Of Good Faith
(for separate acts as of and after the Closing Date)

202.    Plaintiff repeats and realleges the allegations of the foregoing paragraphs as if fully incorporated herein.

203.    Each and every contract under New York law contains implied covenants of good faith and fair dealing exchanged among the parties thereto.

204.    JPMNA's disclaimer of "implied covenants" in the 2014 Credit Agreement cannot as a matter of law disclaim its implied covenant of good faith and fair dealing to the Investors parties thereto.

205.    JPMNA breached its implied covenant of good faith and fair dealing to the Investors in at least two ways:

    a.  First, according to Section 9.4 of the Agreement, JPMNA, in its capacity as Administrative Agent, was entitled to rely upon only statements made by others "believed by [JPMNA] to be genuine and correct." JPMNA could not, in accordance with its obligations of good faith and fair dealing, rely upon statements made by others known to it or recklessly disregarded by it as not being genuine and correct. Yet, JPMNA knew or recklessly disregarded that statements made by Millennium in connection with the 2014 Credit Agreement were not genuine and correct.

    b.  Second, several provisions of the 2014 Credit Agreement provide for JPMNA to take advice or directions from Investors concerning the exercise or non-exercise of contractual rights. JPMNA frustrated the ability of the Investors to exercise or decide not to exercise their contractual rights by withholding from

58

them JPMNA's own knowledge of facts and events that triggered the

Investors' contractual rights.

206.　JPMNA's breaches of its implied duties of good faith and fair dealing caused

injury to the Investors.

207.　The Trust, on behalf of the Investors, is entitled to damages in an amount to be

determined at trial.

**WHEREFORE**, PLAINTIFF TRUSTEE DEMANDS THE FOLLOWING:

1.　Rescission of sales of securities;

2.　Rescissory damages;

3.　Compensatory damages;

4.　Consequential damages;

5.　Punitive damages;

6.　Pre-judgment and post-judgment interest;

7.　Attorneys' fees, experts' fees, disbursements and costs; and/or

8.　Such other and further relief as the Court deems just and proper.[1]

---

[1] Pursuant to Article X, Section L of Millennium's Bankruptcy Plan, notice is hereby provided that insofar a cause of action pleaded herein is subject to statutory or common law contribution on account of the comparative fault of Millennium Lab Holdings, Inc. or TA Millennium, Inc. or either of their respective "Related Parties" as defined in Article I, Section 1.145 of said Plan (each such entity or person individually and collectively defined herein as the "Comparative Fault Party or Parties"), a defendant herein may seek to establish a reduction of its liability to plaintiff equal to the share of damages attributable to such Comparative Fault Party or Parties based upon the percentage of comparative fault (if any) determined to be attributable to such Comparative Fault Party or Parties and without such Party or Parties being named in and participating in these proceedings. This notice is a requirement of the Bankruptcy Plan and not an admission that such provision of Article X, Section L applies.

59

Dated: New York, New York
       August 1, 2017

WOLLMUTH MAHER & DEUTSCH LLP

By: _____
       David H. Wollmuth
       Lyndon M. Tretter
       Jeffrey Coviello

500 Fifth Avenue
New York, New York 10110
Tel: (212) 382-3300

*Attorneys for Plaintiff Marc S. Kirschner,
solely in his capacity as Trustee of the
Millennium Lender Claim Trust*

60

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al., ex rel.*<br>MARK McGUIRE *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MILLENNIUM LABORATORIES, INC., and<br>MILLENNIUM HEALTH, LLC,<br><br>Defendants. | No. 12cv10132-NMG<br>No. 12cv10631-NMG<br>No. 13cv10825-NMG |

## UNITED STATES' COMPLAINT IN INTERVENTION

By notice to the Court on December 19, 2014, the United States of America partially intervened in the above-captioned cases. The United States alleges as follows:

## I.   INTRODUCTION

1.   The United States of America ("United States") brings this action against Defendants pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), seeking treble damages and civil penalties, and also under common law theories of recovery.

2.   Millennium Laboratories, Inc., now Millennium Health, LLC ("Millennium," the "Defendant" or the "Company"), was founded in 2007 and grew to be the largest Medicare Part B biller in the country, receiving over $630 million from Medicare for laboratory-based drug testing through 2014.   Millennium performs urine drug testing ("UDT"), which, used appropriately, informs physicians of the amount of a particular substance (be it a prescription drug such as oxycodone or an illicit substance such as heroin) in a patient's system.   Since its founding, Millennium has knowingly submitted many millions of dollars' worth of false claims to the Medicare program for urine drug tests that were not reasonable and necessary or that were

furnished pursuant to prohibited referrals that resulted from Millennium's improper financial relationships with physicians, in violation of the physician self-referral prohibition, 42 U.S.C. § 1395nn (commonly known as the "Stark Law"), and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

3.      Millennium used a variety of schemes to cause physicians, including many of its biggest referrers, to routinely order excessive amounts of UDT for all patients (including Medicare and Medicaid patients) regardless of individual patient assessment or need. Millennium's abusive practices included the use of physician standing order forms (called "Custom Profiles") to encourage routine, excessive UDT, and the dissemination of false and misleading statements about drug abuse rates and the value of its testing. Millennium also provided many services and benefits to physician customers (including free supplies, as discussed below) contingent on referrals of certain amounts of tests to Millennium.

4.      As Millennium knew, Medicare only covers tests that are reasonable and necessary for the treatment or diagnosis of an individual patient's illness or injury, based on his or her medical condition. 42 U.S.C. § 1395y(a)(1)(A). The need for *each test* for *each patient* must be individually assessed and documented in the patient's medical chart. 42 C.F.R. §§ 410.32(a), (d)(2). Many patients, including those with chronic pain, do not need extensive laboratory-based UDT. Millennium nonetheless sought to, and did, cause many physicians to routinely order extensive and expensive UDT for all of their patients in order to make more money. Millennium then billed Medicare for each drug or drug class tested—averaging more than seventeen procedure codes (many with multiple units) per urine sample—including tests for drugs that patients were not suspected of taking, and for "confirmatory" quantitative tests of expected in-office screening test results.

2

5.      For example, Millennium billed and received from Medicare more than $15 million for laboratory UDT for phencyclidine ("PCP" or "angel dust"), abuse of which is virtually non-existent in the Medicare patient population.  Millennium also billed and received from Medicare more than $55 million for laboratory drug tests for tricyclic antidepressants ("TCAs"), which also are not commonly abused.  Most of Millennium's tests for PCP and TCAs were follow-up testing on in-office test results that were negative and consistent with clinical expectations ("expected negatives"), offering very little, if any, clinical value at great expense to Medicare.

6.      Millennium also paid illegal kickbacks to physicians in the form of free point-of-care ("POC") drug test cups to induce physicians to make referrals to Millennium.  These POC test cups cost about $5-6 each and Millennium gave physicians more than one million of them in exchange for referrals.  As a condition for providing free POC test cups, Millennium explicitly required physicians to refer additional testing to Millennium or pay back the cost of the "free" test cup.  Millennium's provision of the free cups was tied to its excessive testing scheme: its executives required that, to be eligible to receive free POC test cups, physicians have Custom Profiles (i.e., standing orders) with at least twelve drug tests.  Millennium's provision of free POC test cups generated more than 200,000 referrals for Medicare patients, which resulted in Millennium receiving over $90 million in tainted Medicare reimbursements.

7.      Millennium was warned by consultants, customers, competitors, insurers and regulators that its marketing schemes were illegal.  Millennium nonetheless pressured its employees into participating in these schemes by fostering a culture of greed, intimidation, and intense sales pressure.

3

FILED: NEW YORK COUNTY CLERK 08/01/2017 11:29 AM    INDEX NO. 655124/2017
NYSCEF DOC. NO. 3    Case 1:12-cv-10132-NMG   Document 85   Filed 03/19/15   Page 4 of 74    RECEIVED NYSCEF: 08/01/2017

Page 69 of 149

8.      Through its practices, Millennium knowingly submitted many thousands of false and fraudulent claims to Medicare and Florida Medicaid for excessive and unnecessary testing, and for testing referred in violation of the Stark Law and the Anti-Kickback Statute, and was improperly paid many millions of dollars in reimbursement for these claims.

## II.    JURISDICTION, VENUE, PARTIES

9.      This action arises under the FCA, as amended, 31 U.S.C. §§ 3729-33, and under common law theories of payment by mistake of fact and unjust enrichment.  This Court has jurisdiction over this action under 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1345 and 1367(a).

10.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a).

11.     This Court may exercise personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) and because Defendant resides and transacts business in this District.

12.     Plaintiff, the United States of America, brings this action on behalf of the Department of Health and Human Services ("HHS"), and, specifically, its operating division, the Centers for Medicare & Medicaid Services ("CMS").

13.     Relator Mark McGuire is an individual who resides in Boston, Massachusetts. Mr. McGuire is the Administrative Director of Laboratory Services at MetroWest Medical Center.

14.     Relator Ryan Uehling is an individual who resides in the state of California.  Mr. Uehling began working with Millennium in 2007 and was the Regional Director for Millennium's Western Division until 2011.

15.     Relator Omni Healthcare, Inc. ("Omni") is a professional medical company primarily based in Brevard County, Florida.  Omni is a multi-specialty physician group with

4

physicians specializing in family practice, internal medicine, pediatrics, and surgery. Relator John Doe is Dr. Craig Deligdish, a principal of Omni and a practicing physician in the Melbourne, Florida area.

16.     Defendant Millennium Health, LLC, formerly Millennium Laboratories, Inc. (also known as Millennium Laboratories of California, Inc.), is a private corporation incorporated in the State of California in 2007 with its principal place of business in San Diego, California. Millennium conducts business nationwide.

17.     Defendant was founded in 2007 by James Slattery ("Slattery"), who now serves as Chairman of the Board. Slattery previously served as the Chief Executive Officer ("CEO") until 2013, when he was replaced by current CEO Brock Hardaway. Howard Appel ("Appel") is the President of Millennium, and previously served as the Chief Financial Officer ("CFO") until 2013, when he was replaced by current CFO Timothy Kennedy. Elizabeth Peacock ("Peacock") is Millennium's Executive Vice President of Emerging Opportunities, and previously held the titles of Vice President of Sales and Executive Vice President of Sales.

## III.     LAW

### A.     The Federal False Claims Act

18.     The FCA provides, in pertinent part, that a person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains . . . .

31 U.S.C. § 3729(a)(1).[1]  For purposes of the FCA,

> (1) the terms "knowing" and "knowingly"—

> (A) mean that a person, with respect to information—
> > (i)    has  actual  knowledge  of  the  information;
> > (ii)   acts in deliberate ignorance of the truth or falsity of the information; or
> > (iii)  acts in reckless disregard of the truth or falsity of the information; and

> (B) require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1).

## B. The Medicare and Medicaid Programs

### 1. The Medicare Program

19.    In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare program.  Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  42 U.S.C. §§ 426, 426-1.  CMS administers the Medicare program.  At all times relevant to this complaint, CMS contracted with private contractors, referred to as "fiscal intermediaries," "carriers," and Medicare Administrative Contractors ("MACs"), to act as agents in reviewing and paying claims submitted by health care providers.  42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104.  The Medicare program consists of four parts: A, B, C, and D.  Millennium billed Medicare under Part B, which covers certain medical services, such as clinical laboratory test services, furnished by physicians and other providers and suppliers.  42 U.S.C. § 1395k(a)(2)(B).

---

[1]  The FCA was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009.  Sections 3729(a)(1) of the prior statute applies to conduct that occurred before FERA was enacted, and Section 3729(a)(1)(A) of the revised statute applies to conduct after FERA was enacted.  Section 3729(a)(1)(B) is applicable to all claims in this case by virtue of Section 4(f) of FERA.

20.     To participate in the Medicare program as a new enrollee, clinical laboratories, such as Millennium, must submit a Medicare Enrollment Application, CMS Form-855B. Laboratories also complete Form CMS-855B to change information or to reactivate, revalidate and/or terminate Medicare enrollment.

21.     Medicare regulations require providers and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations.  42 C.F.R. § 424.516(a)(1).

22.     An authorized official must sign the "Certification Section" in Section 15 of Form CMS-855B, which "legally and financially binds [the] supplier to all of the laws, regulations, and program instructions of the Medicare program."

23.     Authorized officials for Millennium signed the certification statement in Section 15 of Form CMS-855B, indicating that they understood that the laboratory was required to comply with Medicare laws, regulations, and program instructions, which include, but are not limited to, the Stark Law and the Anti-Kickback Statute.

24.     The National Provider Identifier ("NPI") is a standard and unique health identifier for health care providers.  All providers and practitioners must have an assigned NPI number prior to enrolling in Medicare.

25.     To obtain Medicare and Medicaid reimbursement for certain outpatient items or services, providers and suppliers submit a claim form known as the CMS 1500 form ("CMS 1500") or its electronic equivalent known as the 837P form.  Among the information the provider or supplier includes on a CMS 1500 or 837P form are certain five-digit codes, including Current Procedural Terminology Codes ("CPT codes") and Healthcare Common Procedure Coding System ("HCPCS") Level II codes, that identify the services rendered and for which

7

reimbursement is sought, and the unique billing identification number of the "rendering provider" and the "referring provider or other source."

26.     The Medicare statute requires that each request for payment or bill submitted for an item or service payable under Medicare Part B include the name and unique physician identification number for the referring physician. 42 U.S.C. § 1395l(q)(1).

27.     From 2007 to August 24, 2013, Palmetto GBA was responsible for processing Medicare Part B claims in the State of California. From August 24, 2013 to the present, Noridian Healthcare Solutions, LLC, has been responsible for processing Medicare Part B claims in the State of California. As Millennium performed all of its tests at facilities in California, it submitted all claims to these Medicare contractors.

### 2.     The Florida Medicaid Program

28.     The Florida Medicaid Program is authorized by Title XIX of the Social Security Act. 42 U.S.C. §§ 1396 *et seq.* Medicaid is a joint federal-state program that provides health care benefits, including laboratory services coverage, for certain groups including the poor and disabled. The Florida Medicaid program is required to implement a "State Plan" containing certain specified minimum criteria for coverage and payment of claims in order to qualify for federal funds for Medicaid expenditures. 42 U.S.C. § 1396a. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage, is based on a state's per capita income compared to the national average. 42 U.S.C. § 1396d (b). The Florida Medicaid Program is authorized by § 409.902 Fla. Stat., and Chapter 59G, Florida Administrative Code ("F.A.C."). Section 409.919, Fla. Stat., directs the Florida Agency for Health Care Administration ("AHCA") to "adopt any rules necessary to comply with or administer §§ 409.901-409.920 and all rules necessary to comply with federal requirements."

8

29.     Medicaid handbooks (e.g., the "Florida Medicaid Provider General Handbook") are issued for the purpose of furnishing Medicaid providers with the policies and procedures needed to receive reimbursement for covered services provided to eligible Florida Medicaid recipients. The handbooks are incorporated by reference in Chapter 59G-4, F.A.C.

30.     Physicians and laboratories certify in their state Medicaid provider enrollment forms that they will comply with all federal and state laws applicable to Medicaid. Florida's "Medicaid Provider Enrollment Application" must be completed by any person or entity desiring to receive payment for services provided to Medicaid recipients. Under Section VII of the Application, in order to be eligible to receive direct or indirect payments for services rendered to Florida Medicaid Program recipients, a provider must certify that the provider understands "that false claims, statements, documents, or concealment of material facts may be prosecuted under applicable federal and state laws." Florida Medicaid Provider Enrollment Application, Section VII Certification, at 9.

31.     The Florida Medicaid Provider General Handbook contains the following language, in Chapter 5 at page 5-4:

> **Provider Responsibility** When presenting a claim for payment under the Medicaid program, a provider has an affirmative duty to supervise the provision of, and be responsible for, goods and services claimed to have been provided, to supervise and be responsible for preparation and submission of the claim, and to present a claim that is true and accurate and that is for goods and services that . . . [a]re provided in accord with applicable provisions of all Medicaid rules, regulations, handbooks, and policies and in accordance with federal, state and local law. . . .

Chapter 59G of the F.A.C., section 5.020, entitled Provider Requirements, requires that enrolled Medicaid providers must comply with the Florida Medicaid Provider General Handbook.

32.     Under Chapter 2 of the <u>Florida Medicaid Provider General Handbook</u>, laboratory providers are required to fill out the Florida Medicaid Provider Enrollment Application and Non-Institutional Medicaid Provider Agreement. The applicable <u>Medicaid Provider Agreement for Laboratory Services Providers</u> requires that providers agree to comply with "with local, state, and federal laws, as well as rules, regulations, and statements of policy applicable to the Medicaid program, including the Medicaid Provider Handbooks issued by AHCA," and refund any moneys received in error within ninety days.

33.     Every time they submit an electronic claim to the Florida Medicaid program, physicians and laboratories also certify that they are complying with state and federal laws applicable to the Medicaid program. According to the <u>Electronic Claims Submission Agreement,</u> all providers must abide by all Federal and State statutes, rules, regulations, and manuals governing the Florida Medicaid program. The agreement also requires providers to certify that each claim is in compliance with all federal and state laws and the conditions on the claim form, including that "the services . . . were medically indicated and necessary to the health of this patient" and that the provider understands "that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

### 3.     Regulations Regarding Coverage for Laboratory Tests

34.     Medicare and Florida Medicaid regulations both make clear that laboratory tests must be ordered by the physician treating the patient for the treatment of a specific illness or injury, that laboratory test orders that are not individualized to patient need (or for which the need is not documented in the patient chart) are not covered services, and that claims for such services must be denied.

### a.     Medicare Coverage for Laboratory Tests

35.     Laboratory services must meet all applicable requirements of the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), as set forth at 42 C.F.R. Part 493.

36.     Medicare Part B pays for covered diagnostic laboratory tests that are furnished by a laboratory.   42 C.F.R. § 410.32(d)(v).   "Clinical laboratory services involve the . . . examination of materials derived from the human body for the diagnosis, prevention, or treatment of a disease or assessment of a medical condition."  Medicare Benefit Policy Manual ("MBPM"), (Pub. 100-02), Ch. 15, § 80.1, available at http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c15.pdf (visited March 15, 2014).

37.     Medicare Part B only covers services, including diagnostic laboratory services, that are reasonable and necessary for the diagnosis or treatment of an illness.  See 42 U.S.C. § 1395y(a)(1)(A) ("[N]o payment may be made under [Medicare] part A or part B . . . for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]")

38.     Pursuant to 42 C.F.R. § 410.32(a), all diagnostic tests "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem.  Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."  The MPBM's "Requirements for Ordering and Following Orders for Diagnostic Tests" define an "order" as "a communication from the treating physician/practitioner requesting that a diagnostic test be performed for a beneficiary . . .

. [T]he physician must clearly document, in the medical record his or her intent that the test be performed." MPBM, Ch. 15, Section 80.6.1.

39.    Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary. 42 C.F.R. § 410.32(a). Clinical laboratory services must be ordered and used promptly by the physician who is treating the beneficiary as described in 42 C.F.R. § 410.32(a). MPBM, Ch. 15, § 80.1.

40.    In order to assess whether those services are reasonable and necessary and whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries. In particular, the Medicare statute provides that:

> No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period.

42 U.S.C. § 1395l(e); *see also* 42 U.S.C. § 1395u(c)(2)(B)(i) ("The term 'clean claim' means a claim that has no defect or impropriety (including any lack of any required substantiating documentation) . . . .").

41.    Medicare regulations expressly state that a laboratory's claim for a service will be denied if there is not sufficient documentation in the patient's medical record to establish that the service was reasonable and necessary. 42 C.F.R. § 410.32(d)(3)

42.    CMS regulations further empower laboratories to request documentation from physicians regarding medical necessity:

> *(iii) Medical necessity.* The entity submitting the claim may request additional diagnostic and other medical information from the ordering physician or nonphysician practitioner to document that the services it bills are reasonable and necessary.

12

42 C.F.R. § 410.32(d)(3).

43.     The Department of Health and Human Services, Office of Inspector General ("HHS-OIG") has published <u>Compliance Program Guidance for Clinical Laboratories</u> in the Federal Register.   63   Fed   Reg.   45076   (Aug.   24,   1998),   available   at https://oig.hhs.gov/authorities/docs/cpglab.pdf (visited March 15, 2015).  Among other things, the HHS-OIG guidance clarifies that laboratory order forms should emphasize the need for a justification and assessment of each test ordered and that Medicare does not pay for tests for screening purposes:

> Therefore, Medicare may deny payment for a test that the physician believes is appropriate, but which does not meet the Medicare coverage criteria (e.g., done for screening purposes) or where documentation in the entire patient record, including that maintained in the physician's records, does not support that the tests were reasonable and necessary for a given patient.
> . . .
> a. Requisition design: While HCFA [(CMS)] does not design or approve requisition forms, laboratories should construct the requisition form to capture the correct program information as required by Federal or private health care programs and to promote the conscious ordering of tests by physicians or other authorized individuals.  The laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill. . . . **The form should contain a statement indicating that Medicare generally does not cover routine screening tests.**
> . . .
> 4. Reliance on Standing Orders
> Although standing orders are not prohibited in connection with an extended course of treatment, too often they have led to abusive practices. Standing orders in and of themselves are not usually acceptable documentation that tests are reasonable and necessary. . . . Medicare contractors can and may require additional documentation to support the medical necessity of the test. **As a result of the potential problems standing orders may cause, the use of standing orders is discouraged.**

*Id.* at 45079, 45081 (emphasis added).

13

44.   As Millennium explained to its sales force in 2011, "the [HHS-]OIG consistently and fervently insists on the demonstration of medical necessity for all diagnostic testing." Exhibit 1.

**b.   Florida Medicaid Coverage for Laboratory Tests**

45.   Florida Medicaid also requires that testing be individualized to the medical needs of patients.   As stated in 59G-1.010(166) of the Florida Administrative Code, "Medically necessary" or "medical necessity" means:

> [T]hat the medical or allied care, goods, or services furnished or ordered must: . . .
>
>> Be necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain; [and]
>>
>> Be individualized, specific, and consistent with symptoms or confirmed diagnosis of the illness or injury under treatment, and not in excess of the patient's needs; . . .

It further clarifies:

> The fact that a provider has prescribed, recommended, or approved medical or allied care, goods, or services does not, in itself, make such care, goods or services medically necessary or a medical necessity or a covered service.

46.   Florida Statute § 409.905 also states:

> 409.905 Mandatory Medicaid services. . . . Any service under this section shall be provided only when medically necessary and in accordance with state and federal law.

**C.   Self-Referral and Anti-Kickback Prohibitions**

**1.   The Stark Law**

47.   The federal physician self-referral prohibition, 42 U.S.C. § 1395nn (commonly known as the "Stark Law") prohibits an entity from submitting claims to Medicare for twelve categories of "designated health services" ("DHS"), including clinical laboratory services, if

such services were referred to the entity by a physician with whom the entity had a financial relationship that did not fall within a statutory or regulatory exception. 42 U.S.C. §§ 1395nn; *see also* 42 C.F.R. §§ 411.351 *et seq.*

48.     Compliance with the Stark Law is a condition of payment by the Medicare program. Medicare may not pay for any DHS provided in violation of the Stark Law. *See* 42 U.S.C. §§ 1395nn(a)(1), (g)(1).

49.     The regulations interpreting the Stark Law require that "[a]n entity that collects payment for a designated health service that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis . . . ." 42 C.F.R. § 411.353(d).

50.     A "financial relationship" includes a "compensation arrangement," which means any arrangement involving any "remuneration" paid to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind" by the entity furnishing the DHS. *See* 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

51.     Effective October 1, 2008, "a physician is deemed to 'stand in the shoes' of his or her physician organization and have a direct compensation arrangement with an entity furnishing DHS if -- (A) The only intervening entity between the physician and the entity furnishing [DHS] is his or her physician organization; and (B) The physician has an ownership or investment interest in the physician organization." 42 C.F.R. § 411.354(c)(1)(ii).

52.     Under the Stark Law, an "entity is considered to be furnishing DHS if it . . . [is the] entity that has presented a claim to Medicare for the [DHS] . . . ." 42 C.F.R. § 411.351.

53.     A "referral" includes "the request by a physician for, or ordering of, or the certifying or recertifying of the need for, any [DHS] for which payment may be made under Medicare Part B . . . ." 42 C.F.R. § 411.351.

54.     The Stark Law and its interpretive regulations contain exceptions for certain compensation arrangements. The statute and regulations also exempt certain items from the definition of "remuneration," including items "used solely to (I) collect, transport, process, or store specimens for the entity providing the item, device, or supply, or (II) order or communicate the result of tests or procedures for such entity." 42 U.S.C. § 1395nn(h)(1)(C)(ii); 42 C.F.R. § 411.351.

### 2.     The Anti-Kickback Statute

55.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or potentially harmful to patients. To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. The statute was first enacted in 1972, and was strengthened in 1977 and 1987, to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

56.     The Anti-Kickback Statute prohibits any person or entity from making or accepting payment, in cash or in kind, to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs. In pertinent part, the statute provides:

(b) Illegal remunerations . . .

    (2)    whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--

        (A)    to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

        (B)    to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b.

57.    Compliance with the Anti-Kickback Statute is a condition of payment by the Medicare program. 42 U.S.C. § 1320a-7(b)(7).

## IV.    BACKGROUND: TYPES OF UDT, GUIDELINES, AND REIMBURSEMENTS

### A.    Types of Urine Drug Tests

58.    Drug testing is used to determine the presence or absence of drugs or metabolites, also known as "analytes," in a patient's system. Drug testing can be "qualitative" (to determine the presence or absence of an analyte) or "quantitative" (to provide a numerical concentration of an analyte). Different testing methodologies have different capabilities and limitations.

59.    Drug testing is performed in a number of contexts. Some workplaces have mandatory drug testing requirements, in some instances required by federal regulations. In the clinical health care context, drug testing can be used to monitor whether patients are taking prescribed drugs or taking or abusing drugs not prescribed.

17

60.     Urine is the most common medium used for drug testing, and is the predominant medium for testing used by Millennium.

61.     There are different types of drug testing, generally based on the location of the test (in-office or at a laboratory), which have different associated costs.

62.     "Point of care" or "POC" testing—at a physician's office or clinic—is generally performed by "immunoassay" methodologies, which generally provide a qualitative result indicating the presence or absence of a drug or drug class above pre-set "cut-off" or concentration levels. In-office testing is often performed with POC drug test cups that have a number of built-in drug test strips, each of which tests for a specific drug or drug class. In-office testing can also be performed on immunoassay analyzer machines, known as "desktop" or "benchtop" analyzers, which are more sophisticated and generally reimbursed at higher levels than POC test cups.

63.     Under CLIA, CMS oversees all laboratory testing services. UDT performed using POC drug test strips and test cups is generally "CLIA-waived." CLIA-waived tests are categorized as simple laboratory examinations and procedures that have an insignificant risk of an erroneous result or pose no risk of harm to the patient if the test is performed incorrectly. 43 C.F.R. § 493.15(b). To perform CLIA-waived tests, physicians need to enroll in CLIA and obtain a waiver. 42 C.F.R. § 493.35. To operate a benchtop or desktop analyzer, physician practices are generally required to obtain CLIA certification to perform moderate- or high-complexity laboratory tests.

64.     As discussed in the next section, since April 2010, Medicare generally only reimburses one unit of POC testing per patient encounter, based on the methodology used (analyzer versus POC test cup with embedded test strips). As of January 1, 2011, the Medicare

18

reimbursement for POC tests is determined by the complexity of the test under CLIA (HCPCS billing code "G0434" for CLIA-waived tests and "G0431" for high-complexity analyzer tests).

65.   POC drug testing, including use of POC test cups, is the standard of practice for drug testing in pain management.   Most patients need only limited, if any, laboratory testing, based on their POC test results, drug abuse history, and clinical presentation.

66.   Testing at laboratories is generally performed by more precise methodologies, such as column chromatography in combination with mass spectrometry.   Such methods include gas chromatography with mass spectrometry ("GCMS") and liquid chromatography with mass spectrometry ("LCMS").   These testing methodologies can provide quantitative results, identifying the *concentration* of a drug or metabolite in a sample.   Quantitative tests are often billed for each drug or drug class tested, using CPT codes assigned for quantitative tests of each drug or class and, in some cases, multiple units of those CPT codes.   Quantitative tests can be used to "confirm" POC test results, as they use a second, more accurate methodology.

67.   Millennium performed UDT by liquid chromatography with tandem mass spectrometry ("LC-MS/MS").

68.   Millennium's LC-MS/MS technology enabled it to test urine specimens for numerous drugs and metabolites during a single run of an aliquot of a urine sample through the LC-MS/MS machine.

**B.   Expected Versus Unexpected POC Test Results**

69.   The clinical value of Millennium's "confirmatory" or "quantitative" laboratory testing depends on a patient's medical condition.   The clinical utility of a "confirmation" or "quantitation" of POC test results depends in part on whether the POC test result is expected or unexpected, and the patient's drug abuse history and clinical presentation.

19

70.     For example, if a patient is prescribed a certain drug, such as Xanax, a positive POC test result for benzodiazepines (of which Xanax is one) would be expected. If the test result is negative for benzodiazepines, however, and the patient insists that she is taking her Xanax as prescribed, a quantitative laboratory test to "confirm" whether this unexpected negative result may be reasonable and necessary.

71.     Similarly, if a patient's POC test yielded a positive result for a non-prescribed or illicit drug, then a quantitative laboratory test to evaluate (i.e., "confirm") this unexpected positive result may be reasonable and necessary.

72.     In some instances, laboratory testing of an expected POC test result or for a substance not available on a POC test may also be warranted. For example, aberrant patient behavior, unexpected clinical presentation, or a history of drug abuse may justify specific laboratory tests. The clinical value of such tests, however, depends on the presentation and physician assessment of each individual patient and that patient's need for each such test. If a POC test is negative for an illicit drug or drug not prescribed, and there is nothing in the patient's presentation or drug abuse history to indicate abuse of that drug, then a quantitative laboratory test for that drug is not reasonable and necessary for the treatment and diagnosis of that patient, and therefore not covered by Medicare.

C.      **Guidelines on Urine Drug Testing**

73.     Several organizations have published guidelines regarding UDT in the clinical setting, including UDT for chronic pain patients prescribed opioids. According to the Substance Abuse and Mental Health Services Administration ("SAMSHA"), the development of UDT guidelines in the clinical setting draws on the experience of workplace drug testing, including the

Federal Drug-Free Workplace Program and its guidelines ("Federal Workplace Guidelines"). 73 Fed. Reg. 71858 (Nov. 25, 2008).

74.     Under the Federal Workplace Guidelines, a "Negative Result" includes results reported by certified laboratories when a valid specimen "contains no drug or the concentration of the drug is less than the cutoff concentration for that drug or drug class." *Id.* at 71878 (Sec. 1.5). Laboratories may report a valid specimen as "negative" when "each initial drug test is negative[.]" *Id.* at 71894. Under the Federal Workplace Guidelines, a negative result on these initial immunoassay tests do not require confirmation testing by another method. *See id.*

75.     Millennium is well aware that entities have published guidelines regarding the use of UDT in clinical pain management and, in fact, Millennium compiled excerpts of guidelines into a document it entitled "Urine Drug Testing Guidelines by Leading Industry Organizations." Exhibit 2. The guidelines Millennium cites include those issued by the American Pain Society, the American Society of Interventional Pain Physicians ("ASIPP"), the Department of Veterans Affairs, the State of Utah, the Federation of State Medical Boards, and the Washington State Agency Medical Directors Group.

76.     As Millennium knew, none of these guidelines recommended the routine use of quantitative laboratory testing, such as the LC-MS/MS testing that Millennium performs, to "confirm" expected negative immunoassay results.

77.     Instead, when these guidelines addressed the need for confirmatory/quantitative laboratory testing, they generally recommended a UDT protocol whereby an immunoassay test is administered first and then only *unexpected* results are referred for laboratory-based confirmatory testing via a quantitative method such as LC-MS/MS.

21

78.     For example, the Washington State Agency Medical Directors Group Interagency Guideline on Opioid Dosing for Chronic Non-Cancer Pain ("Washington State Guidelines") states that the purpose of the immunoassay test is to provide rapid results that should help avoid further, unnecessary laboratory confirmation testing of expected results: "The advantages of immunoassays are their ability to concurrently test for multiple drug classes, provide rapid results and guide appropriate utilization of confirmatory testing." Washington State Agency Medical Directors' Group, *Interagency Guideline on Opioid Dosing for Chronic Non-cancer Pain*, 2010 update, available at http://www.agencymeddirectors.wa.gov/Files/OpioidGdline.pdf (visited March 15, 2014).

79.     The Washington State Guidelines recommend such confirmation testing only for positive results: "When the immunoassay result is unexpected and the patient does not acknowledge or credibly explain the result, a confirmatory test using either GC/MS or LC/MS/MS should be ordered." Similar recommendations are made by other authoritative entities, including the ASIPP and SAMSHA. *See* Manchikanti L, Abdi S, *et al., Pain Physician 2012*; 15:S67-S116, ISSN 1533-3159, ASIPP Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain; Substance Abuse and Mental Health Services Administration, *Clinical Drug Testing in Primary Care*, Technical Assistance Publication (TAP) 32, HHS Publication No. (SMA) 12-4668.

**D.      Reimbursements for Laboratory Tests**

80.     Different types of urine drug tests have different costs.

81.     Since January 2011, POC test cup tests have been billed to Medicare using HCPCS code G0434 and reimbursed at a fixed rate of approximately $20-25 per patient encounter—regardless of the number of substances tested. Also since January 2011, POC high-

22

complexity immunoassay tests have been billed to Medicare using HCPCS code G0431 and reimbursed at a fixed rate of approximately $100 per patient encounter—again, regardless of the number of substances tested.

82.     Millennium listed the HCPCS and CPT billing codes it used in its "Annual Physician Notices." *See, e.g.*, Exhibit 3 ("2012 Physician Notice")); Millennium Health Annual Physician Notice ("2014 Physician Notice"), available at http://www.millenniumhealth.com/wp-content/uploads/2014/08/MLI-ADF11001_Annual-Physician-Notice-2014-August-D3.pdf (visited March 17, 2015).  Millennium generally billed LC-MS/MS test results using individual CPT codes for each drug or drug class it tested.

83.     Millennium routinely billed multiple different CPT codes for some drug classes—such as TCAs, for which Millennium billed four separate CPT codes.

84.     Millennium also routinely billed multiple units of the same CPT codes—such as 83925 for opiates—suggesting that it had performed multiple procedures to test for opiates.

## V.     DEFENDANT'S FRAUDULENT SCHEMES

85.     Millennium knowingly submitted and caused to be submitted false claims to Medicare and Florida Medicaid for non-covered drug testing that was not reasonable and necessary.  42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 410.32(a); MBPM, Ch. 15, Section 80.6.1.

86.     Millennium increased physician testing per sample by causing physicians to order large numbers of LC-MS/MS tests on a routine basis for their patients pursuant to practice-wide standing order forms—without an individualized assessment of which drug tests were necessary for a given patient.  This practice resulted in testing that was not reasonable and necessary. Millennium also made false and misleading statements about the need for and value of its drug testing services to encourage such testing, and paid physicians remuneration in the form of free

23

supplies—tied to physician referrals—to secure their referrals and get them to agree to high levels of testing.

87.   Physicians, with Millennium's knowledge and encouragement, routinely ordered dozens of individual tests, each costing Medicare about $25, for all of their patients. In 2012 and 2013, Millennium billed Medicare for an *average* of more than twenty laboratory tests at an *average* cost of more than $450 for each urine sample. In these two years alone, Millennium billed and was paid more than $400 million by Medicare.

### A.   Millennium Caused Physicians to Order UDT That Was Not Reasonable and Necessary, in Violation of Medicare Requirements

88.   A core element of Millennium's business model was the use of physician standing order forms. Millennium created these forms as part of its plan to direct physicians to establish protocols for laboratory testing to be performed on all of their patients—usually, at minimum, a dozen or more drug tests—regardless of each patient's individualized need and condition.

### 1.   Millennium Required Physician Use of Standing Orders

89.   Millennium enabled, required and enforced the use of physician standing orders. These forms were alternately called "Standing Order," "Test Protocol" and "Custom Profile" forms. While the name of Millennium's standing order form changed, the function remained the same.

90.   These forms worked substantially as follows, with some modifications over time: a physician filled out a Custom Profile (or Standing Order or Test Protocol) form that was kept on file with Millennium and remained in effect for the physician's practice until and unless changed. When a urine sample was sent in for testing, the physician, a staff member, or even a Millennium-employed laboratory assistant or third-party specimen collector filled out an order

(or "Requisition") form for the specimen and checked a box in "Section A" of the order form labeled "Use Custom Profile." This caused Millennium to perform and bill to insurers, like Medicare, all of the tests on the Custom Profile.

91.    Millennium's 2014 Annual Physician Notice explained:

> Physician Custom Profiles:   Millennium offers physicians the option of establishing a Custom Profile to serve as general instructions on how they would like their patients tested.   In constructing a Custom Profile, each drug the physician would like tested must be selected individually on the Custom Profile form.   When ordering tests, a physician must select a testing option in Section A of the test requisition form by marking either a) USE Custom Profile, and perform additional tests if ordered, or b) DO NOT USE Custom Profile, and perform only those tests ordered on that requisition form.

92.    Millennium sales representatives and executives expected and encouraged physicians to use their standing order (potentially including additional tests for a given patient—but not fewer) for all or most of the patients in their practices.

93.    The importance of and emphasis on standing orders permeated Millennium's sales and marketing.  For example, on September 10, 2009, Millennium's Vice President of Marketing sent an email to all sales representatives entitled "STATUS OF STANDING ORDER FORM" and stated:  "As you know, the standing order is critical to our confirmation and billing process . . . ."  Exhibit 4.

94.    Millennium's management required physicians to have a Custom Profile on file with the Company.  As stated by Millennium's customer support staff to a member of the sales force, copying Millennium's President: "STANDING ORDER MUST BE RECEIVED BEFORE SPECIMENS CAN BE SENT IN TO LAB OR PROCESSED."  An April 2011 email by Mary Rouse, Millennium's Director of Sales Operation, stated:  "If we do not receive updated custom

profiles, we will discontinue processing specimens for these accounts until an updated profile is received."

95.     Millennium expected not only that physicians would have a Standing Order or Custom Profile, but also required certain testing thresholds, so that Millennium could make more money. Millennium refused to do business with accounts that failed to meet these thresholds.

96.     Early Millennium training documents, reviewed by Millennium Chief Executive Officer James Slattery, made this clear:

> Attached is a revised and even better 'Why Confirm Every Sample' document. This information should be used on the first call and every subsequent call to establish the expectation that all samples get sent to our lab for confirmation. This also lays the groundwork for a complete Standing Order to be put in place. **If an account does not want a Standing Order in place for the 6 drugs not covered by the [POC test], we do not want to do business with them.**

Exhibit 5 (emphasis added).

97.     Millennium executed this strategy by pushing for standing orders that included as many tests as possible. As stated by Elizabeth Peacock, Vice President of Sales, with respect to one customer's Custom Profile in August 2011: "I'm after a one-two punch. Layer on a couple more tests now, then push a couple of new ones as well." Exhibit 6. Or, as stated by Millennium's President regarding updated forms in September 2011: "WE DON'T WANT TESTING TO DECLINE BY UPDATING THE CP [Custom Profile] WITH LESS TESTS[.]" Exhibit 7 (capitalization in original).

98.     Millennium employees routinely submitted completed Custom Profile forms to headquarters for processing, *see* Exhibit 8, and often filled out information on the Custom Profile forms themselves.

26

99.     Millennium even processed specimens under customers' Custom Profiles in instances where the "Use Custom Profile" box in Section A of the requisition form was left blank. *See, e.g.,* Exhibit 9.

### 2.     Millennium Set—and Enforced—Testing Thresholds for Physician Standing Orders

100.     Millennium executives and sales managers set requirements for the amount of testing sales representatives had to obtain from physicians for their Custom Profiles.

101.     Millennium required that physicians agree to Custom Profiles with at least twelve tests in several contexts, including approval as a Millennium customer, removal from "troubled" (unprofitable) account lists, and as a condition for receiving free POC test cups.

102.     Millennium sales managers spread the message to their sales teams that Custom Profiles needed to have twelve or more tests.  For example, in September 2011, the Regional Sales Manager for New England directed his sales team, while circulating new Custom Profile forms, as follows:  "As we discussed on our conference call, the minimum for each account going forward is 12 test[s] + 4 Validity test[s]. . . . good selling!" Exhibit 10.[2]  Similarly, the Regional Sales Manager for Florida wrote in August 2011:  "Strive for at least 15 plus validity. You can take one of 2 approaches – we are losing money every month and/or the clinical necessity." Exhibit 11.

103.     Millennium executives were deeply involved in monitoring and even rejecting Custom Profiles that did not meet these standards.  For example, Millennium's sales support team sent an email to a sales manager in September 2011, copying Millennium's President, Mr. Appel, with the subject "cp issues – not enough tests," stating:  "The attached new client

---

[2] Millennium offered and performed "specimen validity testing" to determine whether a urine sample had been tampered with.

paperwork . . . does not have enough tests on the [Custom Profile] to enter.  Once they are updated with more tests, sales support will process the paperwork."

104.    Another communication from the sales support department to a sales manager made clear that Mr. Appel himself rejected "Custom Profiles" that did not have "enough" tests: "There are not enough tests on the CP and [Mr. Appel] *will not approve.* . . .  If [the sales representative] can get more tests added and send the CP back today, we can overnight the supplies."  Exhibit 12.  The sales manager forwarded this message to the sales representative stating, "we need more tests on this CP.  Sell them on the clinical value of a more comprehensive testing menu."  *Id.*

105.    Millennium also made provision of resources (including millions of dollars' worth of free POC test cups) contingent on robust standing orders.  To be approved for free POC test cups, Millennium required new practices to have at least twelve tests (plus four specimen validity tests) on their Custom Profiles.  Exhibit 13.  For existing customers, Millennium sales personnel were directed to "[v]erify profitability with VP of Business Analytics . . . .  If practice falls below ML profitability guidelines, cup agreement will be denied."  *Id.*

106.    Millennium executives monitored the profitability of its physician customers ("accounts"), and referred to accounts that failed to meet profitability and test-per-specimen thresholds as "troubled" or "at risk."

107.    If sales representatives failed to increase testing by a "troubled" account, Millennium stopped accepting samples from the account, withheld commissions for samples sent in for testing by that account, or both.

108.    Millennium executives reinforced to sales representatives the need to drive up the number of tests on their customers' standing orders.  For example, in a September 2011

communication to a sales manager, Millennium's President wrote: "[A]ttached are CPs we received as a follow up to the August Trouble [*sic*] Practices lists. These are still not adequate. These need to be resolved immediately." Exhibit 14.

109. Millennium executives discussed a standard for acceptable tests per specimen for "troubled accounts" in an August 2011 email chain entitled "Troubled practices." Exhibit 15. Millennium's Vice President of Analytics, Daniel Pencak, wrote that "[a]fter a few sales reps have called me, it's clear there needs to be some education to the field [on] what the minimum number of tests are required to break-even[.]" *Id.* Millennium's Vice President of Sales responded by asking "So, what's the magic number?" She suggested twelve tests per specimen. Mr. Pencak agreed that twelve was a "reasonable number." *Id.*

110. Accordingly, Millennium told sales representatives that they had to increase revenue per specimen from so-called "troubled practices" or "troubled accounts"—or it would suspend sales representatives' commissions on these accounts and/or terminate them as customers. As a Senior Financial Analyst wrote to Mr. Pencak in March 2012 regarding one such "troubled" account: "The Practice is eligible for cancelation [*sic*] as a Troubled Practice and the primary driver for its poor performance is low tests per specimen. My logic is that if they could update the custom profile to include additional tests, then it would increase tests/specimen."

111. Lists of "troubled accounts," prepared by Mr. Pencak, were circulated to sales teams with instructions to make the accounts more profitable by increasing the number of tests on their Custom Profiles. One sales manager directed her team to immediately photograph updated Custom Profiles and send the images to Millennium's Vice President of Business Analytics. Exhibit 16; Exhibit 17.

112.    Millennium's employees executed these instructions successfully, repeatedly causing physicians to increase the testing on their standing orders and bragging about it. For example, in August 2011 a sales manager submitted to Ms. Peacock a "Plan of action for troubled accounts" in his region, with responses from sales representatives. Exhibit 18. One sales representative wrote: "I spoke with the office yesterday and they have modified their protocol effective immediately to include 4 additional confirmations of negative tests . . . ." *Id.* Another stated he set up a meeting to "convince [the account] to add more confirmations to their standing protocol." *Id.* Another wrote: "We will go in and get [the doctor] to increase confirm [*sic*] negatives. . . . He will make changes and add more confirm negative [*sic*] with some convincing." *Id.* Another wrote "we are meeting with these doctors to increase their testing of negatives." *Id.* The proposed marketing plans to increase testing do not reference a clinical justification for the additional tests. *Id.*

113.    Millennium executives rewarded such success and agreed not to suspend sales commissions on "troubled" accounts that ordered additional testing. For example, the Regional Sales Manager for New England argued in a January 2012 email that one sales representative had made substantial progress "in increasing [an] account[']s revenue through test per specimen" and, for another account made "many strides . . . to increase profitability and protocol." Exhibit 19. For the latter account, the manager explained that the sales representative had secured a "[n]ew CP consisting of 14 test[s] per specimen," and that the practice had "[a]greed to use CP every time (Section A)." *Id.* Ms. Peacock wrote back that profitability had sufficiently increased and that commissions would not be suspended. The Sales Manager responded: "What a turn of events! Big win, I'll let [the rep] know, thanks for all the follow up!" *Id.* The email chain did not reference any clinical justification for the increased testing.

30

     **3.    Millennium Promoted the Routine "Confirmation" of Negative POC Test Results and Made False and Misleading Statements to Further Encourage This Testing**

114.    To increase laboratory testing, Millennium trained its sales representatives to (1) "Emphasize the need to confirm every sample" and (2) "strongly suggest to our customers that negative POC results should be confirmed . . . ." Exhibit 20.

115.    Millennium sales training documents emphasized that "confirmations" of POC test results were key to Millennium's revenue (and sales representatives' compensation). For example, one training presentation entitled "Sales Focus and Positioning" contained slides entitled "Make it routine" and "Emphasize the need to confirm." The "Make it routine" slide instructed sales representatives "to help practices establish a testing protocol" to prevent testing volumes from declining over time. The "Emphasize the need to confirm" slide noted that when "[p]hysicians consider point of care adequate and confirmation numbers are low" it "doesn't help our revenues—or yours!" The slide suggested a "goal" for physicians to confirm every sample. Exhibit 21.

116.    Millennium paid its sales representatives commissions of $6, $8, $10, and even $12 per sample sent into Millennium for testing. These commissions were significant—some sales representatives made hundreds of thousands of dollars per year in commissions. Some Regional Managers made upwards of $1,000,000 per year in commissions. Millennium only paid commissions for samples sent in from accounts Company executives deemed sufficiently profitable.

117.    Millennium trained its sales representatives to emphasize to physicians that they should not individually assess their patients, but rather extensively test all patients—with separate, expensive laboratory tests—pursuant to pre-determined Custom Profiles. Millennium

FILED: NEW YORK COUNTY CLERK 08/01/2017 11:42 AM        INDEX NO. 655124/2017
NYSCEF DOC. NO. 5   Case 1:12-cv-10132-NMG   Document 85   Filed 03/19/15   Page 32 of 74   RECEIVED NYSCEF: 08/01/2017

Page 97 of 149

offered various reasons for this blanket approach to testing, including that "profiling" patients (i.e., taking a patient-specific approach to testing) "doesn't sit well" with the Drug Enforcement Agency. *See* Exhibit 21.

118.    Millennium suggested to physicians that they could be subject to regulatory action if they did not order more tests from Millennium. In an April 2009 email, an area Sales Director wrote, "if they do not confirm every sample, they are in violation of the CLIA program. This could result in Medicare asking for all the money that they have billed for for [*sic*] the first half of the test, plus huge fines." Exhibit 22.

119.    Millennium also promoted the simplicity of "confirming" all POC test results. For example, Millennium's Chief Scientific Officer wrote to a sales representative in December 2009, copying Ms. Peacock: "In fact, we recommend to practices that they confirm all POCT results (positive and negative) that way they don't fail to order the correct test for a given drug because they end up getting all the results anyways." Exhibit 23.

120.    Millennium made numerous false and misleading statements regarding "false negative" rates for POC tests in order to cause physicians to increase testing for the confirmation of expected negative POC test results on their Custom Profiles.

121.    Millennium falsely claimed POC tests had very high "false negative" rates. Instead of using the proper definition of "false negatives"—negative test results that should have been positive—Millennium calculated and marketed a different, misleading statistic (the percentage of positive samples missed on POC tests) and called it the "false negative" rate. Millennium did this to create an inflated sense of uncertainty surrounding POC drug tests, undermine physician confidence in POC tests, and promote the routine use of quantitative UDT for drugs that patients were not suspected of taking.

32

122.    For example, Millennium compiled data from the second quarter of 2012 suggesting that, for every one hundred pain patients tested, approximately four were positive for cocaine on LC-MS/MS tests, and that, of these four, POC tests revealed two of them and missed two. Exhibit 24. Negative POC tests results were thus correct 98% of the time (yielding a false negative rate of approximately 2%), yet Millennium encouraged its sales representatives to say that POC tests for cocaine had a "false negative" rate of nearly 50%. *Id.* Millennium internal talking points from April of 2010 stated: "Cocaine was found to return a false negative rate in about 50% of the 2840 samples in which confirmation results vs. immunoassay were studied. Followed by 30% for propoxyphene, 28% for benzo's, etc. *KEY TAKEAWAY: Doctors should confirm all negatives* . . . ." Exhibit 25 (emphasis in original).

123.    Millennium's own data showed that the false negative rate for POC tests was actually very low for most drugs (4% or less for methadone, amphetamines, barbiturates, TCAs, MDMA, cocaine, marijuana, and PCP). *See, e.g.*, Exhibit 26. The likelihood that a negative POC test result is "false" for a given patient is also affected by that individual patient's presentation, prescribed medications, and drug abuse history, if any.

124.    Millennium nonetheless consistently directed its sales representatives to promote false and misleading "false negative" rates, including through a Company marketing document entitled "Empirical Evidence to Consider when Formulating your UDT Program" that was distributed to all sales representatives for use with physicians. Exhibit 27 at 3. As stated by a Regional Sales Manager to his team in an August 2011 email: "Use it to explain the reasons for false positive/false negatives on the POC cups. This will also be helpful in securing more test requests/specimen on the Custom Profiles." Exhibit 28. Millennium's Chief Scientific Officer wrote to another Regional Sales Manager in July 2011: "If you are looking to demonstrate the

importance of confirming negative POCT results, then I would recommend the document entitled 'Empirical data to consider when formulating your UDT program.'" Exhibit 29.

125.    The Company's false statements convinced physicians to order more tests from Millennium.  One Millennium sales representative wrote to Millennium's VP of Sales and other sales managers in March 2011: "I really wish we could take the Empirical data info and make it into a tri-fold presentation piece or flip chart!!  It has been such a beneficial tool at sales calls." Exhibit 30.

126.    Millennium also told physicians that they were risking legal liability if they relied on POC test results—despite a lack of support for routine quantitative testing in drug testing guidelines and Medicare coverage requirements that each test for each patient be reasonable and necessary.

127.    For example, in June and July of 2011, Millennium's Florida sales team recycled the false statement regarding "false negative" rates into talking points for use with physicians that stated: "Our data shows huge %'s of false negatives from the POC cups . . . Cocaine-false negatives on POC occur up to 50% of the time.  To risk medical license on a $6 cup is ___.  You can fill in the blank :)." Exhibit 31.

128.    Millennium also claimed that the alleged lack of reliability of POC tests put physicians' practices as risk:  "You may not have many high risk patients, but it only takes one overdose to put your practice on the line." *Id.*

129.    Millennium used unsupported threats of third-party legal actions to cause physicians to "confirm" POC drug test results.

34

130.    In September 2011, a Millennium Regional Vice President sent an email to all sales managers describing how to respond to complaints about "HUGE BILLS." He suggested they distribute a news article entitled "Another little old lady arrested for pushing drugs":

> Hand this print out to the physician and tell them, 'don't let this patient creep up and surprise you in your practice, **set the protocol to cover most of the drugs we can test** and we will make sure your patients aren't exploited and feel over charged. Once you start cherry picking who gets tested for this and that, you miss one like this. There are hundreds of patients dying in every state every month because of overdose, drug interaction, etc. so make sure none of them come from this practice[.]'

Exhibit 32 (emphasis added). Millennium's Vice President of Sales responded "Great advice Nick."

### 4.    Millennium's Conduct Generated Unnecessary Testing—Including "Confirmations" of Expected POC Test Results for Rarely Abused Drugs

131.    Millennium's use and promotion of standing orders caused testing that was not reasonable and necessary and for which the need was not assessed or documented.

132.    Routine quantitative testing under Custom Profiles led to millions of dollars in drug testing for Medicare patients that was not reasonable and necessary—including for substances that are rarely abused and diverted in the general population, much less in the Medicare population.

133.    For example, Millennium billed Medicare for more than 900,000 laboratory tests for phencyclidine or PCP (CPT Code 83992), at a cost of more than $16 million. PCP is not a commonly abused drug. According to Millennium's own data, the incidence of true positives for PCP is extraordinarily low. In addition, POC tests for PCP have very low false negative rates. For example, Millennium's own data revealed that, for a quarter in 2012, Millennium identified

FILED: NEW YORK COUNTY CLERK 08/01/2017 11:32 AM    INDEX NO. 655124/2017
NYSCEF DOC. NO.    Case 1:12-cv-10132-NMG   Document 85   Filed 03/19/15   Page 36 of 74   RECEIVED NYSCEF: 08/01/2017

Page 101 of 149

only 24 false negatives out of 174,960 LC-MS/MS tests following negative POC test results for PCP—or 0.01 percent. Exhibit 24.

134.    Millennium also billed Medicare more than $55 million dollars for laboratory testing of four types of TCAs—approximately 660,000 drug tests each for amitriptyline (CPT Code 80152), desipramine (CPT Code 80160), imipramine (CPT Code 80174), and nortriptyline (CPT Code 80182). Millennium billed Medicare for each of these four tests nearly every time testing for TCAs was ordered.

135.    TCAs have been on the market since the 1960s. TCAs present a low risk of abuse and diversion, in part because of side effects for users. TCAs are not even listed in the schedules of controlled substances under the Controlled Substances Act. 21 U.S.C. § 812.

136.    While POC tests for TCAs have a somewhat higher risk of false negatives than PCP (around 3%, according to Millennium's 2012 data), the need for that testing is tempered by the low abuse potential for TCAs and lack of abuse history for the vast majority of patients.

137.    Millennium knew many customers ordered TCA testing. In one email, Ms. Peacock asked Mr. Pencak, "What percent of customers order TCA confirmations?" Mr. Pencak responded: "About 49%." Exhibit 33.

138.    Millennium routinely analyzed and summarized data on test ordering patterns, in "Practice Profiles" and "Regional Profiles" (summarizing tests ordered by entire states), that showed ordering patterns indicating frequent use of Custom Profiles and the ordering of unnecessary "confirmations" of expected POC test results. *See, e.g.* Exhibit 34 at 5.

### 5.     Millennium Knowingly Submitted Claims to Medicare for Tests That Were Not Reasonable and Necessary

139.    Millennium knew that, as a laboratory and Medicare supplier, it had an obligation to submit claims to Medicare only for tests that were reasonable and necessary for the diagnosis or treatment of individual patients.

140.    For example, Millennium's 2012 Annual Physician notice stated:

> Medicare will only pay for tests that meet the Medicare coverage criteria and are medically necessary for the diagnosis or treatment of the individual patient. **Tests used for routine screening of patients without regard to their individual need are not usually covered by the Medicare program, and therefore are not reimbursed.** As a participating provider in the Medicare Program, the laboratory has a responsibility to make a good faith effort to ensure all tests requested are performed and billed in a manner consistent with all federal and state law regulations.

Exhibit 3 (emphasis added).

141.    Millennium knew that its emphasis on Custom Profiles put it at high risk that these conditions would not be met.

142.    In pursuing its practices, Millennium ignored and misled its compliance consultants. For example, its compliance consultant CodeMap repeatedly warned Millennium that all testing had to be patient-specific. In 2009 guidance provided to Millennium, CodeMap explained that Medicare does not pay for "preventative" or "screening" urine drug tests, stating:

> The original Medicare law did not cover any preventive or "screening" services. Medicare defines any test or procedure performed in the absence of signs or symptoms of illness, injury, or a malformed body part as a "screening" service. However, Congress has subsequently passed legislation that allows Medicare to cover a number of screening tests under specific conditions.

Congress has not passed legislation regarding Medicare coverage for urine drug tests in the absence of signs or symptoms of illness or injury.

143. CodeMap advised Millennium multiple times that testing had to be based on the needs and condition of an individual patient. In a July 2010 audio presentation to Millennium, CodeMap's founder, Charles Root, emphasized that confirmatory tests must be supported by an individualized determination of medical necessity. *See* Exhibit 35 ("Dr. Root did not answer an important question very favorably."). Mr. Root reiterated this principle again in September 2010, when an independent compliance consultant was upset by Millennium's marketing messages promoting confirmation testing that was not reasonable and necessary. Millennium asked Mr. Root to speak with her. Mr. Root wrote to Millennium's President: "I spoke with [her] yesterday and believe everyone is now on the same page - her issue was confirmation of ALL tests regardless of result or patient needs, I gave her the same advice that we have discussed regarding medical necessity documentation etc. and the need to tailor confirmations to patient needs." Exhibit 36. Millennium's President responded "Thanks. We agree too." *Id.* This representation was not consistent with Millennium's practices.

144. Millennium knew it was submitting claims to Medicare for UDT that failed key coverage requirements. Millennium's sales personnel knew what tests physicians were ordering, what was on their Custom Profiles, and how often they tested their patients. Millennium routinely tracked how many specimens were referred, and how many tests were ordered per sample.

145. Millennium, through its executives and employees, knowingly submitted claims to Medicare for UDT that was not reasonable and necessary.

**B.**    **Millennium Gave $5 Million Worth of Free POC Test Cups to Physicians in Exchange for Referrals in Violation of the Stark Law and Anti-Kickback Statute.**

    **1.**    **Millennium Distributed Free POC Test Cups in Exchange for Referrals**

146.    Millennium provided more than 1,000,000 POC test cups to physician-customers throughout the country for free, explicitly in exchange for laboratory UDT referrals.

147.    Millennium primarily distributed these POC test cups under contractual agreements ("Free Cup Agreements"). The Free Cup Agreements required that physicians agree to refer additional testing to Millennium on the cup specimens and agree not to bill insurers for the POC test cups. *See* Exhibit 37; Exhibit 38. Under the Free Cup Agreements, physicians had to pay for any of the "free" POC test cups that did not generate referrals to Millennium. Exhibit 39. Millennium's President reviewed, approved, and signed Free Cup Agreements.

148.    Millennium monitored the number of free POC test cups it shipped to customers and referrals it received back under the Free Cup Agreements, to ensure that physicians were sending the cup specimens in to Millennium for additional testing. *Id.*

149.    As Millennium attested to federal regulators, over 220,000 of the "free" POC test cups were used on Medicare patients.

150.    Millennium attested to federal regulators that (1) the cost of these "free" POC test cups was approximately $6.25 per cup from June 2010 through December 2012 and $4.90 per cup from January 2013 through June 2014, (2) the value of the free POC test cups used for Medicare patients exceeded $1,200,000, and (3) that Millennium received more than $90,000,000 in payments from Medicare for testing referred by physicians who received free POC test cups.

### 2. Millennium Knew that Free POC Test Cups Were Items of Value to Physicians

151.    POC test cups are specimen collection cups with test strips embedded in them:



Standard             POC Test Strips         P
Specimen Cup                                 OC Test Cup

152.    Millennium knew that the test strips contained in the POC test cups made the test cups more valuable to doctors than clear collection cups—and they were significantly more expensive. Millennium knew the free POC test cups were clinical supplies that physicians normally had to purchase, as well as tools used for evaluation and management of patients.

153.    CMS changed the reimbursement structure for POC test cups, effective April 2010. The new reimbursement rate applicable to POC cup tests after these changes was approximately $20-25—much less than some physicians previously had been billing. Specifically, many physicians, with Millennium's encouragement, had been billing multiple units of the applicable CPT code—one for each test strip contained within the POC test cup— obtaining reimbursements of more than $180 per test cup.

154.    Once physicians could only seek approximately $20-25 in reimbursement for a POC cup test, the POC test cups were no longer a source of significant reimbursement revenue for physicians. The clinical information the POC test cups provided, however, was still valuable

40

in the evaluation and management of patients, and the ability to get them for free presented substantial cost savings to physicians.

155.    Millennium's Free Cup program grew dramatically after CMS's rate reduction, and the number of Free Cup Agreements and the number of free POC test cups Millennium distributed increased significantly.

156.    Many physicians did not want to deal with the costs and administrative burdens associated with billing and seeking reimbursement for tests performed using POC test cups. Exhibit 40. Some insurers also would not reimburse for tests performed using POC test cups. For example, under Medicare, customers that used in-office immunoassay analyzers could not bill for both a POC test cup test result and a POC analyzer test result for the same patient. Because the analyzers results were reimbursed at a higher rate, physicians chose to seek reimbursement for that test; however, practices still wanted the immediate results from POC test cups for patient management and evaluation. In addition, various state Medicaid programs also did not reimburse for tests performed using POC test cups. Some physicians in these states wanted free POC test cups in order to be able to clinically assess their Medicaid patients (and bill for the office visit)—even though the expense would have come out of pocket absent "free" POC test cups from Millennium.

157.    Millennium knew that POC test cups (and the tests results they produced) had financial value. For example, Elizabeth Peacock, Millennium's VP of Sales, wrote in March 2010: "Let's really emphasize the $$ value of the instant test cups . . . . This is unique. No other labs offering. Should be very valuable for [the physician] since they have . . . no way to get that instant preliminary read. That would cost them AT LEAST $5 per patient additional if they don't go with [Millennium] for confirmations." Exhibit 41.

158.     Millennium's President, Howard Appel, agreed that free POC test cups should be used by the sales force as a marketing tool. Exhibit 42.

### 3.     Millennium Knew That Providing Free Test Strips Violated the Stark Law and Anti-Kickback Statute

159.     Millennium knew that the test strips in the free POC test cups had value to physicians and that they were not used solely (or at all) to collect, transport, process, or store specimens for Millennium.

160.     Millennium did not use the POC test strips or results in conducting its LC-MS/MS testing or in reporting the results of its LC-MS/MS testing.  As stated by one Regional Vice President: "I could care less what cup they use.  I don't care if they send it to me in a Ziploc bag. I want their urine[.]"

161.     Millennium knew that providing free drug test strips—outside of cups—to physicians violated the Stark law and Anti-Kickback Statute.

162.     On one occasion, Ms. Peacock circulated an internal company memo acknowledging that Millennium could not provide free test strips:  "Millennium can not [sic] provide other CLIA Waived POC devices like single strips at no cost because the strips have no relationship to the specimen collection and federal regulations say that non-collection items can not [sic] be provided without charge."  The same document acknowledges that the POC test cup—due to the test strips—"serves as a test vehicle for the practice."

163.     Despite Millennium's knowledge that providing test strips for free was illegal, it provided millions of free test strips within the POC test cups it distributed to physicians.

164.     Millennium also knew that absent an applicable statutory exception POC test cups had to be sold at "fair market value" to comply with the Stark Law and Anti-Kickback Statute.

42

165.    Millennium's outside health care consulting firm, CodeMap LLC, advised the Company in August 2009 that point-of-care drug testing supplies provided to physicians who referred laboratory testing to Millennium must be *sold* to them at fair market value, stating: "As long as Millennium charges its customers fair market value for [point of care testing] supplies, the practice should not implicate the Anti-Kickback Law." Regarding the Stark Law, CodeMap stated that Millennium's price must meet the "Fair Market Value Compensation exception," which requires that "the compensation must be . . . consistent with fair market value, and not determined in a manner that takes into account the volume or value of referrals or other business generated by the referring physician." Exhibit 43.

166.    Millennium received concerns from customers, prior to the initiation of the Free Cup Agreement program, that it was selling POC test cups for too low a price, in violation of the Stark Law and Anti-Kickback Statute.    Exhibit 44.    Millennium's president, Mr. Appel, responded to these concerns stating that the pricing was legal because "the most important factor to consider" is that price is "consistent with fair market value and is not determined in a manner that takes into account the volume or value of actual or anticipated referrals." *Id.*    But Millennium determined who qualified for free POC test cups based upon actual and anticipated referrals:  the Cup Agreements required referrals to Millennium and the Company's "Approval Guidelines" mandated that customers must have "12 tests + validity" on a Custom Profile to be approved for a Free Cup Agreement.

167.    Millennium received warnings that the provision of free POC test cups violated the Stark Law.  In September 2010, Charles Root, a compliance consultant at CodeMap, wrote an email to Millennium's President advising him that the provision of free POC test cups would violate the Stark Law, in part because they provided value to physicians beyond plain specimen

43

collection cups: "[M]y assumption was that you provided specimen transport cups, not test cups . . . provision of a test cup rather than a simple specimen collection device *gives the physician something of value not associated with specimen collection.*" Exhibit 45 (emphasis added).

168. Despite this advice, Millennium continued to distribute free POC test cups—which contained free test strips—in exchange for referrals under the Free Cup Agreement.

169. Millennium did not disclose to sales representatives or customers CodeMap's advice that free POC test cups have value and that providing them would violate the Stark Law. In late 2010, Millennium stopped using CodeMap as a compliance auditor after Millennium refused to accept and sign the findings of CodeMap's "Annual Compliance Audit."

170. Millennium also received warnings—from customers and employees—that the provision of free POC test cups in exchange for referrals was a "blatant" and "clear" Stark Law and Anti-Kickback Statute violation.

171. In an internal January 2010 email, Millennium's Laboratory Director noted that "providing POCT test kits free as an inducement to use our lab for confirmations would be a clear Stark violation." Exhibit 46.

172. In November 2010, a customer in New England wrote to a Millennium sales representative that "After reviewing the [Free Cup Agreement] . . . I suggest we avoid receiving [POC test] cups unless we plan to pay for them. *It seems like a blatant stark/kickback concern.* The cups are $6 each. I suggest for both parties we stay clear [of] receiving this product for no charge. If we want some cups we should pay for them." Exhibit 47 (emphasis added). The sales representative forwarded this email to Millennium's President, Howard Appel. Mr. Appel responded directly to the customer, but did not mention that Millennium's own consultant, CodeMap, shared the customer's view that the provision of free POC test cups was illegal. The

customer raised a further concern in a response email that the Free Cup Agreement was inaccurate because it contained language that the POC test "supplies are used solely for collecting and transporting specimens for testing" to Millennium, and noted that "is simply not the case" for his practice. The POC test cups were not solely collection and transportation devices for Millennium; they contained drug test strips that were used by physicians as POC testing devices.

173. Millennium also knew that Florida's AHCA had specifically found that the provision of free POC test cups was illegal on July 8, 2008. Florida's AHCA issued a Declaratory Statement and Final Order that the provision of free POC test cups would violate Florida Administrative Code, Rule 59A-7.020, which mirrors the Stark Law, explaining:

> Specifically, Rule 59A-7.020(15), Florida Administrative Code, allows a laboratory to provide specimen cups to physicians free of charge *only* for the collection, transportation, processing and storing of laboratory specimens; transmitting laboratory information to the laboratory; or ordering or communicating laboratory tests or results and other patient information between the physician, surgeon, organization, agency, or person and the laboratory. Further, Rule 59A-7.020(15)(f), Florida Administrative Code, prohibits laboratories from providing free "test kits" to physicians. The Petitioner's proposal to provide physicians free specimen cups that, in addition to serving as collection devices, perform either waived tests or moderately complex tests on-site for the physicians would violate these rules. Consequently, the Agency declares that Petitioner would be subject to licensure sanctions for violating Rule 59A-7.020, Florida Administrative Code, if it were to engage in the free specimen cups arrangement proposed in the Petition.

*In Re: Petition for Declaratory Statement of Dominion Diagnostics, LLC*, FRAES No. 2008008228, July 8, 2008, at 5. AHCA specifically found a deficiency with respect to Millennium's provision of free POC test cups in June 2012 and sent a notice of this deficiency to Millennium. Nonetheless, Millennium continued distributing free POC test cups to physicians under its Free Cup Agreements.

174.   Competitors also raised concerns that the Free Cup Agreements were illegal. For example, on October 4, 2010, a Millennium sales manager, Brandon Worley, emailed Ms. Peacock stating that potential customers "wanted documentation stating that it is legal to provide them with free cups if they don't bill for them. We think one of the other labs is telling them that it is a Stark violation." Two days later, on October 6, 2010, Ms. Peacock wrote Millennium's President, Mr. Appel, and all of Millennium's sales representatives that some "prospective and current customers have received visits from competitors who are scaring them into believing that furnishing test cups at no charge is illegal and a violation of Stark Laws."

175.   A competitor of Millennium's also sued the Company in federal district court in 2011, alleging that the distribution of free POC test cups violated both the Stark Law and the Anti-Kickback Statute. *Ameritox. Ltd. v. Millennium Laboratories*, Case No. 8:11-cv-0775-T-24 (M.D. Fla) (A jury in that case ultimately found that Millennium's provision of the POC test cups violated the Stark Law and Anti-Kickback Statute, and Millennium has appealed).

### 4.   Millennium Knowingly Submitted Claims for Tests Referred in Violation of the Stark Law and Anti-Kickback Statute

176.   Millennium knew that compliance with the Stark Law and Anti-Kickback Statute was a condition of payment by Medicare. Millennium explicitly certified that, as a Medicare supplier, it would comply with all Medicare laws and regulations, including the Stark Law and Anti-Kickback Statute, on Form CMS-855B and CMS-1500 claims forms.

177.   Millennium knowingly compensated physicians with millions of dollars in free POC test cups in exchange for referrals, in violation of the Stark Law and Anti-Kickback Statute. Millennium paid the kickbacks expressly to obtain referrals, to increase the number of tests referred, and to prevent customers from affiliating with competitors. In doing so, Millennium

46

ignored numerous, specific warnings from its employees, consultants, customers, competitors and even a government agency. Millennium submitted tens of millions of dollars of claims to Medicare for services it performed resulting from these referrals, and knew these claims were false because they were submitted in violation of the Stark Law and Anti-Kickback Statute.

178.    Millennium, through its executives and employees, knowingly submitted claims to Medicare for UDT that was referred in violation of the Stark Law and Anti-Kickback Statute.

### C.    Millennium Fostered a Culture of Non-Compliance and Greed

179.    Millennium fostered a culture of greed and intimidation in its sales force. Sales representative compensation was tied directly to the number of specimens sent in for testing—and obtaining Custom Profiles that met internal testing thresholds. Sales representatives were compensated handsomely when they successfully obtained increased testing and subjected to relentless pressure when they did not.

180.    The message of sales as a means to riches came from the top of the Company. For example, at its 2012 National Sales Meeting, Millennium's CEO, Mr. James Slattery, gave a presentation to approximately 250 sales representatives where $2,000,000 worth of gold coins were brought out and placed on stage. Some of those in attendance interpreted these gold coins as a message that sales representatives should aspire to more wealth; *see* Exhibit 48, others interpreted it as a threat that Millennium was willing to use its resources against perceived threats.

181.    Millennium's General Counsel gave a presentation, nominally on "compliance" entitled "Taking Over." During the presentation, Millennium's General Counsel showed an animated slide of a former employee whom Millennium had sued. The former employee's face

was shown on a target range being shot repeatedly, and another slide depicted Millennium's

competitors and the former employee in body bags:






182.     Speaker notes emphasized the implied threat to employees who did not toe the

Company line:

> Don't be a weasel. . . . I don't want to be on the other side of litigation from any
> of you.  I hope you don't want to be on the other side of litigation with
> Millennium.  There is no amount of time or resources we won't spend to hold our
> employees accountable. . . . [W]e will protect this company . . . .

183.     Millennium also made it clear it did not want any documentation of potential

violations of law.  In a letter to the sales team dated November 28, 2011, Millennium's President

described a violation of Millennium's "e-mail communication policies" where "a sales rep wrote an email to a client of a competitor and listed 25 separate reasons why the account should switch to Millennium, including 'free cups.'" His first proposed rule in response to this and other compliance violations identified in writing was to say "DO NOT WRITE ANY EMAILS LONGER THAN TWO SENTENCES." Exhibit 49.

184. Notes from a "Managers Meeting" in August 2011 state: "Company policy is to delete text messages 10 days or older." Exhibit 50. Similarly, notes from an October 2011 regional team meeting state: "Every two weeks delete your text messages. As we have litigation with our competitors they will want to see your phone." Exhibit 51.

185. In another instance of email deletion, Ms. Peacock, Millennium's VP of Sales, instructed sales representatives to delete all emails from a chain entitled, "4600 today," in which a Regional Vice President challenged members of the sales force to increase drug testing on Fridays and Mondays, and in which other members of Millennium's management offered cash incentives for increased testing.

186. Millennium's sales representatives responded to the Regional Vice President's "4600" email, with encouragement from management, in a manner showing a disregard for professionalism and an emphasis on sales and greed that permeated the Company's culture. For example: "GET. THAT. PEE!!"; "The Friday pee badgers [']we take what we want![']"; "Pick up the liquid GOLD before liquid goldschlager on Fridays!"; "GOLD RUSH FRIDAYS"; "Merry Pissmas!!!"; "Pick up the PISS"; "TGIP/Gold Rush Fridays"; "I LOVE everyone's emails. The common theme is the personal commitment to domination."

187. Many additional emails demonstrate an emphasis on sales without regard for medical necessity or compliance: "[G]et these doctors addicted to Millennium so [] they're

49

PISSED that they're 'not allowed' to send to us"; "We want MORE piss"; "Keep pushing the PISS"; "The purpose of every call is to get more PISS to the house"; "Trying to make it rain liquid gold baby!"

188.    The emphasis on sales came from the top. Millennium's VP of Sales wrote an email to all Millennium sales representatives in November 2011 that stated: **"let's not forget our primary mission - to sell, sell, sell."** Exhibit 52 (emphasis in original).

189.    A Regional Sales Manager described the pressure: "they basically wanted the reps to wake up in the morning fearing their jobs. Not feeling good about themselves, thinking they were going to get fired."

190.    Millennium further promoted its services to physicians with an emphasis on ways that the physicians could make money—from speaking fees, free POC test cups, reimbursements on POC test cup and analyzer test results (with Millennium assistance)—that further placed money over medical necessity.

191.    For example, a Regional Vice President took credit for making Dr. Robert Windsor, Millennium's largest referrer, money in a November 2010 email: "You along with many other physicians made hundreds of thousands of dollars if not more from OUR risk."

192.    Millennium emphasized profits above compliance and intimidated sales representatives to engage in marketing tactics designed to generate UDT orders that were not patient-specific and not reasonable and necessary for patient diagnosis or treatment. This caused Millennium's submission of claims to Medicare for services it performed resulting from these orders that were not reasonable, necessary, or patient-specific.

**D.** **Examples of Physician Practices that Referred Millions of Dollars in False and Fraudulent Testing to Millennium for Medicare and Florida Medicaid Patients**

    **1.** **National Pain Care – Dr. Robert E. Windsor**

193.    Millennium's top-referring physician provider was Dr. Robert E. Windsor, who owns pain management clinics in Georgia, Kentucky, Florida, and Ohio, all operating under the corporate umbrella of National Pain Care, Inc. ("NPC"). Medicare has paid Millennium approximately $35 million in UDT ordered by NPC clinicians. Millennium identified Dr. Windsor, who personally saw patients only infrequently, as the "referring provider" for UDT that has generated nearly $18,000,000 in Medicare payments to Millennium. A large portion of these payments to Millennium were for prohibited claims and unnecessary tests.

194.    Dr. Windsor used Millennium as a test laboratory for his Georgia practice beginning in mid-2010. In August 2010, he indicated he wanted to use Millennium for his clinics in Kentucky. Elizabeth Peacock wrote to Jarrett Smith, at the time a Millennium Regional Manager, "OK, let's . . . maximize the confirmations from these accounts." Mr. Smith replied, "They have already committed to sending everything in. We will make sure they blow it out." Exhibit 53. By this, Mr. Smith meant that Dr. Windsor had told him that Dr. Windsor's practices would be ordering confirmations for all his patients for all drugs tested at the POC, plus some that were not.

195.    Beginning in May and June 2011, Dr. Windsor began using Millennium for most of his clinics, including the ones in Kentucky and his newly purchased clinic in Dayton, Ohio. Dr. Windsor authorized Custom Profiles that were substantively the same across all his clinics. *See, e.g.,* Exhibit 54.

FILED: NEW YORK COUNTY CLERK 08/01/2017 12:21 AM    INDEX NO. 655124/2017
NYSCEF DOC. NO. 5    Case 1:12-cv-10132-NMG    Document 85    Filed 03/19/15    Page 52 of 74    RECEIVED NYSCEF: 08/01/2017

Page 117 of 149

196.    Beginning in approximately May 2011, Millennium provided Dr. Windsor with "Laboratory Service Assistants" ("LSAs")—Millennium employees who were hired to process urine specimens for shipment to Millennium—at no charge to the physician. These LSAs were aware of NPC's UDT protocols, and several of them did work for NPC beyond their permitted tasks—for example, operating NPC's POC analyzer machines.    Millennium also gave Dr. Windsor free POC test cups to use at his Georgia clinics.

197.    Dr. Windsor established uniform UDT practices throughout his pain management clinics.    For example, a patient prescribed narcotics for pain relief was given a thirty-day prescription, and, to receive a refill, the patient was required to return to the clinic for a follow-up visit and undergo UDT.    Thus, virtually all NPC patients prescribed narcotics (as most were) had their urine tested every thirty days.    When the patient produced a specimen, NPC performed a POC test (either with a POC test cup or a chemical analyzer), so that the clinician could have immediate preliminary drug test results to help decide whether to initiate or renew a prescription. Whether NPC sent a specimen to Millennium for further testing typically depended on the patient's insurance: if an insurer would not pay, NPC discarded the specimen; otherwise NPC automatically sent the specimen to Millennium for quantitative testing.

198.    Until at least March 2014, virtually all specimens NPC sent to Millennium from any given NPC clinic were subject to essentially the same quantitative UDT panel, regardless of the patient's presentation, demographic profile, medical history, or history of drug or alcohol abuse.    In approximately March 2014, after learning he was a subject of government investigation, Dr. Windsor purported to modify his UDT policy to require an assessment of a patient's risk of abusing drugs.

199.    Most NPC clinicians treating patients had little or no input into the UDT performed on their patients.  Indeed, until approximately December 2012, the NPC clinicians did not fill out Millennium requisition forms; rather, Millennium employees—the LSAs hired by Millennium to process the specimens—carried out this task.  The LSAs were instructed by their supervisors at Millennium to fill out the requisition forms and always check the "Use Custom Profile" box, contained in Section A on the form.

200.    After Millennium told its LSAs in late 2012 that a NPC employee should be the one to check the "Use Custom Profile" box of the requisition forms, NPC medical assistants took over this specific task.  The process varied, but one NPC medical assistant, for example, gathered 200 or so requisition forms at a time, and filled out certain information on all of the forms in advance, including checking off "Use Custom Profile."  Later, when an individual patient delivered a urine specimen, the medical assistant would add the patient's name and other patient-specific information to the Requisition form.

201.    Millennium sales employees knew about Dr. Windsor's UDT protocols.  For example, Millennium sales representatives Joey Bilyeu and Megan Mason knew that the Georgia Pain Physician clinics (owned by NPC) always checked the box for "Use Custom Profile" on the Millennium requisition form.  The Millennium Regional Director for the Mid-South Region, Jarrett Smith, believed all of the Dr. Windsor/NPC Custom Profiles—for the Georgia, Kentucky, and Ohio practices—were the same, and he understood that the clinics used the Custom Profile as the basis for quantitative UDT virtually all of the time.

202.    Millennium also knew that Dr. Windsor's clinics were ordering tests for drugs that were virtually never encountered in their patient populations.  For example, through about mid-2013, Dr. Windsor's Custom Profiles called for Millennium to conduct quantitative testing

for PCP, MDMA, and heroin. Yet a "Practice Profile" prepared by Millennium for Dr. Windsor, which summarized tests on 10,499 specimens from Dr. Windsor's Kentucky Pain Physicians clinic in Pikeville, Kentucky from January 1, 2013 to August 1, 2013, showed that not a single patient had tested positive for these drugs, and that Millennium's own average positive rate for these drugs (from a sample of approximately 80,000 specimens submitted by other physicians) was 0.3%, 0.0%, and 1.2%, respectively.

203. By way of example, a patient at Dr. Windsor's Georgia Pain Physicians clinic in Calhoun, Georgia, referred to herein as "Patient FA," was a Medicare patient who was seventy-eight years old at the time of his first visit to the clinic in 2011 for treatment for chronic pain. He had no history of alcohol or drug abuse. Yet, every month, NPC tested his urine with an immunoassay point-of-care screen, and then sent the urine sample to Millennium for a battery of quantitative UDT under a Custom Profile that called for testing for methadone, amphetamine, cocaine, marijuana/THC, MDMA, PCP, and specimen validity testing (creatinine, oxidant, pH, and specific gravity).

204. On October 11, 2011, Patient FA was seen at the Calhoun clinic by Dr. Adithya Reddy for a routine follow-up visit. Consistent with his past history, the POC drug test that NPC performed that day yielded negative results for amphetamine, barbiturates, benzodiazepines, cocaine, methadone, methamphetamine, PCP, TCAs, and marijuana. NPC then sent his specimen to Millennium with a Requisition form that had the boxes, "Use Custom Profile," and "Perform Specimen Validity Testing," checked off. Exhibit 55. Dr. Windsor's name was on the Requisition form as the requesting physician, even though he did not see Patient FA on that date. In accordance with the operative Custom Profile, Millennium conducted quantitative testing for Patient FA's prescribed medication, plus oxycodone, noroxycodone, oxymorphone, methadone,

EDDP (methadone metabolite), alpha-hydroxyprazolam, 7-amino-clonazepam, lorazepam, temazepam, oxazepam, amphetamine, methamphetamine, cocaine metabolite, cTHC (marijuana metabolite), MDMA, and PCP. Exhibit 56. Like all the earlier Millennium test results for this patient, the test results and specimen validity testing were consistent with the patient's prescribed medication and revealed no suggestion of abuse. Millennium submitted two claims to Medicare for this testing and was paid more than $217. Exhibit 57.

205. Many of the Millennium tests, including but not limited to the tests for methadone, EDDP (methadone metabolite), benzodiazepines (alpha-hydroxyalprazolam, 7-amino-clonazepam, lorazepam, nordiazepam, oxazepam), cocaine metabolite, amphetamines, methamphetamines, THC, MDMA, and PCP, were not reasonable and necessary and the clinicians treating the patient did not assess the medical need, if any, for these tests. Millennium's claims to Medicare were false claims. See Exhibit 57.

206. On or about April 24, 2012, Dr. Windsor updated his Custom Profiles, including for the Georgia Pain Physicians clinics, by adding approximately thirteen more drugs to the list of drugs for which to test. Exhibit 58. Patient FA was seen again at the NPC Calhoun Clinic for a routine follow-up visit, this time by Dr. Olalekan Ajibowo, on May 15, 2012. Although Patient FA's medical history still indicated no risk factors for drug abuse, and no reason to increase the amount of quantitative UDT, a Millennium LSA filled out the Requisition form with "Use Custom Profile" checked off (just as all the other Requisitions were filled out). This time, Millennium conducted testing on the sample for the drugs referenced in paragraph 205 above (with the exception of amphetamine, methamphetamine, and MDMA), plus propoxyphene, norporpoxyphene, tapentadol, meperidine, normeperidine, methylphedidate, ritalinic acid, ketamine, norketamine, crisoprodol, meprobamate, pehobarbital, secobarbital, butalbital,

amitriptyline, nortriptyline, imipramine, desipramine, cyclobenzaprine, ethyl glucuronide, ethyl sulfate, JWH-018(n-valeric acid)), JWH-073(N-(n-butyric acid), JWH-018(N-(n-petanol)), JWH-073(N-(n-butanol)), MDPV, methylone, mephedrone, and 6-MAM (heroin metabolite). Exhibit 59. None of the Millennium tests for these additional substances was reasonable and necessary and the clinicians who treated the patient did not assess the medical need for these tests, if any.

207.    Millennium submitted claims to Medicare for this testing and was paid $678.65 for it. Exhibit 60. Millennium knew these claims for tests that were not reasonable and necessary, and not ordered by the physician treating the patient, were false. Millennium also knew that these practices occurred across NPC.

### 2.    Tampa Pain Relief Center

208.    Tampa Pain Relief Center ("Tampa Pain") is a pain management practice in Florida with clinics in Brandon, Tampa, Oldsmar, and Miami, Florida. Tampa Pain is owned by Surgery Partners, which owns a large number of medical facilities throughout the United States. Tampa Pain employs a number of physicians who work at its clinics.

209.    Tampa Pain began using Millennium in 2008, and ceased using Millennium in early 2012. From 2008 through 2012, referrals from Tampa Pain to Millennium resulted in almost $5,000,000 in Medicare payments to Millennium.

210.    Like NPC, Tampa Pain used common testing protocols for all patients who were prescribed narcotics, without regard to the individual circumstances of the patient. In 2008, Tampa Pain's "Standing Order" included confirmation of all POC test results (both positive and negative results), and also quantitative testing for methadone, fentanyl, and alcohol (ETOH).

211.    In early 2011, Tampa Pain physicians began using Custom Profiles that covered multiple physicians and multiple locations. Exhibit 61. For patients who were prescribed

narcotics, Tampa Pain physicians almost always used the Custom Profile to order testing from Millennium, without an assessment of each patient's history, demographic information, or risk of abuse.

212.    Millennium sales personnel knew that all Tampa Pain patients were receiving essentially the same extensive UDT, regardless of the individual patient's need, condition or history. *See* Exhibit 62. As one Millennium employee wrote to another in July 2011 (and as forwarded to others): "The selection in box A [of the requisition/order form] should be to use the custom profile. Any specimen coming from a Tampa pain location should all be marked to use the custom profile." Exhibit 63.

213.    An example of false claims submitted by Millennium to Medicare from this conduct is the drug testing for Patient RR, a middle-aged male with a history of chronic pain who was also being treated elsewhere for depression. Patient RR's medical records show no discernible history of drug or alcohol abuse, and, throughout his treatment at Tampa Pain, he did not exhibit abberant behavior or present other indications that he was at a high risk for drug diversion or abuse. Yet, from April 12, 2011 through March 27, 2012, Tampa Pain referred eleven urine specimens of Patient RR to Millennium for testing, and each time the only instruction Tampa Pain gave to Millennium was to "Use Custom Profile."

214.    On November 28, 2011, Patient RR was seen at the Tampa Pain clinic on North Habana Avenue, Tampa, Florida, for a routine follow-up visit and prescription refill. A urine drug screen was performed at the clinic, and the specimen tested positive for classes of drugs that the patient had been prescribed (methadone, opiates/morphone, and oxycodone), and negative for everything else (amphetamines, barbiturates, benzodiazepines, marijuana/THC, cocaine, alcohol, ecstacy, and PCP). Nonetheless, Tampa Pain sent the specimen to Millennium with an unsigned

Requisition form stating, "Use Custom Profile," and Millennium performed, and billed Medicare for, quantitative UDT for substances including benzodiazepines, cocaine, heroin, amphetamines, MDMA, methamphetamine, PCP, and marijuana/THC. Exhibit 64. The Millennium test results were consistent with the urine drug screen testing done by Tampa Pain and consistent with the patient's medical condition and history. Millennium billed Medicare $266.90 for these tests and Medicare paid Millennium that amount. *Id.* Millennium's claims to Medicare for these tests were not reasonable and necessary. Millennium's claims to Medicare for these tests were false claims..

215. Tampa Pain was a high profile account within Millennium. In proposed feedback to a sales representative, one manager wrote: "If you do not have an objective to get more pee to the lab and at every visit to bring value, the visit is useless. . . . Tampa Pain has a massive presence wtihin Millennium as a whole . . . ." Exhibit 65.

216. Millennium also provided free POC test cups to Tampa Pain. From April 2011 through June 2012, Millennium gave approximately 5,275 free POC test cups to Tampa Pain for use at its Habana, Fletcher, Oldsmar, and Brandon locations.

217. Millennium sales personnel also gave gifts to Tampa Pain employees, including watches, jewelry, gift cards, and electronics. These gifts were in violation of Millennium's own compliance policies.

### 3. Coastal Spine and Pain

218. Coastal Spine and Pain Center ("CSP") is a pain management practice with several locations in Florida, including in Jacksonville, Orange Park, Fernandina Beach, Hilliard and Middleburg. CSP has several physicians who work at its clinics, and who also own a share of the practice.

219.   CSP physicians began using Millennium for UDT in June 2009. CSP physicians ordered testing from Millennium pursuant to Custom Profiles.

220.   From August 2010 through May 2014, Millennium provided CSP with more than 67,000 free POC test cups—a value of more than $325,000. Millennium and CSP knew the value of the cups Millennium provided to CSP.

221.   In an August 12, 2010, email, the Practice Administrator of CSP, who was partly responsible for laboratory selection for CSP, told Millennium's President that a Free Cup Agreement "is vital to our practice." Exhibit 66. In her plea for free cups, she explained that CSP physicians "are constant advocates in our area for Millennium Laboratories" and that "Every urine [sample] collected in my facilities is . . . sent for confirmation to Millennium. *Id.* Millennium agreed to provide the free POC test cups, and Millennium's President responded to a thank you note from CSP by stating "You are very welcome[.]" *Id.*

222.   Millennium paid the Practice Administrator and CSP physicians who referred UDT to Millennium, tens of thousands of dollars for speaking engagements and consulting services. For example, CSP's Practice Administrator—a non-physician—had an agreement with Millennium for consulting services that paid her a $24,000 annual retainer.

223.   CSP physicians almost always used Custom Profiles as standing orders for UDT for patients who were prescribed narcotics. A CSP physician testified, "we decided on what we were going to screen for . . . and put that in the [custom] profile to send to Millennium."

224.   The determination of what tests Millennium performed on a particular patient's specimen was not based on the patient's history, demographic information, or risk of abuse, but rather the Custom Profile in effect at that time.

225. From 2009 through 2014, while CSP had prohibited financial relationships with Millennium under the Stark Law and the Anti-Kickback Statute as a result of its receipt of hundreds of thousands of dollars' worth of supplies in the form of POC test cups, CSP physicians referred more than $10,000,000 in UDT to Millennium for Medicare patients, the majority of which CSP referred pursuant to Custom Profiles, without assessments of individual patient needs.

226. For example, CSP ordered and Millennium performed, billed and Medicare paid for, testing that was not reasonable and necessary for Patient LE, a 70 year-old male with a history of chronic back pain. This patient had no discernible history of drug diversion, illicit drug or alcohol abuse, and throughout his treatment at CSP, he never exhibited aberrant behavior nor did he give any other indication that he presented a high risk for drug diversion or abuse. Patient LE was first seen at CSP in May 2011. From this point on UDTs were ordered for Patient LE at every visit (except for one in September 2011). Patient LE was seen on a monthly basis for the first five months he was a patient at CSP and then was stable enough to have follow-up visits every three months from October 2011 onward. From May 23, 2011 through January 17, 2014, CSP referred fourteen of LE's urine specimens to Millennium for testing, and each time Millennium performed testing pursuant to a CSP Custom Profile. Throughout this time period, Patient LE's urine test results were consistent with his medical and prescription histories.

227. By way of example, on January 23, 2012, Patient LE was seen at the CSP Fernadina Beach facility, for a routine follow-up visit and prescription refill. At the time he was taking tramadol and hydrocodone for pain management. CSP performed a urine drug screen at the clinic, and LE's specimen tested positive for opiates—as would be expected given his

60

prescriptions—and negative for cocaine, amphetamines, methamphetamine, phencyclidine, MDMA (ecstacy), barbiturates, benzodiazepines, methadone, tricyclic antidepressants (TCA), and oxycodone. Exhibit 67. CSP sent the specimen to Millennium with a Requisition form indicating, "Use Custom Profile," and Millennium proceeded to conduct LC-MS/MS testing for codeine, morphine, hydrocodone, norhydrocodone, hydromorphone, oxycodone, noroxycodone, oxymorphone, buprenorphine, norbuprenorphine, fentanyl, norfentanyl, methadone, EDDP (methadone metabolie), alpha-hydroxylprazolam (xanax), 7-amino-clonazepam (klonopin), lorazepam (ativan), nordiazepam (valium), temazepam, oxazepam, amphetamine, carisoprodol, meprobamate, phenobarbital, secobarbital, butalbital, methamphetamine, cocaine metabolite, and MDMA, as well as four specimen validity tests. Exhibit 68. The Millennium test results were appropriately positive for hydrocodone (which Patient LE was prescribed) and its metabolite norhydrocodone, and negative for everything else.

228. Millennium billed Medicare $387.23 for its tests, and Medicare paid Millennium $354.79, after denying two units of UDT totaling $32.44. Millennium's claims to Medicare for its testing, including but not limited to the tests it performed for codeine, morphine, oxycodone, noroxycodone, oxymorphone, buprenorphine, norbuprenorphine, fentanyl, norfentanyl, methadone, EDDP (methadone metabolite), alpha-hydroxyalprazolam, 7-amino-clonazepam, lorazepam, nordiazepam, temazepam, oxazepam, amphetamine, carisoprodol, meprobamate, phenobarbital, secobarbital, butalbital, methamphetamine, cocaine metabolite, and MDMA, were not reasonable and necessary. Millennium's claims to Medicare for these tests were false claims.

### 4. Frank Li

229. Dr. Frank Li is a physician in Washington state who owns Seattle Pain Center.

230.    In 2012, Dr. Li ordered more than $2,100,000 in UDT to Millennium for Medicare beneficiaries at an average cost of more than $500 per beneficiary sample.   In 2013, Dr. Li ordered another $1,500,000 in UDT to Millennium from Medicare.  Dr. Li stopped using Millennium in 2013.

231.    Dr. Li ordered his UDT from Millennium under Custom Profiles that were almost always applied to urine samples from his practice.

232.    Millennium-employed LSAs, stationed at Dr. Li's offices, often filled out Dr. Li's test orders, using these blanket testing protocols.  For example, an internal Millennium email from February 2012 noted, "we already have LSA's filling out the requisition forms."  Exhibit 69.

233.    Dr. Li agreed to the Custom Profiles in part because Millennium told him it cost Millennium the same amount to do the testing regardless of how many tests he ordered:  "They said that it costs them the same amount to do the testing so why not do all of them?"

234.    Dr. Li's UDT orders were inconsistent with the recommendations of the Washington State Guidelines.

235.    Dr. Li's Custom Profile increased drastically in 2011 in response to sales pressure from Millennium.

236.    Millennium's VP for Sales, Ms. Peacock, wrote to the Company's regional sales manager regarding Dr. Li, threatening to terminate the account: "Are you and Monet [the Millennium sales representative assigned to Dr. Li's account] able to sucessfully discuss our empirical data on the negatives and obtain additional medically necessary tests?  Need to strive for 5 more to make this business viable."  Exhibit 70.  Although Ms. Peacock used the phrase

"medically necessary" in her email, she had no clinical basis to know that any of Dr. Li's patients actually needed more tests.

237.    Dr. Li increased his testing to Millennium in exchange for resources. For example, Millennium offered to provide an electronic medical record (EMR) interface if he would increase his UDT orders. In April 2011, a Millennium sales manager wrote: "If necessary, I think Dr Li would be amenable to confirming all positives & all negatives on the POC cup in order to have the results on his EMR [Electronic Medical Record]. Then we can run all tests on all specimens regardless of the cup results." Exhibit 71.

238.    Millennium sales representatives strongly promoted the confirmation of expected negative POC test results to Dr. Li, as stated in a May 2011 email: "we are making a strong case to confirm negatives on Cocaine, Opiates, Meth."

239.    Shortly after that email exchange, in June 2011, Dr. Li filled out a new Custom Profile that called for automatic confirmation testing of all POC test results for certain drugs, including cocaine, opiates, and amphetamines.

240.    In January 2012, Dr. Li filled out another Custom Profile for his practice with an even higher level of testing—including confirmation of all POC test drug results, including PCP and TCAs—regardless of POC test results or patient condition. Exhibit 72. This testing protocol also called for a number of other drug tests not on the POC test cup to be performed on all patients, regardless of medical condition and patient presentation or history.

241.    Dr. Li also received money as a paid speaker for Millennium; but, only while he was referring UDT to Millennium.

242.    Millennium executives, LSAs, and sales personnel knew that Dr. Li routinely ordered testing based on Custom Profiles regardless of patient need and without an individual

assessment of the need for each test for each patient—and that Millennium submitted claims to Medicare for this testing, in violation of Medicare claims submission rules (by submitting claims for services that were not covered) and the FCA.

### 5.    Massachusetts Sober-Home Related Testing

243.    Millennium had a strategy in Massachusetts of targeting sober homes for business.   From approximately 2011 through 2013, Millennium billed Medicare more than $1,400,000 for UDT for residents of sober homes in Massachusetts, many of whom received a set of twenty or more drug tests, multiple times per week, without any documentation or justification as to what tests were actually needed.

244.    Sober homes are alcohol- and drug-free living environments for persons seeking to overcome substance addiction or abuse problems.   Residents of sober homes in Massachusetts for whom Millennium submitted claims to Medicare were required by the sober homes to undergo routine quantitative UDT as a condition of residency.  The UDT Millennium performed on sober home residents in Massachusetts was not for the purposes of medical diagnosis or treatment and thus did not qualify for reimbursement by Medicare.

245.    Millennium, through sales representative Mark Cullinan, recruited Massachusetts physicians, including Dr. Jeanne Mase, to act as "medical directors" for sober homes or ordering physicians for UDT of sober home residents.

246.    Millennium performed all UDT for Massachusetts sober home residents (whether under Dr. Mase's NPI or another physician's) pursuant to test Requisition forms that had the box "Use Custom Profile" checked off.

247.    The Custom Profiles put into place at these sober homes often called for quantitative testing for more than twenty separate separate tests.  *See, e.g.*, Exhibit 73.  Residents

64

were tested under these Custom Profiles multiple times per week, regardless of the individual resident's treatment status.

248.    The Requisition forms were not filled out by Dr. Mase or her medical staff, but rather by non-medical staff at the sober homes, or by employees of "specimen collection" companies, which Millennium paid per sample.

249.    Dr. Mase rarely saw the patients at the sober homes, did not provide medical treatment for the sober home residents, and did not regularly review the results of the UDT Millennium performed and billed to Medicare.

250.    Millennium engaged two separate courier/"specimen collection" companies to oversee the UDT process for sober home residents. Millennium paid New England Express LLC ("NEE"), owned by Nicholas Chuckran, $31 per specimen to fill out the resident's demographic information, mark "Use Custom Profile" on the resident's Requisition form, and drop the sample off with UPS for shipping to Millennium's laboratory in San Diego, California.

251.    Millennium sales representative Marc Cullinan made clear to Chuckran that NEE's specimen collectors were to check off "Use Custom Profile" on the Requisition forms and that Millennium would not pay for any sample that was accompanied by a Requisition form that did not have "Use Custom Profile" checked off.

252.    Similar to NEE, Millennium also paid another courier company, Cape Test LLC ("Cape Test"), $32 per specimen to fill out sober home residents' demographic information and mark "Use Custom Profile" on their Requisition forms.

253.    In early 2013, after Dr. Mase was audited by private insurer Harvard Pilgrim Healthcare ("Harvard Pilgrim") for UDT billed by Millennium to Harvard Pilgrim, Dr. Mase

informed Cullinan that she would no longer be associated with Millennium for UDT for sober home residents.

254.    Medicare paid approximately $1,200,000 to Millennium for UDT of sober home residents, ordered under Dr. Mase's NPI, that was not reasonable or necessary.

255.    For example, in January 2013, Millennium submitted to Medicare claims for reimbursement for UDT services ordered under Dr. Mase's NPI for a Medicare beneficiary on January 2, 4, 7, 9, 11, 14, 16, 18, 21, 23, 25, 28, and 30. For those thirteen separate dates of service in January 2013, Medicare paid approximately $12,619.88 to Millennium for tests that were not reasonable and necessary for the diagnosis or treatment of that patient's illness or injury, if any.

256.    Upon learning that Dr. Mase would no longer allow her NPI to be associated with UDT for sober home residents, Cullinan informed NEE that all sober home testing should cease until a new "medical director" for sober home UDT could be located. Thereafter, Millennium attempted to work with two new physicians—Dr. Bahige Asaker (through NEE) and Dr. Joseph Sullivan—to continue Millennium's Massachusetts sober home scheme.

257.    Dr. Asaker did not knowingly order UDT from Millennium for sober home residents, yet Millennium submitted tens of thousands of dollars in claims to Medicare for UDT purportedly ordered under his NPI that were not reasonable and necessary for the diangosis or treatment of patients. These tests were not properly ordered by a physician treating the beneficiary, as required by Medicare.

258.    By way of example, in July 2013, Millennium submitted to Medicare claims for reimbursement for UDT services ordered under Dr. Asaker's NPI for a specific Medicare beneficiary on July 1, 3, 5, 8, 10, 12, 15, 17, and 19. For those nine dates of service in July 2013,

Medicare paid approximately $5,744.25 to Millennium for that one Medicare beneficiary. These tests were not reasonable and necessary for the treatment or diagnosis of that patient's illness or injury, if any.

259.    Dr. Sullivan only ordered a very small amount of UDT from Millennium, yet Millennium submitted approximately $40,000 in claims to Medicare for drug tests allegedly ordered under his NPI that were not reasonable and necessary for the diagnosis or treatment of patients. The majority of these tests were not properly ordered by a physician treating the beneficiary, as required by Medicare.

260.    By way of example, in July 2013, Millennium also submitted to Medicare claims for reimbursement for UDT services ordered under Dr. Sullivan's NPI for a specific Medicare beneficiary on July 1, 5, 8, 10, 12, 15, 19, 22, 24, 26, and 29. For those eleven dates of service in July 2013, Medicare paid approximately $7,501.23 to Millennium for that one Medicare beneficiary. These tests were not reasonable and necessary for the treatment or diagnosis of that patient's illness or injury, if any.

## VI.    THE UNITED STATES WAS HARMED BY MILLENNIUM'S CONDUCT

261.    As a result of Defendant's conduct, the Medicare program paid Millennium many millions of dollars for many thousands of false and/or fraudulent claims for non-covered drug tests.

262.    Medicare was directly affected by Millennium's fraudulent schemes. For example, in a 2011 presentation to potential lenders, Millennium represented that 23.7% of its specimens came from Medicare patients, but that Medicare represented 40.0% of revenue— likely because Millennium took advantage of Medicare's practice of promptly paying claims on the assumption that the supplier has complied with its legal obligations.

Case 1:12-cv-10132-NMG   Document 85   Filed 03/19/15   Page 68 of 74

263.     Medicare was particularly susceptible to Millennium's fraudulent schemes because it does not require a patient co-payment on laboratory services. Because Medicare patients were not required to pay out-of-pocket for Millennium's services, they had no reason to inquire into the charges to Medicare associated with Millennium's UDT. In addition, many Medicare beneficiaries are over sixty-five years old, and seniors are generally at lower risk of illicit drug use.

264.     Exhibit 74 to the Complaint is a list of physicians and physician practices who made drug test referrals to Millennium in violation of the Stark Law and/or the Anti-Kickback Statute and the dates during which each such physician had an improper financial relationship with Millennium with respect to the free testing supplies. Exhibit 74.

265.     The United States' damages arising from the Millennium's submission of claims to Medicare and Florida Medicaid referred by these physicians in violation of Stark Law and Anti-Kickback Statute exceeds $90,000,000.

266.     The United States' damages arising from Millennium's submission of claims to Medicare and Florida Medicaid for UDT that was not reasonable and necessary for the diagnosis or treatment of patients, and for which the need was not assessed or documented for individual patients, including the claims referenced in Section V.E above, likely exceeds $100,000,000.

## FIRST CAUSE OF ACTION
### (False Claims Act: Presentation of False Claims)
### (31 U.S.C. § 3729(a)(1) and (a)(1)(A))

267.     Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

268.     Defendant knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States and Florida Medicaid, including those

claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients.

269. Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

### SECOND CAUSE OF ACTION
**(False Claims Act: False Statements Material to False Claims)**
**(31 U.S.C. § 3729(a)(1)(B))**

270. Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

271. Defendant knowingly made, used, and caused to be made or used, false records or statements — i.e., false statements regarding compliance and coverage for its services and false statements on forms CMS-855B, 837P and CMS-1500—to get false or fraudulent claims paid and approved by the United States.

272. Defendant's false certifications and representations were made for the purpose of inducing physicians to order its services and getting false or fraudulent claims paid, and payment of the false or fraudulent claims was a reasonable and foreseeable consequence of the Defendant's statements and actions.

273. The false certifications and representations made and caused to be made by Defendant were material to the United States' and Florida Medicaid's payment of the false claims.

274. Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## THIRD CAUSE OF ACTION
### (Payment by Mistake)

275.    Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

276.    This is a claim for the recovery of monies paid by the United States to Millennium as a result of mistaken understandings of fact.

277.    The United States paid Millennium for services that were not reasonable and necessary for the diagnosis or treatment of individual patients as required under Medicare coverage rules, and that were furnished pursuant to prohibited referrals from physicians who were in financial relationships that did not comply with the Stark Law and/or the Anti-Kickback Statute, without knowledge of material facts and under the mistaken belief that Millennium was entitled to receive payment for such claims when it was not.  The United States' mistaken belief was material to its decision to pay Millennium for such claims.  Accordingly, Millennium is liable to make restitution to the United States of the amounts of the payments made in error to it by the United States.

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

278.    Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

279.    This is a claim for the recovery of monies by which Defendant has been unjustly enriched.

280.    By directly or indirectly obtaining government funds to which it was not entitled, Defendant was unjustly enriched, and is liable to account for and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Defendant as follows:

I.       On the First and Second Counts under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper.

II.      On the Third and Fourth Counts for payment by mistake and unjust enrichment, for the damages sustained and/or amounts by which Defendant was unjustly enriched or was paid by mistake, or by which Defendant retained illegally obtained monies, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.

Respectfully submitted,

BENJAMIN C. MIZER
Acting Assistant Attorney General

CARMEN M. ORTIZ
United States Attorney

By: ABRAHAM R. GEORGE
GEORGE B. HENDERSON, II
Assistant U.S. Attorneys
John J. Moakley U.S. Courthouse
Suite 9200
1 Courthouse Way
Boston, MA 02210
(617) 748-3152
(617) 748-3272
Dated: March 19, 2015           *abraham.george@usdoj.gov*
                                *george.henderson2@usdoj.gov*

MICHAEL D. GRANSTON
ALAN KLEINBURD
DOUGLAS J. ROSENTHAL
AUGUSTINE M. RIPA
US Department of Justice
Civil Litigation Branch
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
(202) 305-2073
(202) 305-4033

72

## CERTIFICATE OF SERVICE

I hereby certify that on this date a true and correct copy of the foregoing document was served via electronic mail (by agreement) on:

J. Marc Vezina
Monica P. Navarro
Michelle D. Bayer
280 N. Old Woodward Ave., Suite LL20
Birmingham, MI 48009
jmv@vezinalaw.com
mnavarro@vezinalaw.com

Joel M. Androphy
Sarah M. Frazier
Noelle C. Letteri
Berg & Androphy
3704 Travis Street
Houston, TX 77002
JAndrophy@bafirm.com
SFrazier@bafirm.com
AGargour@bafirm.com

Thomas M. Greene
Michael Tabb
Greene LLP
One Liberty Square, Suite 1200
Boston MA 02109
tgreen@greenellp.com
matabb@greenellp.com

Michael E. Mone
Patricia L. Kelly
C. William Barrett
Catherine A. Ryan
Esdaile, Barrett & Esdaile
75 Federal Street
Boston MA 02110
MMone@ebelaw.com
PKelly@ebelaw.com
BBarrett@ebelaw.com
CRyan@ebelaw.com

Suzanne E. Durrell
DURRELL LAW OFFICE
180 Williams Avenue
Milton, MA 02186
Suzanne.durrell@verizon.net

Robert M. Thomas, Jr.
THOMAS & ASSOCIATES
280 Summer Street, 5th Floor
Boston, MA 02210-1131
rmt@thomasandassoc.net

Richard D. King, Jr.
Nathan A. Tilden
Jacquelyn A. McEttrick
SMITH & BRINK P.C.
350 Granite St., Suite 2303
Braintree, MA 02184
RKing@smithbrink.com
NTilden@smithbrink.com
jmcettrick@smithbrink.com

**Pursuant to 31 U.S.C. § 3730(b)(2), no service was made upon the Defendant because this case is still under seal.**

Dated: March 19, 2015

_____
Abraham R. George
Assistant U.S. Attorney

# REQUEST FOR JUDICIAL INTERVENTION
UCS-840 (7/2012)

Supreme **COURT, COUNTY OF** New York

Index No: 655124/2017     Date Index Issued: August 1, 2017

**For Court Clerk Use Only:**
IAS Entry Date

Judge Assigned

RJI Date

**CAPTION:** Enter the complete case caption. Do not use et al or et ano. If more space is required, attach a caption rider sheet.

MARC S. KIRSCHNER solely in his capacity as TRUSTEE of THE MILLENNIUM LENDER CLAIM TRUST,

**Plaintiff(s)/Petitioner(s)**

-against-

J.P. MORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, CITIBANK GLOBAL MARKETS INC., CITIBANK, N.A., BMO CAPITAL MARKETS CORP., BANK OF MONTREAL, SUNTRUST ROBINSON HUMPHREY, INC., and SUNTRUST BANK,

**Defendant(s)/Respondent(s)**

**NATURE OF ACTION OR PROCEEDING:** Check ONE box only and specify where indicated.

**MATRIMONIAL**
- ○ Contested
  **NOTE:** For all Matrimonial actions where the parties have children under the age of 18, complete and attach the MATRIMONIAL RJI Addendum. For Uncontested Matrimonial actions, use RJI form UD-13.

**TORTS**
- ○ Asbestos
- ○ Breast Implant
- ○ Environmental: _____ (specify)
- ○ Medical, Dental, or Podiatric Malpractice
- ○ Motor Vehicle
- ○ Products Liability: _____ (specify)
- ○ Other Negligence: _____ (specify)
- ○ Other Professional Malpractice: _____ (specify)
- ○ Other Tort: _____ (specify)

**OTHER MATTERS**
- ○ Certificate of Incorporation/Dissolution   [see NOTE under Commercial]
- ○ Emergency Medical Treatment
- ○ Habeas Corpus
- ○ Local Court Appeal
- ○ Mechanic's Lien
- ○ Name Change
- ○ Pistol Permit Revocation Hearing
- ○ Sale or Finance of Religious/Not-for-Profit Property
- ○ Other: _____ (specify)

**COMMERCIAL**
- ○ Business Entity (including corporations, partnerships, LLCs, etc.)
- ○ Contract
- ○ Insurance (where insurer is a party, except arbitration)
- ○ UCC (including sales, negotiable instruments)
- ● Other Commercial: Securities law, breach of contract, and tort (specify)

  **NOTE:** For Commercial Division assignment requests [22 NYCRR § 202.70(d)], complete and attach the COMMERCIAL DIV RJI Addendum.

**REAL PROPERTY:** How many properties does the application include?
- ○ Condemnation
- ○ Mortgage Foreclosure (specify):   ○ Residential   ○ Commercial
  Property Address: _____ Street Address _____ City _____ State _____ Zip
  **NOTE:** For Mortgage Foreclosure actions involving a one- to four-family, owner-occupied, residential property, or an owner-occupied condominium, complete and attach the FORECLOSURE RJI Addendum.
- ○ Tax Certiorari - Section: _____ Block: _____ Lot: _____
- ○ Tax Foreclosure
- ○ Other Real Property: _____ (specify)

**SPECIAL PROCEEDINGS**
- ○ CPLR Article 75 (Arbitration)   [see NOTE under Commercial]
- ○ CPLR Article 78 (Body or Officer)
- ○ Election Law
- ○ MHL Article 9.60 (Kendra's Law)
- ○ MHL Article 10 (Sex Offender Confinement-Initial)
- ○ MHL Article 10 (Sex Offender Confinement-Review)
- ○ MHL Article 81 (Guardianship)
- ○ Other Mental Hygiene: _____ (specify)
- ○ Other Special Proceeding: _____ (specify)

**STATUS OF ACTION OR PROCEEDING:** Answer YES or NO for EVERY question AND enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons w/notice been filed? | ● | ○ | If yes, date filed: 08/01/2017 |
| Has a summons and complaint or summons w/notice been served? | ○ | ● | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ○ | ● | If yes, judgment date: _____ |

1 of 4

## NATURE OF JUDICIAL INTERVENTION:  Check ONE box only AND enter additional information where indicated.

- ○ Infant's Compromise
- ○ Note of Issue and/or Certificate of Readiness
- ○ Notice of Medical, Dental, or Podiatric Malpractice    Date Issue Joined: _____
- ○ Notice of Motion                Relief Sought: _____    Return Date: _____
- ○ Notice of Petition              Relief Sought: _____    Return Date: _____
- ○ Order to Show Cause             Relief Sought: _____    Return Date: _____
- ○ Other Ex Parte Application      Relief Sought: _____
- ○ Poor Person Application
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Writ of Habeas Corpus
- ● Other (specify): Request for Judicial Assignment

## RELATED CASES:
List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases. If additional space is required, complete and attach the RJI Addendum. If none, leave blank.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

## PARTIES:
For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in space provided. If additional space is required, complete and attach the RJI Addendum.

| Un-Rep | Parties: List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff). | Attorneys and/or Unrepresented Litigants: Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N): | Insurance Carrier(s): |
|---|---|---|---|---|
| ☐ | See Attached Caption Rider — Last Name; First Name; Primary Role: Plaintiff; Secondary Role (if any): | Wollmuth — Last Name    David — First Name; Wollmuth Maher & Deutsch LLP — Firm Name; 500 Fifth Avenue — Street Address    New York — City    New York — State    10110 — Zip; +1 (212) 382-3300 — Phone    +1 (212) 382-0050 — Fax    dwollmuth@wmd-law.com — e-mail | ○ YES  ○ NO |  |
| ☐ | See Attached Caption Rider — Last Name; First Name; Primary Role: Plaintiff; Secondary Role (if any): | Tretter — Last Name    Lyndon — First Name; Wollmuth Maher & Deutsch LLP — Firm Name; 500 Fifth Avenue — Street Address    New York — City    New York — State    10110 — Zip; +1 (212) 382-3300 — Phone    +1 (212) 382-0050 — Fax    ltretter@wmd-law.com — e-mail | ○ YES  ○ NO |  |
| ☐ | See Attached Caption Rider — Last Name; First Name; Primary Role: Plaintiff; Secondary Role (if any): | Coviello — Last Name    Jeffrey — First Name; Wollmuth Maher & Deutsch LLP — Firm Name; 500 Fifth Avenue — Street Address    New York — City    New York — State    10110 — Zip; +1 (212) 382-3300 — Phone    +1 (212) 382-0050 — Fax    jcoviello@wmd-law.com — e-mail | ○ YES  ○ NO |  |
| ☐ | See Attached Caption Rider — Last Name; First Name; Primary Role: Plaintiff; Secondary Role (if any): | Parekh — Last Name    Niraj — First Name; Wollmuth Maher & Deutsch LLP — Firm Name; 500 Fifth Avenue — Street Address    New York — City    New York — State    10110 — Zip; +1 (212) 382-3300 — Phone    +1 (212) 382-0050 — Fax    nparekh@wmd-law.com — e-mail | ○ YES  ○ NO |  |

I AFFIRM UNDER THE PENALTY OF PERJURY THAT, TO MY KNOWLEDGE, OTHER THAN AS NOTED ABOVE, THERE ARE AND HAVE BEEN NO RELATED ACTIONS OR PROCEEDINGS, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION PREVIOUSLY BEEN FILED IN THIS ACTION OR PROCEEDING.

Dated: August 1, 2017

_____          _____
                                                              SIGNATURE

2035442                                          Lyndon M. Tretter
ATTORNEY REGISTRATION NUMBER                      PRINT OR TYPE NAME

[Print Form]

## Request for Judicial Intervention Addendum

UCS-840A (7/2012)

**Supreme**

_____ COURT, COUNTY OF _____ **New York** _____    Index No: _____

For use when additional space is needed to provide party or related case information.

| | Parties: | Attorneys and/or Unrepresented Litigants: | Issue Joined (Y/N): | Insurance Carrier(s): |
|---|---|---|---|---|

**PARTIES:** For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in "Attorneys" space.

Un-Rep — List parties in caption order and indicate party role(s) (e.g. defendant, 3rd-party plaintiff).

Attorneys — Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address.

| Un-Rep | Parties | Attorneys and/or Unrepresented Litigants | Issue Joined (Y/N) | Insurance Carrier(s) |
|---|---|---|---|---|
| ☒ | J.P. MORGAN CHASE BANK, N.A. — Last Name / First Name / Primary Role: Defendant / Secondary Role (if any): | Last Name / First Name / Firm Name / 270 Park Avenue — Street Address / New York — City / New York — State / 10017 — Zip / +1 (212) 464-1909 — Phone / Fax / e-mail | ○ YES  ◉ NO | |
| ☒ | J.P. MORGAN SECURITIES LLC — Last Name / First Name / Primary Role: Defendant / Secondary Role (if any): | Last Name / First Name / Firm Name / 277 Park Avenue, 3rd Floor — Street Address / New York — City / New York — State / 10017 — Zip / +1 (212) 272-2000 — Phone / Fax / e-mail | ○ YES  ◉ NO | |
| ☒ | CITIBANK GLOBAL MARKETS INC. — Last Name / First Name / Primary Role: Defendant / Secondary Role (if any): | Last Name / First Name / Firm Name / 390 Greenwich Street — Street Address / New York — City / New York — State / 10013 — Zip / +1 (212) 816-6000 — Phone / Fax / e-mail | ○ YES  ◉ NO | |
| ☒ | CITIBANK, N.A. — Last Name / First Name / Primary Role: Defendant / Secondary Role (if any): | Last Name / First Name / Firm Name / 388 Greenwich Street — Street Address / New York — City / New York — State / 10013 — Zip / +1 (800) 285-3000 — Phone / Fax / e-mail | ○ YES  ◉ NO | |
| ☒ | BMO CAPITAL MARKETS CORP. — Last Name / First Name / Primary Role: Defendant / Secondary Role (if any): | Last Name / First Name / Firm Name / 3 Times Square — Street Address / New York — City / New York — State / 10036 — Zip / +1 (212) 885-4000 — Phone / Fax / e-mail | ○ YES  ◉ NO | |
| ☒ | BANK OF MONTREAL — Last Name / First Name / Primary Role: Defendant / Secondary Role (if any): | Last Name / First Name / Firm Name / 115 S. LaSalle St. — Street Address / Chicago — City / Illinois — State / 60603 — Zip / +1 (312) 750-4300 — Phone / Fax / e-mail | ○ YES  ◉ NO | |

**RELATED CASES:** List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

## Request for Judicial Intervention Addendum

UCS-840A (7/2012)

Supreme
_____ COURT, COUNTY OF _____ **New York** _____ Index No.: _____

For use when additional space is needed to provide party or related case information.

**PARTIES:**  For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in "Attorneys" space.

| Un-Rep | Parties:<br>List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff). | Attorneys and/or Unrepresented Litigants:<br>Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address. | | | Issue Joined (Y/N): | Insurance Carrier(s): |
|---|---|---|---|---|---|---|
| ☒ | SUNTRUST ROBINSON HUMPHREY, INC. _Last Name_<br><br>_First Name_<br>_Primary Role:_<br>Defendant<br>_Secondary Role (if any):_ | _Last Name_<br><br>_Firm Name_<br>3333 Peachtree Road   Atlanta   Georgia   30326<br>_Street Address_   _City_   _State_   _Zip_<br>+1 (404) 926-5000<br>_Phone_   _Fax_   _e-mail_ | _First Name_ | | ○YES<br><br>◉NO | |
| ☒ | SUNTRUST BANK _Last Name_<br><br>_First Name_<br>_Primary Role:_<br>Defendant<br>_Secondary Role (if any):_ | _Last Name_<br><br>_Firm Name_<br>3333 Peachtree Road   Atlanta   Georgia   30326<br>_Street Address_   _City_   _State_   _Zip_<br>+1 (404) 926-5000<br>_Phone_   _Fax_   _e-mail_ | _First Name_ | | ○YES<br><br>◉NO | |
| ☐ | _Last Name_<br><br>_First Name_<br>_Primary Role:_<br><br>_Secondary Role (if any):_ | _Last Name_<br><br>_Firm Name_<br>_Street Address_   _City_   _State_   _Zip_<br>_Phone_   _Fax_   _e-mail_ | _First Name_ | | ○YES<br><br>○NO | |
| ☐ | _Last Name_<br><br>_First Name_<br>_Primary Role:_<br><br>_Secondary Role (if any):_ | _Last Name_<br><br>_Firm Name_<br>_Street Address_   _City_   _State_   _Zip_<br>_Phone_   _Fax_   _e-mail_ | _First Name_ | | ○YES<br><br>○NO | |
| ☐ | _Last Name_<br><br>_First Name_<br>_Primary Role:_<br><br>_Secondary Role (if any):_ | _Last Name_<br><br>_Firm Name_<br>_Street Address_   _City_   _State_   _Zip_<br>_Phone_   _Fax_   _e-mail_ | _First Name_ | | ○YES<br><br>○NO | |
| ☐ | _Last Name_<br><br>_First Name_<br>_Primary Role:_<br><br>_Secondary Role (if any):_ | _Last Name_<br><br>_Firm Name_<br>_Street Address_   _City_   _State_   _Zip_<br>_Phone_   _Fax_   _e-mail_ | _First Name_ | | ○YES<br><br>○NO | |

**RELATED CASES:**  List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF <u>New York</u> _____ x

|   | UCS-840C 3/2011 |

See Attached Caption Rider

                                    Plaintiff(s)/Petitioner(s)

-against-

See Attached Caption Rider

                                    Defendant(s)/Respondent(s)
                                                              x

**Index No.** ___655124/2017_____

**RJI No. (if any)** _____

## COMMERCIAL DIVISION
**Request for Judicial Intervention Addendum**

**COMPLETE WHERE APPLICABLE** [add additional pages if needed]:

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

[X] Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

[ ] Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)

[ ] Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

[ ] Shareholder derivative actions — without consideration of the monetary threshold

[ ] Commercial class actions — without consideration of the monetary threshold

[X] Business transactions involving or arising out of dealings with commercial banks and other financial institutions

[ ] Internal affairs of business organizations

[ ] Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

[ ] Environmental insurance coverage

[ ] Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)

[ ] Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold

[ ] Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages** [exclusive of punitive damages, interest, costs and counsel fees claimed]:

$ $1.775 billion _____

**Plaintiff/Petitioner's claim for equitable or declaratory relief** [brief description]:

Rescission of investor purchases

**Defendant/Respondent's counterclaim(s)** [brief description, including claim for monetary relief]:

**I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) AND (c).**

Dated: <u>August 1, 2017</u> _____

                                        _____
                                                        SIGNATURE

                                        **Lyndon M. Tretter**
                                                    PRINT OR TYPE NAME

FILED: NEW YORK COUNTY CLERK 08/01/2017 12:03 PM
NYSCEF DOC. NO. 5

INDEX NO. 655124/2017

RECEIVED NYSCEF: 08/01/2017

# CAPTION RIDER SHEET:

## Commercial Division

## Request for Judicial Intervention Addendum

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------x
MARC S. KIRSCHNER solely in his capacity as
TRUSTEE of THE MILLENNIUM LENDER                    :
CLAIM TRUST,

                                                    :

                         Plaintiff,                      .   Index No. _____   .

                                                    :

              -against-

                                                    :

J.P. MORGAN CHASE BANK, N.A., J.P. MORGAN
SECURITIES LLC, CITIBANK GLOBAL                     :
MARKETS INC., CITIBANK, N.A., BMO CAPITAL
MARKETS CORP., BANK OF MONTREAL,                    :
SUNTRUST ROBINSON HUMPHREY, INC., and
SUNTRUST BANK,                                      :

                         Defendants.                :
------------------------------------------------------------------x

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------x

MARC S. KIRSCHNER solely in his capacity as
TRUSTEE of THE MILLENNIUM LENDER          :
CLAIM TRUST,

                                          :

               Plaintiff,         :        Index No. 655124/2017

                                          :

    -against-                             :        **AFFIRMATION OF**
                                                   **SERVICE**
                                          :

J.P. MORGAN CHASE BANK, N.A., J.P. MORGAN
SECURITIES LLC, CITIBANK GLOBAL           :
MARKETS INC., CITIBANK, N.A., BMO CAPITAL
MARKETS CORP., BANK OF MONTREAL,          :
SUNTRUST ROBINSON HUMPHREY, INC., and
SUNTRUST BANK,                            :

             Defendants.          :

------------------------------------------------------------------ x

      Jeffrey Coviello, an attorney duly admitted to practice law in the State of New York,

under penalty of perjury affirms:

      1.      I am over the age of 18 years and am not a party in this action.

      2.      I am counsel for Plaintiff in this action.

      3.      On August 1, 2017, I served true and correct copies of the Summons and

Complaint (with Exhibit A), Request for Judicial Intervention ("RJI"), and Commercial Division

RJI Addendum as-filed in this action on the same date (together with NYSCEF links to such

filings), and the Notice of Commencement of Action Subject to Mandatory Electronic Filing

(collectively, the "Initiating Documents") via e-mail to the following attorneys with a request

that counsel confirm by reply e-mail whether they were authorized by their respective clients to

accept electronic service of the Initiating Documents on their behalf and, if so, that counsel

acknowledge that the above-referenced electronic service of the Initiating Documents constituted

such service:

Mary Beth Forshaw
<mforshaw@stblaw.com>
William T. Russell, Jr.
<wrussell@stblaw.com>
Isaac Rethy
<irethy@stblaw.com>
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017

*Counsel for Defendants J.P. Morgan
Chase Bank, N.A. and J.P. Morgan
Securities LLC*

Michael Luskin <luskin@lsellp.com>
Luskin, Stern & Eisler LLP
Eleven Times Square
New York, NY 10036

*Counsel for Defendants Citibank
Global Markets Inc. and Citibank, N.A.*

Steve Dollar
<steve.dollar@northonrosefulbright.com>
Kyle Schindler
<kyle.schindler@nortonrosefulbright.com>
Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY 10019

*Counsel for BMO Capital Markets Corp.
and Bank of Montreal*

Sarah Borders <sborders@kslaw.com>
Jeff Dutson <jdutson@kslaw.com>
King & Spalding LLP
1180 Peachtree Street
Atlanta, GA 30309

*Counsel for SunTrust Bank and
SunTrust Robinson Humphrey, Inc.*

4.      By reply e-mail on August 2, 2017, Mary Beth Forshaw, Esq. confirmed

authorization to accept such service of the Initiating Documents on behalf of Defendants J.P.

Morgan Chase Bank, N.A. and J.P. Morgan Securities LLC effective August 2, 2017.

5.      By reply e-mail on August 2, 2017, Michael Luskin, Esq. confirmed authorization

to accept such service of the Initiating Documents on behalf of Defendants Citibank Global

Markets Inc. and Citibank, N.A. effective August 2, 2017.

2

6.    By reply e-mail on August 2, 2017, Steve Dollar, Esq. confirmed authorization to accept such service of the Initiating Documents on behalf of Defendants BMO Capital Markets Corp. and Bank of Montreal.

7.    By reply e-mail on August 2, 2017, Jeff Dutson, Esq. confirmed authorization to accept such service of the Initiating Documents on behalf of Defendants SunTrust Bank and SunTrust Robinson Humphrey, Inc.

Dated: August 15, 2017
       New York, New York

_____
Jeffrey Coviello

3