UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___9/24/18___

MARC S. KIRSCHNER, solely in his
capacity as Trustee of THE MILLENIUM
LENDER CLAIM TRUST,

**ORDER**

Plaintiff,

17 Civ. 6334 (PGG)

- against -

JPMORGAN CHASE BANK, N.A.;
JPMORGAN SECURITIES LLC;
CITIBANK GLOBAL MARKETS INC.;.
CITIBANK, N.A.; BMO CAPITAL
MARKETS CORP.; BANK OF
MONTREAL; SUNTRUST ROBINSON
HUMPHREY, INC.; and SUNTRUST
BANK,

Defendants.

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff Marc S. Kirschner – in his capacity as trustee of the Millennium Lender

Claim Trust (the "Trust") – brings this action against J.P. Morgan Chase Bank, N.A. ("Chase"),

J.P. Morgan Securities LLC ("JPM Securities"), Citibank, N.A. ("Citibank"), Citibank Global

Markets, Inc. ("CitiGlobal"), Bank of Montreal, BMO Capital Markets Corp., SunTrust Bank,

and SunTrust Robinson Humphrey, Inc. (collectively, "Defendants") alleging violations of

various state securities laws; negligent misrepresentation; breach of fiduciary duty; breach of

contract; and breach of the implied covenant of good faith and fair dealing. (Cmplt. (Dkt. No. 1-

1)) Plaintiff's claims arise out of a $1.775 billion syndicated loan transaction[1] that closed on

---

[1] "A syndicated loan is a commercial credit provided by a group of lenders," and is "structured,
arranged, and administered by one or several commercial or investment banks, known as
arrangers." S&P Global Market Intelligence, Syndicated Loans: The Market and the Mechanics
1 (2017), https://www.lcdcomps.com/d/pdf/LCD%20Loan%20Primer.pdf.

April 16, 2014. (Id. ¶¶ 1, 96)  In that transaction, Defendants offered and sold to the Trust's beneficiaries – approximately seventy institutional investor groups, comprised of roughly 400 mutual funds, hedge funds, and other institutional investors (the "Investors") – debt obligations of Millennium Laboratories LLC ("Millennium") – a California-based urine drug test company. (Id. ¶¶ 1, 3, 94-95)  In November 2015, nineteen months after the transaction closed, Millennium filed a bankruptcy petition. (Id. ¶ 3)  The bankruptcy plan issued by the Bankruptcy Court created the Trust, and provided it with the Investors' claims against Defendants. (Id. ¶¶ 8-9)

The Complaint alleges generally that "Defendants misrepresented or omitted . . . material facts in the offering materials they provided and communications they made to Investors regarding the legality of [Millennium's] sales, marketing, and billing practices," as well as "the known risks posed by a pending government investigation into the illegality of such practices." (Id. ¶ 1)

This action was filed on August 1, 2017, in Supreme Court of the State of New York, New York County. (See id.)  On August 21, 2017, Defendants removed the case to this Court, asserting the Edge Act, 12 U.S.C § 632, as the basis for federal jurisdiction. (Notice of Removal (Dkt. No. 1))  "To be removable under the Edge Act, 12 U.S.C. § 632, an action must: (1) be a civil suit, (2) have a federally chartered corporation as a party, and (3) arise out of transactions involving international or foreign banking, including territorial banking, or out of international or foreign financial operations." Wilson v. Dantas, 746 F.3d 530, 535 (2d Cir. 2014) (internal quotation marks and citations omitted) (emphasis added).

Plaintiff has moved to remand the case to state court (Pltf. Mot. (Dkt. No. 26)), arguing that the third element required for Edge Act jurisdiction is absent. (Pltf. Br. (Dkt. No. 26-1))  For the reasons stated below, Plaintiff's motion to remand will be denied.

2

## BACKGROUND[2]

## I.   THE DEFENDANTS

Chase is a national banking association with its principal place of business in New York. (Cmplt. (Dkt. No. 1-1) ¶ 12)  JPM Securities – an affiliate of Chase – is a registered broker-dealer and investment advisor with its principal place of business in New York. (Id. ¶¶ 13-14)

Citibank is a national banking association with its principal place of business in New York. (Id. ¶ 16)  CitiGlobal – an affiliate of Citibank – is a registered broker-dealer and investment advisor with its principal place of business in New York. (Id. ¶¶ 15-16)

Bank of Montreal is chartered under the Bank Act of Canada and is a public company incorporated in Canada. (Id. ¶ 18)  BMO Capital Markets is an affiliate of Bank of Montreal and is a registered broker-dealer with its principal place of business in New York. (Id. ¶ 17)

SunTrust Bank is a member of the Federal Deposit Insurance Corporation ("FDIC"), is chartered under the laws of the State of Georgia, and provides banking and trust products. (Id. ¶ 20)  SunTrust Robinson Humphrey is a wholly-owned subsidiary of SunTrust Bank and is a registered broker-dealer with its principal place of business in Georgia. (Id. ¶ 19)

---

[2] The Complaint's factual allegations are presumed true for purposes of resolving Plaintiff's motion to remand. See Salzberg v. Aetna Ins. Co., No. 17 CV 7909 (VB), 2018 WL 1275776, at *1 (S.D.N.Y. Mar. 12, 2018) ("In considering the motion to remand, the Court accepts as true all relevant allegations in the complaint and construes all factual ambiguities in favor of plaintiff."). A court "may also consider the parties' affidavits and attached exhibits in deciding [a] motion to remand." M.S.S. Const. Corp. v. Century Sur. Co., No. 15 CIV. 2801 ER, 2015 WL 6516861, at *1 n.1 (S.D.N.Y. Oct. 28, 2015) (citing Gov't Employees Ins. Co. v. Saco, No. 12 Civ. 5633 (NGG) (MDG), 2015 WL 4656512, at *3 (E.D.N.Y. Aug. 5, 2015) ("Because [a motion to remand] is a jurisdictional inquiry, a court can look beyond the face of the complaint . . . .")).

3

## II. EVENTS PRECEDING THE SYNDICATED LOAN TRANSACTION

Millennium was a San Diego-based private company that provided laboratory-based diagnostic testing of urine samples for physicians. (Id. ¶¶ 26-27) In March 2012, Millennium came under investigation by the U.S. Department of Justice ("DOJ") for federal healthcare law violations. (Id. ¶¶ 32-40) In March 2012, Millennium was also engaged in litigation with a competitor, Ameritox Ltd., which had sued Millennium in 2011. (Id. ¶ 39) Ameritox's complaint alleged violations of the Stark Law and the Anti-Kickback statute. (Id.) These federal statutes proscribe "certain forms of remuneration to or relationships with physicians who refer Medicare-billable work to other providers such as drug testing labs." (Id. ¶ 35) Ameritox claimed that Millennium's violation of these statutes constituted "unfair competition." (Id. ¶ 39)

Also in March 2012, Chase, JPM Securities, SunTrust Bank, SunTrust Robinson Humphrey, and Bank of Montreal, among others, entered into a credit agreement with Millennium that provided it with a $310 million term loan and a $20 million revolving credit facility (the "2012 Credit Agreement"). (Id. ¶¶ 31-32) As the DOJ investigation of Millennium continued over the next two years, Chase and JPM Securities "carefully monitored the progress of the [] investigation" and began "exploring . . . ways to refinance the 2012 Credit Agreement" to escape their "term loan exposure to Millennium." (Id. ¶¶ 41, 45, 69)

"[B]y the end of February 2014," however, "the only financing option left on the table" was "a huge institutional financing" – totaling $1.775 billion – that "would take out the $304 million principal balance still owed to [Millennium]'s bank lenders" under the 2012 Credit Agreement. (Id. ¶¶ 49, 69) This institutional financing would also provide "an extraordinary dividend and bonuses" to Millennium's directors, officers, and controlling shareholders (the

4

"Insiders"), totaling "just shy of $1.27 billion." (Id. ¶¶ 30, 49, 69) The remaining $196 million would be used to retire debentures held by a private equity investor, leaving Millennium with $1.775 billion in debt and none of the proceeds. (Id. ¶¶ 49, 69)

In a commitment letter dated March 16, 2014 (the "2014 Commitment Letter"), Chase, CitiGlobal, Bank of Montreal, and SunTrust Bank agreed that they – or, in CitiGlobal's case, CitiGlobal or one its affiliates – would fund the $1.775 billion financing through a term loan as "Initial Lenders." (Id. ¶ 66) Defendants also agreed that the four broker-dealer Defendants – JPM Securities, CitiGlobal, BMO Capital, and SunTrust Robinson Humphrey – would serve as "Arrangers" for the debt financing. (See id. ¶¶ 13, 15, 17, 19, 66) The 2014 Commitment Letter made JPM Securities and CitiGlobal the "Lead Arrangers," and made BMO Capital and SunTrust Robinson Humphrey the "Co-Managers" of the loan facility. (Id. ¶¶ 66-67) The 2014 Commitment Letter also provided that Defendants were entitled to "'syndicate' th[e] initial loan amount to a group of institutional lenders managed by the 'Lead Arrangers.'" (Id. ¶¶ 66, 92) According to the "Working Group List" prepared by JPM Securities, all of Defendants' employees working on the Millennium financing were located in the United States. (See Tretter Decl., Ex. A (Working Group List) (Dkt. No. 26-3))

## III. MECHANICS OF THE SYNDICATED LOAN TRANSACTION

The syndicated loan transaction that closed on April 16, 2014, "proceeded in three inter-related and contemporaneous steps." (Cmplt. (Dkt. No. 1-1) ¶¶ 95-96) First, the Arrangers agreed among themselves that JPM Securities or its affiliate, Chase, would – "as an accommodation" to the other Arrangers – "perform the entire initial funding[,] and that the other Defendants would have to contribute only if some of the Investors failed in their obligations to buy the [portion of the term loan] for which they had committed." (Id. ¶ 95) Second, Chase and

5

Millennium entered into a "Master Consent to Assignment," in which Millennium agreed to sell portions of the term loan to the Investors up to the amounts listed in an attached schedule. (Id.) Third, effective no later than the time that Chase funded Millennium, "each individual Investor . . . as 'Buyer' became irrevocably committed to [Chase] as 'Seller' to purchase . . . the amount [of the term loan] it had subscribed for and been allocated." (Id.)

After these three steps, "[t]he actual sale between [Chase] and each Investor was later documented through a formal Assignment and Assumption agreement," under which "[e]ach Investor succeeded to the rights of [Chase] under, and [] became a party to, [a] Credit Agreement between and among all Investors, Millennium, ML Holdings II [an intermediate holding company formed to hold Millennium's stock], and [Chase] as Administrative Agent." (Id.; see also id. ¶ 24)

## IV. EFFECTUATION OF THE SYNDICATED LOAN TRANSACTION

In anticipation of the April 16, 2014 closing date, "Defendants required the Investors or their investment advisors to make a final legally binding offer to purchase" a portion of the term loan "'with [their] [Arranger] salesperson' up to a maximum on or before 5 p.m. (Eastern) on April 14, 2014." (Id. ¶ 93) The next day, April 15, 2014, the Arrangers informed the Investors or their investment advisors of the gross allocation that each had been awarded. (Id.) Investment advisors that managed mutual and other funds considering an investment in the term loan then had the right to inform the Arrangers of the sub-allocations they wished to make to particular investors in their own funds. (Id. ¶ 94) For example, an investment advisor with discretionary authority over multiple funds could make an offer to purchase $50 million in Millennium notes, receive a gross allocation of $45 million, and then sub-divide that $45 million among a group of investors. (Id.) Defendants referred to the investors that received initial

6

allocations as "Parent Investors," and investors that received the sub-allocations as "Child Investors." (Tretter Decl. (Dkt. No. 26-2) ¶ 7)

On April 16, 2014, Chase obtained consent from Millennium to allocate the entirety of the $1.798 billion debt financing – the $1.775 billion "fronted" by Chase, plus a small potential over-allotment – to sixty-one Parent Investors. (Trotter Decl., Ex. D (Master Consent to Assignment) (Dkt. No. 26-6)) Of the sixty-one Parent Investors, fifty-nine are domestic entities – which were allocated 98.52% of the term loan – and two are foreign domiciliaries that were allocated 1.48% of the term loan. (Id.; Tretter Decl. (Dkt. No. 26-2) ¶ 8) Of the Child Investors, more than two hundred are foreign domiciliaries. (See Notice of Removal, Ex. C (Lender Schedule))

On April 16, 2014 – the day that the transaction closed – Chase made the initial term loan of $1.775 billion to Millennium, which triggered the commitments of the Investors to purchase the entire amount from Chase through the assigned allocations. Exhibits submitted by Plaintiff demonstrate how Chase effected these sales. (See Pltf. Br. (Dkt. No. 26-1) at 12 n.2; Def. Opp. (Dkt. No. 27) at 12) For example, on April 15, 2014, JPM Securities sent an email to one of the domestic Parent Investors, Brigade Capital, informing Brigade Capital that it had been allocated $45 million in Millennium notes, and directing that "[s]ub-allocations" were "to be returned via ClearPar" – a U.S. based clearing house – "and funded within no less than 3 and no more than 10 days after funding." (See Tretter Decl., Ex. F (April 15, 2014 Brigade Capital email) (Dkt. No. 26-8) at 2)[3] A corresponding ClearPar "Trade Ticket" dated April 25, 2014 indicates that Brigade Capital sub-allocated that $45 million among twenty-three Child Investors

---

[3] All references to page numbers in this Order are as reflected in this District's Electronic Case Filing system.

(Tretter Decl., Ex. G (ClearPar Trade Ticket) (Dkt. No. 26-9) at 2-3), ten of which are foreign domiciliaries. (Tretter Decl. (Dkt. No. 26-2) ¶ 10)

The Institutional Allocation Confirmation and Assignment and Assumption Agreement executed between Chase and Brigade Credit Fund II, LTD – one of the foreign Child Investors (id. ¶ 11) – are examples of the transaction documents entered into between Chase and the Child Investors. (See Pltf. Br. (Dkt. No. 26-1) at 12 n.2; Def. Opp. (Dkt. No. 27) at 12) In the Institutional Allocation Confirmation, Brigade Credit Fund II confirmed its agreement to assume from Chase the obligation to purchase over $11 million of the term loan "within ten (10) business days of the Funding, or within such other period agreed to by [Chase], by assignment pursuant to the Assignment and Assumption [Agreement]." (Tretter Decl., Ex. H (Brigade Credit Fund II Institutional Allocation Confirmation) (Dkt. No. 26-10) at 2) In the Assignment and Assumption Agreement – which, as contemplated by the Institutional Allocation Confirmation, was executed on April 15, 2014, within ten days of the funding – Chase irrevocably sold and assigned the agreed-upon portion of the term loan. (Tretter Decl., Ex. I (Brigade Credit Fund II Assignment and Assumption) (Dkt. No. 26-11)) Once Brigade Credit Fund II and Chase executed the Assignment and Assumption Agreement, Brigade Credit Fund II became a party to the credit agreement governing the term loan (the "2014 Credit Agreement"). (Id. at 2)

## V.  MILLENNIUM'S DECLINE AND SUBSEQUENT BANKRUPTCY

On June 16, 2014, exactly two months after the closing, a jury in the Ameritox litigation returned a verdict in favor of Ameritox, finding in special interrogatories that Millennium had violated both the Stark Law and the Anti-Kickback statute. (Id. ¶ 110) The jury awarded Ameritox $2.755 million in compensatory damages and $12 million in punitive

8

damages (which were later remitted to $8.5 million), based on Millennium's misconduct in just three states: Florida, Tennessee, and Texas. (Id. ¶ 111) On the date the verdict was announced, Chase and JPM Securities concluded that it would have a $500 million negative impact on Millennium's valuation. (Id. ¶ 114)

In December 2014 – six months later – the DOJ notified Millennium that it would intervene in civil False Claims Act proceedings brought by qui tam relators based on Millennium's alleged federal healthcare law violations. (Id. ¶ 118) Two months later, in February 2015, the Centers for Medicare and Medicaid Services threatened to debar Millennium based on allegations of illegal billing practices. (Id. ¶ 119) In March 2015, the DOJ formally intervened in the qui tam proceedings. (Id. ¶ 120)

In May 2015, Millennium disclosed that it had agreed to a $256 million global settlement in principle with the DOJ. (Id. ¶ 3) Millennium finalized that settlement on October 16, 2015, and on November 10, 2015, Millennium defaulted on the term loan and filed a bankruptcy petition. (Id.) Millennium's bankruptcy plan established the Trust, and Plaintiff was appointed as Trustee. (Id. ¶ 11)

## VI.   PLAINTIFF'S CLAIMS

The Complaint was filed in Supreme Court of the State of New York, New York County, on August 1, 2017, and asserts eleven causes of action. The first six claims arise under the securities laws of California, Colorado, Massachusetts, and Illinois, and generally allege that Defendants made actionable misstatements and omissions to the Investors. (See id. ¶¶ 125-172) The seventh claim alleges that all Defendants are liable for negligent misrepresentation. (Id. ¶¶ 173-181) The remaining four claims are asserted only against Chase, and allege breach of

9

fiduciary duty, breach of contract, and breach of the implied covenant of good faith and fair dealing. (Id. ¶¶ 182-207)

The Complaint alleges that Defendants are liable for negligent misrepresentation and securities law violations, because, inter alia, "Defendants abandoned their obligations" to perform due diligence on (1) Millennium's exposure to liability, damages, and penalties in the DOJ investigation; and (2) the artificial inflation of Millennium's financial results from the company's unlawful sales and marketing practices. (Id. ¶¶ 53-65) The Complaint also alleges that JPM Securities and CitiGlobal created offering materials that contained material misstatements and omissions that were designed to induce, and did in fact induce, the Investors' purchases of the Millennium notes. (Id. ¶¶ 70-91)

Plaintiff's claims for breach of contract and breach of fiduciary duty against Chase arise, in part, from the 2014 Credit Agreement, under which it was a condition precedent for the $1.775 billion loan that Millennium not be in breach of the representations and warranties in the 2014 Credit Agreement. (Id. ¶¶ 100-03) According to the Complaint, Chase knew or should have known that representations and warranties in the 2014 Credit Agreement falsely assured Investors that Millennium had no exposure to material litigation and was in material compliance with all applicable regulations; and that, therefore, the conditions precedent to funding had not been satisfied. (Id. ¶¶ 101-05) The Complaint further alleges that Chase "breached its contractual duties, express and implied, and fiduciary duties as agent to the Investors by (i) failing to give the Investors notice [that the conditions precedent had not been satisfied]; and (ii) proceeding with the funding of Millennium." (Id. ¶ 105)

Plaintiff's breach claims extend to the period after Chase assigned the entirety of the term loan to the Investors. Chase remained a party to the 2014 Credit Agreement as

10

Administrative Agent. (Id. ¶ 95) In that role, Chase was obligated to provide Investors with (1) information from and about Millerinium "contemporaneously with intervening material developments" (id. ¶ 107); and (2) notice of, inter alia, (a) any "investigation or proceeding that may exist at any time between [Millennium] and any Governmental Authority, that if adversely determined would reasonably be expected to have a Material Adverse Effect"; and (b) "any litigation or proceeding . . . in which the amount involved is $15,000,000 or more and not fully covered by insurance." (Id. ¶ 109 (internal quotation marks and citations omitted)) Notwithstanding these obligations, Chase allegedly did not provide contemporaneous notice of the verdict in the Ameritox litigation (id. ¶ 115), even though Chase viewed the verdict as having a material effect on the company's valuation. (Id. ¶ 114) Plaintiff contends that "[i]nterest on the original . . . judgment would easily put the amount involved at over the $15 million figure . . . and it is doubtful that any of the punitive damages would have been covered by insurance." (Id. ¶¶ 113) The Complaint also alleges that Chase failed to contemporaneously notify the Investors either of the DOJ's intervention in the qui tam action or Medicare's threat to debar Millennium. (Id. ¶¶ 118-21) Based on these alleged failures, Plaintiff asserts claims against Chase for breach of contract after the April 16, 2014 closing date. (Id. ¶¶ 196-207)

## VII.   REMOVAL AND MOTION TO REMAND

On August 21, 2017, Defendants removed the case to this Court, asserting jurisdiction under the Edge Act, 12 U.S.C § 632. (Notice of Removal (Dkt. No. 1)) On October 4, 2017, Plaintiff moved to remand the case to state court (Pltf. Mot. (Dkt. No. 26)), arguing that there is no jurisdiction under the Edge Act. (Pltf. Br. (Dkt. No. 26-1))

## I.  LEGAL STANDARD

"The party seeking to preserve removal has the burden of proving that subject matter jurisdiction exists." S.M. v. Oxford Health Plans (NY), Inc., No. 12 CIV. 4679 (PGG), 2013 WL 1189467, at *2 (S.D.N.Y. Mar. 22, 2013) (citing Pan Atl. Group v. Republic Ins. Co., 878 F. Supp. 630, 638 (S.D.N.Y. 1995)). "'Where, as here, jurisdiction is asserted by a defendant in a removal petition, it follows that the defendant has the burden of establishing that removal is proper.'" Goel v. Ramachandran, 823 F. Supp. 2d 206, 210 (S.D.N.Y. 2011) (quoting United Food & Commercial Workers Union, Local 919 v. CenterMark Props. Meriden Square, Inc., 30 F.3d 298, 301 (2d Cir. 1994)).

The Second Circuit has held that, "out of respect for the limited jurisdiction of the federal courts and the rights of states, [a court] must resolve any doubts against removability." In re Methyl Tertiary Butyl Ether Prods. Liab. Litig. ("MTBE"), 488 F.3d 112, 124 (2d Cir. 2007) (internal quotation marks and alteration omitted); see also Anwar v. Fairfield Greenwich Ltd., 676 F. Supp. 2d 285, 292 (S.D.N.Y. 2009) ("Any doubts regarding the propriety of removal are resolved in favor of remand, and 'federal courts construe the removal statute narrowly.'") (quoting Lupo v. Human Affairs Int'l, Inc., 28 F.3d 269, 274 (2d Cir. 1994)). Finally, "[i]n determining whether jurisdiction is proper, [courts] look only to the jurisdictional facts alleged in the Notice[ ] of Removal." Dexia SA/NV v. Bear Stearns & Co., Inc., 945 F. Supp. 2d 426, 429 (S.D.N.Y. 2013) (citing MTBE, 488 F.3d at 124).

## II.  ANALYSIS

Defendants assert that federal jurisdiction is proper under the Edge Act, 12 U.S.C. § 632. (Notice of Removal (Dkt. No. 1)) "The Edge Act was enacted in 1919 for the purpose of

12

supporting U.S. foreign trade, in part by authorizing the establishment of international banking and financial corporations." Am. Int'l Grp., Inc. ("AIG") v. Bank of Am. Corp., 712 F.3d 775, 778 (2d Cir. 2013). "The Act authorized the creation of banking corporations chartered by the Federal Reserve Bank [that] could engage in offshore banking operations 'freed from regulatory barriers imposed by state banking commissioners that hindered . . . U.S. banks in efforts to compete with foreign banks.'" Ritchie Capital Mgmt., L.L.C. v. BMO Harris Bank, N.A., No. 14 CIV. 1936 ER, 2015 WL 1433320, at *3 (S.D.N.Y. Mar. 30, 2015) (quoting AIG, 712 F.3d at 779). "Section 632 of the Act, which was added in 1933 . . . , provide[s] for federal court jurisdiction of certain suits to which Edge Act banks [a]re parties, with the apparent purpose of affording those banks 'predictable uniformity of adjudication supervised in the federal courts, and thus better protection against potentially divergent and conflicting strictures imposed by banking authorities of 48 states.'" Id. (quoting AIG, 712 F.3d at 779).

Section 632 provides, in relevant part:

> [A]ll suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking, or banking in a dependency or insular possession of the United States, or out of other international or foreign financial operations, either directly or through the agency, ownership, or control of branches or local institutions in dependencies or insular possessions of the United States or in foreign countries, shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits[.]

12 U.S.C. § 632.

"To be removable under the Edge Act, 12 U.S.C. § 632, an action must: (1) be a civil suit, (2) have a federally chartered corporation as a party, and (3) arise "'out of transactions involving international or foreign banking, [including territorial banking], or out of international or foreign financial operations."'" Wilson v. Dantas, 746 F.3d 530, 535 (2d Cir. 2014) (quoting

13

AIG, 712 F.3d at 780-81 (quoting 12 U.S.C. § 632)) (alterations in original) (emphasis added). "In addition, 'the suit must arise out of an offshore banking or financing transaction of that federally chartered corporation' that is a party to the suit." Id. (quoting AIG, 712 F.3d at 784) (emphasis in original); see also Ritchie Capital Mgmt., 2015 WL 1433320, at *4 n.5 ("[I]t is not enough to allege (1) that a defendant is a nationally chartered bank, and (2) an international transaction; there has to be a connection between the two.").

Here, the first two requirements are undisputed (Pltf. Br. (Dkt. No. 26-1) at 18): this is a civil suit, and two of the defendants – Chase and Citibank – are federally chartered corporations. See Pinto v. Bank One Corp., No. 02 CIV. 8477 NRB, 2003 WL 21297300, at *2 (S.D.N.Y. June 4, 2003) (for Edge Act jurisdiction, only "one of the parties at interest" must be a federally chartered bank). Plaintiff disputes the third element, however, contending that (1) "the threshold requirement of 'foreign' or 'international' conduct is totally absent"; (2) "neither [Chase] nor [Citibank] is alleged to have engaged in a 'banking transaction' under Edge Act case law"; and (3) "this action does not involve 'financial operations' of the Edge Act Banks." (Pltf. Br. (Dkt. No. 26-1) at 5-6)

## A. International Nexus

Defendants argue that Chase's funding and sale of the term loan involved a "foreign or international" component for three reasons: (1) two of the Parent Investors are foreign entities; (2) approximately two hundred of the Child Investors are foreign entities; and (3) Bank of Montreal, one of the "Initial Lenders," is a Canadian bank. (See Def. Opp. (Dkt. No. 27) at 11-21, 27)

14

### 1. The Foreign Parent Investors

Plaintiff does not dispute that two of the Parent Investors, to which approximately $26 million – or 1.48% of the total amount of the term loan – was allocated, were foreign domiciliaries. (Tretter Decl. (Dkt. No. 26-2) ¶ 8) Because there is no threshold dollar amount or percentage required under the text of the Edge Act or Second Circuit case law, Chase's assignment of $26 million of the loan to these Parent Investors suffices to establish the "foreign or international" element for Edge Act jurisdiction. See 12 U.S.C. § 632; Ritchie Capital Mgmt., L.L.C. v. JPMorgan Chase & Co., 532 B.R. 461, 467 (S.D.N.Y. 2014) (rejecting argument that transactions must be "central to the claim" for jurisdiction to exist under the Edge Act, and observing that the Second Circuit in AIG "apparently was not concerned that the territorial nexus was based on a 'tiny percentage' of mortgages at issue . . . . To the contrary, the [Second Circuit] wrote of 'the necessary transaction' to establish Edge Act jurisdiction and the requirement 'of an offshore transaction.'") (quoting AIG, 712 F.3d at 783-84) (emphasis in original); Pinto, 2003 WL 21297300, at *3 ("Though the five [international] transactions . . . represent a small portion of the total listed on all [of plaintiff]'s statements, a suit satisfies the jurisdictional requisites of Section 632 if any part of it arises out of transactions involving international or foreign banking.") (internal quotation marks and citation omitted).

Plaintiff contends that the foreign domicile of an Edge Act bank's counterparty, "without more, cannot be determinative of whether the transaction or operation qualifies as international or foreign" (Pltf. Reply (Dkt. No. 28) at 7), because "courts generally require a foreign issuer, foreign-denominated security and/or foreign governing law."[4] (Pltf. Br. (Dkt. No. 26-1) at 21) The case law indicates, however, that a transaction between an Edge Act bank and a

---

[4] Defendants do not dispute that these circumstances are absent here.

15

foreign counterparty is sufficient to establish an international nexus. See Corporacion

Venezolana de Fomento v. Vintero Sales Corp. ("Vintero Sales"), 629 F.2d 786, 788, 792 (2d

Cir. 1980) (Edge Act bank's issuance of a letter of credit in New York company's favor against

Venezualan company's account gave rise to Edge Act jurisdiction, even though account was

New York-based, and the letter of credit was drawn upon in New York); Ritchie Capital Mgmt.,

2015 WL 1433320, at *4 (Edge Act bank's "recei[pt] [of] funds advanced by Cayman-based

plaintiffs and transfer[] [of] those monies" to U.S.-based Ponzi scheme operator were "sufficient

to establish Edge Act jurisdiction," even though "there were never any wires in or out of the

United States"); Highland Crusader Offshore Partners, L.P. v. LifeCare Holdings, Inc., 627 F.

Supp. 2d 730, 733, 735 (N.D. Tex. 2008) (relying on Vintero Sales to hold that Edge Act

jurisdiction existed over a dispute between lenders and borrowers who were signatories to a

credit agreement; an Edge Act bank and a Bermudan lender were signatories to the credit

agreement; court held that because "[a]t least one of these lender parties to the Agreement is a

foreign company[,] . . . this action arises out of an international transaction"); Nacional

Financiera, S.N.C. v. Chase Manhattan Bank, N.A., No. 00 Civ. 1571 (JSM), 2001 WL 327159,

at *4 (S.D.N.Y. Apr. 4, 2001) (international banking requirement of the Edge Act was

established based on a wire agreement between a Mexican bank and a federally chartered

defendant, even though the wire transfer was executed domestically).

                With one exception addressed below, none of the cases cited by Plaintiff are to

the contrary. (See Pltf. Br. (Dkt. No. 26-1) at 20-21; Pltf. Reply (Dkt. No. 28) at 7-8) Vintero

Sales, 629 F.2d 786, does not support Plaintiff's position for three reasons. First, although the

Vintero Sales court questioned whether the "mere sale [of corporate notes] within the United

States to a foreign purchaser" was "'foreign banking' within the [Edge Act] statute," id. at 792, it

16

is clear that the court's concern relates to whether the transaction involved "banking," not to whether the transaction was sufficiently "foreign." Id. ("We are troubled by [the district court's] approach because the central provision of the jurisdictional grant [in the Edge Act] is the necessity that the transaction in question be one 'arising out of . . . international or foreign banking.' The 'international' or 'foreign' part of the sale of Cariven's notes was, in essence, a private placement with a financing firm, but not really a banking transaction because neither Cariven nor Merban, nor for that matter CVF, is a bank. Merban's sales of the notes to American and Canadian banks involved 'foreign banking' only if a mere sale within the United States to a foreign purchaser (i.e., a Canadian bank) is 'foreign banking' within the statute.") (emphasis added). Second, the Vintero Sales court did not resolve whether the sale of the notes constituted "foreign banking," because it rejected jurisdiction on that basis on procedural grounds. See id. at 792 ("[I]n any event, the intervention by nationally chartered banks could not confer jurisdiction on that part of the case which consists of CVF's claims against Merban, or Merban's against CVF, because the rule that pleadings by intervenors may be treated as independent actions for jurisdictional purposes does not extend to giving the court ancillary jurisdiction over the other parties."); see also Stamm v. Barclays Bank of New York, 960 F. Supp. 724, 728 (S.D.N.Y. 1997) ("Vintero Sales . . . merely held that intervention by nationally chartered banks cannot serve as a basis for § 632 jurisdiction."). Finally, as noted above, the Vintero Sales court ultimately found jurisdiction under the Edge Act based on a transaction in which a federally chartered bank issued a letter of credit that was charged against the account of a foreign corporation and was drawn on. Id. at 788, 792 ("SPIB is a federally chartered bank, and the transaction in which Vintero [– a New York corporation –], in New York, drew on a

17

letter of credit [issued by SPIB] on the account of a Venezuelan corporation, Cariven, was one involving 'international or foreign banking.'").

Lazard Freres & Co. v. First Nat. Bank of Maryland, No. 91 CIV. 0628 (KMW), 1991 WL 221087 (S.D.N.Y. Oct. 15, 1991), is completely inapposite, because "[t]he agreement on which plaintiffs [we]re suing" in that case was "an agreement between solely American entities," and the only allegation of any international component was that "the agreement was made in connection with another transaction that was international in character." Id. at *2. Here, the agreements on which Plaintiff is suing were executed by foreign entities.

The court in Stamm, 960 F. Supp. 724, held simply that American investors' "investments in Lloyd's [of London – a market for insurance underwriting –] as underwriters . . . and concomitant pledges of capital to Lloyd's syndicates" were "unquestionably an 'international or foreign financial operation' within the meaning of § 632." Id. at 728. The Stamm court did not endorse a test in which a transaction must have multiple foreign attributes to qualify as "international or foreign" under the Edge Act.

Likewise, in Travis v. Nat'l City Bank of N.Y., 23 F.Supp. 363 (E.D.N.Y. 1938), the court merely held that the creation of a trust indenture by a foreign corporation with a · German corporation and an American corporation as trustees, which contemplated the sale and distribution of securities to American holders, was "an international financial operation." Id. at 365. The court said nothing about a multi-factor test.[5]

---

[5] Racepoint Partners, LLC v. JP Morgan Chase Bank, Nos. 06 CIV 2500 (MGC), 06 CIV. 2501 (MGC), 2006 WL 3044416 (S.D.N.Y. Oct. 26, 2006), reconsideration denied, 2007 WL 101866 (S.D.N.Y. Jan. 11, 2007) supports Plaintiff's argument but is not persuasive, because the court's opinions contain almost no analysis. In Racepoint, holders of Enron's 1999 Euro bonds and holders of Enron's 2001 U.S. Dollar bonds sued Chase – the indenture trustee – for damages based on Chase's conduct in relation to the indentures. Racepoint, 2006 WL 3044416, at *1-2. In its initial decision, the court held that there was Edge Act jurisdiction over claims arising from

18

Plaintiff also argues that finding an international nexus based on "the locus of a bank counterparty's domicile [will] render[] [the Edge Act] a superfluous form of diversity jurisdiction." (Pltf. Reply (Dkt. No. 28) at 8 n.4) The party asserting jurisdiction must show, however, that transactions involving "banking" or "financial operations" are at issue, and that the suit arises out of an "offshore banking or financing transaction" of an Edge Act bank. Wilson, 746 F.3d at 535.

The Court concludes that the foreign domicile of two Parent Investors suffices to establish the necessary international nexus.

## 2. The Foreign Child Investors

Chase's sale and assignment of the term loan to approximately two hundred foreign Child Investors also suffices to establish the necessary international nexus. (See Notice of Removal, Ex. C (Lender Schedule))

---

the issuance of the 1999 Euro bonds, because that "issuance was an 'international or foreign' financial operation." Id. at *3 ("The 1999 note issuance was an 'international or foreign' financial operation because the 1999 notes . . . were 'eurobonds,' notes for which the principal and interest are paid in a foreign currency."). The court found that it did not have Edge Act jurisdiction over the claims arising from the 2001 U.S. Dollar bonds, however, and remanded those claims with little explanation. Id. ("The 2001 notes, in contrast, were issued in United States dollars. Plaintiffs do not allege any foreign or international involvement in the 2001 note issuance. Section 632 therefore provides jurisdiction over the 1999 Notes action but does not provide jurisdiction over the 2001 Notes action.").

Chase moved for reconsideration and argued, inter alia, that Edge Act jurisdiction existed because the "2001 bonds were sold pursuant to offering materials that clearly contemplated the sale of bonds internationally," and were, in fact, "purchased by international institutions." Mem. in Supp. of Def.'s Mot. for Recons. at 11, Racepoint, No. 06-Civ-2500, 06-Civ-2501, 2006 WL 3886739. With no substantive discussion, the court denied the motion for reconsideration, stating that "Defendant's . . . arguments in favor of reconsideration are unpersuasive. They do not raise any new issues that were overlooked. I have previously considered [these] arguments and rejected them." Racepoint, 2007 WL 101866, at *1. Given that neither of the opinions in Racepoint provides meaningful analysis of the jurisdiction issue, they are not persuasive here.

19

Relying on iHeart Commc'ns, Inc. v. Benefit St. Partners LLC, No. SA-17-CV-00009-XR, 2017 WL 1032510 (W.D. Tex. Mar. 16, 2017), Plaintiff contends that Chase's sale and assignment of the term loan to foreign Child Investors should be considered domestic, because "[w]here, as here, [a] domestic intermediary" – i.e., the Parent Investors – rather than "the Edge Act entity, exercises primary 'control over who the ultimate purchasers of the notes [are] (whether foreign or domestic) and from the [] perspective of the Edge Act entity the identity of the ultimate noteholder[s] is irrelevant,' there is an insufficient foreign or international nexus for Edge Act jurisdiction." (Pltf. Br. (Dkt. No. 26-1) at 19 (quoting iHeart Commc'ns, 2017 WL 1032510, at *16)) The term "domestic intermediary" – as applied in iHeart – does not aptly characterize the Parent Investors' role here, however.

In iHeart, a domestic bank note issuer "entered into an agreement with a group of initial purchasers" – all of which were domestic entities – in which these entities "agreed to purchase the full amount of [notes]" from the issuer immediately upon closing and then to "re-sell" the notes to the note purchasers, some of which were foreign. iHeart Commc'ns, 2017 WL 1032510, at *2. The court characterized the initial purchasers as "intermediaries" and questioned – but did not decide – whether their participation in the transaction "render[ed] the underlying financing transaction a wholly domestic one." Id. at *15 ("[T]he [c]ourt need not decide whether th[e] presence [of the domestic intermediaries] renders the underlying financing transaction a wholly domestic one."). Here, by contrast, the Parent Investors did not acquire interests in the term loan and then assign those interests to the Child Investors, nor did they perform any similar transactional function. Instead, Chase and the Child Investors transacted directly.[6] (See Tretter

---

[6] If anything, the logic in iHeart supports a finding of jurisdiction here. In iHeart, a non-bank note issuer sued a group of noteholders – some of which were international parties – and defendants argued that Edge Act jurisdiction existed because (1) Edge Act banks served as

20

Decl., Ex. H (Brigade Credit Fund II Institutional Allocation Confirmation) (Dkt. No. 26-10) at

2; Tretter Decl., Ex. I (Brigade Credit Fund II Assignment and Assumption) (Dkt. No. 26-11))

In a similar vein, Plaintiff asserts that "[t]he Complaint is quite specific that

Defendants' legally binding relationship was with domestic Parent Investors, not the off-shore

Child Investors[,] as Defendants argue." (Pltf. Reply (Dkt. No. 28) at 5)  The allegations in the

Complaint belie that assertion, however.  The Complaint alleges that, in the third step of the

syndicated loan transaction at issue, "each individual Investor at the sub-account level" – i.e., the

Child Investors – "as 'Buyer' became irrevocably committed to [Chase] as 'Seller' to purchase

the Millennium security in the amount it had subscribed for and been allocated," and that "[t]he

actual sale between [Chase] and each Investor was later documented through a formal

Assignment and Assumption agreement." (Cmplt. (Dkt. No. 1-1) ¶ 95 (emphasis added))

Accordingly, the Complaint alleges a legally binding relationship between the Child Investors

---

trustees under the indentures governing the notes and had been named in the suit as co-
defendants, and (2) certain of the notes had been sold internationally. iHeart Commc'ns, 2017
WL 1032510, at *1, 14-16.  The court found that it lacked jurisdiction for three reasons: (1) the
indenture trustees were "not parties to" the note sales to international investors, or otherwise
"involved in" those sales, such as through marketing the notes to potential investors, id. at *15-
16 ("[T]he [t]rustee [d]efendants' non-involvement in the international issuances of the [notes]
precludes the exercise of § 632 jurisdiction based on those sales."); (2) the international
noteholders were not parties to the indentures themselves, which were "the contracts that tie[d]
the [t]rustee [d]efendants to th[e] litigation," id. at *16 ("the [n]oteholder [d]efendants are not
signatories to the contracts, nor are any other international parties"); and (3) the trustees were not
accused of any wrongdoing, "[p]laintiffs [did] not seek damages from the [t]rustees," and the
trustees were "parties to th[e] case simply so that they [would] be on notice of any declaratory
judgment that construe[d] a domestic contract to which they [we]re a party." Id. at *17.

The absence of these facts and circumstances was used to justify a remand in iHeart, but those
facts and circumstances are present here.  First, unlike the trustees in iHeart, Chase directly sold
and assigned the interests in the term loan that gives rise to the foreign Child Investors' claims.
Second, unlike the noteholders in iHeart, which were not parties to the indentures, the foreign
Child Investors became parties to the 2014 Credit Agreement, are in direct privity with Chase,
and are asserting breach of contract claims against Chase on that basis. Finally, unlike the
indenture trustees in iHeart, Chase is directly accused of wrongdoing.                       .

and Chase, and a sale directly from Chase to these investors. Moreover, that direct contractual relationship is confirmed by the representative examples of the Institutional Allocation Confirmations and Assignment and Assumption Agreements executed between Chase and the Child Investors. (See Tretter Decl., Ex. H (Brigade Credit Fund Institutional Allocation Confirmation) (Dkt. No. 26-10) at 2; Tretter Decl., Ex. I (Brigade Credit Fund Assignment and Assumption) (Dkt. No. 26-11))

Plaintiff's contention that the foreign domicile of certain Child Investors is a "mere fortuity" (Pltf. Br. (Dkt. No. 26-1) at 19-20) likewise lacks merit. Courts have held that transactions are too "fortuitous" to support Edge Act jurisdiction where the "international dimension" was "far downstream" from the Edge Act banks' participation in the transaction. See, e.g., Sealink Funding Ltd. v. Bear Stearns & Co. Inc., No. 12 CIV. 1397 LTS HBP, 2012 WL 4794450, at *5 (S.D.N.Y. Oct. 9, 2012) ("[The Edge Act bank's] role appears to have been limited to creating U.S. trusts that held U.S. mortgages – actions that had no international dimension. The fact that other [d]efendants ultimately decided sell the [residential mortgage-backed securities] to foreign entities could well have been fortuitous as far as [the Edge Act bank] was concerned. That decision was also far downstream from [the Edge Act bank's] participation in the packaging of [residential mortgage-backed securities.]"); see also Landesbank Baden-Wurttemberg v. Capital One Fin. Corp., 954 F. Supp. 2d 223, 227 (S.D.N.Y. 2013) (connection between international transaction and Edge Act bank found insufficient for exercise of jurisdiction because Edge Act bank "did not directly sell any securities to the [foreign] plaintiffs; rather, the underwriters did"). Here, Chase transacted directly with foreign entities.

22

Citing the Restatement (Third) of Agency § 6.05(2)(b), Plaintiff contends that

"[b]asic agency law shows that Defendants' post-closing assignments are a 'red herring' for

Edge Act purposes." (Pltf. Reply (Dkt. No. 28) at 6) Section 6.05(2)(b) states that

[t]wo or more principals may authorize the same agent to make separate contracts
for them. If the agent makes a single contract with a third party on the principals'
behalves that combines the principals' separate orders or interests and calls for a
single performance by the third party, . . . [and] (b) if the principals are
unidentified or undisclosed, the third party and the agent are the only parties to
the combined contract[.]

Restatement (Third) of Agency § 6.05 (2006). Here, the Child Investors did not simply authorize

the Parent Investors to contract with Chase on their behalf. Instead, the Child Investors

contracted directly with Chase, confirming that they would assume the obligation to purchase

their sub-allocated portion of the term loan "within ten (10) business days of the Funding, or

within such other period agreed to by [Chase], by assignment pursuant to the Assignment and

Assumption [Agreement]." (Tretter Decl., Ex. H (Brigade Credit Fund Institutional Allocation

Confirmation) (Dkt. No. 26-10) at 2) Accordingly, the Restatement provision cited by Plaintiff

is inapposite.

The Court concludes that Chase's transactions with the foreign Child Investors

are sufficient to establish the necessary international nexus.

### 3. **Bank of Montreal**

Bank of Montreal's role in the syndicated loan transaction also establishes the

necessary international nexus. Plaintiff's claims against Bank of Montreal are based on the fact

that it was (1) a party to a commitment letter among certain Defendants, including Chase; and (2)

alongside Chase, an "Initial Lender" for the term loan. (See Cmplt. (Dkt. No. 1-1) ¶ 66 ("In the

executed Commitment Letter dated March 16, 2014 . . . , Defendants [Chase], JPM Securities,

CitiGlobal, [SunTrust Robinson Humphrey], SunTrust [Bank], BMO [Capital Markets], and

23

[Bank of Montreal] agreed that three of them ([Chase], [Bank of Montreal] and SunTrust [Bank]) plus CitiGlobal or one of its affiliates would be 'Initial Lenders'"); id. ¶ 174 (alleging that Bank of Montreal and other Defendants "owed common law duties to the Investors in [their] capacities as . . . 'Initial Lenders' to Millennium under the 2014 Commitment Letter")) Moreover, Plaintiff does not dispute that the international nexus element can be met even where (1) the Edge Act bank and a foreign entity are not litigation adversaries; and (2) the Edge Act bank and the foreign entity are on "different sides" of the transaction at issue. (See Def. Opp. (Dkt. No. 27) at 27 (citing Ritchie, 532 B.R. at 468 (finding Edge Act jurisdiction where plaintiffs alleged that Edge Act bank aided and abetted fraud against plaintiffs by means of banking transactions with foreign entities); City of Stockton v. Bank of Am., N.A., No. C-08-4060 MMC, 2008 WL 5063877, at *2 (N.D. Cal. Nov. 21, 2008) (finding Edge Act jurisdiction where plaintiff "allege[d] that the harm it suffered was caused by [] foreign banks, acting in concert with domestic banks and other entities"); Pltf. Reply (Dkt. No. 28) at 13-14 (offering no response to Defendants' argument and authorities))

Plaintiff argues, however, that Bank of Montreal's involvement in the transaction does not establish the international nexus, because Bank of Montreal "did not end up participating with [Chase] as an initial lender." (Pltf. Reply (Dkt. No. 28) at 14) While the Complaint alleges that Chase ultimately provided the entire initial funding, "the other Defendants would have [had] to contribute [] if some of the Investors failed in their obligations to buy the securities for which they had committed." (Cmplt. (Dkt. No. 1-1) ¶ 95; see also Tretter Decl., Ex. C (Fronting Letter) (Dkt. No. 26-5) at 2-3) Accordingly, Plaintiff's allegations demonstrate that Bank of Montreal was a party to the syndicated loan transaction.

The Court concludes that Bank of Montreal's involvement in the syndicated loan transaction also supplies the necessary international nexus.

## B. Banking Activity

Defendants contend that Chase engaged in a banking activity both by making and selling the term loan. (Def. Opp. (Dkt. No. 27) at 22-23) Plaintiff concedes that making a loan constitutes a banking transaction under the Edge Act. (See Pltf. Br. (Dkt. No. 28) at 23-24 (quoting Nacional Financiera, 2001 WL 327159, at *3 ("Courts have generally required that the bank transactions at issue arise from 'traditional' banking activities, such as loan agreements, . . .")); see also 12 U.S.C. § 24(7) (authorizing national banks to "carry on the business of banking[] by discounting and negotiating promissory notes . . . and other evidences of debt"); Pinto, 2003 WL 21297300, at *1, 3 (observing that "advancing loans to customers to finance purchases, charging interest on those loans, and collecting loan payments from customers – represent what banks do, and have been doing for centuries").

Plaintiff argues, however, that only "bank-retained loans" qualify. (Pltf. Br. (Dkt. No. 28) at 23) According to Plaintiff, loans such as the syndicated loan at issue here – which are "entirely distributed for trading by others" – do not qualify as a banking transaction, because they are not sufficiently "traditional." (Id. at 23; see also id. at 25 ("[Chase] never intended to hold and, in fact, did not hold any of the Millennium notes following the closing."); Pltf. Reply (Dkt. No. 28) at 12 ("[Chase] acted as initial term loan 'lender' to Millennium for only a nanosecond.")) Plaintiff has not cited any authority supporting this argument, however.

As an initial matter, the Edge Act itself indicates that the sale of loans constitutes a traditional banking activity. Section 615(a), which sets forth the powers granted to banks

organized under the Edge Act, authorizes Edge Act banks to "purchase, sell, discount, and negotiate," inter alia, "evidences of indebtedness." 12 U.S.C. § 615(a).

Bank regulators and courts also regard the sale of loans as a traditional banking activity. See Office of the Comptroller of the Currency, Loan Participations, 1998 WL 161494, at *1 (April 1998) ("The purchase and sale of loans and participations in loans are established banking practices.") (emphasis added); Office of the Comptroller of the Currency, Banking Circular: Purchases of Loans in Whole or in Part – Participations, 1984 WL 186691, at *1-3 & n.1 (outlining the "principles of prudent banking which generally apply to any multibank lending transaction," including "a loan syndication"); see also First Nat. Bank v. City of Hartford, 273 U.S. 548, 560 (1927) (concluding, over ninety years ago, that "[t]he sale of mortgages and 'other evidence of debt' acquired by way of loan or discount with a view to reinvestment is . . . within the recognized limits of the incidental powers of national banks") (emphasis added).

The Court concludes that this case arises out of an "'offshore banking . . . transaction of [a] federally chartered corporation' that is a party to the suit," and that accordingly jurisdiction exists under the Edge Act.[7] Wilson, 746 F.3d at 535 (quoting AIG, 712 F.3d at 783-84).

---

[7] Because this case arises out of an Edge Bank's transactions involving international banking, the Court need not decide whether the action also arises out of the international "financial operations" of an Edge Act bank. See Wilson, 746 F.3d at 535. The Court notes, however, that Chase's conduct in the syndicated loan transaction appears to satisfy that basis for Edge Act jurisdiction.

The Second Circuit has stated that, "[t]he Edge Act does not define the term 'international or foreign financial operations' . . . . Under the plain meaning of the phrase, however, Edge Act jurisdiction extends to those foreign operations that consist of '[t]he act or process of raising or providing funds,' including '[t]he raising of funds by issuing capital securities (shares in the business).'" Id. (quoting Black's Law Dictionary 707 (9th ed. 2009) and citing Stamm, 960 F. Supp. at 728 (defining "financial operations" as "those operations that provide . . . capital or loan money as needed to carry on business") (internal quotation marks omitted)). Here, Chase

26

## CONCLUSION

For the reasons stated above, Plaintiff's motion to remand is denied. The Clerk of

Court is directed to terminate the motion. (Dkt. No. 26)

Dated: New York, New York
       September 21, 2018

SO ORDERED.

Paul G. Gardephe
United States District Judge

---

"provid[ed] funds" as part of the syndicated loan transaction, and Plaintiff's claims appear to arise out of "financial operations," as that term has been interpreted by the Second Circuit. Id.

Plaintiff argues that Chase's "one-time activities in Millennium's 2014 Transaction" do not qualify as "financial operations" because – according to Plaintiff – "operations [must] be ongoing[,] instead of discrete transactions." (Pltf. Reply (Dkt. No. 28) at 10; see also Pltf. Br. (Dkt. No. 26-1) at 21-22) None of the cases cited by Plaintiff (Pltf. Br. (Dkt. No. 26-1) at 21-22) found Edge Act jurisdiction lacking on the basis that the financial operations at issue were not a recurring activity, however.

Moreover, to the extent that the term "financial operations" connotes multiple transactions, that requirement is met here. Chase entered into two contracts with each Investor, which amounts to approximately eight hundred transactions in total. Accordingly, it appears that this action arises out of the international "financial operations" of an Edge Act bank.

27