# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARC S. KIRSCHNER, solely in his capacity as TRUSTEE OF THE MILLENNIUM LENDER CLAIM TRUST, <br><br>                Plaintiff, <br><br>    v. <br><br> JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, CITIBANK GLOBAL MARKETS INC., CITIBANK N.A., BMO CAPITAL MARKETS CORP., BANK OF MONTREAL, SUNTRUST ROBINSON HUMPHREY, INC., and SUNTRUST BANK, <br><br>                Defendants. | Civil Action No. 17-cv-6334 (PGG) |

## BRIEF OF AMICI CURIAE THE LOAN SYNDICATIONS AND TRADING ASSOCIATION AND THE BANK POLICY INSTITUTE

April 30, 2019

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTEREST OF AMICI CURIAE ..........................................................................................1

PRELIMINARY STATEMENT ...........................................................................................2

ARGUMENT ........................................................................................................................5

I.      The Syndicated Term Loan Market ..........................................................................5

II.     Syndicated Term  Loans Are Not Securities.............................................................9

        A.      Syndicated Term Loans Have A Commercial Purpose .........................................10

        B.      Syndicated Term Loans Are Not Distributed To The General Public.................11

        C.      Market Participants Understand That Syndicated Term Loans Are Not
                Securities...........................................................................................12

        D.      The Regulatory Scheme Reflects The Understanding That Syndicated
                Term Loans Are Not Securities .................................................................14

III.    Treating Syndicated Term Loans As Securities Would Devastate A Trillion-
        Dollar-Plus Market That Is Vital To The Economy .........................................17

CONCLUSION.....................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Banco Espanol de Credito v. Security Pac. Nat'l Bank*,
  973 F.2d 51 (2d Cir. 1992).............................................................................. *passim*

*Bank of America, N.A. v. Caulkett*,
  135 S. Ct. 1995 (2015)............................................................................................1

*SEC v. Capital Gains Research Bureau, Inc.*,
  375 U.S. 180 (1963)................................................................................................9

*Czyzewski v. Jevic Holding Corp.*,
  137 S. Ct. 973 (2017)..............................................................................................1

*In re DBSD North America, Inc.*,
  634 F.3d 79 (2d Cir. 2011)......................................................................................1

*In re Enron Corp.*,
  379 B.R. 425 (S.D.N.Y. 2007)................................................................................1

*Lorenzo v. SEC*,
  139 S. Ct. 1094 (2019)..........................................................................................10

*Marblegate Asset Mgmt., LLC v. Education Mgmt. Finance Corp.*,
  846 F.3d 1 (2d Cir. 2017)........................................................................................1

*In re MPM Silicones, LLC*,
  874 F.3d 787 (2d Cir. 2017)....................................................................................1

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012)................................................................................................1

*Randall v. Loftsgaarden*,
  478 U.S. 647 (1986)........................................................................................... 9-10

*Reves v. Ernst & Young*,
  494 U.S. 56 (1990)..........................................................................................10, 11

**Statutes**

15 U.S.C. § 78c...................................................................................................15

**Regulations & Other Authorities**

12 C.F.R. part 30 ................................................................................................16

12 C.F.R. part 208, Appendix D-1 ....................................................................16

12 C.F.R. part 364 ..............................................................................................16

78 Fed. Reg. 17,766 (Mar. 22, 2013) ................................................................16

79 Fed. Reg. 5536 (Jan. 31, 2014) ....................................................................18

FDIC, *Division of Supervision Manual of Examination Policies* ....................16

Federal Reserve, *Commercial Bank Examination Manual* ..............................16

Federal Reserve *et al.*, *Shared National Credit Program: 1st and 3rd Quarter 2018 Examinations* (2019) ..............................................................................16

Fiorella De Fiore & Harald Uhlig, *Bank Finance versus Bond Finance*, 43 J. MONEY, CREDIT & BANKING 1399 (2011) ........................................................7

Fitch Ratings, *The 2018 Annual Manual: U.S. Leveraged Finance Primer* (May 2018) ..............................................................................................................5, 6

LSTA, *Code of Conduct* (Nov. 16, 2017) ....................................................8-9, 12

LSTA, *Comments on "Proposed Revisions to Prohibitions and Restrictions on Proprietary Trading"* (Oct. 16, 2018) ........................................................5, 18

LSTA, *Standard Terms and Conditions for Par/Near-Par Trade Confirmations* (June 9, 2017) ...............................................................................................9, 13

LSTA, *Statement of Principles for the Communication and Use of Confidential Information by Loan Market Participants* (Nov. 16, 2017) ........................8, 13

Michael Bellucci & Jerome McCluskey, *The LSTA's Complete Credit Agreement Guide* § 2.2.1 (2d ed. 2017) ....................................................................*passim*

OCC, *Comptroller's Handbook: Commercial Loans* ......................................16

S. Rep. No. 47, 73d Cong., 1st Sess., 1 (1933) ................................................10

S&P Global & LSTA, *S&P/LSTA Index Monthly* 4 (Apr. 1, 2019) ................18

S&P Global, *Leveraged Loan Investor Market* (2019) ...............................18-19

S&P Global, *LCD Loan Primer* 10 (2019) ................................................................7, 8

SEC, No-Action Letter, *Putnam Diversified Premium Income Trust* 1 (July 10, 1989) ...........................................................................................................................15

Wells Fargo Securities, *U.S. Banks: Sector Reallocation* 12 (Feb. 19, 2019)..............................18

## INTEREST OF AMICI CURIAE

The Loan Syndications and Trading Association ("LSTA") is a not-for-profit financial services trade association that represents a broad and diverse membership involved in the origination, syndication, and trading (on both the buy-side and sell-side) of commercial loans. Its members include commercial banks, investment banks, broker-dealers, mutual funds, insurance companies, fund managers, hedge funds, and other institutional lenders, as well as services providers and vendors. LSTA's mission is to promote a fair, orderly, efficient, and growing corporate loan market and to provide leadership in advancing and balancing the interests of all loan market participants. To that end, LSTA has promulgated a code of conduct and a set of principles governing the use of confidential information, most recently revised in 2017, which have existed for many years and are broadly accepted by all market participants. It provides industry guidance on the origination and trading of syndicated loans and associated regulatory issues and creates and maintains industry-standard documentation, including model credit agreement and assignment provisions, for the primary and secondary loan markets. It also gathers, analyzes, and publishes data regarding the loan markets. LSTA has filed amicus briefs in numerous cases raising legal questions affecting the loan market.[1]

The Bank Policy Institute ("BPI") is a nonpartisan policy, research, and advocacy group, representing the nation's leading banks and their customers. BPI's members include universal,

---

[1] Those cases include, among others, *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017); *Bank of America, N.A. v. Caulkett*, 135 S. Ct. 1995 (2015); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012); *In re MPM Silicones, LLC*, 874 F.3d 787 (2d Cir. 2017); *Marblegate Asset Mgmt., LLC v. Education Mgmt. Finance Corp.*, 846 F.3d 1 (2d Cir. 2017); *In re DBSD North America, Inc.*, 634 F.3d 79 (2d Cir. 2011); and *In re Enron Corp.*, 379 B.R. 425 (S.D.N.Y. 2007).

1

regional, and foreign banks that routinely originate, purchase, and sell loans in the United States. Collectively, BPI's members employ almost 2 million Americans, make 72% of the nation's loans, and are an engine for financial innovation and economic growth. BPI seeks to shape policy to allow the nation's foremost banks to best serve their customers and perform their vital economic role while also holding sufficient capital and liquidity to ensure that the risks they take are borne by their shareholders and creditors, not by taxpayers. BPI pursues this goal by distributing research and analysis to U.S. and global regulators, members of Congress, academics, and media through research papers, blog posts, white papers, comment letters, and congressional testimony. BPI thus takes a strong interest in legal developments that could have a significant impact on the U.S. banking industry, and regularly files amicus briefs in U.S. courts.

LSTA's role in promoting the shared interests of all participants in the corporate loan market, and BPI's goal of ensuring banks can continue to provide necessary capital to businesses while remaining safe and sound, give them a keen interest in the threshold question in this case: whether leveraged term loans made to businesses, and syndicated through a bank agent to a group of institutional lenders, are "securities." LSTA and BPI accordingly submit this brief to provide background that is critically important to answering that question, focusing on the characteristics of such loans as borrowers, lenders, and regulators have long understood them.[2]

## PRELIMINARY STATEMENT

Leveraged term loans syndicated to a group of institutional lenders—such as the loan at issue in this case—are not "securities" within the meaning of federal and state securities laws.

---

[2] This brief was not authored in whole or in part by counsel for a party in this matter. No person other than amici or their counsel made a monetary contribution to fund preparation or submission of this brief.

The Second Circuit has held that a loan participation that was in relevant respects very similar to modern syndicated term loans was not a security.  *See Banco Espanol de Credito v. Security Pac. Nat'l Bank*, 973 F.2d 51, 55 (2d Cir. 1992).  While the loan market has changed significantly since 1992, the Second Circuit's reasoning in *Banco Espanol* applies equally to syndicated term loans like the one in this case, and should by itself resolve the question whether such loans are securities.  Indeed, in some respects, the growth and standardization of the syndicated term loan market in recent years and the settled expectations of market participants that have developed over that time—along with the SEC's determination not to treat syndicated term loans as securities for disclosure and liability purposes—militate even more strongly against deeming such loans to be securities.  Borrowers, lenders, and regulators understand that syndicated term loans are not securities and participate in (or oversee) the loan market on that understanding.

That makes perfect sense.  While syndicated term loans share some features with one type of debt security, high-yield bonds, they have several key characteristics that are incompatible with the regulatory scheme governing securities such as bonds.  To start, the members of a loan syndicate are *lenders*:  Each member has its own direct contractual lending relationship with the borrower.  Likewise, syndicated term loans are not marketed to the public.  Rather, the participants in a loan syndicate are sophisticated institutions that are charged with conducting their own due diligence and agree by contract to do so.  And, in contrast to investors in securities, participants in a syndicate may rely on confidential information—which sometimes includes material non-public information under the securities laws—in deciding whether to lend.

Borrowers and lenders that choose to enter the syndicated term loan market could often issue or purchase high-yield bonds instead.  But the two separate markets exist because the two types of debt are different, and both borrowers and lenders can have good reasons for choosing

3

loans over bonds (or vice versa). Syndicated term loans are typically secured by a senior lien on the borrower's assets; bonds are much less likely to be secured. That makes such loans less risky for the lender and less expensive for the borrower. Because syndicated term loans involve a smaller group of lenders (and any particular lender can be vetoed by the borrower), their terms and conditions are more easily amended than the terms of a bond indenture. Borrowers may also prefer a syndicated term loan to issuing bonds precisely because loans are not subject to the restriction on trading securities based on material non-public information, and borrowers thus may disclose confidential information to syndicate members without making it public to the world. Finally, the most important lenders in the syndicated term loan market—collateralized loan obligations ("CLOs"), which provide about 60% of the capital for such loans—cannot as a practical matter buy securities, due to regulations that have been interpreted to bar banks from owning interests in CLOs for investment purposes where the CLO holds securities.

As the SEC has implicitly recognized by declining to regulate syndicated term loans under the securities disclosure and fraud laws, treating such loans as securities would not serve those laws' main purpose—to protect investors who cannot conduct their own due diligence and thus must rely on public information. The heightened disclosure regime applicable to securities, intended to correct that informational disadvantage, is unnecessary in a market where the "investors" are sophisticated institutions that decide based on their own due diligence, and often based on confidential information, to lend large sums of money to a particular borrower.

Nearly $1.2 trillion in syndicated term loans are now outstanding. Such loans play a critical role in ensuring the flow of capital to American businesses. Declaring syndicated term loans to be securities would upend the expectations of borrowers and lenders and wreak havoc in the large, and vitally important, market for those loans.

**ARGUMENT**

## I.    THE SYNDICATED TERM LOAN MARKET

A syndicated loan is simply a loan to a corporate entity provided by a group of lenders, rather than a single lender.  Typically, such a loan will be arranged and administered by a commercial bank or investment bank.  The arranger will then syndicate the loan to a group of other institutions, each of which lends part of the funds and thus takes on part of the risk.  Fitch Ratings, *The 2018 Annual Manual: U.S. Leveraged Finance Primer* 12 (May 2018) ("*Fitch Manual*"), *available at* https://your.fitch.group/annual-manual-2018.html.  Each member of the syndicate is a lender, with a direct contractual relationship with the borrower, not merely with the arranger or the administrative agent bank.  Bellucci & McCluskey, *The LSTA's Complete Credit Agreement Guide* § 2.2.1 (2d ed. 2017) ("[i]n a syndicated credit facility, each lender undertakes a separate commitment to the borrower" and is "individually obligated" to lend).

Many syndicated loans are "leveraged," meaning that they are made to businesses with a relatively higher credit risk (often defined as businesses with a credit rating of less than BB+).  *Fitch Manual* 12.  More than 70% of American businesses fall into this category.  LSTA, *Comments on "Proposed Revisions to Prohibitions and Restrictions on Proprietary Trading"* 2 (Oct. 16, 2018) ("*LSTA Comment Letter*"), *available at* https://www.lsta.org/uploads/ DocumentModel/3821/file/lsta-volcker-comment-letter-oct-2018.pdf.

Broadly syndicated loans ("BSLs") are the largest segment of the leveraged loan market.  BSLs are loans made to large corporations, generally in an amount of $500 million to $1 billion or more.  *Fitch Manual* 12.  BSLs fall into two categories:  (1) "pro rata" loans, which include revolving credit facilities and certain term loans and are typically held by banks, and (2) "institutional" loans, also called "term loan Bs," which are term loans that are typically held by non-bank financial institutions such as CLOs, fund managers, mutual funds, and insurance

companies. *Id.* at 13; *see also* Bellucci & McCluskey § 2.1.1.2.  The loan at issue in this case is a term loan B, and for that reason this brief will focus on term loan Bs (although it will use the phrase "syndicated term loans" for simplicity).  But these arguments also apply to pro rata loans and investment-grade syndicated loans, which are plainly not securities.

Syndicated term loans have some central characteristics that, from the point of view of borrowers and lenders, distinguish them from other types of debt, including their closest analogue in the debt securities market, high-yield bonds.  While syndicated term loans and high-yield bonds have some features in common, "key distinguishing characteristics of each of the two markets continue to differentiate [them] in important ways."  Bellucci & McCluskey § 11.6.

*First*, syndicated term loans are generally secured by a first-priority lien (or, occasionally, a second lien) on the borrower's assets—meaning that the lenders have the first claim to those assets' proceeds.  *Fitch Manual* 12, 14-15.  In contrast, high-yield bonds are typically (although not always) unsecured.  *Id.* at 128 (comparing high-yield bonds and leveraged loans).  Secured debt is safer for the lender and, as a consequence, almost always cheaper for the borrower.

*Second*, syndicated term loans almost always charge interest at a floating rate, while high-yield bonds typically have a fixed rate.  Bellucci & McCluskey §§ 3.1, 11.6; *Fitch Manual* 12, 128.  A floating rate mitigates interest-rate risk for the lender, transferring it to the borrower.

*Third*, syndicated term loans typically allow borrowers to prepay before the loans' maturity date, although some impose a relatively small penalty if the buyer prepays within the first year or two.  *Fitch Manual* 16; Bellucci & McCluskey § 4.11.  In contrast, bonds typically bar borrowers from prepaying their debt before a certain date, or require borrowers who prepay to make the bondholders whole for all or a substantial part of their lost interest over the term of the bonds.  *Fitch Manual* 128-129 ("Bonds have less early repayment flexibility compared with

loans due to higher call premiums and no-call provisions for a longer period."); Bellucci & McCluskey § 4.6 ("The ability to prepay a loan facility is … one of the big advantages of credit agreements over bond indentures.").

More broadly, syndicated term loans offer borrowers greater flexibility in their initial terms and in post-closing amendments.  "The loan market is unique in that it can flex, bend, shape and warp itself on the fly to match the needs of borrowers with the requirements of lenders."  S&P Global, *LCD Loan Primer* 10 (2019) ("*LCD Loan Primer*"), *available at* https://www.lcdcomps.com/d/pdf/LCD%20Loan%20Primer.pdf.  Both "[d]uring syndication and after the loan has closed, all of the terms of a loan are subject to negotiation."  *Id.* at 20.  Simply put, "bank loans are easier to renegotiate than corporate bonds."  De Fiore & Uhlig, *Bank Finance versus Bond Finance*, 43 J. Money, Credit & Banking 1399, 1400 (2011); *see also* Bellucci & McCluskey § 9.1.1 ("[I]f a default occurs, there is greater difficulty in first locating and then obtaining waivers from a disparate and anonymous bondholder group than from lenders under a credit agreement.").

Syndicated term loans and debt securities like bonds also differ substantially in the way they are originated or issued and traded.  As noted, syndicated term loans are typically arranged by a bank, which then seeks lenders to become part of the syndicate.  The arranger prepares an information memorandum describing the loan, which typically includes, among other things, a list of terms and conditions, an industry overview, and a financial model.  Precisely because loans are not securities, an information memorandum is not expected to provide information as comprehensive as would be contained in an offering circular for bonds; rather, lenders know that they must rely on their own due diligence (as discussed below) and on the representations made by the borrower in the credit agreement.  Bellucci & McCluskey § 9.1.2.

Syndicated term loans are not offered to the public as an investment vehicle.  Rather, "[b]ecause loans are not securities, [a loan syndication] will be a confidential offering made only to qualified banks and accredited investors."  *LCD Loan Primer* 10.  The borrower has the ability to "disqualify" particular lenders from participation in the syndicate.  Bellucci & McCluskey § 11.2.2.  And the borrower's consent is typically required for a lender to assign its interest to a third party.  *Id.*  Bonds do not give the borrower the same control over who holds its debt.

Also unlike bonds, syndicated term loans are originated, syndicated, and traded on the basis of confidential information, which can include material non-public information within the scope of the securities laws.  *See generally* LSTA, *Statement of Principles for the Communication and Use of Confidential Information by Loan Market Participants* (Nov. 16, 2017) ("*Confidentiality Principles*"), *available at* https://www.lsta.org/uploads/DocumentModel/ 3271/file/lsta-statement-of-principles-regarding-confidential-information-november-16- 2017.pdf.  Market participants can choose whether to be on the "private side" and have access to such information, or to be on the "public side" without access to such information, so that they can continue to trade in the borrower's securities.  *Id.* at 3-4.  This means that there will often be disparities in the information available to different lenders.  "Public side" participants have "elected to make decisions with respect to a loan without accessing … information available to private side [participants], even though such information may be material to a decision whether to acquire or dispose of such [a] loan."  *Id.* at 3.

Finally, participants in the syndicated loan market—unlike investors in securities—"are expected to have the capacity to independently evaluate their transactions in the loan market, to make informed decisions regarding the amount of due diligence that is appropriate under the circumstances, and to undertake such due diligence deemed appropriate by them."  LSTA, *Code*

*of Conduct* 3 (Nov. 16, 2017) ("*Code of Conduct*"), *available at* https://www.lsta.org/uploads/ DocumentModel/3270/file/lsta-code-of-conduct-november-16-2017.pdf (setting out basic and long-accepted principles for participants in the syndicated term loan market).  Lenders entering a syndicate do so on the express understanding that they—and not the arranger or administrative agent—are responsible for conducting their own analysis of the borrower's credit risk and for determining what information they need to do so.  The same is true when loans are transferred on the secondary market.  The standard terms and conditions for such transactions provide that each party acknowledges that the other may have information about the borrower that may be material to the decision to enter the transaction; that it has chosen to enter the transaction notwithstanding that it lacks such information; and that no liability attaches to either party for nondisclosure of such information, as long as the representations and warranties in the agreement itself are accurate.  LSTA, *Standard Terms and Conditions for Par/Near-Par Trade Confirmations* § 15 (June 9, 2017) ("*Par Trade Confirmation*").  In short, the syndicated term loan market operates on the understanding that the parties do not need or expect a mandatory disclosure regime like that applicable to bonds and other securities.

## II.    SYNDICATED TERM LOANS ARE NOT SECURITIES

The federal securities laws were first enacted in the wake of the 1929 stock market crash and the ensuing Great Depression, in which many ordinary Americans lost their life savings, as investments they believed to be safe quickly became valueless.  *See, e.g.*, *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963).  The laws' fundamental purpose is to protect investors who may not have access to the information necessary to gauge the value of a particular investment, or the risk associated with it, from being defrauded by unscrupulous sellers who exploit their informational advantage.  *See, e.g.*, *Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986) (1933 Securities Act aimed "'to prevent … exploitation of the public by the sale

of unsound, fraudulent, and worthless securities through misrepresentation'" and "'to place adequate and true information before the investor'" (quoting S. Rep. No. 47, 73d Cong., 1st Sess., 1 (1933)); *Lorenzo v. SEC*, 139 S. Ct. 1094, 1103 (2019) ("[T]he basic purpose" of the securities laws is "'to substitute a philosophy of full disclosure for the philosophy of *caveat emptor*,'" to "'meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profit[.]'" (citations omitted)).

In light of that purpose, the Supreme Court has set out four factors relevant to whether a particular instrument is a "security" under the 1933 and 1934 Acts:  (1) "the motivations that would prompt a reasonable seller and buyer to enter into" the transaction—that is, whether the transaction has a "commercial" or "investment" purpose; (2) "the 'plan of distribution' of the instrument"—that is, "whether it is an instrument in which there is 'common trading for speculation or investments'"; (3) "the reasonable expectations of the investing public"; and (4)  whether "the existence of another regulatory scheme" makes "application of the Securities Act unnecessary."  *Reves v. Ernst & Young*, 494 U.S. 56, 66-67 (1990) (citations omitted).  The Court noted that, under these factors, "'notes evidencing loans by commercial banks for current operations'" are not securities.  *Id.* at 65 (citation omitted).

In *Banco Espanol*, the Second Circuit applied the *Reves* factors and concluded that loan participations that were similar in many respects to modern syndicated loans were not securities.  Applying those factors to syndicated term loans, in light of the understandings shared by market participants and regulators, yields the same result.

## A.     Syndicated Term Loans Have A Commercial Purpose

The loan participations at issue in *Banco Espanol* were short-term unsecured notes sold to participants by the original lender.  Addressing the first *Reves* factor—the purpose of the transaction—the Second Circuit concluded that the loan participations were motivated overall by

"'the promotion of commercial purposes' rather than an investment in a business enterprise.'" 973 F.2d at 55. The court of appeals explained that the borrower was "motivated by a need for short-term credit at competitive rates to finance its current operations" and the loan participants "sought a short-term return on excess cash." *Id.*

Syndicated loans are not materially different. From the borrowers' side, the proceeds of such a loan may be used to refinance existing debt or provide dividends to shareholders, but they may also be working capital loans, whose proceeds are used to fund ongoing business operations. From the syndicate participants' side, it is important to emphasize that, just as with traditional bank loans, syndicate members are *lenders*: they have a direct contractual relationship with the borrower, not merely a relationship with the arranger or agent bank in charge of the syndication and administration of the loan. Bellucci & McCluskey § 2.2.1. And while the lenders in the syndicate are "investing" in the sense that they hope to receive a return on their capital in the form of interest, that is equally true of traditional, non-syndicated bank loans, which are unquestionably not securities. *See Reves*, 494 U.S. at 65; *Banco Espanol*, 973 F.2d at 54.

### B.   Syndicated Term Loans Are Not Distributed To The General Public

The second *Reves* factor—"the plan of distribution of the instrument"—weighs strongly against treating syndicated term loans as securities. As discussed above, syndicated term loans are not marketed or available to the general public. No natural person can own part of a syndicated term loan. Rather, the lenders are sophisticated financial institutions. Moreover, a borrower may veto any institution from participating in the syndication by putting it on a so-called "disqualified" or "DQ" list. Bellucci & McCluskey § 11.2.3. And the borrower's consent is typically required for any syndicate member to assign its interests to a new lender. *Id.* § 11.2.2. The borrower's ability to control the entities that hold its debt distinguishes a syndicated loan from bonds, which can trade without meaningful restriction in public markets.

11

Similar factors led the Second Circuit to conclude that the loan participation in *Banco Espanol* was not a security. The court observed that "only institutional and corporate entities were solicited," and participations could not be resold without the originating lender's consent, "thus limiting eligible buyers to those with the capacity to acquire information about the debtor." *Banco Espanol*, 973 F.2d at 55. Participants in the syndicated term loan market are likewise "only institutional and corporate entities," and their interests can generally be assigned only with the borrower's consent. Moreover, syndicate members both have "the capacity to acquire information about [a] debtor" and know that it is their responsibility to seek out that information.

### C. Market Participants Understand That Syndicated Term Loans Are Not Securities

In *Banco Espanol*, each loan participant entered into an agreement with the loan originator acknowledging that it had "made its own credit analysis" based on the information it deemed appropriate, without relying on the originator. 973 F.2d at 53. The Second Circuit concluded that the loan participants would not have reasonably perceived the loan participation as a security. That is even clearer in the context of modern syndicated lending.

As discussed above, a lender that becomes part of a syndicate does so on the express understanding that it is responsible for conducting its own due diligence on the borrower and that it is not relying on any other party to provide it with any information that would be material to its decision to lend, unless the credit agreement specifically provides to the contrary. The LSTA's Code of Conduct, which is broadly accepted in the industry, provides that loan market participants "are expected to have the capacity to independently evaluate their transactions in the loan market, to make informed decisions regarding the amount of due diligence that is appropriate under the circumstances, and to undertake such due diligence." *Code of Conduct* 3.

12

Standard credit-agreement provisions likewise make clear that "each syndicate member makes its own credit decisions and determinations as to what actions to take under the credit agreement, and … syndicate members do not rely upon the administrative agent or any other lender in that regard."  Bellucci & McCluskey § 10.1.  Moreover, the agent is not "required to disclose information in [its] possession to the lenders, except as specifically provided in the credit agreement."  *Id.* § 10.1.3.  Thus, "[t]he agent need not inform the lenders of material adverse information discovered by the [agent] … in the course of [its] business dealings (whether before or after the closing)."  *Id.*

Similarly, the LSTA's principles for the use of confidential information in the syndicated loan market recognize that loans are originated and traded based in part on confidential or even material non-public information, and set out guidelines for originating and syndicating loans and trading loans in the secondary market based on such information.  *Confidentiality Principles* 4; *see Par Trade Confirmation* § 15 (standard documentation of trade in secondary market providing that parties are not liable to one another for failure to disclose material information).

None of this means that syndicated term loan market participants have no recourse against one another for false representations or fraud.  A borrower's materially false representation in a credit agreement or related agreement is an event of default, enabling lenders to accelerate the debt.  (That is rarely true of bonds, precisely because bonds are subject to the securities laws' disclosure regime.)  Bellucci & McCluskey § 9.1.2.  And remedies for breach of contract or common-law fraud are, of course, available when a party's conduct justifies such remedies under applicable law.  But syndicate members and their assignees fully understand when they decide to lend that they are not operating under the securities laws' disclosure or liability regimes.  Market participants know loans are originated and traded based on confidential

13

and potentially material non-public information, and they warrant that they can and will decide for themselves what information they need and conduct their own due diligence. Those basic market principles all but compel the conclusion that syndicated term loans are not securities.

>   **D.      The Regulatory Scheme Reflects The Understanding That Syndicated Term Loans Are Not Securities**

The current regulatory regime also reflects the understanding that syndicated term loans are not securities. The SEC has been well aware of syndicated term loans and their predecessors, loan participations, for decades. In fact, it filed a brief in *Banco Espanol* arguing that, while loan participations typically are not securities, the particular loan participation in that case was a security for purposes of the 1933 Act. Brief of the SEC, *Banco Espanol de Credito v. Security Pac. Nat'l Bank*, Nos. 91-7563, 91-7571, 1992 WL 12667357 (2d Cir. Jan. 22, 1992). Notably, the SEC conceded that "[t]raditional loan participations"—in which the participants "typically have the opportunity to engage in one-to-one negotiation with the lead lender and at times with the borrower, can inspect all information, public and non-public, relevant to a credit decision, and consequently are able to do their own analysis of the borrower"—were not securities. *Id.* at *3. It argued only that the special characteristics of the *Banco Espanol* loan participation, in which "purchasers were not … in a position to approach … borrowers … and conduct their own examination," made it a security. *Id.* at *4. Of course, the Second Circuit rejected that argument. It follows *a fortiori* that syndicated term loans, where members of the syndicate *are* able, and indeed expected, to "inspect all information, public and non-public, relevant to a credit decision" and "do their own credit analysis of the borrower," *id.* at *3, are not securities for purposes of the 1933 and 1934 Act disclosure and liability regimes.

Indeed, the SEC has never taken the position that syndicated term loans are securities for disclosure and liability purposes.[3]  Nor has Congress done so, even in the wake of the 2008 financial crisis, when it enacted major financial reforms such as the Dodd-Frank Act.  In fact, the Dodd-Frank Act amended the definition of "security" under the '34 Act to include "security-based swaps," *see* 15 U.S.C. § 78c, but took no action regarding syndicated or leveraged loans.

For the reasons set out above, that makes sense.  There is no need to subject syndicated term loans to the requirements of the securities laws, because institutional lenders who join a syndicate have both the ability and the opportunity to conduct their own investigations into the credit risk posed by the borrower—and fully understand that it is their responsibility to do so.

Banks' origination and syndication of syndicated term loans, and their trading of such loans on the secondary market, are regulated, but under an entirely different regime.  Bellucci & McCluskey § 11.6 ("An alternate regulatory regime exists in the loan market in the form of banking regulators that actively monitor the syndicated loan market and regularly review the loan operations of regulated institutions who continue to dominate the arranging of syndicated loans.").  Each of the federal banking agencies—the Office of the Comptroller of the Currency ("OCC"), the Federal Deposit Insurance Corporation ("FDIC"), and the Federal Reserve Board—has promulgated enforceable standards relating to bank internal controls, internal audit

---

[3] The SEC has stated that certain loan participations are "securities" under the Investment Company Act of 1940 for purposes of the rule that an investment company with more than a certain amount of its assets in loan participations is not a diversified company unless those participations are securities.  SEC, No-Action Letter, *Putnam Diversified Premium Income Trust* 1 (July 10, 1989).  The letter made clear, however, that whether loan participations are securities under the 1933 and 1934 Acts is a distinct question subject to a different analysis.  *See id.* at 6 (letter from Putnam noting that the SEC had previously concluded that "the definition of security under the 1940 Act is not the same as the definition of a security under the 1933 Act and the 1934 Act" (citing SEC, No-Action Letter, *Bank of America Canada* (July 25, 1983))).

systems, loan documentation practices, and credit underwriting.  12 C.F.R. part 30 (OCC); *id.*

part 364 (FDIC); *id.* part 208, Appendix D-1 (Federal Reserve).  The agencies have created

examination manuals and handbooks that provide detailed guidance to banking agency

examiners for conducting lending-related inspections of banks and bank affiliates.[4]  They have

also issued guidance for regulated institutions highlighting the agencies' focus on bank leveraged

lending activities in the supervisory and examination context.  Interagency Guidance on

Leveraged Lending, 78 Fed. Reg. 17,766 (Mar. 22, 2013).[5]  Finally, the Shared National Credit

Program, jointly administered by the OCC, the Federal Reserve, and the FDIC, annually reviews

and assesses the risk level of syndicated loans of $100 million or more that are shared by three or

more regulated financial institutions, to guard against potential systemic risk.  Federal Reserve et

al., *Shared National Credit Program: 1st and 3rd Quarter 2018 Examinations* 3 (2019), *available*

*at* https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20190125a1.pdf.

In *Banco Espanol*, the Second Circuit relied on OCC's "policy guidelines addressing the

sale of loan participations" to support its conclusion that the loan participation there was not a

security.  *See* 973 F.2d at 55 (explaining that the OCC guidelines "indicated that application of

---

[4] FDIC, *Division of Supervision Manual of Examination Policies* §§ 3.2-38 to 3.2-41, 3.2-66 to
3.2-69 (discussing loan syndications and participations and Shared National Credit Program),
*available at* https://www.fdic.gov/regulations/safety/manual/section3-2.pdf; Federal Reserve,
*Commercial Bank Examination Manual* §§ 2045.1 to 2045.4, 2080.1 to 2080.4, *available at*
https://www.federalreserve.gov/publications/files/cbem-2000-201801.pdf; OCC, *Comptroller's
Handbook: Commercial Loans*, *available at* https://www.occ.treas.gov/publications/
publications-by-type/comptrollers-handbook/commercial-loans/pub-ch-commercial-loans.pdf.

[5] The guidance advises that "[f]inancial institutions purchasing participations and assignments in
leveraged lending transactions should make a thorough, independent evaluation of the
transaction and the risks involved," applying "the same standards of prudence, credit assessment
and approval criteria, and in-house limits that would be employed if the purchasing organization
were originating the loan."  78 Fed. Reg. 17,772.  It thus recognizes that loan market participants
can and should conduct their own evaluation of the borrower and its creditworthiness.

the securities laws was unnecessary").  Here, the oversight of federal banking regulators, along

with the SEC's determination not to treat syndicated term loans as securities for disclosure and

liability purposes, demonstrate that regulators are well aware of such loans, but correctly

recognize that loan market participants are adequately protected without the mandatory

disclosure regime and liability standard of the securities laws.

### III.    TREATING SYNDICATED TERM LOANS AS SECURITIES WOULD JEOPARDIZE A TRILLION-DOLLAR-PLUS MARKET THAT IS VITAL TO THE ECONOMY

As discussed above, all participants in the market have long understood that syndicated

term loans are not securities under federal or state securities laws, and that the underwriting,

syndication, and trading of such loans are not subject to the disclosure requirements for securities

or to liability under the securities laws.  Likewise, regulators have not treated syndicated loans as

securities for disclosure or liability purposes.  Plaintiffs now ask this Court to upend that settled

understanding.  The Court should decline to do so.  In addition to contravening the Second

Circuit's precedent, holding that syndicated term loans are securities would have a devastating

effect on the market for such loans.

If participants in the syndicated term loan market were subject to liability under the

securities laws, the standard practices and code of conduct that the industry has developed over

many years would have to be discarded.  The process of syndicating a loan would be far more

cumbersome, as every information memorandum would need to contain the same exhaustive

information as the offering documents for a security.  It would thus be more costly, and those

increased transaction costs would presumably be passed onto the borrower in the form of higher

interest rates or fees.  It would also be slower, depriving borrowers of quick access to the capital

markets in time-sensitive situations.  Moreover, if loans traded solely based on public

information, some borrowers would lose the ability to obtain financing based on information

they want to keep confidential, and some lenders would lose the ability to assess credit risk based on information that borrowers choose not to make public.

In addition, if syndicated term loans were securities, the principal source of funding for such loans—CLOs—would be jeopardized.  CLOs are created by securitizing pools of syndicated loans and selling notes with varying degrees of credit risk to investors with varying objectives and degrees of risk-tolerance.  Banks provide a substantial amount of capital to CLOs, commonly by buying and holding the highest-rated tranche of notes, which are typically rated "triple A."  *LSTA Comment Letter* 2.  However, regulations implementing § 619 of the Dodd-Frank Act, commonly referred to as the "Volcker Rule" and aimed in part at restricting banks' ability to hold interests in hedge funds or private equity funds, bar banks from acquiring or retaining "ownership interests" in "covered funds" for investment purposes.  79 Fed. Reg. 5536, 5538 (Jan. 31, 2014).  Regulators have interpreted that provision to mean that banks may not invest in notes issued by CLOs that own securities.  *See id.* at 5688-5690.  Because bank capital is so important to CLOs, holding that syndicated term loans should be treated as securities would jeopardize many CLOs' ability to participate in such lending.  Moreover, under regulators' current view, it would mean that U.S. banks would immediately have to divest themselves of approximately $86 billion in interests in CLOs holding syndicated term loans—25% of CLOs' AAA notes.  *See* Wells Fargo Securities, *U.S. Banks: Sector Reallocation* 12 (Feb. 19, 2019).

If that were to occur, the consequences for the lending market and for the broader economy would be severe.  As noted, the syndicated term loan market now amounts to nearly $1.2 trillion in outstanding loans.  *S&P/LSTA Index Monthly* 4 (Apr. 1, 2019).  CLOs have provided over 60% of the capital for syndicated term loans originated since 2014.  S&P Global, *Leveraged Loan Investor Market*, *available at* https://www.spglobal.com/marketintelligence/

en/pages/toc-primer/lcd-primer#sec8ci (last visited Apr. 28, 2019).  A major disruption in the CLO market would risk reducing that flow of capital—which is a vital resource for a wide spectrum of American businesses—to a trickle.

It is no answer to say that borrowers can substitute high-yield bonds for syndicated term loans.  Not only are CLOs unable as a practical matter to do so, but borrowers and lenders—and hence the broader economy—have benefited substantially from the ability to choose the market that best suits their needs.  As discussed, the two kinds of debt instruments differ significantly both in their terms and in the way they are originated and traded, and those differences are important to market participants.  Lenders with a lower appetite for risk can choose syndicated term loans, which offer lower credit risk because they are secured and lower interest-rate risk because they have floating rates.  Lenders with greater risk-tolerance can choose high-yield bonds, which are riskier and almost always pay a higher interest rate.  Borrowers, too, can choose the type of debt best suited for their needs:  higher-priced unsecured debt that trades based on public information and has less flexible terms (bonds), or cheaper secured debt that can be obtained based on confidential information and offers more flexible terms (loans).

Depriving borrowers and lenders of that choice will make it far more difficult for businesses to gain quick access to funding on flexible, bespoke terms, and for lenders to pool funds quickly and easily to offer financing to borrowers that might not qualify for other types of loans.  It would also have tangible effects on the economy.  Syndicated term loans support business growth by providing funding for major projects that might otherwise go unfunded. Cutting off an important source of capital could have serious consequences for leveraged companies, as well as significant ripple effects throughout the economy.

None of this makes any sense.  The participants in the syndicated term loan market—both the original syndicate members and players in the secondary market—are well aware that these loans are not regulated as securities, and fully appreciate the need to conduct appropriate diligence in order to assess the risk associated with the extension of credit.  As sophisticated players, they are more than capable of conducting that diligence and enforcing their legal rights. Participants in the bond market, by contrast, may well rely on the protections of the securities laws to ensure that the issuer has affirmatively disclosed information that a reasonable investor would consider material.  The American economy has been well served by different regulatory schemes, each suited to the circumstances of the particular financial products at issue.  That counsels strongly against holding that syndicated term loans are securities and thus taking a step that the SEC has not taken; overturning the reasonable, settled expectations of market participants; and profoundly disrupting the origination and trading of loans that have become a critical source of capital for modern commerce.

## CONCLUSION

This Court should hold that syndicated term loans are not securities.

April 30, 2019

Respectfully submitted,

*/s/ Danielle Spinelli*
Danielle Spinelli
Craig Goldblatt
Jack Starcher
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C.  20006
(202) 663-6000
danielle.spinelli@wilmerhale.com
craig.goldblatt@wilmerhale.com
jack.starcher@wilmerhale.com

*Counsel for Amicus Curiae Loan Syndications
and Trading Association*


*/s/ Carmine D. Boccuzzi, Jr.*
Carmine D. Boccuzzi, Jr.
Jared M. Gerber
CLEARY GOTTLIEB STEEN &
   HAMILTON LLP
One Liberty Plaza
New York, NY  10006
(212) 225-2000
cboccuzzi@cgsh.com
jgerber@cgsh.com

*Counsel for Amicus Curiae Bank Policy Institute*