**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x
MARC S. KIRSCHNER, solely in his capacity as
TRUSTEE of THE MILLENNIUM LENDER                      :
CLAIM TRUST,

                                                     :

                           Plaintiff,                          17-Civ.-06334 (PGG)(HBP)

                                                     :

              -against-                              :

                                                     :
J.P. MORGAN CHASE BANK, N.A., J.P. MORGAN
SECURITIES LLC, CITIBANK GLOBAL               :
MARKETS INC., CITIBANK N.A., BMO CAPITAL
MARKETS CORP., BANK OF MONTREAL,              :
SUNTRUST ROBINSON HUMPHREY, INC., and
SUNTRUST BANK,                                :

                           Defendants.                :
----------------------------------------------------------------------- x

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>DEFENDANTS' MOTION TO DISMISS THE COMPLAINT</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND ......................................................................................4

ARGUMENT ...........................................................................................................10

   I.    THE COMPLAINT STATES BLUE SKY CLAIMS.....................................10

       A.  The Blue Sky Claims Raise Fact Issues that Bar Dismissal......................10

       B.  The Millennium Notes are Securities Under *Reves*................................12

          1.  Investment Motivations of Buyer and Seller.......................................13

          2.  Wide Distribution and Secondary Trading..........................................15

          3.  Investors' Reasonable Expectations .....................................................16

          4.  Absence of Another Regulatory Scheme or Other Factors .................19

       C.  *Banco Espanol* Does Not Support the Motion to Dismiss.......................20

       D.  Defendants' "Fraud-By-Hindsight" Defense Should Be Rejected ...........23

  II.   THE COMPLAINT STATES COMMON LAW CLAIMS.............................26

       A.  The Complaint States A Negligent Misrepresentation Claim ...................26

          1.  Laws of States Other Than New York Apply and Do Not Require A Special Relationship ...................................................................26

          2.  Plaintiff Also Has Adequately Pled Negligent Misrepresentation Under New York Law .....................................................................27

       B.  The Complaint States A Breach of Fiduciary Duty Claim........................31

       C.  The Complaint States Breach of Contract and Implied Covenant Claims ................32

          1.  Breach of Contract...............................................................................32

          2.  Implied Covenant of Good Faith and Fair Dealing.............................34

  III.  THE COMPLAINT ADEQUATELY STATES BLUE SKY AND NEGLIGENT MISREPRESENTATION CLAIMS AGAINST THE CITI, SUNTRUST, AND BMO DEFENDANTS.........................................................................................36

A.  The Complaint Is Properly Pled As To Each Arranger ..............................................37

B.  The Complaint Is Properly Pled As To Each Initial Lender ....................................39

CONCLUSION..................................................................................................................40

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*766347 Ontario Ltd. v. Zurich Capital Markets, Inc.*,
   249 F. Supp. 2d 974 (N.D. Ill. 2003) ...................................................................... 23

*Adams v. Hyannis Harborview, Inc.*,
   838 F. Supp. 676 (D. Mass. 1993) ....................................................................... 11

*Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*,
   158 Cal. App. 4th 226 (Cal. App. 2nd Dist. 2007)................................................. 38

*Avenue CLO Fund Ltd. v. Bank of Am., N.A.*,
   723 F.3d 1287 (11th Cir. 2013) ............................................................................ 34

*Ballan v. Wilfred Am. Educ. Corp.*,
   720 F. Supp. 241 (E.D.N.Y. 1989)....................................................................... 25

*Banc of Am. Secs. LLC v. Solow Bldg. Co. II, LLC*,
   847 N.Y.S.2d 49 (1st Dep't 2007) ....................................................................... 35

*Banco Espanol de Credito v. Sec. Pac. Nat. Bank*,
   973 F.2d 51 (2d Cir. 1992) ............................................................................ *passim*

*Banco Espanol de Credito v. Sec. Pac. Nat. Bank*,
   763 F. Supp. 36 (S.D.N.Y. 1991) ............................................................... 15, 21, 22

*Banque Arabe et Internationale D'Investissement v. Md. Nat. Bank*,
   57 F.3d 146 (2d Cir. 1995) ................................................................................... 32

*Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*,
   980 N.Y.S.2d 21 (1st Dep't 2014) ....................................................................... 30

*Basis Yield Alpha Fund Master v. Morgan Stanley*,
   23 N.Y.S.3d 50 (1st Dep't 2015) ......................................................................... 29

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
   778 F. Supp. 2d 375 (S.D.N.Y. 2011) .................................................................. 34

*Bowden V. Robinson*,
   67 Cal. App. 3d 705 (Ct. App. 4th Dist. 1977) .................................................... 36

*Buehl v. Dayson*,
   127 Ill.App.3d 958 (5th Dist. 1984)..................................................................... 23

*Chemical Bank v. Sec. Pac. Nat. Bank*,
  20 F.3d 375 (9th Cir. 1994) ................................................................................. 31

*CIBC Bank & Tr. Co. (Cayman) v. Credit Lyonnais*,
  704 N.Y.S.2d 574 (1st Dep't 2000) ...................................................................... 31

*Combustion Engineering, Inc. v. Imetal*,
  235 F. Supp. 2d 265 (S.D.N.Y. 2002) .................................................................. 35

*Commerzbank AG v. U.S. Bank N.A.*,
  277 F. Supp. 3d 483 (S.D.N.Y. 2017) .................................................................. 36

*Consol. Mgmt. Grp., LLC v. Dep't of Corps.*,
  162 Cal. App. 4th 598 (Ct. App. 1 Dist. 2008) .................................................... 11

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991) ................................................................................... 40

*Dabney v. Chase Nat'l Bank*,
  196 F.2d 668 (2d Cir. 1952) ................................................................................. 32

*Devaney v. Chester*,
  1989 WL 52375 (S.D.N.Y. May 10, 1989) ........................................................... 34

*DIMON Inc. v. Folium, Inc.*,
  48 F. Supp. 2d 359 (S.D.N.Y. 1999) .................................................................... 30

*EBC I, Inc. v. Goldman, Sachs & Co.*,
  5 N.Y.3d 11 (N.Y. 2005) ...................................................................................... 31

*Fewell v. Kozak*,
  No. 98 C 2924, 1999 WL 966447 (N.D. Ill. Oct. 19, 1999) ................................. 23

*Fidelity Summer St. Tr.* v. *Toronto Dominion (Texas), Inc.*,
  2002 WL 1858763 (D. Mass. Aug. 14, 2002) ...................................................... 32

*Fin. Guaranty Ins. Co. v. Putnam Advisory Co.*,
  783 F.3d 395 (2d Cir. 2015) ................................................................................. 29

*Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Financing, Inc.*,
  414 F.3d 325 (2d Cir. 2005) ................................................................................. 26

*First Citizens Fed. Savings & Loan Ass'n v. Worthen Bank & Tr. Co.*,
  919 F.2d 510 (9th Cir. 1990) ................................................................................ 31

*Fluid Tech., Inc. v. CVJ Axles, Inc.*,
  964 P.2d 614 (Colo. App. 1998) ........................................................................... 27

iv

*Fluoro Elec. Corp. v. Branford Assocs.,*
  489 F.2d 320 (2d Cir. 1973) ....................................................................................... 1

*Fox v. Dream Tr.,*
  743 F. Supp. 2d 389 (D.N.J. 2010) ........................................................................... 16

*Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets, LLC,*
  No. 602529, 2010 WL 2431613 (N.Y. Sup. Ct. May 10, 2010) .............................. 29

*Highland Capital Management LP v. Schneider,*
  8 N.Y.3d 406 (N.Y. 2007) ........................................................................................ 35

*Holding v. Cook,*
  521 F. Supp. 2d 832 (C.D. Ill. 2007) ....................................................................... 10

*Horowitz v. Nat'l Gas & Electric, LLC,*
  2018 WL 4572244 (S.D.N.Y. Sept. 24, 2018) ......................................................... 36

*ImagePoint, Inc. v. JPMorgan Chase Bank, Nat. Ass'n,*
  27 F. Supp. 3d 494 (S.D.N.Y. 2014) ........................................................................ 35

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ...................................................................... 24

*In re Bear Stearns Companies, Inc.,*
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) ...................................................................... 23

*In re Currency Conversion Fee Antitrust Litig.,*
  230 F.R.D. 303 (S.D.N.Y. 2004) .............................................................................. 26

*In re Horlbeck,*
  589 B.R. 818 (N.D. Ill. 2018) ................................................................................... 36

*In re Lipper Holdings, LLC,*
  766 N.Y.S.2d 561 (1st Dep't 2003) .......................................................................... 34

*In re MTBE Prods. Litig.,*
  MDL No. 1358, 2015 WL 5775852 (S.D.N.Y. Oct. 1, 2015) .................................. 34

*In re NBW Commercial Paper Litig.,*
  813 F. Supp. 7 (D.D.C. 1992) .................................................................................. 19

*In re Oak Rock Fin., LLC,*
  527 B.R. 105 (Bankr. E.D.N.Y. 2015) ..................................................................... 35

*Indus. & Gen. Tr. v. Tod*,
   180 N.Y. 215 (1905) ................................................................................................ 35

*Intellivision v. Microsoft Corp.*,
   784 F. Supp. 2d 356 (S.D.N.Y. 2011) ..................................................................... 26

*JPMorgan Chase Bank, N.A. v. Controladora Comercial Mexicana SAB DE C.V.*,
   2010 WL 4868142 (N.Y. Sup. Ct. Mar. 16, 2010) ................................................. 31

*Kalisch-Jarcho, Inc. v. City of New York*,
   58 N.Y.2d 377 (1983) ............................................................................................. 35

*Kelley v. Carbone*,
   361 Ill.App.3d 477 (2d Dist. 2005) ........................................................................ 27

*Keywell Corp. v. Weinstein*,
   33 F.3d 159 (2d Cir. 1994) ..................................................................................... 33

*Kimmell v. Schaefer*,
   89 N.Y.2d 257 (1996) ............................................................................................. 28

*Knieriemen v. Bache Halsey Stuart Shields Inc.*,
   427 N.Y.S.2d 10 (1st Dep't 1980) .......................................................................... 26

*Lampel v. Higa*,
   No. CV 05-00842-ABC(MAN), 2009 WL 1514656 (C.D. Cal. May 27, 2009) ..................... 10

*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*,
   10 F. Supp. 3d 504 (S.D.N.Y. 2014) ......................................................... 27, 29, 30,

*Leyva v. Superior Court*,
   164 Cal. App. 3d 462 (Ct. App. 4th Dist. 985) ...................................................... 11

*Mass. Mut. Life Inc. Co. v. Residential Funding Co., LLC*,
   843 F. Supp. 2d 191 (D. Mass. 2012) .................................................................... 36

*Millennium Lab Holdings II, LLC*, No. 15-12284 (LSS),
   2019 WL 1005657 (Bankr. D. Del. Feb. 28, 2019).................................... 12, 30, 40

*Nota Const. Corp. v. Keyes Assocs., Inc.*,
   45 Mass.App.Ct. 15 (1998) .................................................................................... 27

*Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*,
   135 S.Ct. 1318 (2015) ............................................................................................ 25

*People v. Mendenhall*,
   363 P.3d 758 (Colo. App. 2015) (applying fact-intensive *Reves* test) ..................... 11

*People v. Superior Court*,
No. H045437, 2018 WL 4214736 (Ct. App. 6th Dist. Sept. 5, 2018) ........................................ 11

*Phoenix Light SF Ltd. v. U.S. Bank N.A.*,
2016 WL 1169515 (S.D.N.Y. Mar. 22, 2016) ........................................................ 36

*Pollack v. Laidlaw Holdings, Inc.*,
27 F.3d 808 (2d Cir. 1994) .................................................................................... 13, 21

*Procter & Gamble Co. v. Bankers Tr. Co.*,
925 F. Supp. 1270 (S.D. Ohio 1996) .................................................................... 19

*Pucci v. Santi*,
711 F. Supp. 916 (N.D. Ill. 1989) ........................................................................ 23

*Raine v. Lorimar Prods., Inc.*,
71 B.R. 450 (S.D.N.Y. 1987) ................................................................................ 30

*Reves v. Ernst & Young*,
494 U.S. 56 (1990) .................................................................................... *passim*

*Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
No. 14-CV-4394 (AJN), 2016 WL 439020 (S.D.N.Y. Feb. 3, 2016) ...................... 32

*S.E.C. v. Rorech*,
673 F. Supp. 2d 217 (S.D.N.Y. 2009) .................................................................. 10

*S.E.C. v. Wallenbrock*,
313 F.3d 532 (9th Cir. 2002) ................................................................................ 13

*S.E.C. v. Zada*,
787 F.3d 375 (6th Cir. 2015) ................................................................................ 14

*Sherter v. Ross Fialkow Cap. Partners, LLP*,
2013 WL 1324818 (Mass. Super. Jan. 4, 2013) .................................................. 39

*Soderberg v. McKinney*,
44 Cal.App.4th 1760 (2d Dist. 1996) ................................................................... 27

*Sokoloff v. Harriman Estates Dev. Corp.*,
96 N.Y.2d 409 (N.Y. 2001) .................................................................................. 31

*Solutia Inc. v. FMC Corp.*,
456 F. Supp. 2d 429 (S.D.N.Y. 2006) .................................................................. 30

*Stechler v. Sidley, Austin Brown & Wood, L.L.P.*,
    382 F. Supp. 2d 580 (S.D.N.Y. 2005) ............................................................... 11

*Suez Equity Investors, L.P. v. Toronto Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001) ...................................................................... 28, 29

*Topping v. Sullivan*,
    496 N.E.2d 8 (Ill. App. 1 Dist. 1986) ............................................................ 11

*TPL Associates v. Helmsley-Spear, Inc.*,
    536 N.Y.S.2d 754 (1st Dep't 1989) ............................................................... 32

*Tutor Perini Corp. v. Banc of Am. Sec. LLC*,
    842 F.3d 71 (1st Cir. 2016) ......................................................................... 38

*U.S. Bank Nat'l Ass'n v. Merrill Lynch Mortg. Lending, Inc.*,
    2018 WL 2234877 (N.Y. Sup. Ct. May 16, 2018) .................................................. 32

*Uni-World Capital, L.P.* v. *Preferred Fragrance, Inc.*,
    43 F. Supp. 3d 236 (S.D.N.Y. 2014) .............................................................. 32

*Unicredito Italianao SPA v. JPMorgan Chase Bank*,
    288 F. Supp. 2d 485 (S.D.N.Y. 2003) ............................................................ 29

*United States v. Zaslavskiy*,
    No. 17 CR 647 (RJD), 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) .......................... 10

*Western Elec. Co. v. Brenner*,
    41 N.Y.2d 291 (1977) ................................................................................ 31

*Yokell v. Draper*,
    No. 18-cv-02124 (JSC), 2018 WL 3417514 (N.D. Cal. July 13, 2018) ........................ 11

## **Statutes**

N.Y. U.C.C. § 1-203 ..................................................................................... 35

N.Y. U.C.C. § 1-304 ..................................................................................... 35

N.Y. U.C.C. § 8-102(a)(15) ............................................................................. 35

## **Rules**

Fed. R. Civ. P. 9(b) ...................................................................................... 1

Fed. R. Civ. P. 12(b)(6) .................................................................................. 1

Fed. R. Civ. P. 60(a) ................................................................................................... 1

## Other Authorities

12A Blue Sky Law § 9:71................................................................................................ 39

Elisabeth de Fontenay, *Do the Securities Laws Matter? The Rise of the Leveraged Loan Market*, 39 J. CORP. L. 725 (2014)....................................................................................... 21

Kenneth J. Steinberg & Darren S. Klein, "Similar But Not The Same: Some Ways in Which Bonds and Loans Will Differ in a Restructuring," *The International Comparative Legal Guide to Lending & Secured Finance* (4th ed. 2016) ........................................................ 18

Lisa Lee, *Leveraged Loan Risks May Require Legislation, SEC's Jackson Says*, Bloomberg, (Apr. 17, 2019) .................................................................................................... 20

Letter from U.S. Senator Elizabeth Warren to regulators on leveraged lending (Nov. 14, 2018) .................................................................................................... 20

Maura E. O'Sullivan and Benjamin M. Cheng, *Term Loans and High Yield Bonds: Tracking the Convergence*, Practical Law The Journal, July/August 2012 ............................. 17

Meyer C. Dworkin & Monica Holland (Davis Polk & Wardell LLP), *The International Comparative Guide to Lending & Secured Finance 2014*, 26 (2d ed. 2014) .......................... 17

*Private Equity, Restructuring and Finance Developments – Trading in Distressed Debt*, Wachtell, Lipton, Rosen & Katz (Jan. 20, 2009) .................................................... 18

Restatement (Second) Contracts § 333 ........................................................................ 36

Restatement (Third) of Agency § 8.01 ........................................................................ 31

Restatement (Third) Of Agency § 8.06........................................................................ 32

S&P Global Market Intelligence, *A Syndicated Loan Primer*, April 2016................................... 16

U.C.C. Article 9 .................................................................................................. 35

Plaintiff Marc S. Kirschner, solely in his capacity as trustee ("Trustee") of the Millennium

Lender Claim Trust ("Lender Trust"), respectfully submits this Memorandum of Law, the

Declaration of Lyndon M. Tretter ("Tretter Decl."), and the exhibits thereto in opposition to

Defendants' motion to dismiss the Complaint under Fed. R. Civ. P. 9(b) and 12(b)(6) ("Motion").[1]

## PRELIMINARY STATEMENT

Defendants are a group of banks and brokers that in 2014 arranged and sold a $1.775 billion

offering of notes ("Notes") of Millennium Laboratories LLC ("Millennium" or the "Company").

The Complaint alleges that Defendants did so without ever disclosing their inside knowledge of a

Department of Justice investigation ("DOJ Investigation") and private litigation as to the illegal

business practices of Millennium, all in an effort to foist their unwanted Millennium credit

exposure onto hundreds of unsuspecting investors. Defendants have moved to dismiss on the

grounds that neither state securities statutes nor common-law duties alleged in the Complaint apply

to them as a matter of law. The Motion fails because it simply ignores Plaintiff's well-pled factual

allegations concerning (1) the characteristics of the Notes that cause them to be "securities"

covered by state securities statutes, and (2) Defendants' bad faith and self-dealing in concealing,

and affirmatively misrepresenting, the legal risks facing Millennium.

*First*, whether the Millennium Notes are "securities" under state securities law is a fact-

intensive question that cannot be resolved on a motion to dismiss. The Supreme Court's *Reves*

---

[1] Defendants JPMorgan Chase Bank, N.A. ("JPMNA") and J.P. Morgan Securities LLC ("JPM Securities") (together, "JP Morgan"), Citigroup Global Markets Inc. ("CitiGlobal"), and Citibank, N.A. submitted one joint Memorandum of Law ("MTD"). Defendants Bank of Montreal ("BMO"), BMO Capital Markets Corp. ("BMOCap"), SunTrust Bank ("SunTrust"), and SunTrust Robinson Humphrey, Inc. ("STRH") submitted a separate Memorandum of Law ("Suppl. MTD") in which they joined the MTD and raised additional arguments. This brief responds to both defense briefs. The Complaint's mislabeling of "Citi**group** Global Markets" as "Citi**bank** Global Markets" (MTD at 1, n.1) is the sort of misnomer the Court may correct under Fed. R. Civ. P. 60(a). *See Fluoro Elec. Corp. v. Branford Assocs.*, 489 F.2d 320, 324–26 (2d Cir. 1973).

"family resemblance" test applies in this case and carries a *presumption* that the Notes are securities. That presumption cannot be rebutted without an in-depth analysis of numerous circumstances, such as the motivations and expectations of investors and other parties to the Note offering, and the subsequent distribution and trading of the Notes. Defendants rely on *Banco Espanol de Credito v. Sec. Pac. Nat. Bank*, 973 F.2d 51 (2d Cir. 1992) ("*Banco Espanol*") as authority for declaring the Millennium Notes "non-securities" on a motion to dismiss. But that case narrowly affirmed a *post-discovery* grant of *summary judgment* that instruments highly unlike the Notes were not securities because they closely resembled **loans by commercial banks for current operations**. The Millennium Notes did not involve loans by "commercial banks" (purchasers were pension funds and other non-bank investors) and did not fund "current operations" (Millennium received *none* of the proceeds). In fact, *Banco Espanol* itself anticipated that evolving ways of marketing bank loans to downstream investors, as here, would create instruments constituting securities under *Reves*. The market evolution since that 1992 decision has been dramatic (*see* Buyer Beware: Bank Loans Are Not What They Seem, at 5, https://www.alliancebernstein.com/sites/library/Instrumentation/FIX-7734-0818.pdf):



*Second*, Defendants contend that Plaintiff pleads "fraud by hindsight" because the Complaint supposedly "pleads no facts showing that defendants knew or should have known of Millennium's potential exposure *at the time* of the alleged misstatements or omissions." MTD at 2 (italics in original). This just ignores the Complaint's allegations that (i) Defendants had followed the DOJ Investigation of Millennium's business practices for two years before duping investors in the Notes, (Compl. ¶¶ 41-43), (ii) Defendants had unique and superior access to Millennium's advisors and inside information concerning the matters under investigation, including DOJ meetings contemporaneous with the 2014 Note offering, (*id.* ¶¶ 55-59, 62-63), and (iii) Defendants listed as a due diligence item, but consciously avoided quantifying (though they could have), the extent of Millennium revenue from the business practices under scrutiny. *Id.* ¶ 64.

*Third*, Defendants cite general exculpatory and non-reliance clauses, investor "sophistication," and lack of a "special relationship" with investors as grounds to dismiss Plaintiff's contract, negligent misrepresentation, and breach of fiduciary duty claims. These arguments fail because the Complaint more than adequately alleges (i) Defendants' bad faith, conflicts of interest, and self-dealing in eliminating their pre-existing, unwanted credit exposure to Millennium, (ii) Defendants' unique and superior access to material inside information concerning Millennium, and (iii) Defendants' actual knowledge that conditions precedent to the Note offering were unsatisfied.

Indeed, Defendants not only *knew* that Millennium breached the credit agreement for the Notes, they *caused* the breach to ensure they could offload the Notes and their own risk on investors. As Millennium's deal counsel stated at the time: "[T]he [Defendant] Underwriters . . . rejected . . . 'any possibility of disclosure to [investors] of material litigations [involving Millennium], ***requiring instead a clear representation that we [the Company] are not subject to***

*any material litigation at all*.'" Compl. ¶ 72 (emphasis added). In addition, the Complaint details how Defendants suborned inflated credit ratings for the Notes, (*id.* ¶ 51), prepared written scripts with deliberately false and misleading answers to investors' questions, (*id.* ¶ 80), and then in fact responded falsely to such questions. *Id.* ¶¶ 80-90.

## FACTUAL BACKGROUND

Millennium was a San Diego-based urine drug-testing lab company that in March 2012 became the focus of a DOJ criminal and civil investigation into federal health law violations. Compl. ¶¶ 26-40.[2] Only weeks before Millennium received its first DOJ subpoena in 2012, Defendants JPMNA, JPM Securities, STRH, BMO, and SunTrust, among others, had committed to a traditional banking relationship with Millennium that included a $310 million term loan. *Id.* ¶¶ 31-32. Immediately upon receipt of the subpoena, the banks' counsel were briefed by Millennium's inside and outside counsel on the scope of the DOJ Investigation. *Id.* ¶ 41.

From then on, Defendants were privy to a wide range of inside information concerning the business practices under investigation: (a) kick-backs to physicians in the form of free urine test cups for in-office diagnoses, conditioned on referral of urine samples to Millennium for "confirmatory" testing, and (b) inducing and pressuring physicians to use a "standard" order form that triggered urine testing well beyond medically-necessary tests. Compl. ¶¶ 35-38 & Ex. A (DOJ Compl.). An unfair competition suit filed in 2011 by Millennium competitor Ameritox Ltd. (the "Ameritox Litigation") also challenged the kick-back scheme. *Id.* ¶ 39.

---

[2] Originally a "C" corporation under California law, Millennium Laboratories, Inc. converted to a California limited liability company days before the 2014 Note offering closed and, a few months later, changed its name to Millennium Health LLC. Capitalized terms used but not defined herein have the meaning set forth in the Complaint.

Given their inside information about the extent of Millennium's legal liabilities, the Defendants that had participated in the 2012 $310 million loan became anxious to eliminate their credit exposure to Millennium. *Id.* ¶¶ 41-49. Unable to entice a third-party to buy the Company, and unwilling to subject themselves to the scrutiny of a typical public securities offering, Defendants and Millennium Insiders elected to recapitalize the Company through a $1.775 billion "leveraged loan" syndication to institutional investors, to be accompanied by an extraordinary dividend of the loan proceeds (other than about $535 million used to refinance the 2012 debt, redeem debentures held by the Company's private equity investor, and pay transaction fees to Defendants) to the Insiders themselves, thus leaving Millennium with all of the new debt and none of the proceeds ("2014 Transaction"). *Id.* ¶¶ 59, 69.

In a commitment letter dated March 16, 2014 ("Commitment Letter"), Defendants JPMNA, CitiGlobal, BMO, and SunTrust agreed with Millennium that they would finance portions of the total amount of new debt (at that time, $1.765 billion) as "Initial Lenders," *provided* that JPM Securities and CitiGlobal were entitled to syndicate the entirety of the financing to a group of institutions. BMOCap and SunTrust became "co-managers" of the syndication. Compl. ¶¶ 66-67.[3] STRH acted as an "Arranger." *Id.* ¶ 19. The financing was what is known in securities parlance as a "firm commitment underwriting" in which a financial institution commits to buy an issuer's securities regardless of whether it is able to re-sell them in a distribution to other investors. *Id.* ¶ 105.

Defendants were uniquely positioned to quantify Millennium's legal-regulatory risks (Compl. ¶¶ 64, 116), but they consciously avoided that topic in discussions with Millennium's

---

[3] A copy of the Commitment Letter is annexed to the Viapiano Declaration submitted with Defendants' Motion as Exhibit C.

inside and outside counsel. Moreover, Defendants refused to allow Millennium to disclose to potential investors or credit rating agencies even the *existence* of the DOJ Investigation, let alone its intense level of activity as of March-April 2014. And Defendants affirmatively misrepresented the status of both the DOJ Investigation and the Ameritox Litigation to the few investors who knew to ask about their existence. As the Complaint alleges:

- In a short telephone conversation on March 7, 2014 among all underwriters, their counsel and Millennium's outside counsel on the DOJ Investigation, the underwriters asked leading questions designed to obtain an off-the-cuff "lack of materiality" opinion based merely on outside counsel's comparison of the "egregiousness" of Millennium's alleged conduct with that of *other* laboratory companies that had reached government settlements of $20 million or less. Compl. ¶¶ 55-59.

- Only one week later – shortly *after* Defendants' commitment committees had approved the 2014 Transaction – Millennium's inside counsel provided underwriters' counsel with more detailed information concerning (i) the Company's contemporaneous meetings with the U.S. Attorneys' Office, (ii) the worst-case damages in the Ameritox Litigation (hundreds of millions of dollars with trial only two months away), and (iii) the likelihood of an adverse verdict in the Ameritox Litigation fueling the DOJ Investigation. *Id.* ¶¶ 62-63.

- JP Morgan refused Millennium's attempts to put *any* information in the Confidential Information Memorandum ("CIM") and Investor Presentation relating to business practices at issue in the DOJ Investigation and Ameritox Litigation, or the associated risks of those proceedings. Compl. ¶¶ 72-74. Not only that, these materials affirmatively misrepresented Millennium's regulatory compliance and falsely attributed Millennium's "organic" growth to superior technology and customer service rather than the kick-back and other illegal business practices that Defendants knew were under challenge. *Id.* ¶¶ 75-77.[4]

- In case any potential investor asked about government investigations or litigation, JP Morgan scripted for Millennium management answers such as a "non-event; have not heard from them [DOJ] in some time," which were deliberately false and misleading in light of Defendants' knowledge of the recent activity in the DOJ Investigation, the upcoming trial of the Ameritox Litigation, and the relative amounts at issue in each

---

[4] Dozens of specific misstatements of existing material fact and omissions of existing facts necessary to render statements in the Offering Materials not materially misleading are cited at paragraphs 76 through 79 of the Complaint. The Offering Materials are defined in the Complaint to include an expansive set of written materials, and other oral and written communications. Compl. ¶ 91. A copy of the 2014 Credit Agreement (cited herein as "CA") is annexed to the Viapiano Decl. that Defendants submitted with their Motion, as Exhibit A.

proceeding. *Id.* ¶¶ 80-82.

- Defendants' employees and their counsel themselves fielded many investor inquiries about the same issues and gave the same duplicitous answers that they had scripted for Millennium management. They also repeated a $20 million exposure figure cited by Millennium's outside counsel, even though they knew it had no basis in facts specific to Millennium; and they went even further by without basis denigrating suspected *qui tam* actions as spiteful retaliation by discharged employees sponsored by Millennium competitors. *Id.* ¶¶ 83-88.

In the two weeks between the initial presentation to potential investors and April 15, 2014, the Arranger-Defendants (JPM Securities, CitiGlobal, BMOCap, and STRH) generated purchase commitments from asset managers, investment advisors, and institutions that guaranteed that none of those Defendants or their lending affiliates would have to hold any of the Notes. *Id.* ¶¶ 92-93.[5] At the closing of the 2014 Transaction on April 16, 2014, JPMNA made the initial loan of $1.775 billion to Millennium and simultaneously triggered the commitments of third-party investors to purchase that entire amount from JPMNA as agent for the Defendant lenders.

After their initial distribution, the Millennium Notes opened for secondary trading. JPM Securities wrote to Millennium Insiders that the Millennium Notes, issued at a price of 99 cents on the dollar, "broke for trading at 99.125 and [have] since traded up to the 99.25." *Id.* ¶ 96; *see also id.* ¶ 115. The initial investors could engage in secondary trading either by outright sale of the Notes ("assignment") or by retaining title, but allowing the third party to share in interest and principal payments ("participation"). *Id.* ¶¶ 94-95. No consent was required from Millennium, or

---

[5] Because all risk had been shifted to the investors, the Arranger-Defendants executed what is referred to as a "Fronting Letter" (Tretter Decl. Ex. A) in which JPM Securities agreed with the others that "[t]o facilitate the closing . . . on April 16, 2014 . . . and as an accommodation," JPM Securities itself or JPMNA "will fund 100% on the Initial Funding Date." The other Defendants remained on-the-hook to the extent investors did not honor their commitments. At the same time, in a "Master Consent to Assignment," JPMNA obtained consent from Millennium to allocate the entirety of the $1.775 billion amount to be "fronted" by it (and a small overallotment) totaling $1.789 billion to 61 managers, advisors, and institutions, (Compl. ¶ 95), with the understanding that many would sub-allocate to their hundreds of affiliates and clients.

JPMNA as agent, for a trade of a participation and only a limited, "negative" consent was required for certain assignments.[6]

By closing the transaction and thereby triggering the funding commitments of initial investors, JPMNA breached both its fiduciary duty as Administrative Agent under the Credit Agreement and its contractual duties, express and implied, to investors under the Credit Agreement and associated assignment documents. Compl. ¶ 6. Under the Credit Agreement, there could be no Closing Date unless "the conditions precedent set forth in Section 5.1 shall have been satisfied." CA § 1.1 (definition of "Closing Date"). Among the several conditions precedent, Millennium was required to certify to JPMNA that the Company was in compliance with all representations and warranties in the Agreement, such as the existence of no material litigation or government investigation, and the accuracy of its financial statements and projections. Compl. ¶¶ 99-101. JPMNA knew that Millennium's representations and warranties were false (indeed, it had refused Millennium's request to disclose material litigation and investigations), and that it had no right to rely on Millennium's closing certificate. *E.g.*, *Id.* ¶ 205(a); CA § 9.4 (Agent entitled to rely on certificates "believed by it to be genuine and correct"). For this reason, JPMNA acted illegally in closing the initial loan under Sections 2.1 and 2.2 of the Credit Agreement, and in elevating its self-interest in eliminating its credit exposure to Millennium and in receiving huge transaction fees

---

[6] If an initial investor wanted to sell to a third party unaffiliated with another existing investor, a written request was required, which if not acted on within five days was deemed approved and for which, in any event, approval could not be unreasonably withheld, conditioned, or delayed. CA § 10.6(b)(i)(A). Trades to third parties had to be in increments of at least $1 million unless the existing investor assigned its "entire remaining amount" under $1 million to the third party. *Id*. § 10.6(b)(ii)(A). There was no minimum amount on trades with affiliates of initial investors, and thus, many such investors had holdings well under $1 million. *See, e.g.*, Trade Ticket #1606471 between JPMNA and Brigade Capital Management ("Brigade"), dated April 15, 2014 (identifying numerous "SubAccount[s]/Fund[s]" with investment amounts between $130,000 and $665,000) (Tretter Decl. Ex. B) (hereinafter "Brigade Trade Ticket").

over the interests of the investors for whom it acted as agent. Compl. ¶ 105. JPMNA also violated

Section 5.2 of the Credit Agreement and JPMNA's implied-in-law warranties as assignor of the

Notes in triggering and executing upon the commitments of the initial investors to repay the

underwriters for whom JPMNA had fronted. Between the April 16, 2014 closing and April 25,

2014, JPMNA executed Note assignments with hundreds of investors.[7]

      After laying off the entirety of the $1.775 billion Millennium Note offering to roughly 400

investors by the end of April 2014, JPMNA had a primary duty as Administrative Agent to convey

information from and about Millennium to investors, such as material developments in the

Ameritox Litigation or the DOJ Investigation, so that investors could determine whether to

exercise their rights under the Credit Agreement or otherwise. Compl. ¶¶ 107-09. On June 16,

2014, just two months after investors purchased the Notes, Millennium lost the Ameritox

Litigation. *Id.* ¶ 110. Defendants knew even before the 2014 Transaction closed that the loss of the

Ameritox Litigation would further ramp up the DOJ Investigation (*id.* ¶ 62), but they failed to

inform the investors prior to the closing or at the time of the adverse verdict. *Id.* ¶ 115. JPM

Securities did, however, tell Millennium management just days after that the verdict had erased

$500 million of the Company's value. *Id.* ¶ 114. In December 2014, the DOJ notified Millennium

that it would intervene in civil False Claims Act proceedings previously commenced by *qui tam*

relators over the Company's health law violations and, in February 2015, the federal Centers for

---

[7] Under Section 5.2, the commitment of each investor to extend any credit "requested to be made by it on any date (including its initial extension . . . )" was also conditioned on, among other things, Millennium's "representations and warranties . . . [being] true and correct in all material respects on and as of such date as if made on such date" and "[n]o Default or Event of Default shall have occurred and be continuing on such date."

The form of Assignment and Assumption Agreement is annexed as Exhibit D-1 to the Credit Agreement. Annexed as Exhibits C and D to the Tretter Declaration are examples of the "Institutional Allocation Confirmation" and "Assignment and Assumption Agreement" between JPMNA and one Sub Account/Fund of Brigade.

Medicare and Medicaid Services threatened to revoke Millennium's Medicare eligibility in light of allegations of flagrantly illegal billing practices. *Id.* ¶¶ 118-20. Employees of JPM Securities and JPMNA learned of, and failed to notify investors about, these and other important events as they happened. Millennium itself did not inform investors of its settlement in principle with the federal government and state Medicaid programs for $256 million until May 2015. *Id.* ¶¶ 121-23.

Millennium finalized this government settlement as of October 16, 2015 and, less than a month later, on November 10, 2015, the Company and certain of its affiliates filed for bankruptcy (the "Millennium Bankruptcy"). *Id.* ¶ 124. The Lender Trust was formed and its Trustee appointed under (i) the Millennium Bankruptcy Plan confirmed on December 14, 2015 and (ii) the Millennium Lender Claim Trust Agreement dated December 21, 2015. *Id.* ¶ 11.

## ARGUMENT

## I.     THE COMPLAINT STATES BLUE SKY CLAIMS

### A.  The Blue Sky Claims Raise Fact Issues that Bar Dismissal

Whether an instrument constitutes a "security" under state or federal law is a fact-intensive question and generally "not appropriately resolved on a motion to dismiss." *S.E.C. v. Rorech*, 673 F. Supp. 2d 217, 225 (S.D.N.Y. 2009) (citation omitted); *see, e.g.*, *United States v. Zaslavskiy*, No. 17 CR 647 (RJD), 2018 WL 4346339, at *4 (E.D.N.Y. Sept. 11, 2018) (highly fact-specific inquiry requiring "case-by-case analysis into the economic realities of the underlying transaction[s]") (citations omitted); *Lampel v. Higa*, No. CV 05-00842-ABC(MAN), 2009 WL 1514656, at *13 (C.D. Cal. May 27, 2009) ("Under California case law, . . . the jury . . . decides, as a question of fact, whether the particular investment at issue meets th[e] definition" of security under California blue sky law) (citation omitted); *Holding v. Cook*, 521 F. Supp. 2d 832, 835, 839 (C.D. Ill. 2007) (whether instrument constitutes security "is better left to a developed factual record

10

after adequate time for discovery"); *Stechler v. Sidley, Austin Brown & Wood, L.L.P.*, 382 F. Supp. 2d 580, 596–97 (S.D.N.Y. 2005) ("definition of 'security' . . . ultimately turns on . . . issues of fact," such as nature and operation of secondary market); *Adams v. Hyannis Harborview, Inc.*, 838 F. Supp. 676, 685-86 (D. Mass. 1993) (trier of fact must examine "what was promoted, what the buyers expected … and what was, in fact, purchased" to determine whether instruments are "securities subject to applicable [Massachusetts] and federal securities laws"); *People v. Mendenhall*, 363 P.3d 758, 768 (Colo. App. 2015) (applying fact-intensive *Reves* test); *Consol. Mgmt. Grp., LLC v. Dep't of Corps.*, 162 Cal. App. 4th 598, 609 (Ct. App. 1 Dist. 2008) ("Whether an investment constitutes a security [under California's blue sky law] is a question of fact."); *Topping v. Sullivan*, 496 N.E.2d 8, 10 (Ill. App. 1 Dist. 1986) ("[b]ased on the facts before the circuit court . . . plaintiff purchased a security" under Illinois Blue Sky law).[8]

Both federal and state courts utilize the "family resemblance" test adopted by the Supreme Court in *Reves v. Ernst & Young*, 494 U.S. 56 (1990), to determine whether a note constitutes a security.[9] The test "begin[s] with *a presumption that every note is a security*." *Id.* at 65 (emphasis

---

[8] Although they fail to acknowledge that the question of what constitutes a "security" is intensely factual, Defendants accept that federal law is "persuasive in determining whether a particular instrument is subject to state securities laws." MTD at 11.

[9] Defendants agree that the *Reves* "family resemblance" test applies to the blue sky laws of Massachusetts, Colorado, and Illinois (MTD at 11-12), but claim that California does *not* apply *Reves* and instead applies the "risk capital test" alongside the "*Howey*" test. *Id.* at 12 (citing no authority). This is incorrect. *See Yokell v. Draper*, No. 18-cv-02124 (JSC), 2018 WL 3417514 (N.D. Cal. July 13, 2018) (because *Reves*, not *Howey*, applies to notes, "the Court will first conduct its analysis [of California blue sky violations] under the *Reves* test"); *id.* ("security" need only satisfy *Reves* test). Moreover, were it relevant, the Notes would also satisfy the "risk capital" test because the collateral securing the Notes was insufficient. *See Leyva v. Superior Court*, 164 Cal. App. 3d 462, 470 (Ct. App. 4th Dist. 985) ("'[R]isk capital' test generally defines a superficial loan transaction as a security if investors are dependent on the promoter's success for a return on the investment; and courts will find dependency where the investors receive inadequate collateral."); *People v. Superior Court*, No. H045437, 2018 WL 4214736, at *7 (Ct. App. 6th Dist. Sept. 5, 2018) ("The return on any investment which has not been secured with

added). "[T]hat presumption may be rebutted *only* by a showing that the note bears a strong resemblance . . . to one of the enumerated categories of instrument[s that are not securities]." *Id.* at 67 (emphasis added).

Of those enumerated categories of "non-securities," Defendants invoke just one category: notes evidencing loans by commercial banks for the borrower's current operations. MTD at 1.[10] This claim plainly fails because the Millennium Note investors were *not* "commercial banks" (they were mutual funds, pension funds, and other non-bank investors) and the use of proceeds was *not* for Millennium's "current operations" but instead primarily for funding an extraordinary dividend to Millennium Insiders. *See* Compl. ¶¶ 45-46; *see also In re Millennium Lab Holdings II, LLC*, No. 15-12284 (LSS), 2019 WL 1005657, at *6 (Bankr. D. Del. Feb. 28, 2019) ("*MLH Bankr.*") (holding Plaintiff, acting as Trustee of the Millennium Corporate Claim Trust, adequately pled that "the 2014 Transaction provided no value to Millennium").

### B. The Millennium Notes Are Securities Under *Reves*

The *Reves* "family resemblance" test looks at four factors: (1) "the motivations that would prompt a reasonable seller and buyer to enter into [the transaction]"; (2) "the 'plan of distribution' of the instrument"; (3) "the reasonable expectations of the investing public"; and (4) "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the [securities laws] unnecessary." *Reves*, 494

---

adequate collateral depends on the success of the business. This is true whether the investment contemplates a percentage of the profits or a fixed return.").

[10] The complete categories of "non-securities" are: (1) "the note delivered in consumer financing"; (2) "the note secured by a mortgage on a home"; (3) "the short-term note secured by a lien on a small business or some of its assets"; (4) "the note evidencing a 'character' loan to a bank customer"; (5) "short-term notes secured by an assignment of accounts receivable'"; (6) "a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)"; and (7) "notes evidencing loans by commercial banks for current operations." *Reves*, 494 U.S. at 65.

U.S. at 66-67. "Failure to satisfy one of factors is not dispositive; they are considered as a whole." *S.E.C. v. Wallenbrock,* 313 F.3d 532, 537 (9th Cir. 2002). These factors strongly support treating the Notes as securities.

### 1.   Investment Motivations of Buyer and Seller

"[T]he fundamental essence of a 'security' [is] its character as an 'investment.'" *Reves*, 494 U.S. at 68-69. "The inquiry is whether the motivations are investment (suggesting a security) or commercial or consumer (suggesting a non-security)." *Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 812 (2d Cir. 1994). From the buyer's perspective, notes are presumed to be held for investment purposes because "'profit' means 'a valuable return on an investment,' which undoubtedly includes interest.'" *Id.* at 813 (quoting *Reves*, 494 U.S. at 68 n.4). Where, as here, an investment advisor for the ultimate beneficial holder obtains instruments as part of an investment portfolio, the buyer's motivation is "not even a close question." *Id.* at 813.[11]

Where the "buyer's motivation [is] so clearly to invest," the seller's motivation is of less significance. *Pollack*, 27 F.3d at 813. Nevertheless, there is no doubt that the Defendants-sellers did not intend to engage in commercial lending since they eliminated their exposure under the prior credit facility, held none of the new financing, arranged for the credit ratings and sale of the Notes with investors, and supported a secondary market that emulated an over-the-counter securities market. Upon closing the 2014 Transaction, they exchanged e-mails with Millennium

---

[11] The following pension and retirement funds are examples of ultimate purchasers of Millennium Notes for their own investment portfolios: The Coca-Cola Company Master Retirement Trust; FedEx Corporation Employees' Pension Trust; FirstEnergy System Master Retirement Trust; Los Angeles County Employees Retirement Association; Maryland State Retirement and Pension System; Municipal Employees' Annuity and Benefit Fund of Chicago; Ontario Public Service Employees Union Pension Plan Trust Fund; and Oregon Public Employees Retirement Fund. *See MLH Bankr.*, Am. Plan, pp. 110-17 ("Summary of Participating Lender Signatures") (ECF 182-2).

executives like any group of securities underwriters and broker-dealers about how the Notes were performing in secondary trading and what that trading indicated as to whether Millennium could have raised even more money. Compl. ¶ 96. Defendant JP Morgan assigned to Millennium an analyst who normally covered high-yield debt securities. He noted to Millennium Insiders that his job would be "similar to an Equity analyst," and that the only "key difference here" was that "because [Millennium's] financials would not be filed with the SEC," he would not write research notes; instead "all dialogue *with investor clients* is verbal." *Id.* ¶ 108 (emphasis added).

Defendants repeatedly cite a handful of references to "borrower" or "lender" in various documents as purported evidence of a "commercial lending" transaction (MTD at 2, 5, 16 n.18), but they ignore that the cover page of the CIM is directed to *"Investors,"* the CIM elsewhere treats participants as *"investors"* (CIM at 12) ("Public investors dial-in"), and that Defendants otherwise employed practices and terminology specific to an investment transaction.[12] Even if it were relevant, the use of "lending" terminology with respect to the Notes is thus negated by the frequent and simultaneous use of terminology and practices reflecting the economic reality of an "investment" transaction. *See S.E.C. v. Zada*, 787 F.3d 375, 381 (6th Cir. 2015) ("A corporate bond, for example, is both a loan to the corporation and an investment for the lender. Moreover, in determining whether an investment is a security, we look to 'economic realities [,]' not to 'moniker[s] or label[s].'") (citation omitted). Because the investors' unmistakable motivation for

---

[12] *See* CIM at 9 (J.P. Morgan transaction team includes Managing Director in the "Capital Markets" group); Compl. ¶ 70 ("Lead Arrangers helped Millennium create . . . an *Investor Presentation*"); *id.* ¶ 71 ("The Millennium securities offering anticipated two categories of Investors: 'Public Side Investors' . . . and 'Private Side Investors'"); *id.* ¶ 96 (tracking Millennium Notes' trading prices at issuance); *id.* ¶108 (J.P. Morgan's post-offering assignment of a "High Yield Research Analyst," self-described as "similar to an Equity Analyst," to introduce new investors to Millennium Notes); *id.* ¶ 115 (tracking Millennium Notes' trading prices after adverse Ameritox verdict). A copy of the CIM is annexed to the Viapiano Decl. as Exhibit B.

14

purchasing the Millennium Notes was to invest, the first *Reves* factor is not even a close question but instead decidedly weighs in favor of the Notes being securities.

### 2.   Wide Distribution and Secondary Trading

The plan of distribution also weighs heavily in favor of finding that the Millennium Notes are securities. Whereas *Banco Espanol* involved no secondary trading at all, *see Banco I*, 763 F.Supp. 36, 40 (S.D.N.Y. 1991) (permission to trade was never "requested nor given"),[13] the Notes had several features that promoted a wide distribution and active secondary trading. The Commitment Letter establishes that the Defendant banks, as "Initial Lenders," acted as "firm-commitment underwriters" and that the Defendant broker-dealers acted as "Arrangers." They all intended to solicit numerous non-bank institutional investors to purchase the entirety of the Note offering, leaving nothing for Defendants themselves. *See* Compl. ¶¶ 66, 92-93; *see also id.* ¶ 50 ("Banks do not play in deals like this given the leverage and lack of covenants."). Distribution was also dependent on obtaining ratings from rating agencies, just as in high-yield security issuances. *Id.* ¶ 51. Defendants solicited hundreds of investment managers across the country to place an order "with your [arranger] salesperson" (*id.* ¶ 93) for purposes of sub-allocations to hundreds more of the managers' accounts. *Id.* ¶¶ 94-95. The minimum amount required to invest in the Millennium Notes was extremely low, only $1,000,000 in a $1.775 billion transaction, which promoted a wider distribution. CA § 10.6(b)(ii)(A). As a practical matter, the minimum investment was even lower as the $1,000,000 threshold did not apply to the investment managers' clients. *See supra* n.6.

---

[13] The district court's opinion, referred to herein as "*Banco I*," contains such additional factual detail. *See generally Banco Espanol de Credito v. Security Pacific Nat. Bank*, 763 F.Supp. 36 (S.D.N.Y. 1991) ("*Banco I*").

The Notes began trading in secondary markets immediately upon the 2014 Transaction's closing and were subject to daily price fluctuations. Compl. ¶¶ 96, 115. The Credit Agreement gave the initial (and subsequent) investors different options for trading: outright sales known as "assignments"; or "participations" in which the seller would retain title, but share its economic interests with buyers.[14] Investors were not required to obtain *any* permission to sell a participation or make certain assignments, and only a minimal five-day waiting period was required before a sale of other assignments. *See supra* n.6 and accompanying text (summarizing CA § 10.6(b)).

### 3.   Investors' Reasonable Expectations

The reasonable expectations of the investing public operates as an "escape hatch by which instruments are deemed securities 'even where an economic analysis of the . . . particular transaction might suggest that the instruments are not securities.'" *Fox v. Dream Tr.*, 743 F. Supp. 2d 389, 400 (D.N.J. 2010) (quoting *Reves*, 494 U.S. at 67). "But it operates as a 'one-way ratchet,' such that failure to satisfy it does not weigh against a finding that a [sic] instrument is a security." *Fox*, 743 F. Supp. 2d at 400. Thus, even if some market participants generally do not view syndicated loans as securities, that fact does not weigh against deeming the Millennium Notes to be securities. In any event, the reasonable expectation factor *favors* treating the Millennium Notes as securities. The Credit Agreement and CIM provisions concerning the receipt and use of material non-public information ("MNPI") reflect the parties' understanding and expectation that *purchases and sales of the Millennium Notes* (and not merely other securities) may be subject to

---

[14] "Loan sales are structured as either assignments or participations . . . ." S&P Global Market Intelligence, *A Syndicated Loan Primer*, April 2016, at 14. In a participation, "the buyer takes a participating interest in the selling lender's commitment" and "[t]he lender remains the official holder of the loan, with the participant owning the rights to the amount purchased." *Id.* at 15. "In an assignment, the assignee become a direct signatory to the loan and receives interest and principal payments directly from the administrative agent." *Id.* at 14.

Federal and state securities laws. For example, the Credit Agreement defines MNPI to include "*any information* regarding the Borrower, . . . [its] assets, its ability to perform its Obligations or any other matter *that would reasonably be expected to be material to a decision by any [investor] to . . . assign or acquire any Tranche B Term Loans [i.e., Millennium Notes]*." CA at 24 (emphasis added). Indeed, the Credit Agreement includes an express acknowledgement by investors that they will "handle such [MNPI] in accordance with [compliance] procedures [they have developed] and applicable law, *including Federal and state securities laws*." *Id.* § 10.15 (emphasis added). The CIM similarly contains an acknowledgement and agreement by prospective "public-side" investors "to use all information in [the CIM] in accordance with . . . *United States Federal or State securities laws . . . .*" CIM at 2 (emphasis added). Unless the parties anticipated that the Notes could be deemed "securities," there was no need to define MNPI in a way that captured information material to trading in the Millennium Notes under the state and Federal securities laws.[15]

Indeed, whatever similarities early generations of syndicated bank loans once shared with traditional commercial lending, the Note offering mirrored a high yield bond issuance. *See* Maura E. O'Sullivan and Benjamin M. Cheng (Shearman & Sterling LLP), *Term Loans and High Yield Bonds: Tracking the Convergence*, Practical Law The Journal, July/August 2012, at 62 ("In the current market . . . , term loans in particular are widely distributed . . . . Further, arrangers no longer expect to hold any portion of the term loan. Their principal task is to negotiate a loan that they can *sell to other investors in the market who are more like bond investors than traditional commercial bank lenders.*") (emphasis added); *see also* Meyer C. Dworkin & Monica Holland (Davis Polk & Wardell LLP), *The International Comparative Guide to Lending & Secured*

---

[15] "For [insider trading] restrictions to apply . . . the instruments traded must be 'securities' under the U.S. securities laws." *The International Comparative Legal Guide to Lending & Secured Finance 2016*, at 28.

*Finance 2014*, 26 (2d ed. 2014) ("The U.S. TLB [term loan B] market has its origins in the commercial bank term loan market. . . .  Practitioners active in today's U.S. TLB market will scarcely recognize this paradigm.").

Defendants nonetheless contend that the market's supposed "settled expectations" and "clearly expressed understanding" compel the conclusion that the Notes are not securities as a matter of law. MTD at 2, 9, 11. A party's one-sided testimonial about trade custom and usage, however, is inappropriate and irrelevant on a motion to dismiss. In any event, Defendants' position is disingenuous. Outside this litigation, market participants (including Defendants' law firms) have openly acknowledged that the status of syndicated debt is less a settled expectation than an uneasy "assumption" that "is not universally held" and "not free from doubt." *See, e.g.*, *Private Equity, Restructuring and Finance Developments – Trading in Distressed Debt*, Wachtell, Lipton, Rosen & Katz (Jan. 20, 2009) ("There are some, including former SEC Chairman Harvey Pitt, who believe that, *as more non-banks trade in the bank debt market, bank debt could be considered a security*.") (emphasis added); Kenneth J. Steinberg & Darren S. Klein, Davis Polk & Wardwell LLP, "Similar But Not The Same: Some Ways in Which Bonds and Loans Will Differ in a Restructuring", *The International Comparative Legal Guide to Lending & Secured Finance* 29 (4th ed. 2016) ("[i]nterests in bank loans have typically not been considered securities," but "this assumption is not free from doubt – and has generated some skepticism around institutional bank loans . . ., particularly as convergence moves this market closer to the bond market in many respects"). In brief, Defendants' breathless policy arguments about how denying the Motion will "throw a multi-trillion dollar sector of the credit markets into disarray" (MTD at 2) are fanciful and plainly overblown.

#### 4.   Absence of Another Regulatory Scheme or Other Factors

The fourth and final *Reves* factor also militates in favor of treating the Notes as securities because there is not "another regulatory scheme" that "significantly reduces the risk of the instrument, thereby rendering application of the securities laws unnecessary." *Reves*, 494 U.S. at 67. Defendants cite the joint interagency guidance on leveraged lending issued by the Office of the Comptroller of the Currency ("OCC"), Federal Deposit Insurance Corporation ("FDIC"), and Federal Reserve Board; the policy guidelines issued by the OCC; and the Shared National Credits Program. MTD at 16. These measures, however, all address risk management controls to ensure sound banking practices and minimize risks *to banks*, not risks *to non-bank investors* in debt instruments due to conduct *by the banks* and others in the offering of such instruments. *See, e.g.*, *Interagency Guidance on Leveraged Lending* (March 21, 2013) at 3 ("A lack of robust risk management processes and controls at a financial institution with significant leveraged lending activities could contribute to supervisory findings that the financial institution is engaged in unsafe-and-unsound banking practices."); OCC, *SNC Program Description and Guidelines* (May 1998) at 1 ("The SNC Program is an interagency program designed to review and assess risk in the largest and most complex credits *shared by multiple financial institutions*.") (emphasis added); OCC, *Leveraged Lending: Comptroller's Handbook* (2008) at 5 (noting that "Risks Associated with Leveraged Lending," "are not mutually exclusive" and that "any product or service *may expose a bank to multiple risks*.") (emphasis added).

While these and similar measures "are useful in regulating the banking industry, their focus is the protection of banks and their shareholders from default or other credit risks. They do not provide any direct protection to [investors]." *Procter & Gamble Co. v. Bankers Tr. Co.*, 925 F. Supp. 1270, 1280 (S.D. Ohio 1996); *see also In re NBW Commercial Paper Litig.*, 813 F. Supp.

7, 13–14 (D.D.C. 1992) ("None of these, however, provides sufficient protection to the *investor,* the goal of the Securities Acts and of this portion of the analysis. For instance, the Federal Reserve Board . . . is designed to ensure the stability of banks and bank holding companies, not to protect the investor."). Recently, legislators have called for more regulation especially in the investor-protection area, noting that "the large leveraged lending market exhibits many of the characteristics of the pre-2008 subprime mortgage market. . . . Many of the loans are securitized and sold to investors . . . allowing the loan originators to pass the risk of poor underwriting on to investors." Letter from U.S. Senator Elizabeth Warren to regulators on leveraged lending (Nov. 14, 2018) (Tretter Decl. Ex. E). Just last month, SEC Commissioner Robert Jackson Jr. noted the need for additional investor protections in the leveraged loan market. *See* Lisa Lee, *Leveraged Loan Risks May Require Legislation, SEC's Jackson Says*, Bloomberg, (Apr. 17, 2019), https://www.bloomberg.com/news/articles/2019-04-17/leveraged-loan-risks-may-require-legislation-sec-s-jackson-says. The daunting politics in passing new securities legislation or regulation aimed at protecting investors in the rapidly growing and changing leveraged loan marketplace makes all-the-more important the judicial function under *Reves* of carefully interpreting the existing securities laws in their application to this form of investment.

In sum, even prior to discovery, the *Reves* factors strongly reflect that the Millennium Notes bear no resemblance to notes evidencing *loans by commercial banks for current operations*, and therefore Defendants cannot rebut the presumption that the Notes are securities.

### C. *Banco Espanol* Does Not Support The Motion to Dismiss

Defendants' reference to decades of precedent supporting the Motion (MTD at 1) boils down to one case: the nearly 30-year old decision in *Banco Espanol*, 973 F.2d 51 (2d Cir. 1992). That decision (i) predates the major shifts in the syndicated loan market and its convergence with

the high-yield bond market, (ii) was not rendered until summary judgment after discovery, (iii) addressed materially different instruments, terms, and distribution from the Millennium Notes, *id.* at 56 ("We rule only with respect to the loan participations as marketed in this case"),[16] and (iv) anticipated that in future cases "even if an underlying instrument is not a security, the manner in which participations in that instrument are used, pooled or marketed might establish that such participations are securities." *Id.* Significantly, even if the first step in the 2014 Transaction—*i.e.*, the four "Initial Lender" Defendants' term loan to Millennium—would not itself qualify as a security, *Banco Espanol* plainly indicates that the marketing of the Notes and their immediate distribution pursuant to assignments, sub-assignments, and participations among the hundreds of investment managers, funds, and other secondary buyers would qualify the Notes as securities.

In *Pollack*, 27 F.3d at 813, decided two years after *Banco Espanol*, Judge Feinberg, one of the two judges in the 2-1 *Banco Espanol* majority, explained that the discovery record in *Banco Espanol* evidenced a small distribution "more analogous to a group of highly sophisticated *commercial entities engaging in short-term commercial financing arrangements* than to the securities markets." (emphasis added).[17] Specifically, a bank called Security Pacific made a series of short-term loans to a borrower called Integrated Resources, Inc. ("Integrated"). *Banco Espanol*, 973 F.2d at 53. The loan maturities were "concentrat[ed] in the overnight to 30-day range." *Id.* at 57. These were revolving loans made under a line of credit to address Integrated's "short-term cash needs" to "finance current operations or to cover a temporary cash shortage." *Banco I*, 763 F.

---

[16] "The question of whether syndicated loans in their current incarnation are securities has not yet come before the courts. The case that is thought to be authoritative on this question, [*Banco Espanol*], deals with their precursor--loan participations." Elisabeth de Fontenay, *Do the Securities Laws Matter? The Rise of the Leveraged Loan Market*, 39 J. Corp. L. 725, 749 (2014).

[17] *See also Banco I*, 763 F. Supp. at 37 (noting the "*facts and the depositions which are part of the record*" provide a sufficient "basis for a Rule 56 determination of the issues") (emphasis added).

Supp. at 39, 42-43. They carried a "fixed rate of interest." *Id.* at 43.

- By contrast, the Millennium Notes evidenced a $1.775 billion term loan with a seven-year maturity and variable interest rate. CA § 1.1. The loan proceeds did not finance current operations, but instead principally funded an extraordinary dividend to Insiders and enriched Defendants by earning them huge transaction fees and eliminating their prior exposure to Millennium, leaving the Company with none of the proceeds. *See* Compl. ¶ 53.

In *Banco Espanol*, the lender Security Pacific did not exit its direct relationship with Integrated as the bank Defendants did with respect to Millennium; rather, it sold only "participations" in its Integrated loans to various purchasers, but paid less in interest on the participations than Security Pacific received directly from Integrated. *Banco I*, 763 F. Supp. at 37, 39. By remaining a lender, Security Pacific earned a fee equal to the difference between the interest rate it received from Integrated and the lower interest rate it paid to the loan participant. *Id.* at 39. The specific transactions at issue in *Banco Espanol* concerned only "17 participations by the 11 plaintiffs" (most of whom were fellow commercial banks) during mid-April 1989 through June 9, 1989. *See id.*; *Banco Espanol*, 973 F.2d at 53. In "1989 dollars," the participations generally ranged from $1 million - $10 million (translating to almost $2 million - $20 million in "2014 dollars"). *Banco I*, 763 F. Supp. at 39.[18]

- By contrast, JPMNA sold outright the entirety of Millennium Notes to investors and all Defendants completely exited any term loan lending relationship with the Company. Compl. ¶ 6. Approximately 400 investors purchased individual amounts of the $1.775 billion term loan, some as low as $130,000. *See* Brigade Trade Ticket (Tretter Decl. Ex. B). And those investors were exclusively non-bank institutions.

In *Banco Espanol*, purchasers of the loan participations "had no right to trade [the participation] without the prior written permission of Security Pacific [the agent]," and, in fact, such permission was never "requested nor given." *Banco I,* 763 F. Supp. at 40.

---

[18]   *See* United States Department of Labor, CPI Inflation Calculator (available at https://www.bls.gov/data/inflation_calculator.htm).

- By contrast, the Millennium investors themselves further distributed or were entitled to distribute the Notes in secondary trading through "participations" or outright "assignments" to third parties with little or no approval from Millennium or JP Morgan, *see* CA §§ 10.6(b)(i)(A), 10.6(c), and trading prices on the Notes appeared daily on Bloomberg terminals to promote such secondary trading. *See, e.g.*, Compl. ¶ 46.

In short, the Millennium Notes differ markedly from the short-term revolving loan participations in *Banco Espanol*, and the 2-1 ruling that those highly distinguishable instruments were not securities has little relevance here. (Annexed as Appendix A is a side-by-side comparison of the main differences between the *Banco Espanol* notes and the Millennium Notes).[19]

### D.  Defendants' "Fraud-By-Hindsight" Defense Should Be Rejected

Defendants raise a "fraud by hindsight" defense, claiming Plaintiff alleges a failure to "predict the future" concerning the DOJ Investigation and subsequent suit (MTD at 19), and citing authority that hindsight pleading is not "actionable." *Id*. at 18-21. These arguments lack merit because "the incantation of fraud-by-hindsight will not defeat an allegation of misrepresentations and omissions that were misleading and false *at the time they were made*." *In re Bear Stearns Companies, Inc.*, 763 F. Supp. 2d 423, 504 (S.D.N.Y. 2011) (emphasis added); *see also In re Atlas*

---

[19] Defendants also move to dismiss the Illinois blue sky claim due to late pre-suit notice. MTD at 20 n.24. This fails because the assignment of claims to the Lender Trust did not actually occur until December 14, 2015 (*see MHL Bankr.*, ECF-195) and Defendants admit that the Lender Trust provided the requisite notice within six months of that date, on June 9, 2016. Moreover, Defendants' own authority states that the knowledge of voidability necessary to start the running of the period "is a mixed question of law and fact on which a layman is entitled to acquire his first knowledge from an attorney.'" *Fewell v. Kozak*, No. 98 C 2924, 1999 WL 966447, at *8 (N.D. Ill. Oct. 19, 1999) (quoting *Buehl v. Dayson*, 127 Ill.App.3d 958, 964–65 (5th Dist. 1984)); *see also Pucci v. Santi*, 711 F. Supp. 916, 925 (N.D. Ill. 1989) (the six-month notice period "begins to run not when the plaintiff has notice of the facts giving rise to his claim, but when he has notice that these facts actually grant him a right to relief" under the statute). The mere assignment of potential claims to the Lender Trust in 2015 does not establish the requisite knowledge of rights under the statute, especially given Defendants' claim that most industry participants, including lawyers, would not view the Notes as subject to securities law claims. *Cf. 766347 Ontario Ltd. v. Zurich Capital Markets, Inc.*, 249 F. Supp. 2d 974, 988-89 (N.D. Ill. 2003) ("The six month rule regarding notice is not a statute of limitations, but rather, an equitable feature . . . .").

*Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 494-95 (S.D.N.Y. 2004) (rejecting fraud by hindsight argument where plaintiffs alleged that "the company failed to take into account information that was available to it" at the time it issued its incorrect financial results).

Plaintiff's blue sky claims (and several common law claims) are premised on Defendants' misrepresentations and omissions of ***facts existing as of March-April 2014***. Those facts include:

(1) ***the commencement and duration of the DOJ Investigation and Ameritox Litigation***, both of which had been ongoing since 2012 (Compl. ¶¶ 33, 39, 41-45, 55);

(2) ***Millennium's and its lawyers' several presentations to the DOJ in March-April 2014*** (and their preparation for summary judgment and trial in the Ameritox Litigation) ***at the very same time the Offering Materials were being disseminated*** to investors, which revealed the ***then current intensity of those matters*** (*Id.* ¶¶ 62-63, 86);

(3) ***Millennium's established business practices in effect since 2009 – "Point-of-Care Cups," "Custom Profiles," and "Troubled Practices,***" which Defendants knew were the focus of the DOJ Investigation and Ameritox Litigation (*Id.* ¶¶ 41, 62-63); and

(4) ***revenues shown on Millennium's historical financial statements and incorporated in the Offering Materials that were associated*** with those challenged business practices. (*Id.* ¶ 78).

The Complaint further alleges that Defendants deliberately or recklessly misstated or omitted material facts about these past and existing matters by, among other things:

(1) demanding that Millennium Insiders make a false "representation that we are *not subject to any material litigation at all*" at the time of the Offering Materials as a condition of Defendants' willingness to arrange the syndicated financing (*Id.* ¶ 72 (emphasis added); *see also id.* ¶ 83);

(2) deceiving the few investors who asked about the DOJ Investigation's status with the scripted response that "this will be a non-event; *have not heard from them [DOJ] in some time*" (*Id.* ¶ 81 (emphasis added)) and disingenuously minimizing the Investigation's origins as an outgrowth from *qui tam* proceedings filed as "spiteful acts of disgruntled former employees that had been financially sponsored by a Millennium competitor" (*Id.* ¶ 88);

(3) *touting Millennium's "commitment to customer and compliance" with health*

*care regulations* in its business practices and representing its revenue growth as a product of "organic" "customer demand" based on "educating clinicians" of Millennium's "superior testing results" compared to its competition (*Id.* ¶¶ 76-77), *without any mention of the roles played by the challenged Point-of-Care Cups, Custom Profiles, and pressure on Troubled Practices*; and

(4) *"willfully turn[ing] a 'blind eye'* to the "obvious follow up questions [regarding] . . . Millennium's *billings associated with the alleged health law violations* in the DOJ Investigation" which were "*easily quantifiable at the time*" (*Id.* ¶¶ 64-65 (alleging "just shy of $90 million as of March 2014" on the Cup Program alone).

The only forward-looking allegations against Defendants are those that relate to misrepresentations and omissions as to (i) Millennium's "financial projections" (*id.* ¶¶ 78-79) and (ii) the "likelihood of a materially adverse effect on the Company" arising out of the DOJ Investigation (*id.* ¶ 86). But even forward-looking statements, projections, and opinions are actionable where, as here, they are made by the speaker without a reasonable basis in existing fact. *See Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S.Ct. 1318, 1328-29 (2015).

The Complaint alleges that (i) Defendants had reason to believe at the time of the Offering Materials that the Company's financial projections were "based on fraudulent and illegal [business] practices and therefore not sustainable even in the near term" (Compl. ¶ 79), and that (ii) Defendants had adopted Millennium's outside counsel's "financial materiality comment" about the DOJ Investigation that Defendants knew was "totally unsupported in fact." *Id.* ¶¶ 57-59; *see also id.* ¶¶ 61-65, 86 (setting forth existing facts known to Defendants that "reflect[ed] the likelihood of a materially adverse effect on the Company and its finances"). Because Plaintiff's allegations are based on past or existing facts known to or consciously disregarded by Defendants, their fraud-by-hindsight and "prediction" cases have no bearing here.[20]

---

[20] Defendants' own authority, *Ballan v. Wilfred Am. Educ. Corp.*, 720 F. Supp. 241 (E.D.N.Y. 1989), neatly shows how "fraud by hindsight" is a misnomer when a complaint alleges that

## II.     THE COMPLAINT STATES COMMON LAW CLAIMS

### A.  The Complaint States A Negligent Misrepresentation Claim

#### 1.   Laws of States Other Than New York Apply and Do Not Require A Special Relationship

Defendants assume that New York substantive law applies. MTD at 21. However, under New York choice of law rules for economic-loss torts, courts apply the laws of the states where the *injury* occurred. *See Intellivision v. Microsoft Corp.*, 784 F. Supp. 2d 356, 369 (S.D.N.Y. 2011). Injury occurred in the many states across the country where investors were located. Further, the actionable *conduct* occurred in the states where Defendants sent the misleading Offering Materials and where the misrepresentations therein were relied upon by the investors' decision-makers. *See id.* (tort occurred when contract containing misrepresentations was signed in Connecticut); *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 311 (S.D.N.Y. 2004) (torts sounding in fraud occurred where plaintiffs were solicited, signed their agreements, and received monthly statements).[21]

Unlike New York, most states—including California and others relevant here—do not require a privity-like or special relationship to impose a tort duty. Instead, they follow variants of Section 552 of the Restatement (Second) of Torts and generally impose liability on one who negligently supplies false information in the course of a business transaction to a limited,

---

"management or employees committed specific acts or permitted specific practices that an informed investor would consider as potentially endangering [a company's] future financial performance. Such acts or practices are not speculations or confessions but 'facts' relevant to a person's decision to invest . . . ." *Id.* at 249.

[21] That certain Offering Materials state they *themselves* are governed by New York law is irrelevant. *See Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Financing, Inc.*, 414 F.3d 325, 335 (2d Cir. 2005) ("Under New York law . . . *tort claims* are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the *terms of the contract* . . . .") (emphasis added); *Knieriemen v. Bache Halsey Stuart Shields Inc.*, 427 N.Y.S.2d 10, 12–13 (1st Dep't 1980) (same).

identifiable group of people whom the supplier intends to influence and reasonably should have foreseen would rely and be harmed by the false information.[22] That standard is readily satisfied here. *See, e.g.*, Compl. ¶ 175 (alleging that "Investors constituted a limited group . . . for whose benefit and guidance the Defendants supplied the Offering Materials"); *see also* Commitment Letter § 3 ("Lead Arrangers will manage . . . all aspects of the syndication, including decisions as to the selection of the institutions to be approached").

### 2. Plaintiff Also Has Adequately Pled Negligent Misrepresentation Under New York Law

Under New York negligent misrepresentation law, a plaintiff typically must allege that "the parties stood in some special relationship imposing a duty of care on the defendant to render accurate information." *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 525 (S.D.N.Y. 2014). Plaintiff meets this standard for at least two reasons. First, investors were in privity with the Initial Lender Defendants as assignees. *See* Compl. ¶ 12 ("JPMNA funded $1.775 billion in debt financing to Millennium in the form of a term loan and assigned individual amounts . . . to each Investor in separate purchase and sale agreements."). While only JPMNA was party to the Assignment and Assumption Agreements with investors, JPMNA served as agent for all Defendants with respect to the initial funding of the transaction. *See id.* ¶¶ 12, 95.

Second, all Defendants were uniquely situated and possessed special knowledge about Millennium that gives rise to a duty under New York law. *See* Compl. ¶ 176 (Defendants "had

---

[22] *See Soderberg v. McKinney*, 44 Cal.App.4th 1760, 1766 (2d Dist. 1996) (California law imposes liability where supplier "intends to supply the information for the benefit of [a third party] in a specific transaction"); *Kelley v. Carbone*, 361 Ill.App.3d 477, 480-81 (2d Dist. 2005) (under Illinois law, plaintiff must allege that the information supplied "was intended to benefit or influence plaintiff[ ]"); *Nota Const. Corp. v. Keyes Assocs., Inc.*, 45 Mass.App.Ct. 15, 19-20 (1998); *Fluid Tech., Inc. v. CVJ Axles, Inc.*, 964 P.2d 614, 616 (Colo. App. 1998) (employing Restatement standard under Colorado law).

knowledge superior to that of the Investors of the facts concerning the DOJ Investigation because of the unique access to which Defendants and their agents had to Millennium's in-house and outside counsel"); *see also id.* ¶¶ 40-42 (discussions with Millennium's counsel in connection with 2012 Credit Agreement); ¶¶ 51-52 (Defendants' control over "every aspect of the rating process for Millennium"); ¶¶ 56-63 (discussions with Millennium's counsel in March 2014). "Under New York law . . . a duty [to speak with care] exists in the commercial context when 'the relationship of the parties . . . is such that in morals and good conscience the one has the right to rely upon the other for information." *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263 (1996) (citation omitted). In particular, this duty will arise where, as here, defendants were "*uniquely situated* to evaluate the economics of [an investment]," and "sought to induce plaintiffs to invest" through negligent misrepresentations. *Id.*, 89 N.Y.2d at 264 (emphasis added); *see Suez*, 250 F.3d at 103–04 (suppliers of information "appeared to possess—and held themselves out as possessing—special knowledge" that plaintiffs sought "to aid their investment decision and defendants supplied it for that purpose").

Defendants barely contest that the Complaint meets the New York "special relationship" standard, offering only a footnote challenge to pleading adequacy, which fails to address any of Plaintiff's allegations. MTD at 23, n.26. Instead, Defendants argue that investors contractually disclaimed any Defendant tort duties and any reliance on Defendants. *See* MTD at 21-22 (citing disclaimers of responsibility for information about Millennium or any fiduciary relationship with investors); *id.* at 23-24 (citing disclaimer of reasonable reliance by investors on Defendants). Neither type of disclaimer is grounds for dismissal at this stage of the case. First, where (as here) the tort duty alleged is not premised on fiduciary or confidential relationships, but rather upon misrepresentation of the speaker's unique knowledge of the subject matter of the transaction,

28

"disclaimers do not preclude the finding of a special relationship." *Fin. Guaranty Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 406-07 (2d Cir. 2015); *see also LBBW*, 10 F. Supp. 3d at 526 (distinguishing between duties based on trust and confidence and duties based on specialized knowledge). Given the Complaint's allegations of Defendants' total control over information flow to investors in service of Defendants' own self-interests (Compl. ¶¶ 51-52, 73-75), the boilerplate disclaimers that Millennium alone bears responsibility for the content of the Offering Materials only creates issues of fact that cannot be resolved on this Motion. *See Fin. Guar. Ins. Co.*, 783 F.3d at 407 (conflict between disclaimers of responsibility for information and facts alleged in complaint implicating defendants cannot be resolved on the pleadings); *Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets, LLC*, No. 602529, 2010 WL 2431613, at *7 (N.Y. Sup. Ct. May 10, 2010) (disclaimer of responsibility for issuer's information not enforceable on motion to dismiss where complaint alleged that loan underwriter prevented investor discovery of relevant facts); *see also Basis Yield Alpha Fund Master v. Morgan Stanley*, 23 N.Y.S.3d 50, 55-56 (1st Dep't 2015) (sophisticated purchaser of note instrument may reasonably rely on credit rating and is not required to assume instrument's credit rating is fraudulent).[23]

The "non-reliance" disclaimers are similarly unavailing, especially at this early stage of the case. *See Suez*, 250 F.3d at 104 (conflict between disclaimers and alleged misrepresentation "cannot be resolved on the pleadings"). A defendant cannot generally disclaim misrepresentation of matters that are within its peculiar knowledge and that the plaintiff could not reasonably have

---

[23] Defendants rely on *Unicredito Italianao SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485 (S.D.N.Y. 2003). In *Unicredito*, however, the court "decline[d] to extend the peculiar knowledge doctrine" where the banks were not in contractual privity with the plaintiffs. 288 F. Supp. 2d at 501 & n.1. Here, the Defendant banks were the contractual assignors to the investors. Further, the *Unicredito* court noted that the plaintiffs there could have obtained from the issuer the information alleged to be in the possession of the defendant banks. *Id.* By contrast, Defendants prevented Millennium from making necessary disclosures. Compl. ¶¶ 51-52, 73-75.

been expected to discover through its own investigation. *LBBW*, 10 F. Supp. 3d at 517.[24] Further, disclaimers are ineffective unless specifically tailored to a particular representation central to plaintiff's claim. *Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*, 980 N.Y.S.2d 21, 29 (1st Dep't 2014); *LBBW*, 10 F. Supp. 3d at 518. Defendants cite no disclaimer specific to the misrepresentations regarding Millennium's legal and financial exposure for health care fraud. In fact, the investors had no choice but to rely on Defendants, who in the short marketing period for the Millennium Notes only made available to investors their own attorneys who had interviewed Millennium's attorneys. Compl. ¶¶ 87-88. Only Defendants had knowledge of (i) information legally privileged to Millennium information about the focus and intensity of the DOJ Investigation in the March-April 2014 time period, (ii) Defendants' refusal to allow Millennium to disclose even a watered-down version of that information to investors, and (iii) Defendants' scripting of deliberately false and misleading answers to investor questions, such as that the DOJ Investigation had gone dormant and would be a "non-event." *Id*. ¶¶ 72-73, 80-81. As explained in *LBBW*, disclaimers do not preclude justifiable reliance "where the allegations suggest foul play . . . [and] defendants create a sense of urgency by limiting the time-frame in which plaintiffs can review an investment." 10 F. Supp. at 519.[25]

---

[24] *See also Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429, 448 (S.D.N.Y. 2006) (reliance disclaimer ineffective when misrepresentations were peculiarly within one party's knowledge); *DIMON Inc. v. Folium, Inc.*, 48 F. Supp. 2d 359, 368 (S.D.N.Y. 1999) ("The New York cases recognize that the peculiar knowledge exception applies not only where the facts allegedly misrepresented literally were within the exclusive knowledge of the defendant, but also where the truth theoretically might have been discovered, though only with extraordinary effort or great difficulty.").

[25] If there were any question whether Plaintiff has pled a "special relationship" supporting negligent misrepresentation under New York law, this Court should allow Plaintiff to restyle its claim as one for fraudulent misrepresentation, where no such relationship is required. *Raine v. Lorimar Prods., Inc.*, 71 B.R. 450, 453 (S.D.N.Y. 1987) ("Under [applicable] liberal pleading standards . . . , the fact that plaintiff's allegations do not support the particular legal theory advanced

### B.  The Complaint States A Breach of Fiduciary Duty Claim

Plaintiff alleges breach of fiduciary duty solely against JPMNA and solely for the period beginning with the Closing Date, when JPMNA became the "*agent* for [each] Lender." CA § 9.1 (emphasis added). An express agency by definition creates fiduciary duties. *Sokoloff v. Harriman Estates Dev. Corp.*, 96 N.Y.2d 409, 416 (N.Y. 2001); *see also Chemical Bank v. Sec. Pac. Nat. Bank*, 20 F.3d 375, 377 (9th Cir. 1994) ("The very meaning of being an agent is assuming fiduciary duties to one's principal."); Compl. ¶ 197 (Credit Agreement required JPMNA to take actions as directed by "Required Lenders").[26] Many of JPMNA's authorities do not concern an express agency and thus are inapposite.[27] JPMNA otherwise contends—in response to its alleged self-dealing (*see* Compl. ¶¶ 72, 105, 186)—that any fiduciary obligations, even the duty to avoid conflicts of interest, were contractually disclaimed. MTD at 25 (citing CA § 9.1). Not so. "[T]he law applicable to relationships of agency . . . *imposes mandatory limits on the circumstances under which an agent may be empowered to take disloyal action*" and "an agreement that contains *general or broad language purporting to release an agent* in advance from the agent's general

should not necessarily result in dismissal; rather, the court must examine the complaint to determine whether the allegations provide for relief on any possible theory."); *see also infra* n.41.

[26] Fundamental to the relationship is that the agent "is to be loyal to his [principal] and is 'prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'" *Western Elec. Co. v. Brenner*, 41 N.Y.2d 291, 295 (1977) (citation omitted); Restatement (Third) of Agency § 8.01 (agent must "act loyally for the principal's benefit in all matters connected with the agency relationship").

[27] *See First Citizens Fed. Savings & Loan Ass'n v. Worthen Bank & Tr. Co.*, 919 F.2d 510, 514 (9th Cir. 1990) (defendant administering loan as "an independent contractor"); *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 19-20 (N.Y. 2005) (defendant acting only as underwriter); *CIBC Bank & Tr. Co. (Cayman) v. Credit Lyonnais*, 704 N.Y.S.2d 574, 575 (1st Dep't 2000) (exchange rate contract where the parties acted as arm's length contractual counterparts); *JPMorgan Chase Bank, N.A. v. Controladora Comercial Mexicana SAB DE C.V.*, 2010 WL 4868142, at *10 (N.Y. Sup. Ct. Mar. 16, 2010) (defendant as derivatives dealer).

fiduciary obligation . . . *is not likely to be enforceable*." Restatement (Third) Of Agency § 8.06, cmt. b (2006); *see also TPL Associates v. Helmsley-Spear, Inc.*, 536 N.Y.S.2d 754, 756 (1st Dep't 1989) ("Where a conflict of interest exists, nothing less than full and complete disclosure is required of the agent" the principal must be "fully informed of every fact material to [its] interests," and unless the principal "freely consented in the presence of such knowledge," "the principal is entitled to rely on the agent's representations and his complete, undivided loyalty") (emphasis added) (citations omitted).[28] JPMNA's authorities concerning disclaimers have nothing to do with conflicts of interest, self-dealing, or the duty of loyalty, and thus have no bearing here.[29]

### C.  The Complaint States Breach of Contract and Implied Covenant Claims

#### 1.  Breach of Contract

The Complaint alleges that JPMNA breached the 2014 Credit Agreement in two respects: (1) closing the transaction with knowledge that conditions precedent had not been satisfied; and

---

[28] Even the most limited agent cannot disclaim its duty to avoid conflicts of interest. *Dabney v. Chase Nat'l Bank*, 196 F.2d 668, 671 (2d Cir. 1952) (indenture trustee's duties may be limited by agreement, but trustee cannot "shake off the loyalty demanded of every trustee, corporate or individual"); *see also Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-4394 (AJN), 2016 WL 439020, at *8 (S.D.N.Y. Feb. 3, 2016) ("[T]he duty to avoid conflicts of interest is independent of contractual obligations under the terms of the [Agreement]."); *U.S. Bank Nat'l Ass'n v. Merrill Lynch Mortg. Lending, Inc.*, 2018 WL 2234877, at *20–21 (N.Y. Sup. Ct. May 16, 2018) (indenture trustee has a fundamental duty to avoid conflicts of interest).

[29] The cases are also factually distinguishable. In *Banque Arabe et Internationale D'Investissement v. Md. Nat. Bank*, 57 F.3d 146, 158 (2d Cir. 1995), the loan syndicator remained a participant in the loan and its interests were aligned with the other participants. In *Fidelity Summer St. Tr.* v. *Toronto Dominion (Texas), Inc.*, 2002 WL 1858763, at *4 (D. Mass. Aug. 14, 2002), the administrative agent itself owned the loans. Further, JPMNA's own authority acknowledges that breach of fiduciary duty claims are not duplicative of contract claims where, as here, unique facts are pled that go beyond contractual obligations. *See Uni-World Capital, L.P.* v. *Preferred Fragrance, Inc.*, 43 F. Supp. 3d 236, 244 (S.D.N.Y. 2014). Here, the facts alleged—*e.g.*, that (i) JPMNA, over the Company's objection, required Millennium falsely to represent in the Credit Agreement that it had no pending material litigation or investigation, and (ii) JPMNA did so to ensure it could offload to investors its own undesirable exposure to Millennium—involve intentional wrongdoing and self-dealing that go well beyond ordinary breach of contract.

(2) failing to notify investors of Millennium's Default under the Credit Agreement.[30] JPMNA seeks dismissal on the grounds that it contractually disclaimed any responsibility for Millennium's representations and warranties in the Credit Agreement, and that Plaintiff reads into the contract a "duty to notify" that does not exist. MTD at 26-27. Neither argument has merit.

JPMNA's first argument is a straw man. Plaintiff's breach of contract claim does not seek to hold JPMNA "responsible" for the falsity of Millennium's representations and warranties (although JPMNA and its affiliate *did* dictate Millennium's false "no material litigation or investigation" representations) (Compl. ¶¶ 72-73). Rather, Plaintiff claims that JPMNA breached Credit Agreement Sections 2.1, 2.2, 5.1, 5.2 and 9.4, and the definition of "Closing Date" incorporated therein, by conducting a closing and triggering investors' commitments when JPMNA knew that the false representations and warranties breached the conditions precedent for the closing and commitments. *See* Compl. ¶¶ 99-101 (detailing representations and warranties that were untrue and breached as of the Closing Date); *see also id.* ¶¶ 104-105, 191-194, 205(a).[31] Further, the disclaimer of the "duty to ascertain or inquire" in Section 9.3 is meaningless because Plaintiff alleges JPMNA *actually knew* Millennium's representations were false and that conditions precedent had not been satisfied. *See Keywell Corp. v. Weinstein*, 33 F.3d 159, 164 (2d

---

[30] Defendants' footnote challenge to pleading sufficiency, including identifying relevant "defaults," makes no sense. MTD at 27 n.28. The Complaint alleges such facts in great detail. *See, e.g.*, Compl. ¶ 101 (detailing false Millennium representations concerning financial condition, compliance with law, material litigations or investigations, accuracy of information, and solvency); *id.* ¶¶ 40, 176 (alleging that Defendants knew the truth behind such representations given their unique access to Millennium's inside information).

[31] Read together, as they must be, these provisions provide that the existence of a "Closing Date," the obligation of JPMNA to make the initial "Tranche B Term Loan" to Millennium on that date, and the investors' obligation to honor JPMNA's concomitant request to make their own initial extension of credit, are subject to the conditions precedent of Sections 5.1 and 5.2 (which include, but are not limited to, the truth of Millennium's representations and warranties) *and* that JPMNA may rely on a certification by Millennium of such truthfulness only if JPMNA believes the certification "to be genuine and correct."

33

Cir. 1994) ("When a party is aware of circumstances that indicate certain representations may be false, that party cannot reasonably rely on those representations."); *Avenue CLO Fund Ltd. v. Bank of Am., N.A.,* 723 F.3d 1287, 1295-96 (11th Cir. 2013) ("If [defendant] actually knew that a condition precedent was not satisfied, it would not be commercially reasonable to interpret the Agreement to allow [defendant] to disregard that knowledge by pointing to a certification by the Borrower, which it knows to be false.") (citing *In re Lipper Holdings, LLC*, 766 N.Y.S.2d 561, 562 (1st Dep't 2003)); *Devaney v. Chester*, 1989 WL 52375, at *4 (S.D.N.Y. May 10, 1989) ("a party cannot justifiably rely on a representation known to be false").

JPMNA's bid to disclaim its duty under Section 9.5 to notify investors of Defaults at and after closing also fails. JPMNA relies upon the caveat that it "shall not be *deemed* to have knowledge or notice of the occurrence of any Default or Event of Default" unless it receives from Millennium or a third-party a written notice stating that "such notice is a 'notice of default.'" CA § 9.5 (emphasis added). This too disregards the allegation that JPMNA *actually knew* of a Default, or Event of Default under Section 8.1(b), and therefore knowledge need not be "deemed." *See In re MTBE Prods. Litig.*, MDL No. 1358, 2015 WL 5775852, at *2 (S.D.N.Y. Oct. 1, 2015) ("Knowledge can be 'true' or 'deemed.' True knowledge is . . . 'where a [party] is actually aware of all the necessary facts . . . .' Deemed knowledge is knowledge that the [party] may not have actually possessed but '[has] been put on notice . . . .'"); *see also BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 396-97 (S.D.N.Y. 2011) ("failure to act based on . . . alleged actual knowledge" implicates "a question of fact unsuited to resolution on . . . motion [to dismiss]").

### 2.  Implied Covenant of Good Faith and Fair Dealing

JPMNA argues that Credit Agreement Section 9.1 disclaims the implied covenant of good

faith and fair dealing. MTD at 28. That disclaimer, however, is ineffective. First, New York's Uniform Commercial Code, which applies to secured transactions[32] and securities (as defined thereunder),[33] provides that "[e]very contract or duty within this act imposes an obligation of good faith in its performance and enforcement," N.Y. U.C.C. § 1-304, and that "[t]he obligations of good faith . . . prescribed by this Act *may not be disclaimed by agreement*." *Id.* § 1-302(b) (emphasis added).[34] Second, *bad faith* conduct that fundamentally destroys another's right to receive the fruits of the contract cannot be disclaimed. *See Indus. & Gen. Tr. v. Tod*, 180 N.Y. 215, 225-26 (1905) ("No covenant of immunity can be drawn that will protect a person who acts in bad faith, because such a stipulation is against public policy, and the courts will not enforce it."); *see also Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385 (1983) ("[A]n exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing[, including] . . . one acting in bad faith."); *Banc of Am. Secs. LLC v. Solow Bldg. Co. II, LLC*, 847 N.Y.S.2d 49, 53 (1st Dep't 2007) (New York public policy precludes enforcement of exculpatory clauses that limit liability

---

[32] *See ImagePoint, Inc. v. JPMorgan Chase Bank, Nat. Ass'n*, 27 F. Supp. 3d 494, 503–05 (S.D.N.Y. 2014) (secured loan agreement "falls squarely within the scope of Article 9" of N.Y. U.C.C.); *see also In re Oak Rock Fin., LLC*, 527 B.R. 105, 114 (Bankr. E.D.N.Y. 2015) (loan participations treated as U.C.C. Article 9 secured transactions).

[33] The Notes qualify as securities under N.Y. U.C.C. § 8-102(a)(15)'s transferability, divisibility, and functional tests because they are an obligation of an issuer (Millennium) the transfers of which must be recorded on a register maintained by JPMNA on Millennium's behalf (CA § 10.6(b)(iv)), they are divisible into sub-assignments and participations (*id.* §§ 10.6(b), (c)), and they are tradeable in over-the-counter markets. *See Highland Capital Management LP v. Schneider*, 8 N.Y.3d 406, 415-16 (N.Y. 2007) (notes made in connection with corporate transactions that are tradeable on over-the-counter markets meet the U.C.C.'s "functional" test for securities).

[34] *See also Combustion Engineering, Inc. v. Imetal*, 235 F. Supp. 2d 265, 270 (S.D.N.Y. 2002) ("Every contract contains an implied covenant of good faith and fair dealing . . . the obligation of good faith may not be disclaimed by agreement.") (citing N.Y. U.C.C. § 1-203 and Restatement (Second) of Contracts § 205).

for one's bad faith); *Horowitz v. Nat'l Gas & Electric, LLC*, 2018 WL 4572244, at *8 (S.D.N.Y. Sept. 24, 2018) (finding plaintiff alleged facts sufficient to show defendant may have acted intentionally and in bad faith to defeat limitation-of-liability clause).[35] Finally, JPMNA's self-interested conduct, as assignor, in aiding and covering up Millennium's breaches of representations and warranties is not disclaimable. *See* Restatement (Second) Contracts § 333, comment a ("[B]y operation of law," an assignor "warrant[s] his lack of knowledge of facts and his future abstention from conduct which would impair the value of the assigned right.").[36]

## III. THE COMPLAINT ADEQUATELY STATES BLUE SKY AND NEGLIGENT MISREPRESENTATION CLAIMS AGAINST THE CITI, SUNTRUST, AND BMO DEFENDANTS

The non-JP Morgan Defendants are included in several of the Complaint's blue sky claims (Second, Third, Fifth, and Sixth Causes of Action) and its negligent misrepresentation claim (Seventh Cause of Action). They move for dismissal due to "group pleading," arguing that the Complaint frequently refers to "Defendants" without particularizing the role of each individually. MTD at 29-31; Suppl. MTD at 2-3.[37] This part of their Motion should be denied because the

---

[35] Here, JPMNA's bad faith includes engaging in a self-interested transaction through which it escaped its own unwanted exposure to Millennium by misleading investors to take on the risk instead. *See, e.g.*, Compl. ¶ 105. These allegations of *affirmative bad faith* distinguish Defendants' RMBS-related authorities that upheld disclaimers of good faith where the defendant was alleged only to have *failed or omitted to take action*. *See Phoenix Light SF Ltd. v. U.S. Bank N.A.*, 2016 WL 1169515 at *5 (S.D.N.Y. Mar. 22, 2016); *Commerzbank AG v. U.S. Bank N.A.*, 277 F. Supp. 3d 483 (S.D.N.Y. 2017).

[36] The allegations of JPMNA's actual knowledge, or at least conscious avoidance, are more than sufficient to negate the Credit Agreement Section 9.3 exculpatory provision cited by JPMNA, which does *not* exculpate "gross negligence or willful misconduct." MTD at 29.

[37] While Defendants also contend that the Complaint fails to satisfy Rule 8(a)'s liberal "notice" pleading standard, they offer no support for that claim, focusing instead on their claim that the Complaint fails to satisfy Rule 9(b)'s heightened pleading standard for fraud. The blue sky laws at issue here generally do not require pleading or proving fraud, and courts have held Rule 9(b) inapplicable. *See, e.g., Bowden V. Robinson*, 67 Cal. App. 3d 705, 714 (Ct. App. 4th Dist. 1977); *Mass. Mut. Life Inc. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 199 (D. Mass. 2012); *In re Horlbeck*, 589 B.R. 818, 836 (N.D. Ill. 2018). In any event, the Complaint meets Rule

Complaint properly alleges each Defendant's material aid as "Arranger" or "Initial Lender" in the 2014 Transaction in violation of applicable securities laws and how each Defendant either directly in the CIM and other Offering Materials, or indirectly through its attorneys, made material misrepresentations to investors.

### A.  The Complaint Is Properly Pled As To Each Arranger

In addition to JPM Securities, the Arrangers were the broker-dealers of each corporate group—CitiGlobal, BMOCap, and STRH. Each is sued under the state securities laws of California, Massachusetts, Colorado, and Illinois, and under the common law of negligent misrepresentation. Those state laws attach liability to any broker-dealer that "materially aids" (Calif. and Mass.), provides "substantial assistance" (Colo.), or "participated or aided in any way" (Ill.) in the offering or sale of securities by means of a material misstatement.

Contrary to Defendants' "group pleading argument," the Complaint specifically alleges each Arranger's status as a broker-dealer (Compl. ¶¶ 15, 17, 19) and that each materially or substantially assisted the primary securities law violations because: (1) each participated in the "due diligence" of Millennium in the period February 28, 2014-March 14, 2014 (*id*. ¶¶ 53-59); (2) each shared one law firm during that diligence (*id.* ¶ 68) and used counsel as their agent to make representations directly to investors about the results of that diligence (*id.* ¶ 84); (3) all but one signed the Commitment Letter, committing them or their lending affiliates to fund the term loan irrespective of whether they could sell to investors;[38] (4) "Citi" was granted, and exercised, a right

---

9(b) by pleading the specifics of the misrepresentations and omissions in the Offering Materials, and the facts underlying Defendants' motive to misrepresent and conceal.

[38] As Paragraph 66 of the Complaint notes, Citibank N.A. did not itself sign the Commitment Letter; rather, CitiGlobal signed on behalf of a group called "Citi," which was defined in the Letter as "Citigroup Global Markets Inc., Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as Citi shall determine to be appropriate to provide the services

under the Commitment Letter to place its logo on the CIM to investors (*id.* ¶ 70); (5) CitiGlobal acted as Joint Lead Arranger and Joint Bookrunner with JPM Securities (*id.* ¶ 15); (6) BMOCap acted as Co-Manager and Co-Documentation Agent (*id.* ¶¶ 17, 67); (7) each Arranger committed itself or its lending affiliate as the Initial Lender to purchase from JPM Securities or JPMNA its pro rata share of any Notes as to which Investors did not honor their syndication allotment (*id.* ¶ 95); and (8) each received fees for their work in the offering.  (*id.* ¶ 68).  The above facts also show that each Arranger made direct misrepresentations to investors or authorized its attorney/agent do so when it had a duty to speak with care under applicable law.

Unable to evade these well-pled facts, Defendants ignore them and instead contend that the Complaint inadequately pleads exactly what CitiGlobal did as Joint Lead Arranger and Joint Bookrunner and what BMOCap did as Co-Manager and Co-Documentation Agent. MTD at 29-31; Suppl. MTD at 1-2. That is for discovery. These facts, together with each Arranger's title and receipt of millions of dollars of fees raise an inference that each was materially involved in selling the Notes. Finally, BMO Cap. and STRH cannot escape liability on the ground that they attended due diligence sessions in "listen-only" mode, since that allegation supports their turning a blind eye to the material misrepresentations being made in the Offering Materials. Compl. ¶ 65. Allowing the offering to go forward with knowledge that the Offering Materials contained misstatements and omissions constitutes "material aid,"[39] and, in any event, the agent/law firm for each Defendant made affirmative misrepresentations to Investors about the diligence. The blue sky

---

contemplated herein." There is an issue of fact therefore as to precisely which "Citi" entity was the "Initial Lender." The Complaint assumes that it was Citibank N.A.

[39] *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 256 (Cal. App. 2nd Dist. 2007); *see also Tutor Perini Corp. v. Banc of Am. Sec. LLC*, 842 F.3d 71, 86 (1st Cir. 2016) ("omissions include a speaker's not speaking when she has a duty to speak").

and negligent misrepresentation claims against all Arranger defendants therefore must stand.[40]

### B.  The Complaint Is Properly Pled As To Each Initial Lender

Each of the Initial Lenders other than the actual seller to investors, JPMNA—namely, Citibank N.A., BMO, and SunTrust—stands liable under the Illinois and Colorado securities laws as a person "on behalf of whom" JPMNA sold to the investors (*id.* ¶ 165), or as a provider of "substantial assistance" to JPMNA. *Id.* ¶ 159. Massachusetts has a similar provision for "non-seller[s]" who control the seller or who have a "similar status." *Id.* ¶ 143(b). The Complaint alleges that each Initial Lender signed the Commitment Letter. *Id.* ¶ 66. It further alleges that the only reason that each did not physically sell its own commitment to investors was that JPM Securities, as an "*accommodation*" to its fellow "Other Arrangers" and their respective lending affiliates, was willing (because the underwriting had been fully subscribed) to have JPMNA "perform the entire initial funding." *Id.* ¶ 95 (emphasis added). The other Initial Lender Defendants (Citibank N.A., BMO, and SunTrust), however, were liable to JPMNA if "some of the Investors failed in their obligations to buy the securities . . . ." *Id.* Further, that the same law firm was agent not only for the Arrangers, but also for the Initial Lenders who signed the Commitment Letter (*id.* ¶ 68) makes those Initial Lenders also liable for the negligent misrepresentations alleged to have been made by counsel on their behalf. Thus the Complaint is adequately pled as to Citibank N.A., BMO, and

---

[40]At best, the Motion merely raises fact issues. "Aiding, as opposed to participating, focuses upon activities that do not directly lead to the sale, but rather make it possible" and that "[w]ithin this legal framework, it remains a factual question whether a person has 'aided,' and if so, whether it is 'material.'" Joseph C. Long, Michael J. Kaufman & John M. Wunderlich, 12A Blue Sky Law § 9:71; *see also Sherter v. Ross Fialkow Cap. Partners, LLP*, 2013 WL 1324818, at *13 (Mass. Super. Jan. 4, 2013) ("What constitutes participation or aid—in any way—in making a sale of securities cannot be determined by a fixed rule of law" and "[e]ach case must be determined upon its own facts.").

SunTrust.[41]

## **CONCLUSION**

For all of the above reasons, Plaintiff respectfully submits that Defendants' motion to dismiss be denied in its entirety.

Dated:  New York, New York
        May 31, 2019

                            WOLLMUTH MAHER & DEUTSCH LLP


By:    */s/ David H. Wollmuth*
          David H. Wollmuth
          Lyndon M. Tretter
          Jeffrey Coviello
          Niraj J. Parekh

          500 Fifth Avenue
          New York, New York 10110
          (212) 382-3300

          *Attorneys for Plaintiff Marc S. Kirschner,*
          *solely in his capacity as Trustee of the*
          *Millennium Lender Claim Trust*

---

[41] If the Motion is granted to any extent, Plaintiff seeks leave to amend. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead") (citations omitted). Prior Rule 2004 discovery does not prohibit leave to replead, MTD at 31, especially since it was expressly limited in scope to *not* include an investigation of Lender Trust claims. *MLH Bankr.*, 12/2/16 Order, at 18-19 (ECF 393) ("Any request for information regarding potential causes of action belonging to the Lenders' Trust . . . is denied . . . .").

**APPENDIX A**

| *Banco Espanol* Notes | Millennium Notes |
|---|---|
| Revolving line of credit transaction (*Banco I*, 763 F.Supp. at 39) | Term "loan" transaction (Compl. ¶ 12) |
| Very short-term instruments (six months or less; mostly overnight to 30 days) (*Banco Espanol*, 973 F.2d at 57) | Seven-year loan term (CA at p. 33, "<u>Tranche B Maturity Date</u>") |
| Fixed rate of interest (*Banco I*, at 44) | Variable interest rate (floating base rate, plus margin calculated by reference to ratio of debt to EBITDA) (CA § 1.1) |
| "Participation" in a note with seller retaining title to instrument (*Banco Espanol*, at 57) | Outright sale of instrument by assignment (Compl. ¶ 12) |
| 17 participations among 11 participants, consisting of "eight commercial banking institutions, two corporations, and one substantial Pension Trust" (*Banco Espanol,* at 53; *Banco I*, at 39) | Approximately 400 "mutual funds, hedge funds, and other institutional investors" (Compl. ¶ 1); Commercial "[b]anks do not play in deals like this given the leverage and lack of covenants." *Id.* ¶ 50 |
| Minimum amount of the participation offered was generally $1,000,000 in "1989 dollars" (equivalent almost $2,000,000 in 2014); and most generally ranged from $1,000,000 to $10,000,000 (equivalent to almost $2,000,000 to $20,000,000 in 2014) (*Banco I*, at 43) | Assignments included amounts as low as $130,000 (CA § 10.6(b)(ii)(A)); Brigade Trade Ticket (Tretter Decl. Ex. B) |
| Credit line to address borrower's "short-term cash needs," to "finance current operations or to cover a temporary cash shortage." (*Banco I*, at 39, 42-43) | Borrower received none of the "loan" proceeds (Compl. ¶ 53) |
| Participations may not be resold without prior written consent of *Seller* (*Banco I*, at 40) | Participations may be sold *without consent* (CA § 10.6(c)) <br><br> Certain assignments (*e.g.*, to other Lenders or their affiliates) may be transferred *without consent*; other transfers of assignments require *Borrower* consent (which cannot be unreasonably withheld, conditioned or delayed), but Borrower is *deemed to consent* absent written objection within five business days (CA § 10.6(b)(i)(A)) |
| No secondary trading   (*Banco I*, at 40 (permission to trade was never "requested nor given")) | Designed for secondary trading (Compl. ¶¶ 46, 96, 108, 115) |