UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARC S. KIRSCHNER, solely in his capacity as Trustee of THE MILLENNIUM LENDER CLAIM TRUST, | **MEMORANDUM OPINION & ORDER** |
| Plaintiff, | 17 Civ. 6334 (PGG) |
| - against - | |
| JPMORGAN CHASE BANK, N.A.; JPMORGAN SECURITIES LLC; CITIGROUP GLOBAL MARKETS INC.; CITIBANK, N.A.; BMO CAPITAL MARKETS CORP.; BANK OF MONTREAL; SUNTRUST ROBINSON HUMPHREY, INC.; and SUNTRUST BANK, | |
| Defendants. | |

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff Marc S. Kirschner – in his capacity as trustee of the Millennium Lender

Claim Trust (the "Trust") – brings this action against J.P. Morgan Chase Bank, N.A. ("Chase"),

J.P. Morgan Securities LLC ("JPM Securities"), Citibank, N.A. ("Citibank"), Citigroup Global

Markets, Inc. ("CitiGlobal"), Bank of Montreal, BMO Capital Markets Corp., SunTrust Bank,

and SunTrust Robinson Humphrey, Inc. (collectively, "Defendants") alleging violations of

various state securities laws; negligent misrepresentation; breach of fiduciary duty; breach of

contract; and breach of the implied covenant of good faith and fair dealing.  (Cmplt. (Dkt. No. 1-

1))

Plaintiff's claims arise out of a $1.775 billion syndicated loan transaction[1] that closed on April 16, 2014.  (Id. ¶¶ 1, 96)  In that transaction, Defendants sold to the Trust's beneficiaries – approximately seventy institutional investor groups, comprised of roughly 400 mutual funds, hedge funds, and other institutional investors (the "Investors") – debt obligations of Millennium Laboratories LLC ("Millennium") – a California-based urine drug testing company.  (Id. ¶¶ 1, 94-95)

In November 2015 – nineteen months after the transaction closed – Millennium filed a bankruptcy petition.  (Id. ¶ 3)  The bankruptcy plan issued by the Bankruptcy Court created the Trust, and provided it with the Investors' claims against Defendants.  (Id. ¶ 8)

The Complaint alleges generally that "Defendants misrepresented or omitted . . . material facts in the offering materials they provided and communications they made to Investors regarding the legality of [Millennium's] sales, marketing, and billing practices," as well as "the known risks posed by a pending government investigation into the illegality of such practices." (Id. ¶ 1)

This action was filed on August 1, 2017, in Supreme Court of the State of New York, New York County.  (See id.)  On August 21, 2017, Defendants removed the case to this District, asserting the Edge Act, 12 U.S.C § 632, as the basis for federal jurisdiction.  (Notice of Removal (Dkt. No. 1))  On September 24, 2018, this Court denied Plaintiff's motion to remand. (Dkt. No. 38)

---

[1]  "A syndicated loan is a commercial credit provided by a group of lenders," and is "structured, arranged, and administered by one or several commercial or investment banks, known as arrangers."  S&P Global Market Intelligence, Syndicated Loans:  The Market and the Mechanics 1 (2017), https://www.lcdcomps.com/d/pdf/LCD%20Loan%20Primer.pdf.

Defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  (Dkt. No. 76)  For the reasons stated below, Defendants' motion will be granted.

## BACKGROUND[2]

### I.   THE DEFENDANTS

Chase is a national banking association with its principal place of business in New York.  (Cmplt. (Dkt. No. 1-1) ¶ 12)  JPM Securities – a Chase affiliate – is a registered broker-dealer and investment advisor with its principal place of business in New York.  (Id. ¶¶ 13-14)

Citibank is a national banking association with its principal place of business in New York.  (Id. ¶ 16)  CitiGlobal – a Citibank affiliate – is a registered broker-dealer and investment advisor with its principal place of business in New York.  (Id. ¶¶ 15-16)

Bank of Montreal is chartered under the Bank Act of Canada and is a public company incorporated in Canada.  (Id. ¶ 18)  BMO Capital Markets is a Bank of Montreal affiliate and is a registered broker-dealer with its principal place of business in New York.  (Id. ¶ 17)

SunTrust Bank is chartered under Georgia law and offers banking and trust services and products.  (Id. ¶ 20)  SunTrust Robinson Humphrey is a wholly-owned subsidiary of SunTrust Bank and is a registered broker-dealer with its principal place of business in Georgia.  (Id. ¶ 19)

### II.   EVENTS PRECEDING THE SYNDICATED LOAN TRANSACTION

Millennium was a San Diego-based private company that provided laboratory-based diagnostic testing of urine samples for physicians.  (Id. ¶¶ 26-27)  In March 2012, the U.S.

---

[2]  The following facts are drawn from the Complaint and are presumed true for purposes of resolving Defendants' motion to dismiss.  See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).

Department of Justice ("DOJ") began investigating Millennium for federal healthcare law violations.  (Id. ¶¶ 32-40)

In March 2012, Millennium was also engaged in litigation with a competitor, Ameritox Ltd.  (Id. ¶ 39)  Ameritox had sued Millennium in 2011 alleging violations of the Stark Law and the Anti-Kickback statute.  (Id.)  These federal statutes proscribe "certain forms of remuneration to or relationships with physicians who refer Medicare-billable work to other providers[,] such as drug testing labs."  (Id. ¶ 35)  Ameritox claimed that Millennium's violation of these statutes constituted "unfair competition."  (Id. ¶ 39)

Also in March 2012, Chase, JPM Securities, SunTrust Bank, SunTrust Robinson Humphrey, and Bank of Montreal, among others, entered into a credit agreement with Millennium that provided it with a $310 million term loan and a $20 million revolving credit facility (the "2012 Credit Agreement").  (Id. ¶¶ 31-32)  As DOJ's investigation of Millennium continued over the next two years, Chase and JPM Securities "carefully monitored the progress of the [] investigation" and began "exploring . . . ways to refinance the 2012 Credit Agreement" to escape their "term loan exposure to Millennium."  (Id. ¶¶ 41, 45, 69)

"[B]y the end of February 2014," however, "the only financing option left on the table" was "a huge institutional financing" – totaling $1.775 billion – that "would take out the $304 million principal balance still owed to [Millennium]'s bank lenders" under the 2012 Credit Agreement.  (Id. ¶¶ 49, 69)  This institutional financing would also provide "an extraordinary dividend and bonuses" to Millennium's directors, officers, and controlling shareholders (the "Insiders"), totaling "just shy of $1.27 billion."  (Id. ¶¶ 30, 49, 69)  The remaining $196 million would be used to retire debentures held by a private equity investor, leaving Millennium with $1.775 billion in debt and none of the proceeds.  (Id. ¶¶ 49, 69)

In a commitment letter dated March 16, 2014 (the "2014 Commitment Letter"), Chase, Citibank, Bank of Montreal, and SunTrust Bank agreed that they – or, in Citibank's case, CitiGlobal or one its affiliates – would fund the $1.775 billion financing through a term loan as "Initial Lenders."  (Id. ¶ 66)  Defendants also agreed that the four broker-dealer Defendants – JPM Securities, CitiGlobal, BMO Capital, and SunTrust Robinson Humphrey – would serve as "Arrangers" for the debt financing.  (See id. ¶¶ 13, 15, 17, 19, 66)

The 2014 Commitment Letter designates JPM Securities and CitiGlobal as the "Lead Arrangers," and BMO Capital and SunTrust Robinson Humphrey as the "Co-Managers" of the loan facility.  (Id. ¶¶ 66-67)  The 2014 Commitment Letter also authorizes Defendants to "'syndicate' th[e] initial loan amount to a group of institutional lenders managed by the 'Lead Arrangers.'"  (Id. ¶¶ 66, 92)  According to the "Working Group List" prepared by JPM Securities, all of Defendants' employees working on the Millennium financing were located in the United States.  (See Tretter Decl., Ex. A (Working Group List) (Dkt. No. 26-3))

## III.   MECHANICS OF THE SYNDICATED LOAN TRANSACTION

The syndicated loan transaction that closed on April 16, 2014, "proceeded in three inter-related and contemporaneous steps."  (Cmplt. (Dkt. No. 1-1) ¶¶ 95-96)  First, the Arrangers agreed among themselves that JPM Securities or its affiliate, Chase, would – "as an accommodation" to the other Arrangers – "perform the entire initial funding[,] and that the other Defendants would have to contribute only if some of the Investors failed in their obligations to buy the [portion of the term loan] for which they had committed."  (Id. ¶ 95)  Second, Chase and Millennium entered into a "Master Consent to Assignment," in which Millennium agreed to sell portions of the term loan to the Investors up to the amounts listed in an attached schedule.  (Id.)  Third, effective no later than the time that Chase funded Millennium, "each individual Investor

. . . as 'Buyer' became irrevocably committed to [Chase] as 'Seller' to purchase . . . the amount [of the term loan] it had subscribed for and been allocated."  (Id.)

After these three steps, "[t]he actual sale between [Chase] and each Investor was later documented through a formal Assignment and Assumption agreement," in which "[e]ach Investor succeeded to the rights of [Chase] under, and [] became a party to, [a] Credit Agreement between and among all Investors, Millennium, ML Holdings II [an intermediate holding company formed to hold Millennium's stock], and [Chase] as Administrative Agent."  (Id.; see also id. ¶ 24)

## IV.    THE SYNDICATED LOAN TRANSACTION IS EFFECTUATED

"[O]n or before 5 p.m. (Eastern) on April 14, 2014," "Defendants required the Investors or their investment advisors to make a final legally binding offer to purchase" a portion of the term loan "'with [their] [Arranger] salesperson.'"  (Id. ¶ 93 (last alteration in original)) The next day, April 15, 2014, the Arrangers informed the Investors or their investment advisors of the gross allocation that each had been awarded.  (Id.)

Investment advisors that managed mutual and other funds considering an investment in the term loan then had the right to inform the Arrangers of the sub-allocations they wished to make to particular investors in their own funds.  (Id. ¶ 94)  For example, an investment advisor with discretionary authority over multiple funds might make an offer to purchase $50 million in Millennium notes, receive a gross allocation of $45 million, and then sub-divide that $45 million among a group of investors.  (Id.)  Defendants referred to the investors that received initial allocations as "Parent Investors," and investors that received the sub-allocations as "Child Investors."  (Tretter Decl. (Dkt. No. 26-2) ¶ 7)

On April 16, 2014, Chase obtained consent from Millennium to allocate the entirety of the $1.798 billion debt financing – the $1.775 billion "fronted" by Chase, plus a small potential over-allotment – to sixty-one Parent Investors.  (Trotter Decl., Ex. D (Master Consent to Assignment) (Dkt. No. 26-6))  Of the sixty-one Parent Investors, fifty-nine are domestic entities – which were allocated 98.52% of the term loan – and two are foreign domiciliaries that were allocated 1.48% of the term loan.  (Id.; Trotter Decl. (Dkt. No. 26-2) ¶ 8)  Of the Child Investors, more than two hundred are foreign domiciliaries.  (See Notice of Removal, Ex. C (Lender Schedule) (Dkt. No. 1-3))  All the Child Investors are legal entities or funds.  (Id.)

On April 16, 2014 – the day that the transaction closed – Chase made the initial term loan of $1.775 billion to Millennium, which triggered the commitments of the Investors to purchase the entire amount from Chase through the assigned allocations.  Plaintiff has submitted exhibits demonstrating how Chase effected these sales.  (See Pltf. Remand Br. (Dkt. No. 26-1) at 12 n.2; Def. Remand Opp. Br (Dkt. No. 27) at 12)[3]

For example, on April 15, 2014, JPM Securities sent an email to a domestic Parent Investor, Brigade Capital, informing Brigade Capital that it had been allocated $45 million in Millennium notes, and directing that "[s]ub-allocations" were "to be returned via ClearPar" – a U.S. based clearing house – "and funded within no less than 3 and no more than 10 days after funding."  (See Trotter Decl., Ex. F (April 15, 2014 Brigade Capital email) (Dkt. No. 26-8) at 2)  A corresponding ClearPar "Trade Ticket" dated April 25, 2014 indicates that Brigade Capital had sub-allocated that $45 million among twenty-three Child Investors (Trotter Decl.,

---

[3]  All references to page numbers in this Order are as reflected in this District's Electronic Case Files ("ECF") system.

Ex. G (ClearPar Trade Ticket) (Dkt. No. 26-9) at 2-3), ten of which are foreign domiciliaries. (Tretter Decl. (Dkt. No. 26-2) ¶ 10)

The Institutional Allocation Confirmation, and the Assignment and Assumption Agreement – both executed by Chase and Brigade Credit Fund II, Ltd., one of the foreign Child Investors (id. ¶ 11) – are examples of the transaction documents entered into by Chase and the Child Investors. (See Pltf. Remand Br. (Dkt. No. 26-1) at 12 n.2; Def. Remand Opp. Br. (Dkt. No. 27) at 12) In the Institutional Allocation Confirmation, Brigade Credit Fund II confirms its agreement to assume from Chase the obligation to purchase more than $11 million of the term loan "within ten (10) business days of the Funding, or within such other period agreed to by [Chase], by assignment pursuant to the Assignment and Assumption [Agreement]." (Tretter Decl., Ex. H (Brigade Credit Fund II Institutional Allocation Confirmation) (Dkt. No. 26-10) at 2) In the Assignment and Assumption Agreement – which, as contemplated in the Institutional Allocation Confirmation, was executed on April 15, 2014 – Chase irrevocably sold and assigned the agreed-upon portion of the term loan. (Tretter Decl., Ex. I (Brigade Credit Fund II Assignment and Assumption) (Dkt. No. 26-11)) Once Brigade Credit Fund II and Chase executed the Assignment and Assumption Agreement, Brigade Credit Fund II became a party to the credit agreement governing the term loan (the "2014 Credit Agreement"). (Id. at 2)

## V.     MILLENNIUM'S DECLINE AND SUBSEQUENT BANKRUPTCY

On June 16, 2014, two months after the April 16, 2014 closing, a jury in the Ameritox litigation returned a verdict in favor of Ameritox, finding in special interrogatories that Millennium had violated both the Stark Law and the Anti-Kickback statute. (Id. ¶ 110) The jury awarded Ameritox $2.755 million in compensatory damages and $12 million in punitive damages – later remitted to $8.5 million – based on Millennium's misconduct in Florida,

Tennessee, and Texas.  (Id. ¶ 111)  On the day of the jury's verdict, Chase and JPM Securities concluded that it would have a $500 million negative impact on Millennium's valuation.  (Id. ¶ 114)

        In December 2014 – six months later – DOJ notified Millennium that it intended to intervene in civil False Claims Act proceedings brought by qui tam relators based on Millennium's alleged federal healthcare law violations.  (Id. ¶ 118)  Two months later, in February 2015, the Centers for Medicare and Medicaid Services threatened to debar Millennium based on allegations of illegal billing practices.  (Id. ¶ 119)  In March 2015, the DOJ formally intervened in the qui tam proceedings.  (Id. ¶ 120)

        In May 2015, Millennium disclosed that it had agreed in principle to a $256 million global settlement with DOJ.  (Id. ¶ 3)  Millennium finalized that settlement on October 16, 2015, and on November 10, 2015, Millennium defaulted on the term loan and filed a bankruptcy petition.  (Id.)  The Bankruptcy Court issued a bankruptcy plan that established the Trust, and Plaintiff was appointed as Trustee.  (Id. ¶ 11)

## VI.   PLAINTIFF'S CLAIMS

        The Complaint was filed in Supreme Court of the State of New York, New York County, on August 1, 2017, and asserts eleven causes of action.  Causes of Action One through Six arise under the securities laws of California, Massachusetts, Colorado, and Illinois, and allege that Defendants made actionable misstatements and omissions to the Investors.  (See id. ¶¶ 125-172)  The Seventh Cause of Action alleges negligent misrepresentation as to all Defendants. (Id. ¶¶ 173-181)  Causes of Action Eight through Eleven are asserted only against Chase, and allege breach of fiduciary duty, breach of contract, breach of post-closing contractual duties, and breach of the implied covenant of good faith and fair dealing.  (Id. ¶¶ 182-207)

The Complaint alleges that all Defendants are liable for negligent misrepresentation and securities law violations because, inter alia, "Defendants abandoned their obligations" to perform due diligence concerning (1) Millennium's exposure to liability, damages, and penalties in connection with the DOJ investigation; and (2) the artificial inflation of Millennium's financial results stemming from the company's unlawful sales and marketing practices.  (Id. ¶¶ 53-65)  The Complaint also alleges that JPM Securities and CitiGlobal created offering materials that contained material misstatements and omissions that were designed to, and did, induce the Investors' purchases of the Millennium notes.  (Id. ¶¶ 70-91)

Causes of Action Eight through Eleven arise, in part, from the 2014 Credit Agreement, which includes as a condition precedent for the $1.775 billion loan that Millennium not be in breach of the representations and warranties in the 2014 Credit Agreement.  (Id. ¶¶ 100-03)  According to the Complaint, Chase knew or should have known that the representations and warranties in the 2014 Credit Agreement falsely assured Investors that Millennium had no exposure to material litigation and was in material compliance with all applicable regulations and laws, and that, therefore, the conditions precedent to funding had not been satisfied.  (Id. ¶¶ 101-05)  The Complaint further alleges that Chase "breached its contractual duties, express and implied, and fiduciary duties as agent to the Investors by (i) failing to give the Investors notice [that the conditions precedent had not been satisfied]; and (ii) proceeding with the funding of Millennium."  (Id. ¶ 105)

These claims against Chase extend to the period after Chase assigned the entirety of the term loan to the Investors, because Chase remained a party to the 2014 Credit Agreement as Administrative Agent.  (Id. ¶ 95)  In that role, Chase was obligated to provide Investors with (1) information from and about Millennium "contemporaneously with intervening material

developments" (id. ¶ 107); and (2) notice of, inter alia, (a) any "investigation or proceeding that may exist at any time between [Millennium] and any Governmental Authority, that if adversely determined would reasonably be expected to have a Material Adverse Effect"; and (b) "any litigation or proceeding . . . in which the amount involved is $15,000,000 or more and not fully covered by insurance." (Id. ¶ 109 (internal quotation marks and citations omitted)) Notwithstanding these obligations, Chase allegedly did not provide contemporaneous notice of the verdict in the Ameritox litigation (id. ¶ 115), even though Chase viewed the verdict as having a material effect on the company's valuation. (Id. ¶ 114) Plaintiff contends that "[i]nterest on the original . . . judgment would easily put the amount involved at over the $15 million figure . . . and it is doubtful that any of the punitive damages would have been covered by insurance." (Id. ¶ 113) The Complaint also alleges that Chase failed to contemporaneously notify the Investors either of the DOJ's intervention in the qui tam action or Medicare's threat to debar Millennium. (Id. ¶¶ 118-21) Based on these alleged failures, Plaintiff asserts claims against Chase for breach of contract after the April 16, 2014 closing date. (Id. ¶¶ 196-207)

## VII.   PROCEDURAL HISTORY

On August 1, 2017, the Complaint was filed in Supreme Court of the State of New York, New York County. (Id.) On August 21, 2017, Defendants removed the case to this District, asserting jurisdiction under the Edge Act, 12 U.S.C § 632. (Notice of Removal (Dkt. No. 1)) On October 4, 2017, Plaintiff moved to remand (Pltf. Mot. (Dkt. No. 26)), arguing that there is no jurisdiction under the Edge Act. (Pltf. Br. (Dkt. No. 26-1)) On September 24, 2018, this Court denied Plaintiff's motion to remand. (Dkt. No. 38) Defendants have moved to dismiss for failure to state a claim. (Dkt. No. 76)

11

## DISCUSSION

## I.   MOTION TO DISMISS STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . .  the court is to accept as true all facts alleged in the complaint," Kassner, 496 F.3d at 237 (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff."  Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests."  Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957))).

Fed. R. Civ. P. 9(b) sets standards for pleading fraud claims and requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b); see also In re Pfizer Inc. Sec. Litig., 584 F. Supp. 2d 621, 632–33 (S.D.N.Y. 2008) (quoting Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001)). Rule 9(b) requires a plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Kottler v. Deutsche Bank AG, 607 F. Supp. 2d 447, 462 (S.D.N.Y. 2009) (quoting Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999) (internal quotation marks omitted)).

II.     **STATE SECURITIES LAW CLAIMS**

Defendants Chase, JPM Securities, Citibank, and CitiGlobal (collectively, "Chase and Citi") have moved to dismiss Plaintiff's claims under the securities laws of California, Colorado, Illinois, and Massachusetts – so-called "blue sky laws" – on the ground that "a syndicated bank loan is not a 'security' and a loan syndication is not a 'securities distribution.'" (Chase and Citi. Br. (Dkt. No. 77) at 10)  Defendants Bank of Montreal, BMO Capital Markets, SunTrust Bank, and SunTrust Robinson Humphrey (collectively, "BMO and SunTrust") join in Chase and Citi's arguments, and offer additional grounds for dismissal.  (BMO and SunTrust Br. (Dkt. No. 80) at 5)  Plaintiff contends that the Millennium notes are securities, and thus subject to the state security laws.  (Pltf. Opp. Br. (Dkt. No. 81) at 22)

A.     **Legal Standards**

In determining whether debt obligations such as the Millennium notes are "securities," courts apply the "family resemblance" test set forth in Reves v. Ernst & Young. 494 U.S. 56 (1990).  For purposes of resolving Defendants' motion to dismiss, this Court accepts Plaintiff's assertion that Reves applies to Plaintiff's claims under California, Colorado, Illinois, and Massachusetts law.  (See Pltf. Opp. Br. (Dkt. No. 81) at 21 n.9)

In Reves, the Supreme Court instructed that "because the Securities Acts define 'security' to include 'any note,'" courts should "begin with a presumption that every note is a security."  Reves, 494 U.S. at 65.  The Court adopted the Second Circuit's "list of instruments commonly denominated 'notes' that nonetheless fall without the 'security' category," however. Id.  "[T]ypes of notes that are not 'securities' include 'the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, []a note which simply formalizes an

open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized' [and] 'notes evidencing loans by commercial banks for current operations.'"  Id. at 65, 67 (first quoting Exchange Nat. Bank of Chicago v. Touche Ross & Co., 544 F.2d 1126, 1138 (2d Cir. 1976), then quoting Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930, 939 (2d Cir. 1984)).  The presumption that a note is a security "may be rebutted only by a showing that the note bears a strong [family] resemblance . . . to one of the enumerated categories of instrument" set forth above.  Id. at 67.

The four factors of the family resemblance test are:  (1) "the motivations that would prompt a reasonable seller and buyer to enter into [the transaction]"; (2) "the plan of distribution of the instrument"; (3) 'the reasonable expectations of the investing public"; and (4) "the existence of another regulatory scheme [to reduce] the risk of the instrument, thereby rendering application of the Securities Act unnecessary."  Id. at 66-67.

**B.** **Analysis**

Plaintiff argues that the determination of whether an instrument is a security "is a fact intensive question and generally 'not appropriately resolved on a motion to dismiss.'"  (Pltf. Opp. Br. (Dkt. No. 81) at 20 (quoting S.E.C. v. Rorech, 673 F. Supp. 2d 217, 225 (S.D.N.Y. 2009) (citation omitted)))  Courts in this District have on occasion, however, concluded on a motion to dismiss that a particular instrument is not a security under Reves.  See, e.g., Intelligent Digital Sys., LLC v. Visual Mgmt. Sys., Inc., 683 F. Supp. 2d 278, 281, 283, 286 (finding on a motion to dismiss that an "unsecured convertible promissory note" is not a security) (E.D.N.Y. 2010); Benedict v. Amaducci, No. 92 CIV. 5239 (KMW), 1995 WL 413206, at *1, *10 (S.D.N.Y. July 12, 1995) (finding on a motion to dismiss that several notes at issue were not securities).  In analyzing the four Reves factors here, this Court assumes the truth of the Complaint's factual allegations.

14

1.    **Motivations of Seller and Buyer**

The first <u>Reves</u> factor requires to consider "the motivations that would prompt a

reasonable seller and buyer to enter into [a particular transaction]":

> If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security."  If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security."

<u>Reves</u>, 494 U.S. at 66; <u>see</u> <u>also</u> <u>Pollack v. Laidlaw Holdings, Inc.</u>, 27 F.3d 808, 812 (2d Cir.

1994) (the first <u>Reves</u> factor asks "whether the motivations are investment (suggesting a

security) or commercial or consumer (suggesting a non-security)").

In arguing that the Millennium notes are securities – Plaintiff points out that

Chase assigned an "analyst who normally covered high-yield debt securities" to this transaction;

referred to participants as "public investors"; and "employed practices and terminology specific

to an investment transaction."  (Pltf. Opp. Br. (Dkt. No. 81) at 24)

Defendants counter that the Millennium notes offered a fixed rate of return,

without any opportunity to share in profits earned by Millennium.  (<u>See</u> Chase and Citi Br. (Dkt.

No. 77) at 23 (citing Credit Agreement (Dkt. No. 79-1) §§ 2.14-2.15 (providing for a market rate

of interest plus a fixed "applicable margin" that varies depending on the lender's tranche)))  In

<u>Pollack</u>, however, the Second Circuit held that "the district court erred in finding that the fixed

rate of return cut against the presumption that the notes are securities."  <u>Pollack</u>, 27 F.3d at 813.

Defendants also cite the seller's motivation, which was to pay dividends and to

satisfy or refinance existing debt.  (Cmplt. (Dkt. No. 1-1) ¶¶ 49, 69)  Defendants argue that

"[t]hese are core commercial lending functions not traditionally associated with securities

offerings."  (Citi and Chase Br. (Dkt. No. 77) at 23)

Applying the <u>Reves</u> dichotomy – where "the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments . . . the instrument is likely to be a 'security,'" but where "the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, . . . the note is less sensibly described as a 'security,'" <u>Reves</u>, 494 U.S. at 66 – the Millennium notes are not, from the seller's perspective, for the purpose of an investment or for Millennium's general use.  Instead, from Millennium's perspective, the Notes are better described as advancing "some other commercial purpose[s]": loan repayment and the paying of a dividend.

From the buyers' perspective, however, the purpose of acquiring the Notes appears to have been investment.  Many of the ultimate purchasers are pension and retirement funds who purchased the Millennium Notes for their investment portfolios.  (Pltf. Opp. Br. (Dkt. No. 81) at 23)

Given that the buyers' and sellers' motivations are mixed, this factor does not weigh heavily in either direction.

## 2.   <u>Plan of Distribution</u>

The second <u>Reves</u> factor considers "the plan of distribution" for the instrument, including whether it is subject to "common trading for speculation or investment."  <u>Reves</u>, 494 U.S. at 66.

Defendants argue that the purchasers of the Notes "are a small group of sophisticated institutions; members of the general public were not solicited and did not participate in the loan syndication."  (Chase and Citi Br. (Dkt. No. 77) at 23 (citing Cmplt. (Dkt. No. 1-1) ¶ 66))  The Lender Schedule attached to the Complaint indicates that only a few hundred Parent and Child Investors purchased the Notes.  (<u>See</u> Lender Schedule (Dkt. No. 1-3))

Moreover, while the Notes can be assigned, an assignment can take place only with the consent of a Lender, Lender affiliate, or "Approved Fund," which itself must have some connection to a Lender or Lender Affiliate.  (Credit Agreement (Dkt. No. 79-1) § 10.6)  The Notes cannot be assigned to a natural person, which reduces the potential for unsophisticated investors to acquire Notes in the secondary market.  (Id.)

Plaintiff argues that Defendants "solicited hundreds of investment managers across the country," and had an "extremely low" minimum investment amount of $1 million that "did not apply to the investment managers' clients."  Plaintiff further alleges that the Notes "began trading in secondary markets immediately."  (Pltf. Opp. Br. (Dkt. No. 81) at 25-26) Moreover, "[t]here was no minimum amount on trades with affiliates of initial investors, and thus, many such investors had holdings well under $1 million[,] . . . . [including] numerous 'SubAccount[s]/Fund[s]' with investment amounts between $130,000 and $665,000)."  (Id. at 18 n.6)

The Court concludes that the plan of distribution here is relatively narrow.  As in Banco Espanol, the restrictions on the Notes "worked to prevent the loan participations from being sold to the general public."  Banco Espanol, 973 F.2d at 55.  Acknowledging that "hundreds of investment managers" were solicited, this constitutes a relatively small number compared to the general public.  And, as in Banco Espanol, "only institutional and corporate entities were solicited."  Id.  The $1 million minimum investment amount, while small in comparison to the size of the Notes, is a high absolute number that would only allow sophisticated investors to participate.  That certain affiliates of Parent Investors received sub-allocations in the hundreds of thousands of dollars does not change the result.  Instead, it merely reflects the fact that sophisticated investors have complex corporate structures through which

17

they arrange their business and financial affairs.  In any event, such affiliates are by definition not the "general public."

While Plaintiff has also alleged that the Notes were traded in an "immediate" secondary market that saw "daily price fluctuations" (Pltf. Opp. Br. (Dkt. No. 81) at 26 (citing Cmplt. (Dkt. No. 1-1) ¶¶ 96, 115)), Plaintiff has not pled that this trading in the secondary market broadened the distribution of the Notes significantly.  Indeed, the trading in the secondary market appears to have been consistent with the aforementioned transfer restrictions.

The Court concludes that the second Reves factor weighs strongly in favor of finding that the Notes are not securities.  See Banco Espanol, 973 F.2d at 55 (finding that a note was not a security where the "plan of distribution . . . worked to prevent the loan participations from being sold to the general public"); Pollack, 27 F.3d at 814 (finding that a note was a security, in part, because of "broad-based, unrestricted sales to the general investing public).

### 3.      Reasonable Expectations of the Investing Public

The third Reves factor is "the reasonable expectations of the investing public: The Court will consider instruments to be 'securities' on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction."  Reves, 494 U.S. at 66.

Here, Defendants argue that "[t]he governing documents" – including the Confidential Informational Memorandum ("CIM") distributed to potential investors and the Credit Agreement – "made clear to the parties that they were participating in a lending transaction, not investing in securities."  (Citi and Chase Br. (Dkt. No. 77) at 24-25)

This Court agrees with Defendants that the Credit Agreement and CIM would lead a reasonable investor to believe that the Notes constitute loans, and not securities.  For example, the Credit Agreement repeatedly refers to the underlying transaction documents as

"loan documents," and the words "loan" and "lender" are used consistently, instead of terms such as "investor."  (See, e.g., Credit Agreement (Dkt. No. 79-1) § 2.1 ("each Tranche B Term Lender severally agrees to make a term loan"))  The CIM also consistently refers to prospective purchasers of the Notes as "lender[s]."  (CIM (Dkt. No. 79-2) at 4 ("[w]e hereby authorize your distribution of Evaluation Materials . . . to lenders and potential lenders"; "the Loan Documents will contain covenants requiring that the Company will provide to the Administrative Agent and the lenders audited and unaudited financial statements"))

In Banco Espanol, the court found the use of such terms significant, concluding that buyers "were given ample notice that the instruments were participations in loans and not investments in a business enterprise."  Banco Espanol, 973 F.2d at 55; cf. Reves, 494 U.S. at 69 ("The advertisements for the notes here characterized them as 'investments,' . . . and there were no countervailing factors that would have led a reasonable person to question this characterization.  In these circumstances, it would be reasonable for a prospective purchaser to take the [seller] at its word.").

Plaintiff argues, however, that provisions in the Credit Agreement and CIM relating to non-public information "reflect the parties' understanding and expectation that purchases and sales of the Millennium Notes . . . may be subject to Federal and state securities laws."[4]  (Pltf. Opp. Br. (Dkt. No. 81) at 26-27)  This argument is not persuasive.  The Lenders'

---

[4]  See Credit Agreement (Dkt. No. 79-1) § 10.15 ("[E]ach Lender agrees to keep confidential all non-public information provided to it by any Loan Party, the Administrative Agent or any Lender pursuant to or in connection with this Agreement, and further not to use any such non-public information other than in connection with the making and administration of the Loans. . . ."); CIM (Dkt. No. 79-2) at 4 ("We hereby authorize your distribution of Evaluation Materials . . . to lenders and potential lenders, including representatives of such lenders who indicate . . . that they would not wish to receive information that would be deemed material non-public information within the meaning of the United States federal and state securities laws . . . if the Parties had publicly-traded securities outstanding.").

agreement to keep non-public information confidential, and "not to use . . . non-public information other than in connection with the making and administration of the Loans," is simply that.  It does not signal that the Notes are securities or that the transaction is subject to the securities laws.

Plaintiff also cites market commentary to the effect that term loans now commonly contain features that "mirror[] a high yield bond issuance."  (Pltf. Opp. Br. (Dkt. No. 81) at 27-28)  Plaintiff's reference to these publications is unavailing.  Two articles merely describe "[a] number of bond-like features [that] have appeared in term loan agreements."  Term Loans and High Yield Bonds: Tracking the Convergence, Practical Law Article 5-520-2458; Meyer C. Dworkin & Monica Holland, The International Comparative Guide to Lending & Secured Finance 2014 at 26 (2d ed. 2014).  Another article cited by Plaintiff cuts against its argument; that publication states that "[i]nterests in bank debt . . . typically have been considered not to constitute 'securities' for purposes of the securities laws."  Private Equity, Restructuring and Finance Developments – Trading in Distressed Debt at 2, Wachtell, Lipton, Rosen & Katz (Jan. 20, 2009).

Plaintiff has cited no case in which a court has held that a syndicated term loan is a "security," and this Court has found no such case in its review of Reves and its progeny.  Given these circumstances, Plaintiff's claim of a shift in the market are premature at best.

The Court concludes that the "reasonable expectations of the investing public" factor weighs in favor of finding that the Notes are not securities.  See Banco Espanol, 973 F.2d at 55 (finding that notes were not securities because borrowers "were given ample notice that the instruments were participations in loans and not investments in a business enterprise").

4.      **Existence of Another Regulatory Scheme**

The last Reves factor is "the existence of another regulatory scheme [to reduce] the risk of the instrument, thereby rendering application of the Securities Act unnecessary." Reves, 494 U.S. at 67.  The parties disagree as to whether interagency guidance and others measures taken by the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, and the Federal Reserve Board (collectively, "Federal banking regulators") constitutes such a regulatory scheme.

Plaintiff argues that Federal banking regulators "ensure sound banking practices and minimize risks to bank, not risks to non-bank investors."  (Pltf. Opp. Br. (Dkt. No. 81) at 29) Defendants counter (see Citi and Chase Br. (Dkt. No. 77) at 25) that in Banco Espanol the Second Circuit affirmed the district court's finding "that the Office of the Comptroller of the Currency has issued specific policy guidelines addressing the sale of loan participations," and relied in part on "the existence of another regulatory scheme" in concluding that "application of the securities laws was unnecessary."  Banco Espanol, 973 F.2d at 55-56.

The primary focus of Federal banking regulators is presumably the safety and soundness of banks, rather than protection of note holders.  Having said that, in Banco Espanol, the Second Circuit appeared to distinguish the entirely unregulated scenario at issue in Reves, 494 U.S. at 69 (involving "uncollateralized and uninsured" instruments and "no risk-reducing factor") from the market for the sale of loan participations to "sophisticated purchasers," which is subject to policy guidelines from the Comptroller.  Banco Espanol, 973 F.2d at 55.

In light of Banco Espanol, this Court concludes that the fourth Reves factor weighs in favor of finding that the Notes are not securities.

21

5. **Summary**

The second, third, and fourth <u>Reves</u> factors weigh in favor of finding the Notes "analogous to the enumerated category of loans issued by banks for commercial purposes." <u>Banco Espanol</u>, 973 F.2d at 56. The first factor does not weigh strongly in either direction.

Having conducted the <u>Reves</u> analysis, the Court concludes that the limited number of highly sophisticated purchasers of the Notes would not reasonably consider the Notes "securities" subject to the attendant regulations and protections of Federal and state securities law. Instead, it would have been reasonable for these sophisticated institutional buyers to believe that they were lending money, with all of the risks that may entail, and without the disclosure and other protections associated with the issuance of securities. The presumption that the Notes are securities is thus overcome under the facts of this case. Accordingly, Defendants' motion to dismiss will be granted as to Causes of Action One through Six on the ground that the Notes are not securities.

## III.   **NEGLIGENT MISREPRESENTATION**

Defendants have moved to dismiss Plaintiff's negligent misrepresentation claim. The parties dispute what state's law applies. Defendants argue that the Notes are governed by New York law, and that accordingly New York law applies to Plaintiff's negligent misrepresentation claim. (Citi and Chase Br. (Dkt. No. 77) at 30) Plaintiff contends that negligent misrepresentation is a tort claim; that choice of law is dictated by where the injury occurred; and that here the injury occurred in the domiciles of the Trust's beneficiaries. (Pltf. Opp. Br. (Dkt. No. 81) at 36)

"A federal court, sitting in diversity, must look to the choice-of-law rules of the state in which it sits – here New York – to resolve the conflict-of-law questions." <u>AroChem International, Inc. v. Buirkle</u>, 968 F.2d 266, 269-70 (2d Cir. 1992) (citing <u>Klaxon Co. v. Stentor</u>

Elec. Mfg. Co., 313 U.S. 487, 496 (1941)).  "New York law employs an 'interest analysis' in tort actions that applies the law of the jurisdiction with the greatest interest in the litigation.  Under this analysis, the court should focus almost exclusively on the parties' domiciles and the locus of the tort."  Roselink Inv'rs, L.L.C. v. Shenkman, 386 F. Supp. 2d 209, 225 (S.D.N.Y. 2004) (citations omitted).  "In cases in which conduct cuts across several jurisdictions, the Second Circuit has made clear that the law of the jurisdiction with the most significant contacts in the case governs.  New York courts agree that conduct should be weighed for choice-of-law purposes when it cuts across multiple jurisdictions.  This weighing of conduct is in line with the core principle of New York's approach, interest balancing."  Kashef v. BNP Paribas SA, No. 16-CV-3228 (AJN), 2020 WL 1047573, at *7 (S.D.N.Y. Mar. 3, 2020) (internal quotation marks, citations, and alterations omitted).

Here, Plaintiff does not plead where its beneficiaries – the original lenders – reside, but instead merely asserts that the Trust beneficiaries have "claims under the Blue Sky laws of California, Colorado, Illinois and Massachusetts."  (Cmplt. Dkt. No. 1-1) ¶ 21)  In opposing Defendants' motion to dismiss, Plaintiff still does not assert where the Trust beneficiaries reside.  Instead, Plaintiff merely argues that "[i]njury occurred in the many states where investors were located," and that "[u]nlike New York, most states – including California and others relevant here – do not require a privity-like or special relationship to impose a tort duty."  (Pltf. Opp. Br. (Dkt. No. 81) at 36)  Plaintiff thus appears to suggest that some Trust beneficiaries sustained their alleged injuries in states that do not require a special relationship.  Plaintiff, goes on to argue, however, that it "has adequately pled negligent misrepresentation under New York law."  (Id. at 37 (emphasis removed))

Plaintiff's approach to choice of law analysis is untenable, because New York law requires a court to apply the law of "the [single] jurisdiction with the greatest interest" and "the most significant contacts," not to construct a composite based on law drawn from a variety of states that may or may not collectively reflect a majority interest.  Roselink Inv'rs, 386 F. Supp. 2d at 225; Kashef, 2020 WL 1047573, at *7.  Neither the Complaint nor Plaintiff's briefing demonstrates that a state other than New York has "the greatest interest" in or the "most significant contacts" with this litigation.

Plaintiff – as trustee – pleads that he is a resident of New York (Cmplt. (Dkt. No. 1-1) ¶ 10; see In re Tremont Sec. Law, State Law, & Ins. Litig., No. 08 CIV. 11117, 2013 WL 2257053, at *4 (S.D.N.Y. May 23, 2013) (finding that under Texas' "most significant relationship" test, Texas law applied to negligent misrepresentation claim because "the parties were spread across several jurisdictions," and "though the Trust is a Cayman Islands entity, its Protector is domiciled in Texas"))  As to the Trust's beneficiaries, the greatest number appear to be domiciled in the Cayman Islands, but many – including Cornell University, New York Life Insurance Company, the New York State Common Retirement Fund, the United States Life Insurance Company in the City of New York, Metropolitan Life Insurance Company, and The City of New York Group Trust – are headquartered in New York.  (See Lender Schedule (Dkt. No. 1-3))  As to the Defendants, all save three – Bank of Montreal (Canada), SunTrust Bank (Georgia), and SunTrust Robinson Murphy (Georgia) – are domiciled in New York.  (Cmplt. (Dkt. No. 1-1) ¶¶ 11-20)  Finally, at least some of the alleged misrepresentations occurred in part in New York, the place from which the CIM originated.  (CIM (Dkt. No. 79-2) at 4)

Because Plaintiff has not demonstrated that any particular state has a greater interest in or more significant contacts with this litigation than New York, Plaintiff has not

24

provided this Court with a basis to apply the common law of any state other than New York. Accordingly, this Court will test the sufficiency of Plaintiff's negligent misrepresentation claim under New York law.  See Roselink Inv'rs, 386 F. Supp. 2d at 225; Kashef, 2020 WL 1047573, at *7.

Under New York law – as Plaintiff acknowledges (Pltf. Opp. Br. (Dkt. No. 81) at 37) – a party bringing a negligent misrepresentation claim must plead facts demonstrating that "(1) the parties stood in some special relationship imposing a duty of care on the defendant to render accurate information; (2) the defendant negligently provided incorrect information; and (3) the plaintiff reasonably relied upon the information given." LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC, 10 F. Supp. 3d 504, 525 (S.D.N.Y. 2014) (citation omitted).  Accordingly, in order for "a party [to] recover in tort for pecuniary loss sustained as a result of another's negligent misrepresentations there must be a showing that there was either actual privity of contract between the parties or a relationship so close as to approach that of privity." Prudential Ins. Co. of Am. v. Dewey, Ballantine, Bushby, Palmer & Wood, 80 N.Y.2d 377, 382 (1992) (citations omitted).

Plaintiff argues that a "special relationship" existed here because "investors were in privity with the Initial Lender Defendants as assignees," and "Defendants were uniquely situated and possessed special knowledge about Millennium . . . ."  (Pltf. Opp. Br. (Dkt. No. 81) at 37)  In support of its "uniquely situated" argument, Plaintiff cites Kimmell v. Schaefer, 89 N.Y.2d 257 (1996).  (Id. at 38)

In Kimmel, the defendant was the issuer's "chief financial officer . . . [and] the contact person . . . for the [investment] project"; it was his responsibility to seek investors for the limited partnership.  Kimmell, 89 N.Y.2d at 260-51.  Defendant "met with each plaintiff, and

personally represented that the [investment] project would generate some income"; he "urged plaintiffs to review and rely on the projections [he had overseen]; he "informed [plaintiff] that he could provide 'hot comfort' should plaintiff entertain any reservations about investing"; he "personally requested 'updated' projections, which he represented were reasonable and generated after a 'thorough discussion . . .'"; and he "personally received a $20,000 commission for his efforts on behalf of the [investment] project."  Id. at 265.

Here, Plaintiff claims that "Defendants had knowledge superior to that of the Investors of the facts surrounding the DOJ Investigation because of the[ir] unique access," including to Millennium's general counsel.  (Cmplt. (Dkt. No. 1-1) ¶¶ 41-42, 176)  But the Complaint does not contain factual allegations demonstrating that Defendants used this "unique access" to induce purchase of the Notes.

For example, Plaintiff asserts that Chase "controlled every aspect of the rating process for Millennium, down to writing the Rating Agency Presentation . . . and scripting oral responses to [rating agency] questions. . . ."  (Id. ¶ 52)  But this activity was directed at a third party and not Plaintiff's beneficiaries.

Plaintiff also makes much of an investor call in which Michael Loucks of Skadden, Arps, Slate, Meagher & Flom LLP – outside counsel for Millennium – "opine[d] as to the likely immateriality of the result [of the DOJ investigation] on Millennium's finances. . . ." (Id. ¶ 58)  Defendants' outside counsel led the questioning of Loucks during this call.  According to Plaintiff, one of Defendants' lawyers "jumped in with a leading question," and Loucks responded that one "could conclude that" Millennium's exposure – as a result of the DOJ investigation – would be less than $20 million.  (Id. ¶¶ 56-58)  But Plaintiff has not alleged that Defendants had any control over Loucks or what he said during this investor call, and potential

26

investors participating in the call were presumably free to ask Loucks any question they wished regarding Millennium's potential exposure.  The facts here are clearly much different than in Kimmel, where the defendant was responsible for generating the data designed to promote the investment, and presented that data to potential investors.

As to privity, Plaintiff asserts that "investors were in privity with the Initial Lender Defendants as assignees," and that Chase was a "party to the Assignment and Assumption Agreements with investors, [and] served as agent for all Defendants with respect to the initial funding of the transaction."  (Pltf. Opp. Br. (Dkt. No. 81) at 37)  Plaintiff is thus arguing that the alleged privity arises from the contract itself.

Assuming arguendo that the agreements with investors demonstrate privity, Plaintiff cannot overcome disclaimers in these agreements that are fatal to its negligent misrepresentation claim.  Section 9.6 of the Credit Agreement states that Chase, the "Administrative Agent[,] shall not have any duty or responsibility to provide any Lender with any credit or other information . . . ."  (Credit Agreement (Dkt. No. 79-1) § 9.6)  And Section 9.6 further provides that "[e]ach Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis . . . ."  (Id.) Accordingly, the agreements on which Plaintiff relies to claim privity contain a clear disclaimer of the "special relationship" and "duty of care" alleged by Plaintiff.

This case is analogous to UniCredito Italiano SPA v. JPMorgan Chase Bank, 288 F. Supp. 2d 485 (S.D.N.Y. 2003).  In UniCredito, the court dismissed a negligent misrepresentation claim because "even if the bank Defendants had the knowledge the Complaint attributes to them, the banks had no duty to disclose it to Plaintiffs."  UniCredito, 288 F. Supp.

2d at 499.  There, as here, "the lenders specifically agreed that they had, and would continue to, make their own credit decisions and would not rely on the Defendant banks, either in entering into the facilities or in making decisions in the course of the performance of the relevant agreements."  Id.

Plaintiff argues that UniCredito is distinguishable for two reasons:  (1) in that case, "the banks were not in contractual privity with the plaintiffs"; and (2) "Defendants [here] prevented Millennium from making necessary disclosures."  (Pltf. Opp. Br. (Dkt. No. 81) at 39 n.23)  But UniCredito turns on the same type of disclaimer seen here, and – as discussed above – Plaintiff has not pled factual allegations demonstrating that Defendants prevented Millennium from making necessary disclosures to the investors.

Plaintiff also argues that the contractual disclaimers are not effective, because "'disclaimers do not preclude the finding of a special relationship.'"  (Pltf. Opp. Br. (Dkt. No. 81) at 39 (quoting Fin. Guaranty Ins. Co. v. Putnam Advisory Co., 783 F.3d 395, 406 (2d Cir. 2015)))

Fin. Guaranty Ins. does not involve a claim of contractual privity.  See Fin. Guaranty Ins., 783 F.3d at 405 ("It is undisputed that there was no actual contractual privity between [plaintiff and defendant].")  The plaintiff in that case instead contended that defendant "owed it a duty of care" under Bayerische Landesbank v. Aladdin Capital Mgmt. LLC, 692 F.3d 42, 59-61 (2d Cir. 2012), in which the Second Circuit held that an investor in a collateralized debt obligation ("CDO") could bring a negligence action against the defendant CDO manager – even absent contractual privity – where "'(1) the defendant had awareness that its work was to be used for a particular purpose; (2) there was reliance by a third party known to the defendant in furtherance of that purpose; and (3) there existed some conduct by the defendant linking it to that

28

known third party evincing the defendant's understanding of the third party's reliance.'" <u>Id.</u> at 405-06 (quoting <u>Bayerische Landesbank</u>, 692 F.3d at 59).

In reversing the district court's dismissal of the complaint, the Second Circuit found that the disclaimers at issue in <u>Fin. Guaranty Ins.</u> – statements in a "pitchbook" and offering memorandum that defendant was not "'acting as a financial advisor'" or in a "'fiduciary capacity,'" and that investors should "'rely on their own examination of the co-issuers and the terms of the offering, including the merits and risks involved'" – "do not preclude the finding of a special relationship between [plaintiff and defendant]." <u>Id.</u> at 406.

That case turns, however, on the court's finding that the disclaimers at issue did not track the misrepresentations plaintiff alleged. Plaintiff alleged that defendant "represented that it would select the collateral for [the investment vehicle] and that it would do so independently and in good faith." <u>Id.</u> Defendant instead "cede[d] control of the collateral selection process to other market participants with interests adverse to long investors . . . ." <u>Id.</u> As the disclaimers cited by defendant did not disclose the possibility that defendant would "cede control" in this fashion, they "'[fell] well short of tracking the particular misrepresentations alleged'" by plaintiff. <u>Id.</u> at 406-07 (quoting <u>Caiola v. Citibank, N.A., N.Y.</u>, 295 F.3d 312, 330 (2d Cir. 2002).

Here, by contrast, the contractual disclaimers at issue address the evaluation of credit risk, which is exactly what the alleged misrepresentations relate to. Accordingly, the agreements on which Plaintiff relies provide no basis for a negligent misrepresentation claim.

For all these reasons, Defendants' motion to dismiss Plaintiff's negligent misrepresentation claim will be granted.

IV.      **BREACH OF FIDUCIARY DUTY**

Chase seeks dismissal of Plaintiff's breach of fiduciary duty claim, arguing that it had no such duties under the Credit Agreement.  (Citi and Chase Br. (Dkt. No. 77) at 33-34)

"In order to establish a breach of fiduciary duty, a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct."  Kurtzman v. Bergstol, 40 A.D.3d 588, 590 (2d Dept. 2007) (citing Ozelkan v. Tyree Bros. Envtl. Servs., 29 A.D.3d 877, 879 (2d Dept. 2006)); see also Kidz Cloz, Inc. v. Officially For Kids, Inc., No. 00 CIV. 6270 (DC), 2002 WL 392291, at *4 (S.D.N.Y. Mar. 13, 2002).  "A fiduciary relationship exists under New York law 'when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.'"  Kidz Cloz, Inc., 2002 WL 392291, at *4 (quoting Flickinger v. Harold C. Brown & Co., 947 F.2d 595, 599 (2d. Cir. 1991)).  "Generally, where parties have entered into a contract, courts look to that agreement 'to discover . . . the nexus of [the parties'] relationship and the particular contractual expression establishing the parties' interdependency . . . .'"  EBC I, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d 11, 19-20 (2005) (citations omitted) (alterations in original).

Chase argues that it had no fiduciary duty under "the plain terms of the Credit Agreement," which states that the "'Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender.'"  (Def. Br. (Dkt. No. 77) at 33-34 (quoting Credit Agreement (Dkt. No. 79-1) § 9.1))

Plaintiff contends, however, that this provision confers "express agency [which] by definition creates fiduciary duties."  (Pltf. Opp. Br. (Dkt. No. 81) at 41)  Plaintiff does not otherwise provide a basis for an agency relationship that gives rise to fiduciary duties in these circumstances, but instead cites authority providing that "general or broad language" is

insufficient for an agent to disclaim fiduciary duties.  (Id. at 41-42 (quoting Restatement (Third) Of Agency § 8.06, cmt. b (2006)))

As discussed above with respect to negligent misrepresentation, however, Chase is not relying solely on a general disclaimer in the Credit Agreement.  Instead, Chase is relying on a specific disclaimer in the same section of the agreement that allegedly creates the agency relationship.  This Court cannot impose a broader agency relationship than that to which the parties agreed in their contract.  See EBC I, 5 N.Y.3d at 20.  Since the parties agreed that Chase, as agent, would have only limited and non-fiduciary duties, Defendants' motion to dismiss Plaintiff's breach of fiduciary duty claim will be granted.

## V.   BREACH OF CONTRACT CLAIMS

Defendants have moved to dismiss Plaintiff's two breach of contract claims. (Def. Br. (Dkt. No. 77) at 35)  The Ninth Cause of Action seeks to hold Chase liable for "enforcement of conditions precedent to the Closing" which Millennium "fail[ed] . . . to satisfy." (Cmplt. (Dkt. No. 1-1) ¶¶ 190, 194)  The Tenth Cause of Action seeks to hold Chase liable for its alleged failure "to provide notice . . . to all Investors" of Millennium's default.  Chase allegedly had notice of Millennium's default "on and after the closing date."  (Id. ¶¶ 197-200)

### A.   Conditions Precedent

Plaintiff claims that Chase "breached Credit Agreement Sections 2.1, 2.2, 5.1, 5.2 and 9.4, and the definition of 'Closing Date' incorporated therein, by conducting a closing and triggering investors' commitments when [it] knew that . . . false representations and warranties breached the conditions precedent for the closing and commitments."  (Pltf. Opp. Br. (Dkt. No. 81) at 43)  Defendants argue that Chase "is not responsible for representations, warranties, or other statements made by Millennium in the Credit Agreement, or Millennium's failure to perform its obligations under those documents."  (Def. Br. (Dkt. No. 77) at 35)

31

The sections of the Credit Agreement cited by Plaintiff provide no support for its breach of contract claim.  The "Closing Date" in the Credit Agreement is defined as "the date on which the conditions precedent set forth in Section 5.1 shall have been satisfied . . . ."  (Credit Agreement (Dkt. No. 79-1) § 1.1)  Sections 2.1 and 2.2 of the Credit Agreement set forth the commitments of the term loan and the procedure for borrowing under it.  (Id. §§ 2.1, 2.2)  Section 5.1 sets forth in great detail the conditions precedent, none of which refer to representations and warranties or Chase's duties as Administrative Agent.  (Id. § 5.1)  Section 5.2 provides that the Lenders' agreement "is subject to the satisfaction of . . . conditions precedent," including that "the representations and warranties made by any Loan Party . . . shall be true and correct."  (Id. § 5.2)  And Section 9.4 provides that Chase, as Administrative Agent, "shall be entitled to rely . . . upon any [document] believed by it to be genuine and correct. . . ."  (Id. § 9.4)

None of these provisions suggest that Chase has a duty to enforce compliance with, or investigate, Millennium's representations and warranties.  And Section 9.3 of the Credit Agreement absolves Chase from liability "for any recitals, statements, representations or warranties made by any Loan Party" and from "any obligation . . . to ascertain or to inquire as to the observance or performance of any of the . . . conditions . . . ."  (Id. § 9.3)

Plaintiff argues that Section 9.3 is irrelevant because Chase "actually knew Millennium's representations were false and that conditions precedent had not been satisfied."  (Pltf. Opp. Br. (Dkt. No. 81) at 43 (emphasis in original))  Plaintiff also cites a number of cases holding that, in such circumstances, Chase may not rely on those representations.  (Id. at 43-44)  But Plaintiff does not cite any contractual provision in which Chase takes on an obligation to do anything with respect to Millennium's representations and warranties, or the conditions

precedent, except for administrative actions that are not relevant here.  Indeed, the evidence is all to the contrary.  Chase's alleged actual knowledge is thus irrelevant to Plaintiff's breach of contract claim.

Because there is no evidence that Chase had a duty of "observance and enforcement of conditions precedent [prior] to the Closing" (Cmplt. (Dkt. No. 1-1) ¶ 190), Defendants' motion to dismiss this breach of contract claim will be granted.

### B.   Failure to Provide Notice

Plaintiff claims that Chase "actually knew of a Default" but failed to provide notice as required under Section 9.5 of the Credit Agreement.  (Pltf. Opp. Br. (Dkt. No. 81) at 44 (emphasis in original))

Defendants contend that Chase "is only deemed to have notice (a prerequisite for triggering any duty to notify) after receipt of a formal notice of default."  (Def. Br. (Dkt. No. 77) at 36)

Section 9.5 of the Credit Agreement provides that, "[i]n the event that the Administrative Agent receives [a notice of default], the Administrative Agent shall give notice thereof to the Lenders."  (Credit Agreement (Dkt. No. 79-1) § 9.5)  This provision does not generally require the Administrative Agent to provide notice when it knows of default.  To the contrary, Section 9.5 states that "[t]he Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of [default] unless the Administrative Agent has received notice from a Lender, Holdings, or Borrower referring to this Agreement . . . ."  (Id.)  Plaintiff does not allege that Chase received such a notice of default, and accordingly the plainly ministerial duty cited by Plaintiff was never triggered.

Defendants' motion to dismiss this breach of contract claim will be granted.

## VI.    BREACH OF COVENANT OF GOOD FAITH

Defendants have moved to dismiss Plaintiff's claim for breach of the implied covenant of good faith and fair dealing against Chase, arguing that this claim "is barred by the express terms of the Credit Agreement."  (Def. Br. (Dkt. No. 77) at 36)

Although the Complaint does not cite to the New York Uniform Commercial Code ("N.Y. U.C.C."), Plaintiff claims that Chase's duties here are governed by the N.Y. U.C.C. (Pltf. Opp. (Dkt. No. 81) at 45)

Under N.Y. U.C.C. § 1-304, "[e]very contract or duty within this act imposes an obligation of good faith in its performance and enforcement."  N.Y. U.C.C. Law § 1-304 (McKinney).  "This section does not support an independent cause of action for failure to perform or enforce in good faith[, however].  Rather, this section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract . . . ."  Id. cmt. 1.

Plaintiff contends that neither the duty of good faith, nor the duty to refrain from "bad faith conduct that fundamentally destroys another's right to receive the fruits of the contract," can be disclaimed.  (Pltf. Opp. Br. (Dkt. No. 81) at 45 (emphasis in original))  A plaintiff must identify a "specific duty or obligation under the contract" that provides the basis for a good faith and fair dealing claim, however, because there is no "independent cause of action" arising out of the duty to act in good faith.  N.Y. U.C.C. Law § 1-304, cmt. 1 (McKinney).

Here, Plaintiff contends that Chase (1) "knew or recklessly disregarded that statements made by Millennium in connection with the 2014 Credit Agreement were not genuine and correct"; and (2) "frustrated the ability of the Investors to exercise or decide not to exercise their contractual rights by withholding from them [Chase's] own knowledge of facts and events

34

that triggered the Investors' contractual rights."  (Cmplt. (Dkt. No. 1-1) ¶ 205)  Neither of these assertions refers back to a contractual provision that Chase allegedly breached, however.

Moreover, to the extent that Plaintiff's good faith and fair dealing claim rests on the conditions precedent and notice provisions that form the basis for Plaintiff's breach of contract claims, its good faith and fair dealing claim must be dismissed as duplicative of its breach of contract claims.  Deutsche Bank Nat. Tr. Co. v. Quicken Loans Inc., 810 F.3d 861, 869 (2d Cir. 2015) ("because the facts underlying both claims are identical and the Trustee seeks identical remedies, the claim for breach of the implied covenant was properly dismissed as duplicative").

Because Plaintiff's good faith and fair dealing claim is (1) unmoored from a specific provision in the underlying contract; and (2) duplicative of its breach of contract claims, Defendants' motion to dismiss the good faith and fair dealing claim will be granted.

## VII.    LEAVE TO AMEND

Plaintiff has filed a motion seeking leave to amend.  See Dkt. No. 114.  Plaintiff's proposed Amended Complaint ("PAC") pleads the same factual allegations and eleven causes of action set forth in the Complaint, and adds two new claims against all Defendants:  (1) fraudulent misrepresentation and fraud; and (2) conspiracy to defraud.  (PAC (Dkt. No. 116-1))  Because Plaintiff's PAC includes claims that this Court has dismissed, Plaintiff's motion for leave to file the PAC is denied.

District courts "ha[ve] broad discretion in determining whether to grant leave to amend."  Gurary v. Winehouse, 235 F.3d 793, 801 (2d Cir. 2000).  Leave to amend may properly be denied in cases of "'undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the

opposing party by virtue of the allowance of the amendment, futility of amendment, etc.'"
Ruotolo v. City of N.Y., 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S.
178, 182 (1962)); see Murdaugh v. City of N.Y., No. 10 Civ. 7218(HB), 2011 WL 1991450, at
*2 (S.D.N.Y. May 19, 2011) ("Although under Rule 15(a) of the Federal Rules of Civil
Procedure leave to amend complaints should be 'freely given,' leave to amend need not be
granted where the proposed amendment is futile." (citations omitted)).

   Here, Plaintiff will be granted leave to amend.  "Where the possibility exists that
[a] defect can be cured," leave to amend "should normally be granted" at least once.  Wright v.
Ernst & Young LLP, No. 97 CIV. 2189 (SAS), 1997 WL 563782, at *3 (S.D.N.Y. Sept. 10,
1997), aff'd, 152 F.3d 169 (2d Cir. 1998) (citing Oliver Sch., Inc. v. Foley, 930 F.2d 248, 253 (2d
Cir. 1991)).  Moreover, where a claim is dismissed on the grounds that it is "inadequate[ly]
pled," there is "a strong preference for allowing [a] plaintiff[] to amend."  In re Bear Stearns
Companies, Inc. Sec., Derivative, & ERISA Litig., No. 07 CIV. 10453, 2011 WL 4072027, at *2
(S.D.N.Y. Sept. 13, 2011) (citing Ronzani v. Sanofi S.A., 899 F.2d 195, 198 (2d Cir. 1990)).

   Accordingly, Plaintiff is granted leave to amend.  Any motion for leave to amend
will attached the proposed Amended Complaint as an exhibit.

## **CONCLUSION**

   For the reasons stated above, Defendants' motion to dismiss (Dkt. No. 76) is
granted.  Plaintiff's motion for leave to amend (Dkt. No. 114) is denied.  The motion for leave to
file a brief as amicus curiae, submitted by the Loan Syndications and Trading Association and
Bank Policy Institute (Dkt. No. 62), is denied.  The parties' motions for oral argument (Dkt. Nos.
84, 86) are denied.  Plaintiff will file any motion for leave to amend by **June 5, 2020**.  The Clerk

of Court is directed to terminate the motions (Dkt. Nos. 62, 76, 84, 86, 114).

Dated:  New York, New York
        May 22, 2020

SO ORDERED.

_____

Paul G. Gardephe
United States District Judge